No. 06-5109
United States Court of Appeals, Third Circuit

# Disabled in Action of Pennsylvania v. Southeastern Pennsylvania Transportation Authority

539 F.3d 199 (3d Cir. 2008)
Decided Aug 19, 2008

No. 06-5109.

Argued January 10, 2008.

Filed: August 19, 2008.

Appeal fro the United States District Court for the Eastern District of Pennsylvania, Gene E.K. Pratter, J. *200

200

Stephen F. Gold (Argued), Philadelphia, PA, Rocco J. Iacullo, Mark J. Murphy, Disabilities Law Project, Philadelphia, PA, Attorneys for Appellant.

Gregory B. Friel (Argued), Jessica D. Silver, United States Department of Justice, Civil Rights Division, Appellate Section, Washington, DC, Attorneys for Amicus Appellant.

Saul H. Krenzel (Argued), Saul H. Krenzel Associates, Philadelphia, PA, Attorneys for Appellee.

Before: FISHER, HARDIMAN and STAPLETON, Circuit Judges.

201   *201

## OPINION OF THE COURT

HARDIMAN, Circuit Judge.

In this statutory interpretation case, we must decide when the statute of limitations begins to run in a case arising under the Americans With Disabilities Act (ADA) and the Rehabilitation Act (RA). Appellant Disabled in Action of Pennsylvania (DIA) argues that under the plain language of the statute, its claims accrued "upon the completion" of alterations to two Philadelphia subway stations. Appellee Southeastern Pennsylvania Transportation Authority (SEPTA) argues, and the District Court held, that DIA's claims accrued prior to the completion of the alterations when DIA discovered that the planned alterations would not include elevators.

## I.

We view the facts and draw all reasonable inferences in the light most favorable to DIA, the party against whom summary judgment was entered. *Feesers, Inc. v. Michael Foods, Inc.*, 498 F.3d 206, 208 (3d Cir. 2007) (citing *Andreoli v. Gates*, 482 F.3d 641, 644 (3d Cir. 2007)).

DIA is a non-profit corporation that seeks to eliminate discrimination against disabled individuals in all aspects of community life. To achieve this goal, DIA employs a variety of methods including: government monitoring, political activism, *202 direct involvement in municipal planning, and, as a last resort, litigation. Many of DIA's approximately 450 members use wheelchairs and rely on SEPTA for their public transportation needs.

202

SEPTA is an agency of the Commonwealth of Pennsylvania responsible for providing public transportation in Southeastern Pennsylvania. In Philadelphia, SEPTA's City Transit Division operates a vast network of subway and subway-elevated rapid rails, regional rails, light rails,

casetext

trackless trolleys, and buses that provide over 850,000 passenger trips per day. SEPTA receives federal funding for many of its activities, including its recent remodeling of an entrance to the 15th Street Station.

## A. 15th Street Station and Courtyard

The bustling 15th Street Station is located underground near 15th and Market Streets in downtown Philadelphia. Passengers can access the station in two ways. First, using the stairway at the southwest side of 15th and Market Streets, passengers can descend directly to the platform for the Market-Frankford subway line. Second, using the stairway or escalator at the northwest side of the same block, passengers can descend to the "15th Street Courtyard." From there, they can turn northward toward the Suburban Regional Rail Line Station (Suburban Station), or southward, toward the Market-Frankford platform. SEPTA's renovations to this latter entrance gave rise to the present dispute.[1]

[1] The parties dispute whether the 15th Street Courtyard is an "entrance" to the Market-Frankford Station or to the Suburban Station. According to SEPTA, "in order to reach the 15 th Street Market-Frankford Station, an individual" must first enter "the Suburban Station Transit Facility at the 15th Street Courtyard" and then "travel south in the 15th Street corridor, exit Suburban Station, and travel over underground transit lines before entering the 15th Street Market-Frankford Station." Regardless whether it is technically labeled an "entrance," the 15th Street Courtyard undisputedly provides access to the Market-Frankford Station. Accordingly, at this stage of the litigation, we accept DIA's characterization of the 15th Street Courtyard as an "entrance" to the Market-Frankford Station. *Michael Foods*, 498 F.3d at 208, 212. The District Court may take up this nuance and determine its relevance to § 12147(a) liability on remand.

Prior to SEPTA's renovations, the 15th Street Courtyard included a set of stairs and two escalators enclosed within a head-house. On September 27, 1999, SEPTA received a $700,000 grant from the Economic Development Administration of the United States Department of Commerce for a project entitled "Renovation of 15th and Market Streets Headhouse at Suburban Station." According to the grant, the project was to involve "various renovations to the 15th and Market Streets entrances and related areas" including "renovation of entrances to the underground train station concourse; demolition of existing facilities; the construction/installation of new stairs, landscaping, lighting, signage, finishes, canopies; and all appurtenances."

In accepting the Commerce Department funding, SEPTA agreed to "pursue diligently the development of the Project so as to ensure completion . . . within [the] time schedule." Specifically, the grant required SEPTA to begin construction within 18 months of its receipt of the funds and to limit the total construction period to 29 months. In addition, the grant was to expire "five (5) years from the fiscal year of the Grant Award," requiring that the project be "physically and financially completed by September 30, 2004."

203 Having secured funding, SEPTA applied to the City of Philadelphia for a variance from certain provisions of the Building *203 Code. Among the provisions from which SEPTA sought a variance was Section B-1110.2.2(9), which requires that "[w]here building entrances are altered, or when plans are presented to relocate and provide a new primary entrance, the entrance shall be made accessible." For obvious reasons, SEPTA's variance application caught the attention of DIA's legal counsel, Stephen F. Gold.

Fearful that SEPTA's renovations would not include an elevator, Gold wrote to Edward McLaughlin, City Commissioner for the Department of Licenses and Inspections. In his

letter of August 3, 2000, Gold expressed concern "that the City would allow SEPTA to apply for such a variance on its behalf for such a major public access point." Gold insisted that "[i]n addition to ensuring that renovations . . . are carried out in compliance with the Building Code, the City also has an obligation to ensure that such renovations are . . . carried out in compliance with the [Americans With Disabilities Act]." He asked McLaughlin to keep him informed "as to how the City plans to proceed with [SEPTA's] variance request."

Gold received no response from McLaughlin and consequently discussed his concerns with Pete Winebrake, an attorney in the City Solicitor's Office. Gold summarized the discussion in a letter dated September 28, 2000: "As I stated on the phone yesterday, this problem should be resolved *before* construction commences, or you leave me with very few options. I am very concerned that the City's train has already left the station and I must act sooner than later[ *sic*]. I am available to meet with you at your earliest convenience." (Emphasis in original.)

Gold heard nothing more from Winebrake, but received a letter dated November 14, 2000 from Assistant City Solicitor Fredrick K. Pasour regarding the "15th Street Courtyard Portion of the Suburban Station Project." In pertinent part, Pasour's letter stated:

204    I represent the City of Philadelphia with respect to the above-referenced project. I understand that you believe that the ADA, its regulations and the Accessibility Guidelines require an elevator in the 15th Street courtyard. I also understand that you are considering bringing a lawsuit to enjoin the 15th Street courtyard portion of the project if the City issues a building permit based on plans that do not include an elevator in the 15th Street courtyard.

This letter is to advise you that the City doe [ *sic*] not share your view that an elevator is required in the 15th Street courtyard and has issued a building permit for the project.[2] Please remember that the 15th Street courtyard will be readily accessible to and usable by individuals with disabilities. As you are aware, elevators are planned for other locations near the 15th Street courtyard.

> [2] It is unclear to what building permit this permit for the 15th Street Courtyard project statement refers as the City did not issue a until mid-February 2001. App'x 216.

The current bids for the portion of the project that includes the 15th Street courtyard renovations are only good through December 30, 2000. If, therefore, you plan to bring an action challenging the 15th Street courtyard portion of the project, please do so in an expeditious manner.

I understand that you had one meeting with representatives of the City and SEPTA at the 15th Street courtyard to discuss the project. I believe that another meeting this week may be useful in order to discuss the project in more detail and to determine if we can reach an agreement that is satisfactory to you,

*204

the disabled community, the City and SEPTA.

App'x 477.

Despite Pasour's letter, Gold did not immediately file a lawsuit, and the City issued SEPTA a building permit on or about February 14, 2001, describing the 15th Street Courtyard project as follows:

Demolition incorporates head house, stair, railings, limited wall, veneer, pavement, and lighting systems. Also to be removed are planters, fountain and ceilings. Construction scope consists of glass head house, stair, (2) retail spaces, railings, storefront sys., planters, lighting and paving installed, as well as new ceiling.

App'x 216. SEPTA commenced construction a few days later.

The record suggests several explanations for DIA's decision not to file suit prior to this juncture. First, Gold testified that in 2000, he met with representatives of SEPTA and the City because "they were really anxious to get a commitment from [him] that there would not be a law suit regarding 15th Street." *See also* App'x 477 (referring to a meeting between Gold and "representatives of the City and SEPTA" to determine if the parties could "reach an agreement"). According to Gold, Frances Egan, Assistant to SEPTA's General Manager for Government and Public Affairs, and Deborah Russo, a representative of the City, assured him that in lieu of an elevator at 15th Street, SEPTA "would put in the elevator at City Hall and begin construction in `02 with the completion date of `04."[3] *See also* App'x 477 (noting that "elevators are planned for other locations near the 15th Street courtyard").

[3] The City Hall project is discussed in Part I.B, *infra*.

Gold discussed the proposed compromise with DIA, and DIA agreed that it was acceptable. Gold informed Egan of his client's assent, but neither party memorialized the deal.[4] Assuaged nonetheless,[5] DIA took no further action until late 2002 when it appeared that SEPTA was not installing an elevator at City Hall.[6]

[4] Although the parties stipulated DIA's allegations of the DIA-SEPTA-City agreement out of the litigation, the stipulation only precludes DIA "from presenting any *claim* that Defendant SEPTA allegedly agreed to construct elevators at City Hall in lieu of construction of an elevator at the northwest corner of 15 th and Market Streets." App'x 136 (emphasis added). Here, DIA raises no "claim" based on the alleged agreement. *See Disabled in Action of Pa. v. Southeastern Pa. Transp. Auth.*, No. 03-CV-1577, 2006 WL 3392733, at *16 (E.D.Pa. Nov.17, 2006) (hereinafter *DIA*). Rather, DIA proffers the agreement as an explanation for its decision not to file suit before construction began on the 15th Street Station entrance.

[5] Gold was confident that he could rely on the assurances of Egan and Russo because of their long professional relationship, and DIA Executive Director Nancy Salandra was content to wait and see if "[SEPTA] would do the right thing."

[6] The foregoing account parallels the allegations in DIA's Second and Third Amended Complaints with one exception. The Complaints state that the negotiations among Gold, SEPTA, and the City occurred "[i]n 2000 while the 15th and Market Street entrance was in construction." App'x 111, 119. Construction on the entrance did not commence until February 2001, however. App'x 212 (SEPTA's Capital Project Progress Report noting that a *"[p]re-construction* meeting" regarding the "15th Street Entrance" was held on February 5, 2001) (emphases added); App'x 216. Because we must resolve such factual discrepancies in the light most favorable to DIA, we assume that construction had not commenced when the alleged deal among DIA, SEPTA, and the City was brokered. *Michael Foods*, 498 F.3d at 208, 212.

Gold's explanation for DIA's decision not to file a pre-construction lawsuit is supported *205 by a Settlement Agreement in which DIA voluntarily

dismissed its claims against the City, and the City affirmed that it "only granted permits for [the 15th Street Courtyard] renovation because [it] believed SEPTA had agreed to construct elevators in the City Hall Courtyard in lieu of the required elevator at 15th and Market."

Alternatively, the record suggests that at some point, DIA's strategy shifted from obtaining a pre-construction injunction to pursuing post-construction remedies based on Gold's belief that even though "[SEPTA] had started construction or even completed [construction]," the ADA enabled DIA to force SEPTA to install an elevator. Gold admitted that he gave Pasour's admonition to file suit in an expeditious manner "[v]ery, very, very much consideration" but determined that he could "optimize representing [DIA][by] letting [SEPTA] move the stairs and begin[] the construction because [DIA] could always get the elevator and make [SEPTA] put it [in] if necessary along 15th Street." For reasons that are not clear from the record, Gold concluded that if construction did not proceed, "there would be no elevator." Accordingly, he "decided . . . to let [SEPTA and the City] sit in their own petard *[sic]*."[7]

[7] In the pantheon of misused metaphors, "hoist with his own petard" may be preeminent. A "petard" is a small bomb used to break down doors, but the word was derived from the Middle French "peter," meaning "to break wind." *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1689 (1993). It is no wonder the word found favor with the master of the double entendre. *See* WILLIAM SHAKESPEARE, HAMLET, Act III, Scene 4 ("For 'tis the sport to have the engineer/Hoist with his own petard").

Whatever the reasons for waiting, DIA filed its initial Complaint on March 14, 2003, approximately eight months after the newly renovated 15th Street Courtyard entrance was opened on August 8, 2002 without an elevator.

DIA requested "permanent injunctive relief to enjoin [SEPTA] to begin construction immediately of a[n] elevator at the 15th and Market Street entrance . . . to assure access for persons with disabilities."

## B. City Hall Station and Courtyard

The second subject of the present dispute is SEPTA's replacement of an escalator that carried passengers from the concourse above the City Hall Station platform to City Hall Courtyard.[8] Located near the 15th Street Station, City Hall Station is one of the busiest stops on the Broad Street subway line and serves as a transfer point between the Broad Street Line, the Market-Frankford Line, and Regional Rail Lines. For instance, from the concourse below City Hall Courtyard, passengers can access the 11th and 13th Street Market-Frankford Line platforms without using stairs.

206  *206

[8] The parties dispute whether this escalator is an exit from the City Hall Station platform or from the City Hall Station mezzanine, a concourse one level above the platform. DIA asserts that the escalator "serves as an exit for patrons disembarking from the Broad Street Subway City Hall Station and pedestrians traversing the concourse." SEPTA admits that the escalator "serves as an exit for pedestrians traversing the concourse" but denies that it is "an exit for patrons disembarking from City Hall Station." Apparently, the City Hall Courtyard escalator does not extend beyond the mezzanine level so that passengers exiting onto the City Hall Station platform must take another escalator to the mezzanine level, then board the City Hall Courtyard escalator to reach street level. At this stage of the proceedings, we reject SEPTA's hyper-technical definition of "exit." *Michael Foods*, 498 F.3d at 208, 212. The District Court may consider the relevance, if any, of this dispute on remand.

The City Hall Courtyard project was part of SEPTA's Escalator Replacement Program, launched in 1999 to improve the safety of escalators throughout the system. SEPTA included funding for the program in its FY 2001 Capital Budget after holding a public meeting to discuss the improvements on May 22, 2000. Although no representative of DIA attended the meeting, DIA's Executive Director testified that DIA reviews SEPTA's Capital Budget each year and was aware of the project.

By August 17, 2001, SEPTA had barricaded the area around the City Hall Courtyard escalator and posted signs that read "Project of the Pennsylvania Public Transportation Assistance Fund; Escalator Replacement at Erie, Spring Garden, City Hall 30th Street Stations; Southeastern Pennsylvania Transportation Authority." SEPTA removed the existing escalator, extended the wellway and relocated the truss upon which it sat, and installed a new escalator. Construction was completed and the escalator was opened to the public on or about August 24, 2003. The finished project did not include an elevator. On February 15, 2005, DIA filed its Fourth Amended Complaint, adding allegations regarding this project.

## C. The District Court Proceedings

DIA filed its initial Complaint on March 14, 2003, alleging that SEPTA's renovations to the 15th Street Station entrance violated the ADA and the RA. The District Court dismissed the complaint because DIA failed to name the City of Philadelphia, the owner of the real property upon which the entrance is located, as a defendant. After the Court granted DIA relief from the dismissal, DIA added the City as a defendant in its First Amended Complaint. On October 10, 2003, DIA filed a Second Amended Complaint, which included allegations about a deal between DIA, SEPTA, and the City to install an elevator at the City Hall Courtyard instead of the 15th Street Courtyard.

After an unsuccessful settlement attempt, DIA filed a Third Amended Complaint, adding an ADA "key station" claim. *See* 42 U.S.C. § 12147(b); 29 C.F.R. § 37.47. SEPTA moved to dismiss the key station claim and argued that portions of the Third Amended Complaint should be stricken pursuant to a stipulation between DIA and SEPTA. The District Court refused to dismiss the key station claim, but DIA agreed to strike its allegations that SEPTA had agreed to install an elevator at City Hall in lieu of 15th Street.

On August 16, 2004, DIA reached a settlement agreement with the City. Therein, the City stipulated that "[i]t is the City's legal opinion that SEPTA is legally obligated under the ADA and accompanying Regulations to construct an elevator at the 15th and Market Street Courtyard entrance, which SEPTA renovated." Moreover, the City asserted that it "only granted permits for [the 15th Street] renovation because [it] believed SEPTA had agreed to construct elevators in the City Hall Courtyard." Based on this agreement, the District Court dismissed the City from the case.

On February 15, 2005, DIA filed a Fourth Amended Complaint in which it added a second claim under § 12147(a) based on SEPTA's renovations to the City Hall Courtyard. DIA alleged that SEPTA's renovations to both the 15th Street and City Hall Courtyards constituted "alterations" that triggered ADA and RA
207 accessibility obligations.[9] *207 42 U.S.C. § 12147(a); 29 U.S.C. § 794(a). DIA also alleged that both 15th Street and City Hall are "key stations" that SEPTA must make accessible. 42 U.S.C. § 12147(b); 29 U.S.C. § 794(a). DIA requested, *inter alia*, an injunction compelling SEPTA to construct elevators at both locations. After completing discovery, the parties filed cross motions for summary judgment.

---

[9] Because the District Court dismissed DIA's § 12147(a) claims as barred by the statute of limitations, it did not reach the vigorously disputed question of whether

SEPTA's renovations constituted "alterations" within the meaning of the ADA. We leave this question for the District Court on remand.

The District Court granted SEPTA's motion for summary judgment on all counts. As to DIA's § 12147(a) claims, the court reasoned that "[t]o determine the accrual date of a discrimination claim, a court must focus on when the discriminatory act occurred, not when the effect of that act became painful." *DIA* 2006 WL 3392733, at *14 (citing *Chardon v. Fernandez*, 454 U.S. 6, 8, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981)). The District Court rejected DIA's argument that SEPTA's discriminatory acts occurred "upon completion of [the] alterations" to the 15th Street and City Hall Courtyards. *Id.* at *13 (citing 42 U.S.C. § 12147(a)). Rather, the District Court held that the claims accrued when DIA knew, or had reason to know, that SEPTA's renovations would not include elevators. According to the District Court, DIA had such knowledge regarding the 15th Street Courtyard "no later than November 1, 2000, when DIA was informed that SEPTA would proceed with the planned construction at the 15th and Market Street Courtyard without installing an elevator," *id.* at * 14, and regarding the City Hall Courtyard, "at least as early as August 17, 2001," when a sign was posted "in the City Hall Courtyard on the outside of the boarded-off construction area where the escalator was being replaced." *Id.* at *17. Because DIA filed its § 12147(a) claims more than two years after these dates, the District Court dismissed them as barred by the statute of limitations, *id.*, and DIA appealed.[10]

[10] The District Court also dismissed DIA's "key station" claims, holding that § 12147(b) does not create a private right of action by which individuals may enforce Department of Transportation regulations designating "key stations." *Id.* at *29. This decision is not challenged on appeal.

II.

DIA's claims arise under Section 227 of the ADA, 42 U.S.C. § 12147(a), and Section 504 of the RA, 29 U.S.C. § 794(a).[11] The District Court had jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343. We review the District Court's final order granting summary judgment to SEPTA pursuant to 28 U.S.C. § 1291.

[11] Because the procedures, rights, and remedies provided by Section 227 of the ADA are identical to those provided by Section 504 of the RA, *see* 42 U.S.C. §§ 12133 and 12147(a), we will generally refer only to the ADA with the understanding that both the ADA and the RA are implicated. *See Doe v. County of Centre*, 242 F.3d 437, 446 (3d Cir. 2001); *see also McDonald v. Commw. of Pa.*, 62 F.3d 92, 95 (3d Cir. 1995) ("Whether suit is filed under the Rehabilitation Act or under the [Americans With] Disabilities Act, the substantive standards for determining liability are the same.").

Our review is plenary, and we apply the same standard as the District Court. *Michael Foods*, 498 F.3d at 212. We will affirm the grant of summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" and that SEPTA is "entitled to judgment as a matter of law." FED. R.CIV.P. 56(c). In making this determination, we "view the facts in the light most favorable" to DIA and "draw all inferences" in DIA's favor. *Michael Foods*, 498 F.3d at 212 (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000)).

208  *208

In 1973, Congress passed the Rehabilitation Act to assure that no individual with a disability "shall . . . be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Seventeen years later, Congress extended this mandate to cover all public transportation providers in Title II of the Americans With Disabilities Act. *See* 42 U.S.C. §§

12132 and 12131(1). Title II begins with a general prohibition of disability-based discrimination, § 12132, followed by seven provisions that define what "shall be considered discrimination" for purposes of the statute. 42 U.S.C. §§ 12142, 12143, 12144, 12146, 12147, 12148, and 12162. In this case, we address an important question of first impression regarding one of these provisions: when does a claim under § 12147(a) accrue?

## III.

Neither Title II of the ADA nor Section 504 of the RA includes an express statute of limitations. As both statutes were enacted prior to the effective date of the default four-year statute of limitations for federal statutes, see 28 U.S.C. § 1658, we borrow the statute of limitations of the most analogous state law cause of action. *North Star Steel Co. v. Thomas*, 515 U.S. 29, 33-34, 115 S.Ct. 1927, 132 L.Ed.2d 27 (1995); *Wilson v. Garcia*, 344 U.S. 261, 266-67, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). The District Court concluded, and the parties do not dispute, that Pennsylvania's two-year statute of limitations for personal injury claims should apply to claims under § 12147(a).

This conclusion is consistent with our precedent regarding the statute of limitations for federal civil rights claims. *See, e.g., Lake v. Arnold*, 232 F.3d 360, 368 (3d Cir. 2000); *Kost v. Kozakiewicz*, 1 F.3d 176, 190 (3d Cir. 1993); *Bougher v. Univ. of Pittsburgh*, 882 F.2d 74, 78 (3d Cir. 1989). It is also consistent with the majority of Courts of Appeals that have decided the question. *See Gaona v. Town Country Credit*, 324 F.3d 1050, 1055 (8th Cir. 2003) (noting that "most Courts of Appeal[s] . . . have applied the state statute of limitations for personal injury actions to claims under the Rehabilitation Act and the ADA"); *Everett v. Cobb County Sch. Dist.*, 138 F.3d 1407, 1409-10 (11th Cir. 1998); *Soignier v. Am. Bd. of Plastic Surgery*, 92 F.3d 547, 551 (7th Cir. 1996); *Baker v. Bd. of Regents*, 991 F.2d 628, 632 (10th Cir. 1993); *Morse v. Univ. of Vermont*, 973 F.2d 122, 127 (2d Cir. 1992); *Hickey v. Irving Indep.*

*Sch. Dist*, 976 F.2d 980, 983 (5th Cir. 1992); *cf. Wolsky v. Med. Coll. of Hampton Rds.*, 1 F.3d 222, 223-25 (4th Cir. 1993).

Accordingly, we hold that the statute of limitations applicable to claims under Title II of the ADA and Section 504 of the RA is the statute of limitations for personal injury actions in the state in which the trial court sits. In this case, the applicable statute is 42 PA. CONS. STAT. § 5524, which prescribes a two-year statute of limitations.

## IV.

The more difficult question — and the crux of the dispute between DIA and SEPTA — is when this two year statute of limitations begins to run. In answering this question, we note that "[t]he ADA is a remedial statute, designed to eliminate discrimination against the disabled in all facets of society," and as such, "it must be broadly construed to effectuate its purposes." *Kinney v. Yerusalim*, 812 F.Supp. 547, 551 (E.D.Pa. 1993) (citing *Tcherepnin v. Knight*, 389 U.S. 332, 335, 88 S.Ct. 548, *209 19 L.Ed.2d 564 (1967)), *aff'd*, 9 F.3d 1067 (3d Cir. 1993).

## A.

Ordinarily, a statute of limitations begins to run from the moment the potential plaintiff has a "complete and present cause of action." *Bay Area Laundry Dry Cleaning Pension Trust Fund v. Ferbar Corp.*, 522 U.S. 192, 195, 118 S.Ct. 542, 139 L.Ed.2d 553 (1997) (quoting *Rawlings v. Ray*, 312 U.S. 96, 98, 61 S.Ct. 473, 85 L.Ed. 605 (1941)); *Arnold*, 232 F.3d at 366 (quoting *Ross v. Johns-Manville Corp.*, 766 F.2d 823, 826 (3d Cir. 1985)) (limitations period begins to run "from the time the cause of action accrue[s]"). For federal causes of action, the accrual date is a matter of federal law. *Romero v. Allstate Corp.*, 404 F.3d 212, 221 (3d Cir. 2005).

Where Congress has specified an accrual date by "explicit command" or "by implication from the structure and text of the statute," we defer to its directive. *TRW Inc. v. Andrews*, 534 U.S. 19, 27-

28, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001); *see Romero*, 404 F.3d at 222. "[I]n the absence of a contrary directive from Congress," we apply the "federal discovery rule," which dictates that a federal cause of action accrues "when the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim." *Romero*, 404 F.3d at 222 (internal quotation and citations omitted).[12]

> [12] The Supreme Court has not adopted the "discovery accrual rule" as its own, *Andrews*, 534 U.S. at 27, 122 S.Ct. 441 (internal citation omitted), and Justice Scalia has criticized the rule as "bad wine of recent vintage." *Id.* at 37, 122 S.Ct. 441 (Scalia, J., concurring).

We agree with the parties that Congress did not "explicitly command" an accrual date for § 12147(a) claims as it has done for other civil rights actions. *Cf.* 42 U.S.C.2000e-5(e)(1) ("A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred. . . ."); *id.* § 3613 ("An aggrieved person may commence a civil action . . . not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice. . . ."). Nevertheless, for the reasons that follow, we hold that the "structure and text of the statute," *Andrews*, 534 U.S. at 28, 122 S.Ct. 441, evince Congress's intention that claims under § 12147(a) accrue "upon the completion of . . . alterations" to public transportation facilities.

1.

The portion of § 12147(a) at issue in this appeal provides:

With respect to alterations of an existing facility or part thereof used in the provision of designated public transportation services that affect or could affect the usability of the facility or part thereof, it shall be considered discrimination, for purposes of section 12132 of this title and section 794 of Title 29, for a public entity to fail to make such alterations (or to ensure that the alterations are made) in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheel-chairs, upon the completion of such alterations.

As the District Court correctly observed, the dispute between DIA and SEPTA "emanates from the difference in how the parties interpret" this provision "as to when the alleged discrimination occurs." *DIA*, 2006 WL 3392733, at *11. Like the parties and the District Court, we believe § 12147(a)'s concluding phrase — *210 "upon the completion of such alterations" — is of fundamental importance in answering this question.

DIA argues that the phrase modifies the entire definition of what "shall be considered discrimination" because "only when . . . alterations are completed and the inaccessible facility is reopened will people with mobility disabilities be subject to discrimination." Therefore, DIA concludes, claims under § 12147(a) do not accrue until alterations are completed.

SEPTA invokes the rule of the last antecedent, arguing that the "upon the completion" phrase only modifies the phrase "the altered portions of the facility are readily accessible to and usable by individuals with disabilities" and not "the entire definition of what constitutes discrimination."[13] Under this interpretation, which the District Court adopted, the function of the "upon the completion"

phrase is "merely [to] suggest that accessibility for disabled individuals must be in place at the time the alterations are completed." *DIA*, 2006 WL 3392733, at *13. In other words, the phrase merely acknowledges that while renovations are in progress, facilities will necessarily be inaccessible to everyone, including "individuals with disabilities," and that this temporary inaccessibility is not what § 12147(a) prohibits.

> 13 The "rule of the last antecedent" is a principle of statutory interpretation under which "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it *immediately* follows." *Bamhart v. nomas*, 540 U.S. 20, 26, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003) (emphasis added). This rule does not help SEPTA because the statutory phrase *immediately* preceding "upon the completion of such alterations" is "including individuals who use wheelchairs." To be precise, SEPTA is arguing for a rule of the *second-to-last* antecedent — a far more aspirational proposition.

Our evaluation of these conflicting interpretations is guided by familiar rules of statutory construction. Our primary concern is to give effect to Congress's intent. *Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001). We assume that "Congress expresses its intent through the ordinary meaning of its language" and therefore begin "with an examination of the plain language of the statute." *Id.* If the language is unambiguous, our inquiry is at an end. *Id.*

A statutory provision is not ambiguous simply because "by itself, [it is] susceptible to differing constructions" because in addition to the "statutory language . . . itself," we take account of "the specific context in which that language is used, and the broader context of the statute as a whole." *In re Price*, 370 F.3d 362, 369 (3d Cir. 2004). We assume, for example, that *every* word in a statute has meaning and avoid interpreting one part of a

statute in a manner that renders another part superfluous. *Rosenberg*, 274 F.3d at 141-42. We also consider he overall "object and policy" of the statute, *United States v. Schneider*, 14 F.3d 876, 879 (3d Cir. 1994), and avoid constructions that produce "odd" or "absurd results" or that are "inconsistent with common sense." *See Public Citizen v. U.S. Dept. of Justice*, 491 U.S. 440, 454, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (internal quotations omitted); 2A N. SINGER, SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 45:12, at 92 (6th ed. 2000) (hereinafter SUTHERLAND).

Applying these principles to § 12147(a), we find DIA's interpretation of the "upon the completion" phrase more persuasive. The language appears in the "specific context" of a single sentence that defines activities that "shall be considered discrimination"; and in the "broader context" of Title II, which assures that no "individual *211 with a disability" is "subjected to discrimination." 42 U.S.C. §§ 12147(a) and 12132. "Discrimination," as it is ordinarily defined, is the denial of "privileges to a certain class because of race, age, sex, nationality, religion, or handicap." BLACK'S LAW DICTIONARY 500 (8th ed. 2004). The privileges at stake in § 12147(a) are access to, and use of, public transportation facilities. It is difficult to understand how these privileges are denied to individuals with disabilities by the mere promulgation or approval of renovation plans that do not include accessibility features. Instead, as Congress recognized, it is only when renovations are completed that individuals with disabilities will be excluded from accessing and using such facilities while others will not. This is the time at which disabled individuals are subjected to the disparate treatment that § 12147(a) was enacted to prevent.

SEPTA's argument that the "upon the completion" language merely clarifies that § 12147(a) imposes no duty upon public entities to ensure accessibility while transportation facilities are under construction is specious. We are confident that

Congress would not have felt compelled to make such an obvious clarification. *See Public Citizen*, 491 U.S. at 454, 109 S.Ct. 2558. Faced with a choice between SEPTA's interpretation, which essentially renders the phrase surplusage, and DIA's interpretation, which gives it substantial effect, we choose the latter. *See Silverman v. Eastrich Multiple Investor Fund, L.P.*, 51 F.3d 28, 31 (3d Cir. 1995) (A statute "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."); SUTHERLAND § 45:12, at 94 (" [A] construction that renders a portion of the statute meaningless should not be reached by the court unless that construction is unavoidable."); SUTHERLAND § 46:06, at 190-92 ("No clause[,] sentence[,] or word shall be construed as superfluous, void or insignificant if the construction can be found which will give force to . . . all the words of the statute.").

We thus interpret the "upon the completion" clause as modifying the statutory definition of discrimination such that claims under § 12147(a) arise "upon the completion" of inaccessible "alterations."

## 2.

Our interpretation of this seminal clause in dispute on appeal is bolstered by the remainder of the statute. In fact, even if the "upon the completion" clause was absent from the statute, we would conclude that a claim under § 12147(a) does not accrue until alterations are completed.

As the District Court stated, "[t]o determine the accrual date of a discrimination claim, a court must focus on when the discriminatory act occurred." *DIA*, 2006 WL 3392733, at * 14 (citing *Chardon*, 454 U.S. at 8, 102 S.Ct. 28). Section 12147(a) defines two closely related discriminatory acts: the failure (1) "to make" alterations, and (2) the failure "to ensure that . . . alterations are made," in such a manner that the altered portions of transportation facilities are accessible and usable.

Regarding the first act, we agree with the *amicus curiae* submission of the U.S. Department of Justice that as a matter of logic, there can be no "fail[ure] to make" the "altered portions" of a facility accessible until the alterations are completed. The relevant act is "to make" — "to cause (something) to exist." BLACK'S LAW DICTIONARY 975 (8th ed. 2004). Merely funding, designing, approving, or even commencing construction of alterations that will not provide accessibility does not "cause" such alterations "to exist," especially in light of the notoriously contingent nature of construction *212 plans. *See, e.g., DIA v. Sykes*, 833 F.2d 1113, 1115 (3d Cir. 1987) (subway station renovation planned and funded in 1979 but modified in 1981 to exclude elevator). Therefore, an individual cannot suffer discrimination under this portion of the statute until the alterations are completed.

Unlike the first discriminatory act, the second act can logically occur before, during, or after construction. For example, a public entity arguably fails "to ensure that . . . alterations are made" when it fails to insist that construction drawings include certain features.[14] Although rational *in vacuo*, this reading is unfaithful to the structure of the statute. *Price*, 370 F.3d at 369. The phrase "or to ensure that the alterations are made" appears in parentheses immediately following the phrase "to fail to make such alterations," indicating that the meaning of the former phrase is related to, or dependent upon, the latter. *See Peters v. Ashcroft*, 383 F.3d 302, 309 (5th Cir. 2004) (noting that parentheses "reduce[] the grammatical import" of the language contained therein); *see generally Pritchard v. Liggett Myers Tobacco Co.*, 350 F.2d 479, 483 (3d Cir. 1965) (noting that punctuation can be a relevant factor in statutory interpretation); SUTHERLAND § 47:15, 261 (favoring rule that treats punctuation as a relevant factor in statutory construction). Furthermore, both phrases center around a form of the verb "to make," an additional indication that they are, in DIA's words, "two sides of the same coin." *See*

*Merrill Lynch, Pierce, Fenner Smith, Inc. v. Dabit,* 547 U.S. 71, 86, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006) ("Generally, identical words used in different parts of the same statute are . . . presumed to have the same meaning.") (internal quotation and citation omitted). Given this context, we hesitate to ascribe to the phrase "ensure that the alterations are made" the broad and independent meaning SEPTA urges. *See Mizrahi v. Gonzales,* 492 F.3d 156, 166 (2d Cir. 2007) (declining to ascribe independent meaning to parenthetical statutory phrase beginning with word "or" because "it can reasonably be construed to illustrate or explain" the preceding phrase).

> [14] We nevertheless question how plans can "ensure" certain results, for it is axiomatic that even the best laid plans of mice and men often go awry. *See, e.g., Sykes,* 833 F.2d at 1115; *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 986 (1st Cir. 1988); *see generally Harris v. N.Y. State Dept. of Health,* 202 F.Supp.2d 143, 155 (S.D.N.Y. 2002) ("[A]s is common wisdom, even the best laid plans are bound to contain inherent flaws, and — in the course of their evolution from idea to reality, from rudiments to perfected model — to encounter operational and developmental difficulties, and even to be tested by purposeful hindering or corruption of their effective functioning.").

It is more probable that Congress included the parenthetical and used the passive verb form "are made" because it recognized that a public entity is rarely the entity that "make[s]" the alterations. Instead, alterations "are made" by sundry contractors and subcontractors. Without the parenthetical, a public entity could immunize itself from § 12147(a) liability by delegating renovation projects to private entities that are not subject to ADA liability. 42 U.S.C. § 12132. The parenthetical closes this loophole by placing the onus on the public entity, as opposed to its agents, "to ensure" that alterations "are made" in an accessible and usable manner.

This interpretation comports with a similar provision in Title III of the ADA (dealing with public accommodations):

> "[Discrimination . . . includes — with respect to a facility or part thereof that is altered by, *on behalf of,* or for the use of an establishment in a manner that affects or could affect the usability of the facility or part thereof, a failure to make *213 alterations in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities."

42 U.S.C. § 12183(a)(2) (emphasis added). Absent from § 12183(a)(2) is the "or to ensure that the alterations are made" phrase. Instead, the statute provides that the offending alterations can be made "by" or "on behalf of" a public entity. This language is consistent with our conclusion that Congress included the parenthetical phrase in § 12147(a) to cover the situation in which alterations to a public transportation facility are made "on behalf of" a public entity.

Moreover, regardless whether the "mak[er]" of the alterations is the public entity itself or the entity's agents, the general activity that § 12147(a) regulates is the same: the *mak[ing]*" of alterations. *Cf.* 42 U.S.C. § 3604(f)(3)(C) (regulating the underlying activities of *"design[ing]* and *construct[ing]"* multifamily dwellings) (emphases added). As discussed, the failure to *"make"* alterations in a certain manner, as opposed to "plan" or "design" them, cannot logically occur until the completion of such alterations.

**3.**

Finally, to establish whether a public entity committed the discriminatory acts of "fail[ing] to make" alterations, or "fail[ing] . . . to ensure that . . . alterations are made" in an accessible manner, the statute directs us to determine whether "the *altered* portions of the facility *are* readily accessible" — not whether the portions to *be*

*altered will be* readily accessible. 42 U.S.C. § 12147(a) (emphases added). The verb tenses employed by Congress in this phrase *i.e.* "altered," past tense, and "are," present tense) further clarify that the time for passing upon a public entity's success or failure in complying with the statute is upon completion of the alterations.

In short, despite the District Court's repeated emphasis on SEPTA's construction plans, [15] the word "plan" is absent from the statute while the phrase "completion of . . . alterations" is present. Consistent with this language, as well as the structure and purpose of the statute, we hold that the discriminatory acts defined by § 12147(a) occur, and the statute of limitations begins to run, "upon the completion of . . . alterations" to public transportation facilities.

[15] *See, e.g., DIA*, 2006 WL 3392733, at *12 (referring to "SEPTA's *planned* renovations") (emphasis in original); *id.* (formulating the question presented as "when, in a suit under the ADA, a discriminatory action is deemed to have occurred, where the alleged discriminatory action is the violation of a statutory obligation to include an accommodation for *See, e.g.*, DIA, 2006 WL 3392733, at *12 (referring to "SEPTA's *planned* renovations") (emphasis in original); *id.* (formulating the question presented as "when, in a suit under the ADA, a discriminatory action is deemed to have occurred, where the alleged discriminatory action is the violation of a statutory obligation to include an accommodation for disabled individuals in *planning* and completing a construction project") (emphasis added); *id.* at *14 (noting importance of SEPTA's intention to "proceed with the *planned* construction at the 15th and Market Street Courtyard without installing an elevator") (emphasis added).

B.

Before discussing the policy considerations underlying our holding, we clarify the proper application of the discovery rule as it was the basis of the District Court's holding and the subject of extended debate between the parties. The District Court reasoned:

> [In] the absence of any explicit statutory limitation period . . . the Court must look elsewhere for guidance as to when a cause of action such as this one accrues. Under federal law, a claim accrues on the date when the plaintiff knows or has reason to know of the *214 injury that is the basis of the action. To determine the accrual date of a discrimination claim, a court must focus on when the discriminatory act occurred, not when the effect of that act became painful.

214

*DIA*, 2006 WL 3392733, at *13-*14 (internal quotations and citations omitted). Although largely accurate, two corrections to this statement of law are necessary. First, as discussed in Part IV.A, in addition to arising from an "explicit statutory" directive, *id.* at * 13, an accrual date can arise "by implication from the structure and text of the statute." *Andrews*, 534 U.S. at 27-28, 122 S.Ct. 441. Second, the District Court erred in applying the discovery rule to establish when DIA's claims accrued before first determining, per the terms of § 12147(a), when DIA's alleged injuries occurred. These inquiries are analytically distinct.

Because a potential plaintiff cannot discover his injury before it has occurred, the discovery rule only *postpones* the accrual date of a claim "where the [plaintiff] is unaware of the injury." *CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375, 384 (3d Cir. 2004). It does not *accelerate* the accrual date "when the [plaintiff] becomes aware that he will suffer injury in the future." *Id.; see Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 590 (3d Cir. 2005) ("The discovery rule *delays* the initial running of the statute of limitations, but only until the plaintiff has

discovered: (1) that he or she has been injured; and (2) that this injury has been caused by another party's conduct.") (emphasis added); *Oshiver v. Levin, Fishbein, Sedran Berman*, 38 F.3d 1380, 1386 (3d Cir. 1994) (The discovery rule *"postpones* the beginning of the limitations period from the date a plaintiff was wronged until the date a plaintiff discovers that he or she was injured.") (emphasis added).

Accordingly, the first step in applying the discovery rule in a situation like the present is to establish when the injurious discriminatory act defined by the statute actually occurred. *See Podobnik*, 409 F.3d at 590. The second step is to determine whether that injury was immediately discoverable, or whether the accrual date will be *postponed* until it is reasonable to expect the plaintiff to discover the injury. *Oshiver*, 38 F.3d at 1386. Having skipped step one, the District Court's application of the discovery rule resulted in an accrual date that preceded the occurrence of DIA's alleged injuries.

Because DIA was not injured before SEPTA completed its alterations, the discovery rule would not have rendered DIA's claims untimely.

## C.

We conclude by reviewing the policy considerations underlying our holding. *See Price*, 370 F.3d at 375. In particular, we appreciate the District Court's concern that:

> [I]t would be impractical to impose upon a defendant the requirement that it fully complete a facility modification before having to address any assertion that modifications that can be clearly understood from design drawings and specifications amount to alterations triggering an obligation under the ADA that might require significant and material modifications that surely would have been more easily, efficiently and economically incorporated well prior to the completion of the work.

*DIA*, 2006 WL 3392733, at *13. This concern — that public entities will incur unnecessary expense if potential plaintiffs can wait until "the last nail is hammered into *215 place" to bring suit — is assuaged by a number of mitigating and countervailing considerations. *Id.*

First, our interpretation of § 12147(a) does not prevent a public entity like SEPTA from obtaining preliminary declaratory relief to ensure ADA compliance prior to commencing alterations. *See* 28 U.S.C. § 2201. Declaratory relief is available "to settle actual controversies *before* they ripen into violations of a law or a breach of duty." *United States v. Fisher-Otis Co.*, 496 F.2d 1146, 1151 (10th Cir. 1974) (emphasis added); *see Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 647 (3d Cir. 1990). Such relief is appropriate where "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality." *Armstrong World Indus., Inc. by Wolf son v. Adams*, 961 F.2d 405, 411 (3d Cir. 1992) (quoting *Md. Cos. Co. v. Pacific Coal Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941)).

Although SEPTA's activities did not ripen into actual violations of § 12147(a) until SEPTA completed its alterations to the 15th Street and City Hall Courtyards, a substantial, immediate, and real controversy existed between SEPTA and DIA regarding these activities much earlier. On August 3, 2000, DIA's attorney, Stephen Gold, wrote to City Commissioner Edward McLaughlin expressing DIA's concern that the 15th Street Courtyard project would not comply with the ADA. Gold relayed the same concerns to SEPTA throughout 2000 in a series of meetings with SEPTA and the City. In these meetings, Gold also discussed SEPTA's ADA obligations regarding the City Hall Courtyard project. Because of these interactions, SEPTA was "anxious" to get a commitment from DIA "that there would not be a lawsuit" and was undeniably aware that a substantial controversy existed. Accordingly, to the extent that SEPTA's planned "modifications

[could be] clearly understood from design drawings and specifications," SEPTA could have obtained a declaratory judgment to assuage its anxieties before proceeding with construction.

Conversely, our interpretation of § 12147(a) does not prevent an entity like DIA from seeking an injunction prior to the commencement of construction to prevent threatened ADA violations. *See* 43A C.J.S. *Injunction* § 8 ("A preliminary injunction is an anticipatory remedy which prevents the perpetration of a threatened wrong. . . ."); *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); *Swift Co. v. United States*, 276 U.S. 311, 326, 48 S.Ct. 311, 72 L.Ed. 587 (1928).

There is little doubt that it would have been better for all if DIA or SEPTA had sought declaratory or injunctive relief before construction began. It does not follow, however, that a claim for relief on the merits under § 12147(a) accrues as soon as claims for declaratory and injunctive relief accrue. *Ramey v. District 141*, 378 F.3d 269, 279 n. 4 (2d Cir. 2004) ("[T]he possibility of maintaining a preliminary injunction proceeding does not trigger the statute of limitations."); *see Reiter v. Cooper*, 507 U.S. 258, 267, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993) ("While it is theoretically possible for a statute to create a cause of action that accrues at one time for the purposes of calculating when the statute of limitations begins to run, but at another time for purposes of bringing suit, we will not infer such an odd result in the absence of any such indication in the statute."); *Dasgupta v. Univ. of Wis. Bd. of Regents*, 121 F.3d 1138, 1140 (7th Cir. 1997) ("If an employer tells his employee, 'I am going to infringe your rights under Title VII at least once every year you work for me,' this does 216 not start the statute of limitations running on *216 the future violations, violations that have not yet been committed."). The following hypothetical adapted from our decision in *CGB Occupational Therapy*, 357 F.3d at 384 n. 9, illustrates our point.

A telephone company informs a homeowner that it has a right-of-way across the homeowner's property, and that next Friday, it plans to utilize the right-of-way to repair an underground line. The homeowner informs the company that he disputes the parameters of the right-of-way. Upon receiving notice of this controversy, the phone company could seek a declaratory judgment to establish the parameters of the right-of-way and protect itself from future trespass liability. *See Centel Cable Television Co. v. Admiral's Cove Assocs., Ltd.*, 835 F.2d 1359, 1361 (11th Cir. 1988); *Commw. v. Wertelet*, 696 A.2d 206, 209-10 (Pa.Super. 1997). Conversely, the homeowner could obtain an injunction to prevent the phone company from entering his property until the right-of-way dispute is resolved. *See Wertelet*, 696 A.2d at 209-10. Even though both declaratory and injunctive relief are available, the homeowner has no trespass claim against the phone company until it physically enters his property. *CGB Occupational Therapy*, 357 F.3d at 384 n. 9; *see United States v. Union Corp.*, 211 F.Supp.2d 478, 495 (E.D.Pa. 2003) (citing RESTATEMENT (2D) OF TORTS § 158).

Assume that neither party seeks preliminary relief and the phone company enters the homeowner's property. At the moment of entry, the homeowner's trespass claim accrues. *See CGB Occupational Therapy*, 357 F.3d at 384 n. 9; *Union Corp.*, 277 F.Supp.2d at 495. It would be incorrect to say that the statute of limitations on this claim began to run from the time the parties discovered the dispute regarding the right-of-way. Similarly, it would be incorrect to say that the statute of limitations on a § 12147(a) claim begins to run as soon as the parties discover a controversy that may entitle them to preliminary declaratory and injunctive relief.

In light of the availability of preliminary relief to parties facing the dilemma that confronted DIA and SEPTA, we believe the District Court's concern that public entities will be forced to "re-engineer" completed projects "to add the ADA-

compliance features" is overstated. *DIA*, 2006 WL 3392733, at \*13. That may be the unfortunate consequence of our decision in this instance, however.

Second, the District Court's desire to give public entities repose from § 12147(a) liability is not advanced by an interpretation of the statute that incorporates the discovery rule. *See DIA* 2006 WL 3392733, at \*13-\*14. The discovery rule dictates that a cause of action accrues when a potential claimant discovers, or should have discovered, the injury that forms the basis of his claim. *Romero*, 404 F.3d at 222. As DIA argues, it is easy to imagine a situation where an individual with a disability relocates to Philadelphia many years from now and attempts to use the 15th Street or City Hall Courtyard for the first time. A court might fairly conclude that this individual neither discovered, nor, having moved from some distant locale, should have discovered, the inaccessibility of these stations until his arrival there.[16] Perhaps

217 recognizing this danger, \*217 Congress rejected a variable accrual date[17] in favor of a bright-line rule: § 12147(a) claims accrues "upon the completion of . . . alterations." We find nothing "implausible," much less imprudent, about this decision. *DIA* 2006 WL 3392733, at \* 13

16 Although we do not decide this question, we would hesitate to apply the discovery rule in such a manner. The discovery rule originated as an equitable doctrine to extend the period during which victims of *latent* injuries could seek recovery. *Andrews*, 534 U.S. at 27, 122 S.Ct. 441 (noting that the "cry for [the discovery] rule is loudest" in "latent disease and medical malpractice" cases); *Oshiver*, 38 F.3d at 1386 n. 5 (noting that "the discovery rule's origins are in products liability and medical malpractice cases"). We find nothing latent about the injuries defined in § 12147(a) because the fact that newly renovated subway stations do not

include elevators should be readily apparent to any reasonably diligent potential plaintiff.

17 As further evidence of the indeterminate nature of SEPTA's interpretation of § 12147(a), SEPTA's counsel failed at oral argument to identify a point during the planning phases of the 15th Street and City Hall projects (e.g. upon receipt of funding, approval of blueprints, or letting of contracts) at which it would have been reasonable to conclude that DIA should have discovered its alleged injuries.

To the contrary, we find that Congress struck a wise balance between the plaintiff-friendly accrual rule just described and the defendant-friendly rule advanced by SEPTA. If § 12147(a) dictated that claims accrued during the planning stages of a project as SEPTA suggests, potential claimants would be encouraged to sue early and often, and public entities would have little opportunity to address accessibility concerns informally before being hailed into federal court. *See Franconia Assoc. v. United States*, 536 U.S. 129, 146-47, 122 S.Ct. 1993, 153 L.Ed.2d 132 (2002). This result would be antithetical to Congress's explicit directive that ADA claims be resolved whenever appropriate through "alternative means of dispute resolution." 42 U.S.C. § 12212.

SEPTA's proffered rule also encourages claimants to bring unripe lawsuits that rely on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998). Here, for example, SEPTA could have decided to install elevators before completing its renovations, thus making DIA's ADA and RA claims unnecessary.

Third, the facts of this case belie the District Court's suggestion that applying the discovery rule to § 12147(a) will assure that accessibility concerns will be addressed "well prior to completion of the work." *DIA* 2006 WL 3392733, at \*13. In fact, under the District Court's accrual

theory, DIA could have filed a timely claim *after* SEPTA completed the 15th Street Station renovations. The District Court concluded that DIA had notice of SEPTA's allegedly injurious alterations to the 15th Street Courtyard "no later than November 1, 2000." *DIA* 2006 WL 3392733, at * 14. Accepting the District Court's conclusion that DIA's cause of action accrued on this date, DIA would have had until November 1, 2002 to bring suit. SEPTA completed construction on the 15th Street Courtyard on August 8, 2002, three months *before* November 1, 2002. Thus, it is apparent that the rule of law established by the District Court is ineffectual in preventing cases from being brought after construction is completed.

In sum, although we recognize the District Court's concerns about the inefficiency of requiring public entities to address accessibility deficiencies after the expenditure of substantial resources, that is the "natural effec[t] of the choice Congress has made" when it included the phrase "upon the completion of such alterations" in the statute. *Ricks*, 449 U.S. at 260 n. 11, 101 S.Ct. 498 (citation omitted). We are bound by this choice.

## V.

It is undisputed that DIA's § 12147(a) claims were timely if the statute of limitations *218 began to run from the date the alterations to the 15th Street and City Hall Stations were completed. *See* App'x 159, 180 (15th Street Courtyard project completed on August 8, 2002); App'x 2 (Complaint regarding 15th Street Courtyard filed on March 14, 2003); App'x 164, 188, 320 (City Hall Courtyard project completed in August 2003); App'x 11 (Complaint regarding City Hall Courtyard filed on February 15, 2005). Because we have so held, we reverse the District Court's grant of summary judgment in favor of SEPTA and remand for further proceedings consistent with the opinion.

casetext