Civil Action No. 12-6781
United States District Court, E.D. Pennsylvania.

# Rawdin v. Am. Bd. of Pediatrics

985 F. Supp. 2d 636 (E.D. Pa. 2013)
Decided Nov 6, 2013

Civil Action No. 12–6781.

2013-11-6

David E. RAWDIN, M.D. v. The AMERICAN BOARD OF PEDIATRICS.

Robert F. Morris, Joshua J. Knepp, Morris Clemm & Heleniak, PC, Plymouth Meeting, PA, for David E. Rawdin, M.D. Christopher B. Sullivan, Douglas P. Farr, Wesley D. Felix, Snell & Wilmer LLP, Salt Lake City, UT, Jeffrey P. Bates, Samantha Lynn Kane, Marshall Dennehey Warner Coleman & Goggin, Philadelphia, PA, for The American Board of Pediatrics.

JUAN R. SÁNCHEZ

639 *639

Robert F. Morris, Joshua J. Knepp, Morris Clemm & Heleniak, PC, Plymouth Meeting, PA, for David E. Rawdin, M.D. Christopher B. Sullivan, Douglas P. Farr, Wesley D. Felix, Snell & Wilmer LLP, Salt Lake City, UT, Jeffrey P. Bates, Samantha Lynn Kane, Marshall Dennehey Warner Coleman & Goggin, Philadelphia, PA, for The American Board of Pediatrics.

*MEMORANDUM*

**JUAN R. SÁNCHEZ, District Judge.**

Plaintiff David Rawdin, M.D., is a skilled pediatrician who has been unable to obtain board certification from the American Board of Pediatrics (ABP or "the board"). Although Dr. Rawdin is, by all accounts, an excellent pediatrician, he has been unable to pass the multiple choice exam ABP uses to evaluate all candidates for certification in any of his five attempts to do so. Dr. Rawdin contends he suffers from a disability—a memory deficiency—caused by a brain tumor and the subsequent treatment he received. He brings this action against ABP to accommodate his disability by either awarding him board certification without requiring him to pass the multiple choice exam or providing him with an alternative form of testing. The Court is sympathetic to Dr. Rawdin's position and agrees he suffers from a memory impairment. After holding a preliminary injunction hearing, which was consolidated with a trial on the merits, and upon review of the relevant case law, however, the Court concludes Dr. Rawdin is not disabled within the meaning of the ADA and is therefore not entitled to the accommodations he seeks. In addition, the Court concludes that even if Dr. Rawdin had a disability within the meaning of the Statute, his requested accommodations are not reasonable and would fundamentally alter ABP's exam and place an undue burden on ABP. As a result, the Court is constrained to deny Dr. Rawdin's request for relief. Pursuant to Federal Rule of Procedure 52(a), the Court issues the following findings of fact and conclusions of law.

# FINDINGS OF FACT

1. ABP is an independent, non-profit organization, and is one of 24 certifying boards of the American Board of Medical Specialties (ABMS). Board certification is recognized as a credential signifying a high level of physician competence. ABP's mission is to certify pediatricians against a

series of qualifying standards so as to assure the public that certified physicians have demonstrated a high level of competency.

2. One of the benchmarks for certification requires passing a multiple choice exam. Throughout its 80–year existence, ABP has always required candidates to pass an exam prior to certification.

3. In the pediatric field, board certification is a critical mark of professional medical competence. Board certification is a factor used by the public in selecting a physician and by hospitals and private practices in deciding whether to hire a physician. A pediatrician is not, however, required to be board certified in order to practice, and approximately 15–20% of pediatricians are not board certified.

4. Dr. Rawdin is a licensed pediatrician who has been unable to pass ABP's multiple choice exam and obtain board certification. In 1987, while in college, Dr. Rawdin was diagnosed with Posterior Fossa Ependymoma, a type of brain tumor. He underwent brain surgery, chemotherapy, and radiation therapy to treat the tumor. Dr. Rawdin began to experience difficulty taking multiple choice examinations after surgery and treatment.

640 Despite these difficulties,*640 Dr. Rawdin graduated from Franklin & Marshall College in 1990 and began attending Temple University School of Medicine. He graduated from medical school in 1994.

5. To become a licensed physician, a medical student must pass the United States Medical Licensing Examination (USMLE). This exam consists of three "Steps," each of which includes multiple choice questions. Dr. Rawdin completed the first two Steps in medical school. After medical school, Dr. Rawdin took Step III of the USMLE but failed it twice. Following his second failed attempt in 1996, Dr. Rawdin was evaluated by a neuropsychologist, Laura Slap–Shelton, Psy.D. Dr. Slap–Shelton concluded that as a result of his brain tumor and subsequent surgical resection, chemotherapy, and radiation, Dr. Rawdin had sustained a cognitive impairment impacting his memory retrieval system. Specifically, Dr. Slap–Shelton determined Dr. Rawdin's verbal retrieval function, visual memory system, and visual fine motor function were all significantly impaired by the tumor and subsequent treatment, but these impairments were only apparent when Dr. Rawdin took multiple choice examinations. Dr. Slap–Shelton found, however, that Dr. Rawdin's impairments did not impact his clinical ability to practice medicine.

6. During the second year of his general surgery residency at the Graduate Hospital in Philadelphia, Dr. Rawdin's tumor recurred, requiring further surgery and treatment. Because Dr. Rawdin suffered a series of complications after surgery, he left the medical profession for four years and changed residencies, leaving the more demanding surgical specialty for pediatrics.

7. Dr. Rawdin returned to medicine in 1999, applied to take Step III of the USMLE for the third time, and for the first time requested accommodations. His request was granted, and he was provided double time to take the exam, an individual testing room, and additional "off the clock" breaks. Dr. Rawdin passed Step III of the USMLE on this third attempt and earned a Pennsylvania medical license in 2000. After passing the USMLE, Dr. Rawdin entered the general pediatric residency program at Albert Einstein Medical Center, which he completed without any reprimands or poor evaluations. His only struggles were with the mock board exams intended to prepare the residents for their board certification exam.

8. In July 2003, Dr. Rawdin began clinical practice as a pediatrician in the Neonatology Department of the Children's Hospital of Philadelphia (CHOP). He became the Assistant Director of CHOP's nursery, held a faculty post, and was part of the Academic Clinician Tract at the University of Pennsylvania School of Medicine. Dr. Rawdin worked at CHOP until his termination in 2010.

Rawdin v. Am. Bd. of Pediatrics    985 F. Supp. 2d 636 (E.D. Pa. 2013)

9. Dr. Rawdin's performance during his years at CHOP was exemplary, as reflected by the credible testimony of Dr. William Fox, the Director of the Newborn Infant Breathing Disorder Center at CHOP, who worked with Dr. Rawdin when Rawdin served as Assistant Director of the well-baby nursery. Dr. Fox never observed Dr. Rawdin having any difficulties with the functions of his position or with his diagnostic abilities, stating "I never heard any question about Dr. Rawdin's abilities, or his diagnostic abilities, or patient management abilities in the whole time he was there, which I think was about five years." Hr'g Tr. 35, July 29, 2013, ECF No. 38. Dr. Fox also never observed any shortcomings in Dr. Rawdin's pediatric knowledge. Dr. Rawdin treated 10,000 babies during his six and half years at CHOP. He was never reprimanded, never *641 underwent a peer review as a result an incident that occurred on his watch, and there were no medical malpractice claims against him or the hospital as the result of the treatment of any baby under his care.

10. Under CHOP's bylaws, physicians employed by the hospital must be board certified in their specialties within five years of employment. Because Dr. Rawdin was not able to obtain certification, CHOP terminated his employment in January 2010.

11. ABP is the sole organization responsible for certifying physicians as specialists in the field of pediatrics. To obtain board certification, a physician must: (1) graduate from a medical school accredited by the Liaison Committee on Medical Education or the American Osteopathic Association; (2) complete three years of pediatric training in programs accredited by the Accreditation Council for Graduate Medical Education on the advice of the Review Committee for Pediatrics; (3) possess a valid, unrestricted license to practice medicine in at least one state or territory in the United States; (4) pass a peer and patient review; and (5) pass a multiple choice exam known as the General Pediatrics Certifying Examination (the Exam). The Exam is given once a year and is computer-based, consisting of four sections with a total of 335 multiple choice questions. These questions are cue—or story-based and contextual, providing the test-taker with a scenario and asking for the most likely diagnosis, treatment, or next step. Each question provides five possible answers and is designed to have one correct answer. The questions are intended to test knowledge, not memory. ABP has sole control over the planning, administration, and scoring of the Exam.

12. Dr. Rawdin meets all of the requirements for board certification except for passing the Exam, which he has taken five times (in 2004, 2006, 2008, 2009, and 2011) and failed each time. Without live performance, enabling him to talk to the actual patient or parent of the patient, ask questions, and see his or her reactions, Dr. Rawdin is not able to answer the questions correctly because he feels he lacks all of the necessary information.

13. In October 2007, following his second failed attempt to pass the Exam, Dr. Rawdin was reevaluated by Dr. Slap–Shelton, who performed a new psychological evaluation. As part of the evaluation, Dr. Slap–Shelton gave Dr. Rawdin a number of tests, including an intelligence test, the Wechsler Adult Intelligence Scale–III (WAIS–III); an academic achievement test, the Woodcock Johnson–III Tests of Achievement (WJ–III ACH); a series of neuropsychological tests; [1] and personality and behavior tests. Dr. Rawdin's scores placed him into the superior range or high average range on most of the tests. His verbal IQ placed him in the 98th percentile for overall language based intellectual ability, while his full scale IQ score placed him in the 93rd percentile. Dr. Rawdin's WAIS–III results revealed a 21–point difference between his verbal IQ and performance IQ, indicating a significant relative weakness in his visual-spatial processing as compared to his verbal processing. His fund of information placed him in the 75th percentile, indicating a relative weakness in his ability to retrieve information as

642 compared to other higher *642 level language-based abilities. Additionally, his Perceptual Organization Index score placed him in the 68th percentile, indicating a relative weakness in his working memory when sequencing was required. Dr. Rawdin's WJ–III ACH scores were all within or above the average range, with the exception of one lower score which Dr. Slap–Shelton attributed to his hearing loss.

> [1] Dr. Slap–Shelton performed the following neuropsychological tests on Dr. Rawdin: Sensory Perceptual Examination, Finger Tapping Test, Visual Motor Integration Test, Rey Complex Figure Test and Recognition Trial, Tactual Performance Test, Seashore Rhythm Test, Speech-sounds Perception Test, California Verbal Learning Test II, Wechsler Memory Scale III, Trail Making Tests: Part A and B, and Booklet Category Test.

14. The neuropsychological tests Dr. Slap–Shelton performed also evaluated Dr. Rawdin's cognitive functions. Dr. Rawdin performed in the normal range in the sensory perceptual function test and the sensory motor learning test. He demonstrated a mild impairment in his fine motor speed. Other tests demonstrated a mild impairment in his visual memory, but his memory improved when he was cued on a delayed recognition measure. Dr. Rawdin performed within normal limits on the memory function evaluation; however, for his age and education his score was low. The California Verbal Learning Test–II score demonstrated above average learning, but did show some struggle with recall ability. Again, cueing helped him retrieve information. Dr. Rawdin's scores on the Wechsler Memory Scale III test all fell within the average range, but were weak as compared to his full scale IQ. Furthermore, the memory tests demonstrated Dr. Rawdin's memory was not efficient and he particularly suffered when asked to retrieve information out of context. Following this testing, Dr. Slap–Shelton diagnosed Dr. Rawdin with a Cognitive Disorder Not Otherwise Specified (NOS), a diagnosis generally given when a person suffers from some difficulties but not enough to diagnose a specific disorder.

15. In July 2008, Dr. Rawdin consulted another neuropsychologist, Edward Moss, Ph.D., for further evaluation. In his practice as a neuropsychologist, Dr. Moss assesses individuals with mental disorders, attention disorders, and other issues affecting the brain and behavior. Dr. Moss had previously consulted with physicians struggling with some aspect of their training. Dr. Moss reviewed the results of Dr. Slap–Shelton's 2007 neurological testing, but he did not re-test Dr. Rawdin because Rawdin had been thoroughly tested by Dr. Slap–Shelton less than a year prior. Dr. Moss felt confident relying on the 2007 test results and wanted to avoid any artificially inflated results caused by repeating the tests in a relatively short time span. Dr. Moss concluded Dr. Rawdin has a declarative memory impairment directly related to his brain tumor and subsequent treatment. He opined Dr. Rawdin's impairment is unique to his specific brain injury and the location of the injury in the part of the brain "require[d] to do that kind of work, to pull together on command discrete bits of unrelated information." Moss Dep. at 148. Dr. Moss agreed with Dr. Slap–Shelton's evaluation that Dr. Rawdin's testing indicated his verbal and visual memory are significantly weak compared to his full scale IQ, his memory is not efficient, and his performance suffers when he has to retrieve out-of-context information. Based on his meeting with Dr. Rawdin and his evaluation of the 2007 test results and Dr. Slap–Shelton's report, Dr. Moss made four recommendations, advising that Dr. Rawdin should (1) meet with a neurospychiatrist, an M.D. who specializes in brain injury, to see if any medication might help either reduce anxiety related to the test or assist with attention and concentration; (2) receive Cogmed Working Memory training to help him focus during the test; (3) undergo cognitive behavior therapy to reduce his anxiety and teach

him better test-taking strategies; and (4) take the October 2008 Exam, even though it was only two months away, for practice.*643

16. On Dr. Moss's recommendation, Dr. Rawdin took the Exam for the third time in 2008 and again failed it. Because Dr. Rawdin was unable to pass the Exam within five years of his employment with CHOP and was facing termination, Dr. Moss wrote a letter to CHOP explaining that Dr. Rawdin's disability required more time to treat before he was likely to improve and advocating CHOP grant him additional time. CHOP allowed Dr. Rawdin one final attempt to take the Exam the following year. CHOP granted Dr. Rawdin this extension because of his excellent work and Dr. Moss's persuasive letter of advocacy; however, Dr. Rawdin failed the 2009 Exam and was terminated in January 2010.

17. Dr. Rawdin struggled to obtain employment as a pediatrician after CHOP terminated him. He hired a job recruiter specializing in medical jobs, did online searches, and joined physician job sites, but he could not find a position that did not require board certification within a certain number of years post-residency. For example, Dr. Rawdin sought a job at Albert Einstein Hospital performing circumcisions for newborns. Circumcision is a minor medical procedure that is not required to be performed by a doctor; however, the head of pediatrics refused to hire any doctor without board certification. No hospital has been willing to give Dr. Rawdin admitting privileges without certification, thus limiting his ability to practice medicine, at least in a hospital setting. Although Dr. Rawdin contends his inability to obtain admitting privileges also limits his ability to practice in a private practice setting because he is unable to admit patients to the hospital, he has not attempted not to start or join a private medical practice, nor has he sought a position in a rural area.

18. On September 10, 2010, Dr. Rawdin wrote to ABP, explaining his difficulties in passing the Exam and requesting an alternative method of certification. On September 29, 2010, Dr. Gail McGuiness, the Executive Vice President of ABP, responded by letter, informing Dr. Rawdin ABP was unable to offer him an alternative exam and could not certify physicians who had not taken and passed the Exam, as this would "fundamentally alter the nature of the certification process." Ex. 9. Dr. McGuiness suggested Dr. Rawdin submit a request for accommodations under the ADA. Dr. Rawdin and Dr. McGuiness also spoke by phone, and Dr. McGuiness reiterated that ABP could not waive the Exam requirement because it would compromise the uniform standard for certification.

19. On April 28, 2011, Dr. Rawdin again applied to take the Exam. On May 2, 2011, Dr. Slap–Shelton sent a letter to ABP on Dr. Rawdin's behalf, informing ABP of Dr. Rawdin's diagnosis. Dr. Slap–Shelton explained Dr. Rawdin "demonstrates ongoing neurocognitive impairment [a]ffecting his verbal retrieval, visual memory, and his visual fine motor functioning." Ex. 4. She also reported Dr. Rawdin's memory retrieval impairment appeared to particularly affect his ability to retrieve information where limited context is provided. Because of Dr. Rawdin's difficulties related to his memory impairment, Dr. Slap–Shelton recommended ABP provide the following accommodations: (1) extended time; (2) a quiet setting; (3) advance knowledge of the material covered on the Exam; (4) access to reference material while taking the Exam; (5) short breaks every half hour of the Exam; and (6) an essay format for the Exam instead of the multiple choice format. Exs. 4, 14.

20. On June 9, 2011, ABP granted Dr. Rawdin's request for double time to take the Exam, an individual testing room, and *644 a maximum of 3.5 hours of testing each day with breaks after each hour and an additional 30 minutes of "off the clock" breaks. Ex. 15. These were the same accommodations Dr. Rawdin was given in Step III

of the USMLE. ABP did not send Dr. Rawdin's request for accommodations to a consultant or neuropsychology expert because he had received these accommodations from the USMLE, a comparable high stakes testing organization, and ABP's policy was to defer to the accommodations given by other testing organizations.

21. ABP has an ADA accommodations program. ABP's Policy and Procedures for Applicants with Disabilities (ADA Guide) states "[ABP] supports the intent of the [ADA], ... and the ABP will make reasonable accommodations for individuals with documented disabilities. Individuals are reminded that modifications, accommodations, auxiliary aids and/or services ... can only be offered if they do not fundamentally alter the measurement of the skills or knowledge the examination is intended to test.... [A]ccommodations are not a guarantee of improved performance, test completion or a passing score." Ex. 16. Dr. McGuiness oversees ABP's ADA program. The program's goal is to "provide equal access to individuals who might have a disability," but the program does not attempt to provide equal outcomes or unfair advantages. Hr'g Tr. 59, July 29, 2013, ECF. No. 39.

22. ABP denied Dr. Rawdin's request to access the exam questions beforehand or to have reference materials during the Exam because these accommodations would not allow ABP to adequately, reliably, and validly test Dr. Rawdin's knowledge. ABP also denied Dr. Rawdin's request to take the Exam in essay form because changing the format of the Exam would take a significant period of time and would be prohibitively expensive. Furthermore, a different format would not meet the reliability and validity standards required by ABMS, ABP, and other national accrediting boards.

23. In October 2011, Dr. Rawdin failed the Exam for the fifth time.

24. On December 5, 2012, Dr. Rawdin filed the instant action against ABP. On December 10, he filed a motion for preliminary and permanent injunction, requesting an order directing ABP to grant him immediate board certification without having to pass the Exam. On July 29, 2013, this Court held a hearing on Dr. Rawdin's motion for a preliminary injunction. At the hearing both parties represented they had presented all evidence they intended to produce. After the hearing the Court, with the consent of both parties, consolidated the hearing with a trial on the merits.

25. The evidentiary record includes the hearing testimony of Dr. Rawdin, Dr. Linda Althouse, and Dr. McGuiness, in addition to supporting documentation admitted at the hearing and expert deposition testimony submitted by each party. In support of his claim, Dr. Rawdin submitted expert testimony from Dr. Moss. ABP submitted the expert testimony of Gerald Golden, M.D., a neurologist, with substantial knowledge regarding ABP's Exam.

26. In his deposition, Dr. Moss credibly testified that Dr. Rawdin performs well when information is presented within context, such as in a story, but has trouble on verbal learning tests where there is no context, such as recalling lists of words. He opined that Dr. Rawdin would benefit from a test format that does not require him to "just pull up discrete bits of information that he can't predict." Moss Dep. 64. The Court credits Dr. Moss's opinion that Dr. Rawdin would be substantially 645 *645 limited by a multiple choice exam that requires straight recall.

27. Dr. Moss agreed, however, that beyond knowing the Exam was multiple choice, he does not know the format of the questions or the layout of the Exam. He also conceded he has no expertise regarding the development of professional exams, and does not know whether an open-book exam or a different form of examination would fundamentally alter ABP's Exam. Because of Dr. Moss's lack of familiarity with the Exam,

including the extent to which the Exam questions provide needed context, the Court does not credit his opinion that the accommodations ABP is willing to provide do not accommodate Dr. Rawdin's specific focal memory deficit because they do not assist his ability to recall discrete pieces of information.

28. Dr. Rawdin testified at the hearing, regarding how his memory deficiency specifically impacts his ability to take the Exam, stating

When I read the question, and I saw the answers, my mind could reason answers for each of the answers—correct answers. And meaning that, these—these exams, what it says in their literature and whatever you read about them, were designed for one right answer.... My brain needs live performance for that, so I can—like a real setting, so in a sense, I could ask the questions. I could verbally talk to the person. I could see their reaction. I could feel the room, the person and everything. Those aren't present, so I only have my mind to rely on, and my mind is reasoning answers for those questions, which actually could be construed as being correct. They just weren't the absolute correct one, because I didn't have all the information.

Hr'g Tr. 51–52, July 29, 2013, ECF No. 38. Dr. Rawdin further stated that what he really needed were "cues" via words a parent would say or answers to a question from a live patient or parent of a patient in order to select the right answer.

29. Dr. Golden, a board certified neurologist, offered expert opinion testimony regarding the results of Dr. Rawdin's psychological tests, the nature of the Exam, and the impact of his alleged impairment on the Exam.

30. Dr. Golden testified that none of Dr. Rawdin's neuropsychological test scores are below the average range when compared to the general population. There is no dispute regarding the outcome of Dr. Rawdin's test results as both experts agree that Dr. Rawdin's scores related to his memory were substantially lower than his overall IQ. Both experts also agree that the test scores were all average or above average. Because there is no dispute about Dr. Rawdin's test scores, the Court accepts Dr. Golden's testimony that "the discrepancies between [Dr. Rawdin's psychological test] scores, between achievement measures and intelligence measures, ... show cognitive abilities that are all average or above average when compared to individuals in the general population." Golden Dep. 46.

31. Dr. Golden was also an official examiner for ABP between 1979 and 1992, served as the chairman of the computerized examination advisory committee, and was also a member of the written examination committee. Based on his committee service, he has experience developing Exam questions and is familiar with the goal of the Exam. Dr. Golden testified the format of the current Exam presents the test-taker "with a clinical scenario which provides context, presents all the relevant information for formulating an answer, it tells a story ... [a]nd the answer is provided among the options, so [the test-taker] does not have to dredge up the answer from nowhere and write it down, but it *646 becomes a recognition skill based on the clinical scenario on that context." *Id.* at 49. The Court accepts Dr. Golden's uncontroverted testimony regarding the nature of the Exam.

32. Because of Dr. Golden's experience with and knowledge about the Exam, and absent any evidence to the contrary, the Court accepts his testimony that the Exam questions do not require the test-taker to recall discrete, unconnected information and Dr. Rawdin's impairment should not impact his ability to take the Exam.

33. Dr. Linda Althouse, the Vice President of Psychometrics Research and Testing Services at ABP, testified regarding the nature and development of the current Exam. Dr. Althouse has a Ph.D. in psychology with an emphasis on measurement and testing. In her position with ABP, she oversees the entire test development

process and is thus intimately familiar with the format of the Exam and the impact alteration has on both the Exam itself and the certification process. The Court therefore accepts Dr. Althouse's unrefuted testimony in its entirety on these subjects.

34. Dr. Althouse testified the format of an examination impacts what the exam is testing. ABP currently focuses on the psychometric reliability of the Exam, meaning that the results of the exam are consistent across test-takers. Reliability is important to ABP because it is the only way to have a valid exam across all candidates that is scored the same way. Because multiple choice examinations provide a high level of reliability, they have always been a part of ABP's certification process. An essay format would add an element of subjectivity that is not present in the current Exam. Introducing subjectivity into an exam, via an essay format, makes human judgment a relevant factor in scoring the Exam, lessening its reliability.

35. A multiple choice exam also allows ABP to test a large breadth of knowledge in a short period of time. In one exam, ABP can test 35 broad areas of content. Because ABP is primarily interested in testing objective knowledge, it chose the multiple choice format.

36. The construction and development process for the Exam is extensive. The process begins with a test blueprint, i.e., a content outline that serves as the foundation for the Exam. The blueprint specifies 35 content areas and the approximate percentage of the Exam devoted to each area. Thus, the content of the Exam always comes from the same pool of information, i.e., the 35 specified content areas. To develop the actual questions, ABP brings in practicing pediatricians, who write questions for submission into a question pool, which ABP edits internally. The questions are then reviewed at an annual meeting. Those that survive the meeting are again reviewed internally by a staff editor and a medical editor. The staff editor is not an M.D., but a trained copy editor, while the medical editor is a pediatrician. At the next annual meeting, a group of 40–50 pediatricians reviews the questions a second time. After this meeting, the questions undergo a final edit to ensure they are relevant, accurate, and not flawed. ABP's question database contains approximately 4,000–4,500 questions. It generally takes at least two years before a question makes it onto an exam. ABP tracks and monitors the cost of developing questions. For the 2011–2012, Exam the cost per question was $3,500, and the total cost of the Exam was approximately $1.2 million.

37. Even after a question makes it onto the Exam, the question is reviewed, and if it does not perform well it will not be scored. Additionally, the database often undergoes review because of changes in the medical field, and questions that are no *647 longer relevant are removed. Furthermore, every five years, ABP undertakes a practice analysis, which is a more formal review. ABP sends out a survey to practicing pediatricians, asking them to look at the content outline and rate how important each of the 35 content areas is to their practice and how frequently they encounter each area. Based on the results of this survey, ABP changes the Exam to focus on more relevant areas of pediatrics by increasing the frequency of the questions in those areas.

38. Given the lengthy and ongoing process required to develop questions and the need for reliability and objectivity, the Court accepts Dr. Althouse's testimony that is not possible for ABP to develop an exam with a different format in a short period of time and still meet the relevant standards of reliability. Developing an essay exam would take even longer than the two years required for developing the current multiple choice questions because there is no system in place for developing an exam in this format. Additionally, a rubric would also have to be developed to ensure consistency in scoring. Moreover, an essay or other alternative type of

exam cannot cover the same amount of material as the current multiple choice Exam covers. The current Exam is also designed specifically as a closed-book exam and would have to be changed if it were administered as an open-book exam. Thus, even the change from closed-book to open-book would require a significant development process. ABP would have to analyze the current database to determine which questions must be changed, write new questions, and then field test the new Exam, all of which would be a very expensive process.

39. The Court also credits the uncontroverted testimony of Dr. McGuiness, who as ABP's Executive Vice President has significant knowledge regarding the requirements for board certification, that ABP could not forego the examination altogether and evaluate Dr. Rawdin in a clinical setting because "certification required that final step [i.e., the Exam] and he had already passed the bar of finishing training where his training program director told us he was clinically competent and ready to sit for the exam and now he had to demonstrate the fund of knowledge [ABP] require[s]." Hr'g Tr. 74, July 29, 2013, ECF. No. 39.

## LEGAL STANDARD

Dr. Rawdin seeks permanent injunctive relief, asking the Court to find he is qualified for board certification and to direct ABP to award him certification without requiring him to pass the Exam. Alternatively, Dr. Rawdin seeks injunctive relief directing ABP to provide the accommodation of substituting either open-book testing, an essay exam, or an evaluation in a clinical setting for the current multiple choice Exam.

For this Court to grant the requested relief, Dr. Rawdin must establish a violation of Title III of the ADA, which provides, in relevant part, that a person offering "examinations or courses related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." 42 U.S.C. § 12189. Dr. Rawdin alleges ABP violated Title III by failing to accommodate his disability. To show a violation of the ADA based on a failure to accommodate, Dr. Rawdin must prove " '(1) that [he] is disabled; (2) that [his] requests for accommodation are reasonable; and (3) that those requests have *648 been denied.' " *Mahmood v. Nat'l Bd. of Med. Exam'rs*, No. 12–1544, 2012 WL 2368462, at *4 (E.D.Pa. June 21, 2012) (quoting *Mucci v. Rutgers*, No. 08–4806, 2011 WL 831967, at *21 (D.N.J. Mar. 3, 2011)). ABP granted several of Dr. Rawdin's requested accommodations but denied the rest. Dr. Rawdin is challenging the denial of these other requested accommodations. Because it is not disputed that these requests were denied the Court focuses its analysis on the first two prongs.

The Court must first determine whether Dr. Rawdin is disabled within the meaning of the ADA. The ADA defines a disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of [the] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Dr. Rawdin asserts he has a disability solely under the first definition; thus, in order to find Dr. Rawdin is disabled, the Court must find he has a physical or mental impairment that substantially limits one or more major life activities.

To determine whether Dr. Rawdin meets this definition, the Court applies a three-part test. The first step is determining whether Dr. Rawdin suffers from a physical or mental impairment. A mental impairment is "any mental or psychological disorder, such as an intellectual disability ..., organic brain syndrome, emotional or mental illness, and specific learning disabilities."

Rawdin v. Am. Bd. of Pediatrics    985 F. Supp. 2d 636 (E.D. Pa. 2013)

29 C.F.R. § 1630.2(h)(2). Dr. Rawdin claims he suffers from a memory impairment by virtue of having a cognitive disorder impacting his memory.

If the Court finds Dr. Rawdin suffers from a mental impairment, the next step is to determine whether this impairment impacts a major life activity. In making this determination, the Court analyzes whether the activities Dr. Rawdin claims are limited by his impairment constitute major life activities. "[M]ajor life activities include, but are not limited to ... learning, reading concentrating, thinking, communicating, and working." [2] 42 U.S.C. § 12102(2)(A). "[T]he term "major" shall not be interpreted strictly to create a demanding standard for disability." 29 C.F.R. § 1630.2(i)(2). Dr. Rawdin claims his mental impairment impacts the major life activities of test-taking and working.

> [2] This is a non-exhaustive, illustrative list of major life activities. 29 C.F.R. § 1630.2; *Bragdon v. Abbott,* 524 U.S. 624, 639, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998).

Finally, if the Court determines Dr. Rawdin's claimed activities constitute major life activities, it analyzes whether his impairment substantially limits those major life activities. *See Bragdon,* 524 U.S. at 641, 118 S.Ct. 2196 ("When significant limitations result from the impairment, the definition is met even if the difficulties are not insurmountable."). In determining whether Dr. Rawdin is substantially limited, "the Court may consider the condition, manner, and duration of [his] ability to perform a major life activity, including consideration of difficulty, effort, or time required, pain experienced, the length of time the activity can be performed, and the way the impairment affects the operation of major bodily functions." *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs,* 870 F.Supp.2d 607, 617 (S.D.Ind.2012) (citing 29 C.F.R. § 1630.2(j)(4)(i), (iii)). "The focus is on how a major life activity is substantially limited, and not what outcomes an individual can achieve." 29 C.F.R. § 1630.2(j)(4) (iii). Dr. Rawdin claims his mental impairment substantially limits his ability to take multiple choice tests and to work.

In undertaking this three-part analysis, the Court 649 recognizes that in a 2008 amendment*649 to the ADA, Congress expressly rejected the notion that the terms "substantially" and "major" need be " 'interpreted strictly to create a demanding standard for qualifying as disabled,' and that to be substantially limited in performing a major life activity under the ADA 'an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives.' " ADA Amendments Act of 2008 (ADAAA), Pub.L. No. 110–325, 122 Stat. 3553 § 2(b)(4) (2008). Prior to passage of the ADAAA, the EEOC defined the term "substantially limits" to mean:

(i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

*Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 306 (3d Cir.1999) (quoting 29 C.F.R. § 1630.2(j) (1) (2011)). Following passage of the amendment, the EEOC did not adopt a new definition for the term substantially limits; rather, the current regulations state substantially limits "shall be interpreted and applied to a degree of functional limitation that is lower than the standard for 'substantially limits' applied prior to the ADAAA." 29 C.F.R. 1630.2(j)(1)(iv). The current regulations also provide the term substantially limits "shall be construed broadly in favor of expansive coverage." *Id.* § 1630.2(j)(1)(i). Thus, "an impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be

considered substantially limiting," nor should the "threshold issue of whether an impairment 'substantially limits' a major life activity ... demand extensive analysis." *Id.* § 1630.2(j)(1)(ii), (iii).

Despite this broad expansion of what constitutes a disability, the changes reflected in the ADAAA were not intended to make "every impairment ... a disability within the meaning of this section." *Id.; see also Koller v. Riley Riper Hollin & Colagreco,* 850 F.Supp.2d 502, 513 (E.D.Pa.2012) (holding that even under the relaxed ADAAA standard, "the qualifying impairment [must] create an 'important' limitation"). The relevant inquiry remains whether the impairment "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). This inquiry "usually will not require scientific, medical, or statistical analysis," but such evidence may be used in order "to make such a comparison where appropriate." *Rico v. Xcel Energy, Inc.,* 893 F.Supp.2d 1165, 1168 (D.N.M.2012) (quoting 29 C.F.R. § 1630.2(j)(1)(v)).

## DISCUSSION

With respect to the first step of the analysis—i.e., whether Dr. Rawdin suffers from a mental impairment—Dr. Rawdin's clinical test scores, relative to his overall IQ and other skills, indicate to the Court that Dr. Rawdin suffers from a memory impairment. A series of neuropsychological tests demonstrate Dr. Rawdin suffers from a mild impairment impacting his ability to recall information, particularly when he is required to retrieve such information out of context. These clinical test scores also demonstrate Dr. Rawdin's memory is not efficient. Dr. Rawdin's two treating neuropsychologists determined that he suffers from a cognitive disorder that negatively impacts his memory retrieval system *650 and his ability to remember discrete, unrelated information. This diagnosis took into account Dr. Rawdin's age and level of education. This evidence persuades the Court that Dr. Rawdin has a mental impairment.

Having determined Dr. Rawdin suffers from a memory impairment, the Court next analyzes whether this impairment impacts a major life activity. Dr. Rawdin first asserts his impairment impacts the major life activities of test-taking. The parties dispute whether test-taking activity is a major life activity. Dr. Rawdin correctly notes at least one district court has found test-taking is a major life activity. *Bartlett v. N.Y. State Bd. of Law Exam'rs,* 970 F.Supp. 1094, 1117 (S.D.N.Y.1997), *aff'd in part and vacated in part on other grounds,* 156 F.3d 321 (2d Cir.1998), *vacated on other grounds,* 527 U.S. 1031, 119 S.Ct. 2388, 144 L.Ed.2d 790 (1999); *see also Doe v. Samuel Merritt Univ.,* 921 F.Supp.2d 958, 967 (N.D.Cal.2013) (finding the plaintiff at a minimum raised serious questions as to whether test-taking is a major life activity under the ADA). In *Bartlett,* then-Judge Sotomayor found test-taking met the EEOC's definition of major life activities, even prior to the 2008 expansion of the law. *Bartlett,* 970 F.Supp. at 1117 ("[I]n the modern era, where test-taking begins in the first grade and standardized tests are a regular and often life-altering occurrence thereafter, both in school and at work, I find test-taking is within the ambit of 'major life activity.' ") ABP relies on a D.C. Circuit opinion which reached the opposite conclusion and found that "test-taking itself is not a major life activity." *Singh v. George Washington Univ. Sch. of Med. & Health Scis.,* 508 F.3d 1097, 1104 (D.C.Cir.2007). *Singh* was also decided prior to the ADAAA's enactment and relies heavily on the now-overruled strict interpretation of the term "major activities" in reaching its conclusion.[3]

---

[3] The D.C. Circuit relied on the Supreme Court's ruling in *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 197, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), which defined major life activities as "those activities that are of central importance to

daily life," including "such basic abilities as waking, seeing, and hearing," in determining test-taking was not a major life activity. The ADAAA expressly overrules the holding in *Toyota.* 122 Stat. 3553 § 2(b)(4) (rejecting "the standards enunciated by the Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams,* 534 U.S. 184 [122 S.Ct. 681, 151 L.Ed.2d 615] (2002), that the terms "substantially" and "major" in the definition of disability under the ADA "need to be interpreted strictly to create a demanding standard for qualifying as disabled" ").

Thus, even prior to the passage of the ADAAA, there was a split of authority as to whether test-taking is a major life activity. In the ensuing years the rationale of *Bartlett* has not lost any of its potency because testing has not become any less significant in modern life, as demonstrated by the fact that a test often serves as a bar to entry for certain professions. Moreover, in amending the ADA, Congress expressly rejected the notion that the term "major" should be "interpreted strictly to create a demanding standard for qualifying as disabled." 122 Stat. 3555 § 2(b)(4). The Court is persuaded by Judge Sotomayor's opinion regarding the significance of test-taking in modern society. Therefore, given the recent amendments by Congress overruling the strict interpretation of the "major activity" requirement and the significant and ever-increasing importance of test-taking in society, the Court is persuaded test-taking constitutes a major life activity.

Dr. Rawdin also asserts his impairment affects the major life activity of working. The parties do not dispute that working is *651 a major life activity. See 42 U.S.C. § 12102(2)(A) ("Major life activities include, but are not limited to[,] ... learning, reading, concentrating, thinking, communicating, and working."). Accordingly, for the purposes of the remaining analysis, the Court accepts that working constitutes a major life activity.

Having found Dr. Rawdin is impaired and that test-taking and working are major life activities, this Court must determine whether Dr. Rawdin's impairment substantially limits his ability to engage in these activities. Whether an individual's limitation is substantial is measured in comparison to "most people." 28 C.F.R. Pt. 35, App. B§ 35.104; 29 C.F.R. § 1630.2(j)(1)(ii) ("An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population."). The Court must compare Dr. Rawdin not with other test-takers or doctors taking a certification exam, but with members of the general population. *See Singh,* 508 F.3d at 1100–01 (finding the proper comparison is to "the general population, rather than to persons of elite ability or unusual experiences," such that, for example, "an injured ultramarathoner, who could once run 100 miles at a time, is not disabled by an impairment that forces him to quit after 26.2 miles, even though his limitation is substantial as compared to his unimpaired abilities or those of his erstwhile running partners"); *Wong v. Regents of Univ. of Cal.,* 410 F.3d 1052, 1054 (9th Cir.2005) (analyzing a medical student's claim of disability by looking at whether his impairment limited his ability to "learn as a whole for purposes of daily living, as compared to most people," and not whether the impairment hindered his ability to keep up with the medical school curriculum); *Bartlett v. N.Y. State Bd. of Law Exam'rs,* 226 F.3d 69, 81–82 (2d Cir.2000) (finding a determination of whether a student's impairment substantially limits her ability to read does not depend on whether she is limited compared to other college freshman). Significantly when Congress passed the ADAAA, it did not eliminate the requirement that an individual's substantial limitation be measured in comparison to the general population. 29 C.F.R. § 1630.2(j)(1)(ii).

Because the evidence does not show Dr. Rawdin's test-taking abilities are lower than those of the average person in the general population, the Court cannot find Rawdin is substantially limited in the major life activity of test-taking. The test results from Dr. Rawdin's October 2007 psychological evaluation show a relative impairment between his overall IQ and his results related specifically to his memory. Despite this relative impairment, however, his test scores are all either in the average or above average range. Both Dr. Rawdin's treating neuropsychologist, Dr. Slap–Shelton, and his expert witness, Dr. Moss, focus on his relative weaknesses as compared to his high IQ score overall, but, as discussed above, a relative impairment is not enough to qualify Dr. Rawdin as disabled because the Court must compare his test scores and test-taking ability against the general population and not against his own expected capabilities. 29 C.F.R. § 1630.2(j); *see also Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 629 (6th Cir.2000) (finding a medical student was not substantially limited in the major life activity of reading where the clinical tests demonstrated he "read as well as the average person"); *Rumbin v. Ass'n of Am. Med. Colls.*, 803 F.Supp.2d 83, 95 (D.Conn.2011) (determining the plaintiff was not substantially limited as compared to the general population because the record *652 lacked any evidence regarding whether his reading skills were unusual or the extent to which his skills departed from the norm). The objective measures of Dr. Rawdin's cognitive function placed him within normal ranges. In her report, Dr. Slap–Shelton concluded Dr. Rawdin's test results indicated weak verbal and visual memory, but she conceded his results fell within in the average range and stated these test results were weak only in comparison to his full scale IQ. *See Healy*, 870 F.Supp.2d at 620 ("By definition, 'average' is not 'substantially limited.' "). While the Court does not doubt Dr. Rawdin's struggles with the Exam, the law requires a substantial limitation in comparison to most people, and Dr. Rawdin's memory impairment cannot be said to substantially limit his test-taking ability compared to the general population. Accordingly, Dr. Rawdin has failed to prove he is substantially limited in the major life activity of test-taking.

The record further fails to support Dr. Rawdin's claim that his impairment substantially limits his test-taking ability because the evidence demonstrates ABP's Exam does not require the test-taker to recall information out of context—i.e., Dr. Rawdin's claimed difficulty—but provides context through cue/story-based questions. Although Dr. Moss stated Dr. Rawdin struggles with his ability to recall discrete, non-contextual pieces of information, he agreed Rawdin does better with story-based questions that provide cues. Dr. Golden provided unrefuted evidence that the Exam's questions provide a test-taker with "a clinical scenario which provides context, presents all the relevant information for formulating an answer, [and] tells a story." Golden Dep. at 49. Thus, the evidence demonstrates the Exam's questions do not require straight recall but rather are cue/story-based questions that provide context. *See Koller*, 850 F.Supp.2d at 513–14 (finding the nature of an impairment is relevant to the analysis of whether that impairment substantially limits a major life activity).

The evidence further demonstrates Dr. Rawdin's impairment does not substantially limit his ability to take a multiple choice exam of this nature. Dr. Moss conceded he does not know what form the Exam took and thus could not testify about how Dr. Rawdin's impairment affects his ability to answer the type of cue/story-based multiple choice questions in the Exam. Dr. Golden, who does have significant knowledge regarding the nature of the Exam, testified that Dr. Rawdin's impairment should not impact his ability to take the Exam because, the questions as structured, do not require the test-taker to recall discrete, unconnected information. Moreover, Dr. Rawdin's own testimony does not support his claim that his memory impairment, as described by his expert witness, impacts his ability to pass the Exam.

Describing his difficulty with the Exam, Dr. Rawdin stated "[w]hen I read the question, and I saw the answers, my mind could reason answers for each of the answers.... My brain needs live performance for [choosing the correct multiple choice answer],.... Those [elements of live performance] aren't present, so I only have my mind to rely on, and my mind is reasoning answers for those questions, which actually could be construed as being correct." Hr'g Tr. 51–52, July 29, 2013, ECF No. 38. This testimony, however, is not indicative of a struggle to recall discrete pieces of information in attempting to choose the correct Exam question; rather, Dr. Rawdin testified that without live performance and the necessary "cues" from a parent or patient, he could rationalize any of the provided answers as being correct. This does not indicate to the Court the type of problem resulting from *653 his described memory deficiency. Accordingly, the evidence does not support Dr. Rawdin's claim that a memory impairment substantially limits his ability to pass ABP's cue/story-based multiple choice exam.

The Court next considers whether Dr. Rawdin is substantially limited in the major life activity of working, the other basis for his claim of disability. Dr. Rawdin concedes the only real-world manifestation of his disability is his difficulty with multiple choice exams, particularly ABP's Exam. There is no dispute, and the record fully supports, that Dr. Rawdin is an excellent physician and his impairment does not impact his ability to clinically practice medicine. Insofar as Dr. Rawdin argues he is substantially limited in the major life activity of work, this limitation is confined to his inability to pass the Exam. It would make little sense for this Court to say Dr. Rawdin is substantially limited at working based on his inability to pass the Exam where the Court has found Dr. Rawdin is not substantially limited at the major life activity of test-taking, and particularly not substantially limited as to this specific test. *Cf. Bartlett v. N.Y. State Bd. of Law Exam'rs,* No. 93–4986, 2001 WL 930792, at *44–45 (S.D.N.Y. Aug. 15, 2001) (finding plaintiff was substantially limited at the major life activity of working where she was also substantially limited at test-taking, among other limitations, preventing her from passing the New York bar exam). Because Dr. Rawdin is not substantially limited in his ability to practice medicine, nor is he substantially limited in his ability to take ABP's Exam, the Court finds Dr. Rawdin is not substantially limited at the major life activity of working. Having found Dr. Rawdin does not have an impairment that substantially limits any major life activities, the Court must conclude Dr. Rawdin is not disabled within the meaning of the ADA, and he is not entitled to accommodations.

Even if Dr. Rawdin was disabled—which he is not—the Court also concludes he is not entitled to the accommodations he seeks. Disabled individuals are entitled to reasonable accommodations "that permit them to have access to and take a meaningful part in public services and public accommodations." *Powell v. Nat'l Bd. of Med. Exam'rs,* 364 F.3d 79, 85 (2d Cir.2004). Title III of the ADA provides that private entities offering examinations related to licensing, certification, or credentialing for professional purposes must offer such examinations "in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." 42 U.S.C. § 12189. An examination provider must ensure that "the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's [impairment]." 28 C.F.R. § 36.309(b)(1)(i); *Dep't of Fair Emp't & Hous. v. Law Sch. Admission Council, Inc.,* 896 F.Supp.2d 849, 869 (N.D.Cal.2012) (emphasizing the burden is on the test provider to best ensure the examination equally measures the abilities of disabled and nondisabled test-takers). However, the EEOC has explained "[t]his provision does not require that an employer offer every applicant his

or her choice of test format." 29 C.F.R. Pt. 1630, App. § 1630.11; *see also Bonnette v. D.C. Court of Appeals*, 796 F.Supp.2d 164, 183 (D.D.C.2011) (acknowledging the ADA does not require an entity to provide a requested accommodation merely because it is what the test-taker prefers); *Liberty Res., Inc. v. Phila. Hous. Auth.*, 528 F.Supp.2d 553, 567 (E.D.Pa.2007) ("[M]eaningful access does not require that the disabled receive a greater *654 benefit but, instead, that the handicapped are provided equal access to the benefit offered by the state as provided to non-handicapped individuals." (quoting *Safe Air for Everyone v. Idaho*, 469 F.Supp.2d 884, 889–90 (D.Idaho 2006))). Reasonable accommodation is mandated in order to place people with disabilities on an even playing field, but "it does not authorize a preference for disabled people generally [,] ... [and it] does not extend to the provision of adjustments or modifications that are for the personal benefit of the individual with a disability." *Falchenberg v. N.Y. State Dept. of Educ.*, 642 F.Supp.2d 156, 163 (S.D.N.Y.2008) (quoting *Hartnett v. Fielding Graduate Inst.*, 400 F.Supp.2d 570, 576 (S.D.N.Y.2005), *aff'd in part and rev'd in part*, 198 Fed.Appx. 89 (2d Cir.2006)).

A private entity is required to provide a requested modification to a disabled person if three requirements under Title III are met: (1) the requested accommodation is reasonable; (2) it is necessary; and (3) it does not fundamentally alter the nature of the services provided by the entity. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 683 n. 38, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001). Having discussed the necessity of Dr. Rawdin's requested modifications above, the Court will address only the second and third prongs of the test.

"Determining whether a specific accommodation is reasonable requires an individualized inquiry into the circumstances of the particular case." *Doe v. Haverford Sch.*, No. 03–3989, 2003 WL 22097782, at *6 (E.D.Pa. Aug. 5, 2003); *see also Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 795 (1st Cir.1992) (finding reasonableness is not a constant and what is reasonable in one situation may not be reasonable in a different situation, even if the situations differ only slightly).[4] In general, courts are reluctant to disturb the academic decisions of educational institutions. *Haverford Sch.*, 2003 WL 22097782, at *6 (citing *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 225, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985)). As discussed above, the burden is on the institution to demonstrate its exam best ensures it is testing ability and not the disability. Where the institution can show it has considered alternative means to an allegedly discriminatory test, including the feasibility, cost, and effect on the program of such alternative means, courts will generally grant the decisions of the institution deference if the institution "arrived at a rationally justifiable conclusion that the requested modification would result in a lowering of academic standards." *Id; see also Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1048 (9th Cir.1999) (granting deference "to the evaluation made by the institution itself, absent proof that its standards and its application of them serve no purpose other than to deny an education to handicapped persons"); *Bercovitch v. Baldwin Sch., Inc.*, 133 F.3d 141, 153 (1st Cir.1998) (finding decisions made by educational officials at a private school covered by Title III of the ADA should be given deference).

---

[4] Although the plaintiff in *Wynne* sued under the Rehabilitation Act, the Third Circuit applies the same standard to claims under the Rehabilitation Act and Title III of the ADA. *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir.2009).

---

ABP is not an educational institution, but it is an academic institution in that it awards a credential based on testing and evaluation of candidates, and just as educational institutions are granted deference regarding accommodations that would devalue an academic degree, so too should ABP

655 be granted deference regarding *655 accommodations that would devalue certification. *Cf. Wynne,* 976 F.2d at 795 (finding Tufts University's decision not to permit accommodations should be granted deference where the University "concluded that to do so would require substantial program alterations, result in lowering academic standards, and devalue Tufts' end product-highly trained physicians carrying the prized credential of a Tufts degree"). ABP provided Dr. Rawdin with the accommodations of extra time, a separate testing room, and off the clock breaks because it decided these accommodations would not upset the intended purpose of the Exam. Even prior to his request for accommodations, Dr. Rawdin was notified ABP would not certify a physician who has not taken and passed the Exam because it would "fundamentally alter the nature of the certification process." Ex. 9. ABP's Vice President of Psychometrics Research and Testing Services, Dr. Althouse, credibly testified why each of Dr. Rawdin's proposed alterations are not feasible, as they would alter the Exam such that it no longer tests knowledge to the extent the current Exam does. Additionally, Dr. Althouse went through a thorough analysis of the cost of developing the Exam and presented evidence of the prohibitive cost of granting Dr. Rawdin's request for an alternative format for the Exam. Accordingly, this Court finds that ABP, having considered Dr. Rawdin's proposed alternatives, reached a rationally justifiable conclusion that changing the format of the Exam or allowing Dr. Rawdin to take it open-book would alter and lower the standard for certification, thus, Dr. Rawdin's requested accommodations are not reasonable.

Even if this Court were to find Dr. Rawdin's requested accommodations are reasonable, ABP has credibly demonstrated these accommodations would result in a fundamental alteration of ABP's Exam. 42 U.S.C. § 12182(b)(2)(ii). An examination provider is exempt from the requirement to provide reasonable accommodations when it can demonstrate such accommodations "fundamentally alter the measurement of the skills or knowledge the examination is intended to test or would result in an undue burden." 28 C.F.R. § 36.309(b)(3); *see also Jacobsen v. Tillmann,* 17 F.Supp.2d 1018, 1026 (D.Minn.1998) (finding the plaintiff's request for waiver of the math portion of the Minnesota Teacher Qualification Test was an "unreasonable modification that would fundamentally alter the nature of Minnesota's certification of individuals ... to teach the children of the State"). Through Dr. Althouse's testimony, which this Court accepts in full, ABP has demonstrated the importance of the Exam to the certification process. Dr. Rawdin presented no evidence, and there is no evidence on the record, that an alternative format would not result in a fundamental alteration and would serve the intended goal of the Exam.

ABP's primary purpose is to ensure that a physician who has achieved board certification in pediatrics has met all of the demanding requirements, including possessing a high level of knowledge, such that certification assures the public of a certain level of competency. In order to maintain the meaning of certification, the qualification standards have to be reliable. ABP presented evidence as to why a multiple choice exam is the best way to ensure a reliable and objective outcome. Furthermore, Dr. Althouse explained that a multiple choice exam allows ABP to test a large amount of knowledge in a short period of time in a way that a differently formatted exam would not. Finally, Dr. Althouse testified that the closed-book nature of the Exam tests a
656 person's knowledge, while an *656 open-book exam would test a different skill, i.e., a test-taker's ability to look up information. *Cf. Falchenberg,* 642 F.Supp.2d at 165 ("Where a program is designed to achieve definite pedagogical objectives, this Court will not substitute its judgment for that of experienced education administrators and professionals in assessing

whether the program does in fact meet its pedagogical objectives [through the established objective and grading criteria]." ) (citation omitted); *see also Haverford Sch.,* 2003 WL 22097782, at *6 ("Educational institutions are in the best position to know what modifications would fundamentally alter their services. Courts generally will not substitute their judgment for that of an educational institution regarding what modifications fundamentally alter these policies.").

Additionally, ABP presented evidence as to how the clinical evaluation Dr. Rawdin seeks as an alternative to the Exam does not comply with the intended goal of the Exam. One of the requirements for certification is completion of three years in a pediatric training program with the approval of the program director. Thus, by the time a person sits for the Exam, the test-taker has already met the required clinical standards. The Exam is an additional test of the test-taker's fund of pediatric knowledge. For this same reason, the Exam requirement cannot be waived outright. *See Jacobsen,* 17 F.Supp.2d at 1025 (finding plaintiff's request to be relieved from taking the math portion of the teaching certification exam was not reasonable because it was actually a request to be "relieved of the need to demonstrate an essential and inherent element of competence in the field for which she seeks to practice").

ABP has also credibly demonstrated a change in format would be an undue burden based on the cost of developing a new Exam in an entirely different format or even just developing new questions. Under the ADA, an accommodation results in an undue burden when it requires significant difficulties or expense when considered in light of a number of factors, including the type of service or product being offered. *Powell,* 364 F.3d at 88. In addition to explaining that a new format would not test the same broad scope of information as tested by a multiple choice exam, ABP also explained it would not be feasible to change the Exam because of the prohibitive expense of doing so. Dr. Althouse testified about the involved process of developing the Exam and how each question takes at least two years of development before it makes it onto an Exam at a cost of $3,500 per question. Moreover, ABP does not have the infrastructure or process in place to provide Dr. Rawdin with a differently formatted Exam that maintains the reliability and objectiveness required by ABP for board certification. Because developing a new format would require creating not only new questions but an entirely new process for developing those questions in order to ensure the reliability ABP seeks, Dr. Rawdin's requested accommodations would result in an undue burden.

Allowing Dr. Rawdin to take the Exam open-book would also result in a fundamental alteration and undue burden because the questions as currently designed are meant to be answered without access to reference material. While an open-book exam would not necessarily require ABP to develop a new process, ABP would still have to undertake the two-year development process for questions specifically intended to be answered with access to reference material to ensure such questions are reliable and test knowledge, not merely the ability 657 to look up information.*657

Dr. Rawdin points to the fact that other certification boards use oral components, and that ABP itself used an oral component as part of its certifying exam in the past, as evidence that a different format would not be overly burdensome and would still allow him to demonstrate his knowledge. Whether or not other certification boards have a different format is not relevant to this analysis. In this situation, after considering Dr. Rawdin's application for accommodation, ABP felt that no further accommodation could be made without fundamentally altering the exam or imposing an undue hardship. *See Wynne,* 976 F.2d at 795 (finding a medical school's decision not to grant further accommodations in the form of an oral examination in place of a multiple choice examination is not unreasonable where the school

Rawdin v. Am. Bd. of Pediatrics    985 F. Supp. 2d 636 (E.D. Pa. 2013)

made a professional, academic decision that such an accommodation cannot be made without imposing an undue hardship on the academic program); *Haverford Sch.,* 2003 WL 22097782, at *6 (finding that courts will generally give deference to educational institutions regarding what constitutes a fundamental alteration, where the institution considers the feasibility and cost of alternatives). Moreover, ABP did provide Dr. Rawdin the accommodations of double time, a separate testing space, and off the clock breaks. In light of the accommodations provided, this Court cannot conclude ABP failed to make reasonable accommodations because it did not offer Dr. Rawdin the chance to take the Exam open-book or in a different format. *See Wynne,* 976 F.2d at 795 (concluding where the school provided a series of remedial measures it did not fail to make a reasonable accommodation by declining to also offer an oral version of a multiple choice examination).

## CONCLUSION

For the reasons set forth above, the Court concludes that although Dr. Rawdin has a memory impairment, this impairment does not substantially limit a major life activity, and he is therefore not disabled within the meaning of the ADA. The Court also concludes that even if Dr. Rawdin were disabled, the accommodations he seeks are not reasonable and would result in a fundamental alteration and undue burden to ABP. Accordingly, while the Court expresses its admiration for what Dr. Rawdin has accomplished, it is bound by the limits of the law and finds that his failure to accommodate claim fails and he is not entitled to injunctive relief.

For the foregoing reasons, judgment will be entered in favor of ABP and against Dr. Rawdin. An appropriate Judgment follows.

