UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

JASON A. ZANGARA )
)
    Plaintiff )    Civil No. 3:22-cv-01559-GC-LHG
)
v. )
)
) **CERTIFICATION IN SUPPORT OF**
) **LEAVE TO AMMEND**
National Board of Medical Examiners (NBME) ) **COMPLAINT**
)
    Defendants

I, Jason A. Zangara, Plaintiff Pro Se in the above captioned matter sworn and state the following:

1. I am the Plaintiff in the above captioned matter

2. I had originally filed a complaint against the Defendants in March of this year

3. For reasons beyond my control, my application and complaint was not processed until June and not served until after that date

4. I had taken another exam after the complaint was already filed

5. I was discriminated against Defendants again as I accused them in the original complaint

6. Even with the updated "reporting of a score change" I believe my exam was scored illegally again in violation of the Americans with Disabilities Act and is implementing regulations

7. I wish to add this violation to this complaint as a separate count

8. There is currently a Motion to Dismiss the fist complaint before this court and the Defendants have stated that there are deficiencies in the complaint

9. I make no answer as to if I feel they are correct or incorrect in their interpretation of the complaint until the court rules on the motion

10. I believe the second count, which is a separate incident would best bee added to the original complaint as an amendment

11. The second count has addressed the concerns raised by the Defendants and I believe adding it is justified

12. The court my chose to view this amendment as a single court since it consisted of a new violation but, involving the same circumstances as the first

13. I submit this information to the court asking to add the attached documents to this certification to the original complaint and treat it as a whole

14. In support of my motion to Amend while a Motion to Dismiss is pending I ask the court to rely on <u>Merritt v. Fogel</u>, 349 F. App'x 742 (3d Cir. 2009) which I have attached to this certification

I further certify that the above statements are true, the attached documents are true and accurate copies and I am aware that if they are willingly false, I am aware that I am subject to punishment.

_____
Jason A. Zangara, Pro Se
573 Sidorske Avenue
Manville, N.J. 08835
(908) 672-0626
Attorney for Plaintiff

No. 08-3622
United States Court of Appeals, Third Circuit

# Merritt v. Fogel

349 F. App'x 742 (3d Cir. 2009)
Decided Oct 22, 2009

No. 08-3622.

Submitted Pursuant to Third Circuit LAR 34.1(a) June 22, 2009.

743 Opinion Filed: October 22, 2009. *743

On Appeal From the United States District Court For the Western District of Pennsylvania (D.C. Civ. No. 07-cv-01681), District Judge: Honorable David S. Cercone.

Monroe Merritt Smithfield SCI, Huntingdon, PA, pro se.

John G. Knorr, III, Esq., Kemal A. Mericli, Esq., Office of Attorney General of Pennsylvania Department of Justice, Kathryn M. Kenyon, Esq., Pietragallo, Gordon, Alfano, Bosick Raspanti, Harrisburg, PA, for Alan B. Fogel.

Before: McKEE, HARDIMAN and COWEN, Circuit Judges.

## OPINION

PER CURIAM.

Monroe Merritt appeals *pro se* from the District Court's order dismissing his complaint and denying his motions for leave to amend. For the following reasons, we will vacate the District Court's judgment and remand for further proceedings.

## I.

Merritt is a Pennsylvania state prisoner serving a sentence of life imprisonment. In 2007, he filed suit *pro se* against various medical professionals and Department of Corrections employees under 42 U.S.C. § 1983, asserting an Eighth Amendment claim that they have been deliberately indifferent to his medical needs. He also asserted a claim for medical malpractice under state law. We take the following factual allegations as true for purposes of this appeal. *See Ashcroft v. Iqbal,* ___ U.S. ___, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

Merritt has the Hepatitis C virus ("HCV") and has tried repeatedly for many years to obtain treatment but has been refused. Merritt alleges that he began seeking a combined drug treatment for HCV with Interferon and Ribavirin in 1998. In 2000, a physician's assistant initially told him that he had to complete drug and alcohol therapy before receiving the treatment. Merritt completed the therapy in 2001 and again requested treatment. Defendants Fairman and Howard-Diggs (both physician's assistants), however, told him that his white blood cell count was too low to receive 744 treatment. Merritt *744 alleges he was ultimately approved for the treatment in 2003 (by a psychiatrist), but does not allege why the treatment was never begun.

In 2005, Merritt's liver condition began to deteriorate, which he attributes to medication he was prescribed after a tooth extraction. Merritt again began seeking treatment. In 2007, defendant Falor (a physician) told Merritt that his liver function test numbers were "all out of wack," but denied treatment and told Merritt to "pray."

Merritt was referred to defendant Jin (another physician), but he too denied treatment. Merritt alleges that Jin refused to consider the effect of the medication he had been taking on his liver. He also alleges that, while he was reviewing his medical records, he overhead a physician's assistant tell a technician that he had "shredded all of plaintiffs sick call requests."

Shortly thereafter, he again requested treatment, but defendant Howard-Diggs told him that he had not qualified for treatment under the Department of Corrections HCV treatment protocol for the past two and one-half years because he had turned 50 years of age. He alleges that he finally obtained a copy of that protocol and learned that his white blood cell count had in fact been within the protocol range for treatment in 2001 and that the protocol contemplates treatment until the age of 60, not 50 as Howard-Diggs had told him. After filing multiple grievances, he filed the instant suit, seeking both an injunction requiring defendants to provide him with HCV treatment and monetary damages. He filed along with his complaint a motion for the appointment of counsel, which a Magistrate Judge denied. Merritt timely appealed that ruling to the District Court, but the District Court never ruled on his appeal.

The defendants filed motions to dismiss Merritt's complaint under Rule 12(b)(6). Merritt thereafter filed a motion for leave to amend his complaint, a second motion for leave to amend his complaint, and several "addenda" in support of his motions to amend. By these filings, he sought to include the following additional allegations. In 2004, medical staff denied him treatment on the grounds that his "ALT and AST values" were normal and told him that he could not receive treatment until those values were at least three times normal, though normal ALT and AST values are not exclusionary criteria for treatment under the protocol. Then, in 2005, he received a liver biopsy, which revealed that his ALT and AST values were over six and one-half and five and one-half times normal, respectively, but that he was still refused treatment.

Merritt further alleges that, in 2007, defendant Falor, the physician defendant who had told him to "pray" after denying him treatment, also told him "that whenever the SCI Greene medical staff met for their staff meetings, and the question of what they are going to do about inmates with Hepatitis C comes up, SCI Greene medical staff members just shrug their shoulders, indicating nothing." He also alleges that, during that same year, defendant Jin reviewed his most recent liver test and told him that "it looks bad" but that "I will not be treated." Finally, he alleges that he obtained from defendants in discovery a 1996 letter from a Dr. Frederick Ruthardt, whom he characterizes as "defendants' own specialist," stating that Merritt "would be an excellent candidate for therapy with alpha interferon" and "would benefit from the treatment." Merritt alleges that defendants' refusal to provide treatment has caused his liver condition to deteriorate and may lead to his death.

The Magistrate Judge issued a Report and Recommendation recommending that *745 the District Court dismiss Merritt's Eighth Amendment claim for failure to state a claim and his malpractice claim for failure to comply with Pennsylvania's certificate of merit requirement. He also recommended denying Merritt's motions to amend on the grounds that amendment would be futile. The District Court followed that recommendation by order entered August 1, 2008, 2008 WL 2967528. Merritt appeals.

## II.

We have jurisdiction pursuant to 28 U.S.C. § 1291. On appeal, Merritt challenges the dismissal of his complaint and the denial of his motions for leave to amend. We review the first of those rulings *de novo, see Phillips v. County of Allegheny,* 515 F.3d 224, 230 (3d Cir. 2008), and

the second for abuse of discretion, *see Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 193 (3d Cir. 2001).[1]

[1] Merritt also challenges the District Court's (1) denial of his motion for counsel, (2) denial of a motion for discovery he sought to respond to defendants' motions to dismiss, and (3) application of Pennsylvania's certificate of merit requirement. In light of our disposition and the posture of this case, we do not reach these issues, though we briefly discuss the issue of counsel below.

We begin by addressing a procedural wrinkle identified by neither the parties nor the District Court. After Merritt filed his initial complaint and defendants filed their motions to dismiss, Merritt filed his first motion "for leave" to file an amended complaint. Merritt, however, was entitled to file that amended complaint as of right. Defendants' motions to dismiss were not "pleadings," *see* Fed.R.Civ.P. 7(a), so Merritt remained entitled to amend his complaint once as a matter of course, *see* Fed.R.Civ.P. 15(a)(1). Thus, the District Court should have construed Merritt's initial motion, to which his amended complaint was attached, as the filing of that amended complaint. That filing would have rendered moot defendants' motions to dismiss. *See Pure Country, Inc. v. Sigma Chi Fraternity*, 312 F.3d 952, 956 (8th Cir. 2002). Technically speaking, then, there were no motions to dismiss properly pending when the District Court dismissed Merritt's complaint.

In any event, we believe that the District Court's dismissal of Merritt's complaint and denial of leave to amend were erroneous on the merits, and we address those issues in tandem under the posture presented here. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Iqbal*, 129 S.Ct. at 1949 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Complaints filed *pro se*, like Merritt's, must be liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 93-96, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007). Before dismissing a complaint, "a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips*, 515 F.3d at 245.

In this case, Merritt's Eighth Amendment claim required him to allege that the defendants (1) were deliberately indifferent to (2) his serious medical needs. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004). There is no dispute that HCV constitutes a serious medical need. Instead, the District Court dismissed this claim and denied leave to amend on the grounds that Merritt had not adequately *746 alleged that defendants were deliberately indifferent to that need. "We have found 'deliberate indifference' in a variety of circumstances, including where a prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). Deliberate indifference, however, requires more than mere malpractice or disagreement with a particular course of treatment. *See Spruill*, 372 F.3d at 235.

The Magistrate Judge thought Merritt's claim deficient as a matter of law because his own allegations show that defendants have repeatedly monitored and tested him and have determined that he does not qualify for HCV treatment. In reaching that conclusion, the Magistrate Judge relied primarily on responses by certain defendants and others to Merritt's grievances that he attached to his initial complaint. As the Magistrate Judge noted, those responses indicate that Merritt has been tested and that certain

defendants and others have concluded that he is not a candidate for combined drug treatment for various reasons.² Thus, the Magistrate Judge reasoned that Merritt's allegations show that he merely disagrees with defendants' medical judgment and insists on the treatment of his choice.

> ² The responses state that Merritt is not a candidate for treatment because he is "asymptomatic," his biopsy showed "grade 1 inflamation and no fibrosis," and because his lab tests have shown improvement in his liver condition. Merritt, however, alleges that his liver condition continues to deteriorate. The Magistrate Judge properly did not purport to resolve that factual issue at the pleading stage.

If that were all that Merritt alleged, then the Magistrate Judge would be right. Merritt, however, makes many other specific factual allegations that the Magistrate Judge did not discuss and that, taken as true as they must be at this stage, raise an inference of deliberate indifference. For example, Merritt alleges that one of defendants' own specialists recommended him for treatment as long ago as 1996 but that defendants fraudulently concealed that information from him until he finally filed suit. He also alleges that he is within the protocol for treatment, though various defendants have falsely told him otherwise. Thus, as Merritt argues, he claims to seek, not merely the treatment of his own choice, but treatment that has been recommended by a specialist and that is called for by the Department of Corrections protocol.

Moreover, his allegations permit the inference that defendants may have nonmedical reasons for refusing to provide this treatment. For example, he alleges that defendant Falor told him both that medical staff merely "shrug their shoulders, indicating nothing" when the subject of HCV treatment arises at staff meetings and that Merritt would not receive treatment though his liver numbers were "all out of wack" and that he should instead "pray." He also alleges that he overheard a physician's assistant admit to having shredded his sick call requests. Finally, he alleges that has been denied treatment for at least five different reasons over the years, most of which he alleges were fabricated.

Taken together, and in light of Merritt's *pro se* status, we believe that these specific factual allegations permit the inference that at least some defendants have acted with deliberate indifference to Merritt's medical needs. Thus, for pleading purposes, Merritt's factual allegations have "'nudged his claim . . . across the line from 747 conceivable to plausible.'" *Iqbal,* *747 129 S.Ct. at 1951 (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955). For that reason, the District Court should not have dismissed Merritt's complaint without leave to amend and should not have denied his motions for leave to amend as futile. Accordingly, we will vacate the dismissal of Merritt's complaint and remand with an instruction to allow him to file an amended complaint.³

> ³ Defendants moved to dismiss Merritt's complaint on other grounds, including the statute of limitations and failure to exhaust his claims against one defendant. The District Court did not address those arguments, and we will not do so in the first instance on the record presented here.

Merritt also challenges the Magistrate Judge's order denying his motion for the appointment of counsel. Merritt timely appealed that order to the District Court, but the District Court never addressed it. Because the Federal Magistrate Judges Act contemplates a first level of review in the District Court, *see* 28 U.S.C. § 636(b)(1)(A), we will not reach that issue in the first instance. Instead, Merritt's appeal to the District Court will remain pending on remand. Although we do not address the merits of the Magistrate Judge's ruling, we observe that the potential merit and medical complexity of Merritt's claims may warrant the appointment of counsel in the 'District Court. *See Montgomery v. Pinchak,* 294 F.3d 492, 501-06 (3d

Merritt v. Fogel    349 F. App'x 742 (3d Cir. 2009)

Cir. 2002) (holding that District Court abused its discretion in refusing to appoint counsel for prisoner asserting potentially-meritorious claim of deliberate indifference to medical needs); *Parham v. Johnson*, 126 F.3d 454, 458-461 (3d Cir. 1997) (same).[4]

[4] As the Department of Corrections defendants note in their brief, we previously denied Merritt's motion for the appointment of counsel in this Court. Although it should go without saying, many of the considerations relevant to the appointment of counsel in a trial court are not relevant to the appointment of counsel in an appellate court. *See Montgomery*, 294 F.3d at 498-99.



5

## Second Count

1. Plaintiff references and incorporates all allegations, information, and exhibits from the first part of this complaint, the "Pro Se" form which shall be considered part of this for pleading purposes and be known as "First Count" of "Plaintiffs Complaint whereas this shall be known as the "Second Count"

2. I am currently Medical Student at Caribbean Medical University in which I attended basic science courses on the island of Curacao and have had clinical training at various hospitals here in the United States

3. I have been diagnosed with both Attention Deficit Hyperactivity Disorder and Learning Disabilities since second grade and have seen doctors for 30 years for treatment which has included but not limited to multiple types of medications

4. I am substantially limited in multiple life activities including but not limited to reading, writing, comprehension and mathematics

5. Despite mitigation measures I am unable to concentrate for academic purposes anywhere but a silent rooms the slightest distraction significantly interferes with any activity that I am working on

6. I have a problem with memory that has been investigated for years that the case was never found.

7. This memory problem effects my abilities to recall isolated facts and remember the steps of complicated subjects such as physiology and physics along with calculus

8. I sometimes need to be told things multiple times or reminded to do things

9. There are times that the symptoms of the ADHD such as impulsivity effect me while I am working and I have had trouble at employers over issues sometimes with other employees
10. I was placed out of district for High school and classified under section 504 of the Rehabilitation Act and the Americans with Disabilities Act
11. I attended a specialized high school that was specifically for those with learning disabilities.
12. I had an Individualized Education Plan (IEP) that dictated my education until I graduated
13. I was told that I would never become a Doctor all through High school because of my disabilities
14. I was able to graduate High School but I have learned from the IEP that I was exempt from some of the requirements
15. I applied for and attempted to pursue a pre medical program at Middlesex County College in with I was placed on academic restriction for failing courses
16. I then applied for the Licensed Practical Nurse Program at the Somerset County Vocational and Technical School in which I failed Anatomy & Physiology by 1.5 points and was removed from the program.
17. I attempted to apply to the nursing program at Raritan Valley Community College in which I passed Anatomy & Physiology at the first attempt with a "D" and passed with a "C" in the second attempt
18. I then attempted to take the second course in the sequence which was Anatomy 2 and received a "D"

19. I was then barred from applying to the nursing program since I had two letter grades of "D"

20. At this time I official gave up on attempting to finish college or become a doctor.

21. I was a firefighter during this time and I used these skills to build my knowledge base of the field.

22. I was able to complete my Associates of Applied Science online after 10 years as I was able to isolate myself to self accommodate and rely on my experience

23. I was online one day and saw the advertisement for my Medical School and applied for the Pre medical program

24. The classes had 6-8 students just like high school and I was able to study alone

25. I still barley made it through these scoring the absolute minimal on most of my exams

26. As the medical school is not in the US and the professors are not from here, they are more forgiving and do not discredit grades such as "d"s like the US does

27. I was able to meet the minimum requirements to proceed into the medical program and start working on my Doctor of Medicine

28. While in the program I still have the same academic troubles as I did when I was younger and in pre med

29. I was still however able to eventually meet the minimal requirements of the clinical years even though I had to retake courses and final exams multiple times

30. I attempted to study for the Comprehensive Basic Science Examination (CBSE) which was required to be passed before the United States Medical Licensing Examination (USLME)

31. This took years and it was suggested that I see if Clinical Rotations would help me learn some of the material on the exams
32. During this time I was able to obtain another degrees online, as I was at home in a quiet place and used my experience in Emergency Services to serve as the primary study source for all the courses and assignments
33. I started rotations and with the expiration of my first, Infectious Disease, in which I received a "B", I have received "A"s in all of my rotations to date
34. I was told at some point that if I received an "A" in the rotation, I did not need to take the "Shelf" or "Subject Examination" for that rotation
35. These examinations were all administered by the National Board of Medical Examiners
36. At the current time, I would only be responsible to pass the Comprehensive Basic Science Examination, the Comprehensive Clinical Science Examination (CCSE), United States Medical Licensing Examination (USMLE) Step 1 & 2 to graduate, all of which are administered by the National Board of Medical Examiners (NBME)
37. I originally wanted to try and complete all the rotations and then try and dedicate studying time to all of the examinations
38. I was informed that the accreditation requirements for all schools in the United States and those who wanted to practice in the United States would change as of 2023
39. As a result of that, I was told that I had to stop rotations and pass the CBSE, USMLE Step 1
40. I was also told that I had to go back and take all the shelf examinations that i had not taken because of my grades as they were now a requirement

41. I started studying for the CBSE again in the spring of 2021 and still received the same grade I was receiving before I even started clinical
42. I attempted to take the Shelf exams for Pediatrics and Psych and failed those also
43. I studied and studied and studied but did not pass
44. I then started researching how the examinations were set up and scored to understand how close that I was to passing
45. I found out these examinations used by the test provider, NBME were scored using complex methods that essentially were comparing my score to the scores of others or the average person
46. The examinations were based on "norms" and "percentiles" and "equated percentiles which all are set up to discriminate against those with disabilities
47. These examinations were deliberately excluding me from passing me due to the score not comparing me to those that took the examinations prior
48. Two of the methods that I am aware of in use by utilized in include the Angoff and Hofstee methods of scoring
49. These methods and all methods used by NBME were and are discriminating against those with disabilities
50. In order to establish a disability testing such , but not limited to as Nerophysiological testing must show that the patient does not compare to the general population or most people by the results of these tests
51. All of the testing completed has shown that I suffer from ADHD, Learning Disabilities, I do not compare to the general population

52. Therefore the exams administered by NBME will not allow me to pass because I cannot score the same as others do on the examinations
53. The examinations administered by NBME discriminate though their scouring and the do not grade the candidate on their own merit
54. NBME does not have a minimum standard for passing any of these exams on a test takers own merit
55. NBME intentionally fails percentages of test takers by using testing methodologies such as including but not limited to the Hofstee and Angoff Methods
56. NBME intentionally, knowingly and willing discriminates against individuals in violation of including, but not limited the Americans with Disabilities Act by not having their exams created meeting the stand of minimal competence but average competence
57. On February 1, 2022 I took the CBSE at the Prometric testing center in Hamilton New Jersey after paying the fee of $200 which was scheduled through my school **(See Exhibit D1)**
58. On or about March 27, 2022, I had taken a CBSE at home after I paid the fee of $60 to NBME without my school being involved **(See Exhibit E1)**
59. Both examinations were supposed to be graded differently in relation to the recent scoring changes on USMLE Step 1 and they were not and NBME issued failing scores
60. I have taken multiple examinations over the past few years from NBME that were graded as failing.
61. I was awaiting the new scoring system of "PASS/FAIL" that was implemented at the end of January for USMLE step 1

62. The scoring system used on all NBME Examinations including the CBSE and USMLE regardless of any information contained on examination reports is a lie and all the examinations are now scored the same way, illegally and discriminatory against me by NBME as these "explanations " are pretextual for discrimination

63. I took the examination on March 27, 2022 which was supposed to be scored using the new scoring system

64. This new scoring system is discriminatory as it implements the Angoff and Hofstee methods of scoring involving "equated percentages"

65. I base this second count on the examination taken on March 27, 2022 and all future examinations taken from this day forward both online, at the testing center or any other location under any other circumstances

66. My school requires me to pass the examinations offered by NBME at the score that NBME sets, not my school as they need to obtain the "normalization" table which are not public knowledge directly from NBME **(See Exhibit B1)**

67. These "Normalization tables" are the same able used by NBME when grading an online examination such as the examination from March 27, 2022

68. Any terminology or explanations put forward by NBME or their Representatives such as test administrators, test creators, test makers, executives or council for scoring or publicly available information such as score reports or other information contained in them regarding the explanation of test results is a pretext for discrimination as all of the testing materials used to calculate score is not public knowledge and school are prohibited for sharing this information with anyone **(See Exhibit B1)**

69. If I take any examinations administered by NBME without involving my school, NBME will not allow me access to the "normalization tables uses to score the examinations See **(Exhibit B1)**

70. NBME has not made public and refuses to make public test scoring information including but not limited to information such as "Normalization tables" which directly score "Equated Percentiles " of test takers with those of the general public **(See Exhibit B1)**

71. NBME sets the passing scores for all examinations and the school must obtain those results from NBME **(See Exhibit B1)**

72. NBME bases the passing score of the CBSE on a group of test takers that have taken USMLE Step 1 at a previous date, not on "the percentage of content you have mastered" or "equated percentage correct"

73. NBME bases the passing cores for all of their examinations on the Hofstee and Angoff methods **(See Exhibit C1)**

74. The scoring for "the percentage of content you have mastered" is based not on a" percent correct" or the "percentage of content you have mastered" or "Equated percentage correct" but on the Hofstee and Angoff scoring methodology

75. All test results involve "Equated Percentiles" are discriminatory in that they are decided by test creators and/ or makers and or judges using methods such as Angoff and Hofstee methods with internally fail a pre determined amount of test takers with the lowest scores

76. Angoff and Hofstee methods are used by NBME **(See Exhibit C1)** and as stated in the publication "Three controversies over item disclosure in medical licensure examinations" Park, Y. S., & Yang, E. B. (2015). Three controversies over item disclosure in medical licensure examinations. Medical education online, 20(1), 28821.

**"the United State Medical Licensure Examination (USMLE), administered by the National Board of Medical Examiners (NBME), has turned to the Angoff and Hofstee methods in determining cut score.** The former approach involves a group of subject matter experts setting minimal qualifying requirements (in terms of test score) for a successful candidate, who will later be certified as a medical doctor. The Board's opinion serves as a foundation for the evaluation of each test item and a reference for determining cut score. The latter method asks judges to determine minimum/maximum acceptable scores, along with minimum/maximum fail rates, which serve as the key parameters in determining the final cut score

77. NBME created their examinations using the Angoff method to discriminate against individuals in violation of multiple federal and state laws along with other rules and regulations as only account for the abilities of average people not minimally competent as stated in Standard setting: comparison of two methods. BMC medical education George, S., Haque, M. S., & Oyebode, F. (2006). Standard setting: comparison of two methods. *BMC medical education*, 6(1), 1-6.

" In the Angoff method a panel of judges examines each multiple-choice item or item on a checklist (for OSCEs) and estimates the probability that the "minimally competent" or "borderline" candidate would answer the item correctly. Then the scores are discussed in the group and consensus is reached if possible. This stage is avoided in the modified approach. Each judge's estimate scores on all items are added up and averaged and the test standard is the average of these means for all the judges. Each standard- setting method has its advantages and disadvantages, and there is no gold standard. The norm reference methods are easy to use and understand, can easily be explained to trainees and variations in test difficulty are automatically corrected for as the pass mark is influenced by the performance of the examinee cohort. The drawbacks of these methods are that some examinees will always fail irrespective of their performance, students can deliberately influence the pass score and that the pass score is not known in advance"

78. NBME grades their exams using the Hofstee method **(See Exhibit C1)** which fails a pre determined number of test takers as stated in  Burr, S. A., Whittle, J., Fairclough, L. C., Coombes, L., & Todd, I. (2016). Modifying Hofstee standard setting for assessments that vary in difficulty, and to determine boundaries for different levels of achievement. BMC Medical Education, 16(1), 1-11. **"The essence of the classical Hofstee method is that**

**judges decide on the minimum and maximum failure rate** and acceptable pass mark"

also see **(See Exhibit C1)**

79. NBME grades their exams in violation of the ADA utilizing the Hofstee method **(See Exhibit C1 and Exhibit A1)** which grades on a score curve as explained in Bowers, J. J., & Shindoll, R. R. (1989). *A Comparison of the Angoff, Beuk, and Hofstee Methods for Setting A passing Score.* Iowa City, IA: American College Testing Program. "The Hofstee method will fail to produce a passing score if the judges' estimates fall entirely above or below the **score curve.** If the judges' estimate of the **highest acceptable failure** rate is lower than the actual percent of the examinee group who would fail at the score representing judges' estimate of the lowest acceptable passing score, the line that is supposed to intersect the score curve will instead lie entirely under it. Likewise, if the judges' estimate of the **lowest acceptable failure rate** is higher than the actual percent of the examinee group who would fail at the score representing the judges' estimate of the highest acceptable passing score, the line that is supposed to intersect the **score curve** will instead lie entirely above it

80. NBME is the only agency allowed to administer examinations in New Jersey via Prometric for Medical licensing

81. The Examinations administered by NBME are required by the New Jersey Department of Health and under New Jersey Law to obtain a license to practice in New Jersey

82. Exams administered by NBME including CBSE, CCSE, USMLE Steps and Shelf examinations are administered in the states medical schools and at multiple Prometric testing locations in New Jersey

83. Every person who wishes to obtain medical licensure in New Jersey must pay the cost of the examinations to NBME

84. NBME deliberately, knowingly and recklessly scored my examination in violation of the Americans with Disabilities Act by not grading my exams on their own merit and is liable for their actions under the act and its implementing regulations including but not limited to 28 C.F.R. §36.309 Which States:

> (b) Examinations.
> (1) Any private entity offering an examination covered by this section must assure that -
> (i) The examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure);

85. NBME is required to score my examinations which include CBSE, CCSE, all Shelf or Subject Examinations and all USMLE Step Exams in a manner that the results do not reflect my disability but my competence

86. NBME's current scoring for all of their examinations does not comply with the Americans with Disabilities Act or the regulations that are used to implement it

87. I have suffered a delay in my medical education do the scoring of NBMEs examinations

88. My medical career is in jeopardy solely due to the conduct of NBME administering examinations that are discriminatory

## Statement

89. Any exhibits or allegations contained in this complaint herin shall be made to be imputed upon all examinations collectively and separately by NBME meaning - just because there

is no attached document that states " The Hofstee or Angoff method was used in the creation of the CBSE", or "this is not curved" I am still accusing NBME all such allegations in all of the previous statements of this complaint, on all examinations until proven by a preponderance of evidence during discovery. Any attempted statement by any attorney representing NBME or presentation of fraudulent public documents is not subjected to cross examination on the record . All methods used on all examinations are imputed on each other. They are all scored the same way regardless of any statements made by or attempted to be made by said individuals and all allegations stand until proven by testimony on the record from representatives of NBME

## Relief Demand

90. I hereby demand that NBME grade any exams I take created by them for any purpose be graded on their own merit to the minimum standard required to safely practice medicine not using any such methods that are discriminatory including but not limited to any type of variation of the Hofstee or Angoff methods or any others that are not created to evaluate a single exam taker independent of any group, norm, curve, score, percentile or any other criteria and will request this court issue such injunctive relief as it seems fit to prevent NBME from engaging in such acts.
91. I make no claim for any relief of monetary value at this time but reserve my right to amend this complaint if the circumstances present
92. I reserve the right to amend this complaint at any time

_____
Jason Zangara
Plaintiff