UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

JASON A. ZANGARA )
)
    Plaintiff )        Civil No. 3:22-cv-01559-GC-LHG
)
v. )
)
)
National Board of Medical Examiners (NBME) )
)
    Defendants

---

## PLAINTIFFS BRIEF IN SUPPORT OF APPLICATION
## FOR PRELIMINARY INJUNCTION

---

JASON A. ZANGARA PRO SE
573 SIDORSKE AVENUE
MANVILLE, NJ 08835
(908)672-0626
ATTORNEY FOR PLAINTIFF

## **Table of Contents**

**Page**

Table of Authorities............................................................................................................iii

Statement.............................................................................................................................1

Procedural History..............................................................................................................2

Introduction.........................................................................................................................3

Statement of Facts...............................................................................................................5

Argument.............................................................................................................................9

    **I. Success on the Merits**..........................................................................................10

        A. Jurisdiction.........................................................................................10

        B. Plaintiffs Protected Status................................................................12

        C. Significant Impairment.....................................................................13

        D. Liability............................................................................................14

        E. The Regulation & The ADA.............................................................16

        F. Not Being a "Place of Public Accommodation" Does Not Matter...................19

        G. Defendants Use the Same Standard to "Decide" Who is Disabled
          and Who is Not ..................................................................................20

        H. The Defendants & Their "Experts" Concede....................................28

        I. Deference to Plaintiffs Own Physicians.............................................31

        J. The Examinations Offered by Defendants..........................................32

        K. The "Passing Scores" Set By Defendants are
          Unreasonably High and Prejudice Anyone Disabled........................35

**II. The Extent of Harm to Plaintiff**................................................................................36

**III. Harm to Defendants**................................................................................38

**IV. Public Interest**................................................................................38

Conclusion................................................................................39

## Table of Authorities

**Cases**                                                                                     **Pages**

ABF Freight Sys., Inc. v. NLRB,
510 U.S. 317, 324, 114 S.Ct. 835, 839, 127 L.Ed.2d 152 (1994) ..................................................17

Acierno v. New Castle County,
40 F.3d 645, 653 (3d Cir. 1994)......................................................................................................36

Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.,
42 F.3d 1421, 1427 (3d Cir. 1994)....................................................................................................9

American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Bd. of Educ.,
84 F.3d 1471, 1477 n. 2 (3d Cir. 1996) (en banc).............................................................................9

Bartlett v. N.Y. State Bd. of Law Exam'rs,
2001 WL 930792 (S.D.N.Y. Aug. 15, 2001).................................................................................12

Bartlett v. New York State Bd. of Law Examiners,
156 F.3d 321 (2d Cir. 1998)..........................................................................................................16

Bartlett v. New York State Bd. of Law Examiners,
226 F.3d 69 (2d Cir. 2000)............................................................................................................16

Bartlett v. New York State Board of Law Examiners,
527 U.S. 1031, 119 S. Ct. 2388, 144 L. Ed. 2d 790 (1999)............................................................16

Bartlett v. New York State Board of Law Examiners,
93 Civ. 4986 (SS) (S.D.N.Y. Aug. 15, 2001) .................................................................................16

Bartlett v. York State Bd. of Law Examiners,
2 F. Supp. 2d 388 (S.D.N.Y. 1997)................................................................................................16

Batterton v. Francis,
432 U.S. 416, 425, n.9, 97 S. Ct. 2399, 53 L. Ed.2d 448 (1977)....................................................17

Biank v. Nat'l Bd. of Med. Examiners,
130 F. Supp. 2d 986, 988 (N.D. Ill. 2000) .................................................................................11,8

Boggi v. Med. Rev. & Accrediting Council,
415 F. App'x 411, 414 (3d Cir. 2011)..........................................................................................12,18

Bragdon v. Abbott,
524 U.S. 624, 642, 118 S. Ct. 2196, 141 L. Ed.2d 540 (1998)........................................................17

Chevron USA Inc. v. Echazabal,
536 U.S. 73, 122 S. Ct. 2045, 153 L. Ed. 2d 82 (2002)................................................................. 19

Chevron USA Inc. v. Natural Resources Defense Council, Inc.,
467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984) ..........................................................17,19

Chrysler Corp. v. Brown,
441 U.S. 281, 302-303, 99 S. Ct. 1705, 60 L. Ed.2d 208 (1979) ....................................................17

Cooper v. Harris,
___ U.S. ___, 137 S. Ct. 1455, 1474, 197 L.Ed.2d 837 (2017)......................................................31

Currier v. National Board of Medical Examiners,
965 N.E.2d 829, 462 Mass. 1 (2012) ..........................................................................................11,19

Doe v. National Bd. of Med. Exam'rs,
199 F.3d 146, 154-155 (3d Cir. 1999)........................................................................................29,35

Doe v. Pa. State Univ.,
276 F. Supp. 3d 300, 313-14 (M.D. Pa. 2017) .................................................................................37

Enyart v. Nat'l Conf. of Bar Exam'rs,
630 F.3d 1153, 1166 (9th Cir. 2011)................................................................................................37

Ferring Pharms., Inc. v. Watson Pharms., Inc.,
765 F.3d 205, 217 n.11 (3d Cir. 2014) .............................................................................................36

Fishback v. Western Union Tel. Co.,
161 U.S. 96, 16 S.Ct. 506, 40 L. Ed. 630 (1896)..............................................................................10

Ford Motor Co. v Mont Eighth Judicial District Court,
141 S. Ct. 1017, 592 U.S., 209 L. Ed. 2d 225 (2021).......................................................................11

Gonzales v. National Bd. of Medical Examiners,
225 F.3d 620 (6th Cir. 2000) ......................................................................9,11,15,0,23,26,28,29

Gonzalez v. National Bd. of Medical Examiners,
60 F. Supp. 2d 703 (E.D. Mich. 1999)..............................................................................................11

Greater Phila. Chamber of Commerce v. City of Philadelphia,
949 F.3d 116, 133 (3d Cir. 2020) ........................................................................................................9

Halt v. Indiana Manufacturing Co.,
176 U.S. 68, 20 S.Ct. 272, 44 L. Ed. 374 (1900)..............................................................................10

Issa v. Sch. Dist. of Lancaster,
847 F.3d 121, 143 (3d Cir. 2017)................................................................................38

Love v. Law Sch. Admissions Council, Inc.,
513 F. Supp. 2d 206, 223 (E.D. Pa. 2007) ...............................................................12,18

Marten v. Godwin,
499 F.3d 290, 296 (3d Cir. 2007) ...................................................................................10

 McIntyre Mach., Ltd. v. Nicastro,
 564 U.S. 873 (2011)........................................................................................................10

Nicastro v. McIntyre Mach. Am., Ltd.,
201 N.J. 48, 72 (2010).....................................................................................................10

O'Connor v. Sandy Lane Hotel Co.,
 496 F.3d 312, 316 (3d Cir. 2007)....................................................................................10

Olmstead v. L.C. ex rel. Zimring,
527 U.S. 581, 597-598, 119 S. Ct. 2176, 2185-2186, 144  L. Ed.2d 540 (1999)............7

PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.,
139 S. Ct. 2051, 2055, 204 L. Ed.2d 433 (2019).............................................................17

Powell v. National Bd. of Medical Examiners ,
364 F.3d 79 (2d Cir. 2004) ................................................................................11,13,21,28

Price v. National Bd. of Medical Examiners,
966 F. Supp. 419 (S.D.W. Va. 1997).......................................................12,13,5,17,18,20,26,27,28

Provident Nat '1 Bank v. cal. federal Say. & Loan Ass 'n,
 819 F.2d 434, 437 (3d Cir.1987) ....................................................................................10

Ramsay v. Nat. Bd. of Medical Examiners
968 F.3d 251 (3d Cir. 2020)............................9,12,13,14,15,17,18,20,21,22,28,29,31,32,36,37,38

Rawdin v. Am. Bd. of Pediatrics,
985 F. Supp. 2d 636 (E.D. Pa. 2013) ..............................................................................15

Rothberg v. LSAC,
300 F.Supp.2d 1093 (D.Colo. 2004)................................................................................12

Rumbin v. Ass'n of Am. Med. Colls.,
803 F.Supp.2d 83, 95 (D.Conn.2011) .............................................................................15

Rush v. National Board of Medical Examiners,
268 F. Supp.2d 673 (N.D. Tex. 2003)..........................................................................11,37

Scheibe v. Nat'l Bd. of Med. Examiners,
Civ. A. No. 05-180, 2005 WL 1114497, at *3 (W.D. Wis. May 10, 2005) ...........................11,18

Skidmore v. Swift & Co.,
323 U.S. 134, 139-140, 65 S. Ct. 161, 89 L. Ed.2d 124 (1944).....................................................17

United States v. Olhovsky,
 562 F.3d 530, 548-49 (3d Cir. 2009).............................................................................31

United States v. Sayward,
160 U.S. 493, 16 S.Ct. 371, 40 L. Ed. 508 (1895)...........................................................10

United States v. Turner,
718 F.3d 226, 231 (3d Cir. 2013)...................................................................................31

Winter v. Nat. Res. Def. Council, Inc.,
555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)...................................................36

## Regulations

28 C.F.R. § 35.104(1)(i)(B) .........................................................................................12

 28 C.F.R. § 36.105(b)(2)..............................................................................................13

28 C.F.R. § 36.105(d)(1)(vi)..........................................................................................31

28 C.F.R. §36.309.............................................................................................4,14,15,16,21,30

29 C.F.R. § 1630.2(j)(1)................................................................................................16

N.J. Admin. Code § 13:35-3.1.......................................................................................10

## Statutes

28 U.S.C. § 1331........................................................................................................10

42 U.S.C.  §12102(2)...................................................................................................13

42 U.S.C. § 12102(1)(A) ..............................................................................................13

42 U.S.C. § 12102(2)(A)...............................................................................................13

42 U.S.C. § 12102(4)(A)..............................................................................................13

42 U.S.C. § 12181.........................................................................................................4

42 U.S.C. § 12189.......................................................................................................18

42 U.S.C. § 12188(a)(1)...............................................................................................37

42 U.S.C. § 2000a-3(a)...............................................................................................37

**Publications**

Bowers, J. J., & Shindoll, R. R. (1989). *A Comparison of the Angoff, Beuk, and Hofstee Methods for Setting Apassing Score*. Iowa City, IA: American College Testing Program......33,34

Burr, S. A., Whittle, J., Fairclough, L. C., Coombes, L., & Todd, I. (2016).Modifying Hofstee standard setting for assessments that vary in difficulty, and to determine boundaries for different levels of achievement. *BMC Medical Education*, *16*(1), 1-11...................................33

George, S., Haque, M. S., & Oyebode, F. (2006). Standard setting: comparison of two methods. BMC medical education, 6(1), 1-6.................................................................33

Park, Y. S., & Yang, E. B. (2015). Three controversies over item disclosure in medical licensure examinations. Medical education online, 20(1), 28821.................................32

Salehi, P. P., Azizzadeh, B., & Lee, Y. H. (2021). Pass/fail scoring of USMLE step 1 and the need for residency selection reform. Otolaryngology–Head and Neck Surgery, 164(1), 9-10.........................................................................................36

## Statement

Plaintiff signifies the public importance of this case and the importance of the relief that he has requested which requires Defendants to stop the discriminatory practice. However this practice, now realized during this litigation has raised additional significant public concerns. Regardless of the emphasis on rules, laws regulations, legal conclusions  or differences of opinions of the parties it is imperative that the court act in the best interest of the public.

Plaintiff has accused the Defendants of not grading his examinations on their own merit, but based solely on others who took the exams prior and their exams based on those who took the exams prior to them. Meaning the only criteria to passing the exam is that you score as the others did before you.

Despite this discriminating against Plaintiff and others who are disabled by forcing them to get the same score as a non disabled person to pass; it has the potential to allow a group of students to receive a sub standard score and therefore those after them are compared to this group. This then allows individuals who should not have passed the exam now because the first group did not take their exam seriously.

It is apparent that there is no minimum standard to safety practice medicine established by Defendants which is why they are fighting this lawsuit so hard. Until they demonstrate to the court in real time (1) what the minimum standard is on a specific exam is and (2) how they score their exams without comparison to any group, norm, reference population, ect;  It should be assumed that they do not have one. Otherwise they would have told Plaintiff that they would agree to this since it is required by law anyway.

Every person reading and even touching this brief along with their families is affected and have an interest in the outcome of this case. Ask yourself: do you want an anesthesiologist to

1

put you to sleep in an operating room and a surgeon to cut you open or do the same to you or

your significant other, kids, parents knowing that they received their licenses because they

scored like "the last group" or because they met the standard necessary to practice medicine?

## Procedural History

Plaintiff has filed his complaint requesting relief in the form an Injunction to stop the

unlawful actions of Defendants. Plaintiff then filed a request for an order to Show Cause why a

Preliminary Injunction should not issue which was never acted on by the court and is still on file.

This action was then transferred from Judge Michael Shipp to Judge Georgette Castner by order

of the court on its own motion. The summons was issued and Defendants were served.

Defendants responded with a request to extend the time to answer which was granted by the

clerk. Defendants then responded with a motion to dismiss, Plaintiff responded later seeking

Leave to Amend from the Court. Plaintiff now again seeks a Preliminary Injunction due to

irreparable harm as the court still has not heard his original application.

## Introduction

"The NBME, together with the Federation of State Medical Boards of the United States, Inc., offers the USMLE. The USMLE is a standardized multiple-choice test administered in three parts, or "Steps". The USMLE was designed as a licensing exam meant to assess an examinee's understanding of, and ability to apply, concepts and principles that are important in health and disease and constitute the basis of safe and effective patient care. In order to obtain a license to practice medicine in the United States, an examinee must obtain a passing score on all three Steps of the USMLE. Prior to May 1999, the USMLE was provided in a written format. Since May 1999, the USMLE has been given in a computerized format. After an examinee takes the USMLE, the NBME sends a score report to the examinee. Although the USMLE was designed for use as a licensing exam, it is common practice for residency and fellowship programs to use USMLE test scores in evaluating candidates for admission to their programs. At an examinee's request, the NBME will send a USMLE score transcript to third parties designated by the examinee, including residency and internship programs and state licensing authorities." quoting Doe v. National Bd. of Med. Exam'rs, 199 F.3d 146, 154-155 (3d Cir. 1999)

Plaintiff is a third year medical student at Caribbean Medical University and is required to take the USMLE exams. However in order to sit for these examination, Plaintiff is required to receive a "passing score" on examinations administered by Defendant (NBME) such as the Comprehensive Basic Science Exam (CBSE) These exams are administered via computer at Prometric testing centers and scored in a manner outlined by Defendant which decides "Passing" or "Failing" solely by comparing his test results to others.

Plaintiff has been diagnosed with Attention Deficit Hyperactivity Disorder and multiple learning disabilities dating back to second grade almost 30 years ago. He has attempted exams

3

administered by Defendants multiple times but has not passed because these exams, Plaintiff

believes are not accounting for his disabilities since they are not graded upon what he knows, but

only how he compares to others who have taken the exams. This grading practice appears to not

be in compliance with the requirements of the Americans with Disabilities Act ("ADA"), Pub.L.

101-336, Title III, 42 U.S.C. § 12181 et seq. and its implementing regulation 28 C.F.R. §

36.309 which requires examinations to "reflect the applicant's aptitude and knowledge, rather

than the limitations or manifestations of the applicant's disability"

Plaintiff has commenced this action to obtain an Injunction against Defendants to prevent

them from scoring his exams and others exams solely on the bases of comparison to others

because the current such practice  does not "reflect the applicant's aptitude and knowledge,

rather than the limitations or manifestations of the applicant's disability" He has applied to the

court for an Order to show Cause why a Preliminary Injunction should not issue when he filed

his complaint. However this has still not been acted upon by the court even though his

application is on file with the clerk's office. Plaintiff has been experiencing irreparable harm by

the day so he has submitted a second application.

### Statment of Facts

#### Plaintiff

Plaintiff is a 36 year old male that was diagnosed with Attention Deficit Hyper Activity

Disorder (ADHD) at age 7 and started on medication before age 8 (See Plaintiffs Certification at

1) The relevant medical records are included in the certification but not all of them for economic

and logistical reasons (See Plaintiff Cert at 2) Plaintiff is unaware of what happened during

Elementary/ Middle School and can only go by medical records which show he was treated by

the physicians with medications until 2007, In which is indicated in the last entry in the chart

(omitting the unnecessary portions) (See Plaintiff Cert at 1&2) Plaintiff was told that he was

diagnosed with ADHD in second grade in 1994 (See Plaintiff Cert at 10) Plaintiff has maintained

medical care through his life at multiple doctors and has tried to keep the related documentation

(See Plaintiff Cert at 3-9)

Plaintiff (to the best of his knowledge) first received testing and classification of being

"learning disabled' in 9th grade, 2001 under section 504 of the Rehabilitation Act and given an

Individualized Education Plan "IEP" (See Plaintiff Cert at 11 ) He was placed into full time

special education out of district until he graduated (See Plaintiff Cert at 12) When he was

changed from a mainstream school environment into special education, his grades improved

significantly (See Plaintiff Cert at 13)

When Plaintiff attempted mainstream education when he graduated High School, his

grades fell and he experienced multiple failures (See Plaintiff Cert at 14 ) Multiple issues such as

attention and visual memory were (and still are) great challenges to him (See Plaintiff Cert at 15)

Following this he gave up on in person classes and experimented with online courses a few years

later and was successful in obtain his Associates Degree followed by his Bachelors  (See

5

Plaintiff Cert at 16) He then applied to a medical school located outside of the United States and began to experience the same problems he had with undergraduate learning (See Plaintiff Cert at 17) Following the completion of the Basic Science program at the medical school and his return home, he requested a Neurophysiologic evaluation from his physicians and the symptoms he was experiencing were confirmed by multiple tests (See Plaintiff Cert at 27) When he was out of the classroom his grades again, just as before improved significantly (See Plaintiff Cert at 17)

### Examinations

In order to proceed and finish the program Plaintiff needs to pass two examinations administered by Defendants (See Plaintiff Cert at18) He also need to pass other examinations all of which are offered by Defendants (See Plaintiff Cert at 19) Plaintiff has tried multiple times to pass the first examination and attempted clinical examinations but has not succeeded (See Plaintiff Cert at 20) The reason he has not succeeded is that all of the examinations administered by Defendants do not allow him to pass unless he scores comparable to others (See Plaintiff Cert at 21)

The current CBSE is also graded on an "Equated Percent Correct" and compares this score to the performance on USMLE Step 1 to a reference group from 2020 (See Plaintiff Cert at 23) Defendants, not medical schools have set the "low pass" in a "range" from 62 to 68 as stated on the first paragraph of page 4 of documentation available on Defendants website (See Plaintiff Cert at 24) This score is not "a percentage of content mastered" but a range that "represents CBSE scores corresponding to Step 1 performance starting at the passing standard plus 2 standard errors of measurement" (See Plaintiff Cert at 24) As Plaintiff has stated, he is required to pass the CBSE (See Plaintiff Cert at 18) which requires a score of 62 (See Plaintiff Cert at 24) and this passing score of 62 is set by Defendants, not medical schools, as it is "corresponding to

6

Step 1 Performance starting at the passing standard plus 2 standard errors of measurement" (<u>See</u> Plaintiff Cert at 24)

Therefore in order to "Pass" CBSE, as required by his school Plaintiff must score a 62 "corresponding to Step 1 Performance starting at the passing standard plus 2 standard errors of measurement" (<u>See</u> Plaintiff Cert at 24) As stated on the CBSE Plaintiff took on March 27,2022, Plaintiffs score is shown "along with a range that corresponds to low passing" (<u>See</u> Plaintiff Cert at 23) His score is "corresponding to Step 1 Performance starting at the passing standard plus 2 standard errors of measurement" (<u>See</u> Plaintiff Cert at 24) Plaintiffs exam results specified that the "performance of a 2020 national cohort of students" was utilized to estimate his "probability of passing step 1 within a week" (<u>See</u> Plaintiff Cert at 23) Therefore in order to obtain the passing score of 62 set by Defendants  (<u>See</u> Plaintiff Cert at 24) and required by his school (<u>See</u> Plaintiff Cert at 19) he must score a 62 in the range on the "equated percent scale" which "represents CBSE scores corresponding to Step 1 Performance starting at the passing standard plus 2 standard errors of measurement"(<u>See</u> Plaintiff Cert at 24). The data utilized to "convert" the "equated percent correct" however is not public knowledge for the CBSE as stated by Defendants (<u>See</u> Plaintiff Cert at 24) This requires a "table" in which Schools are prohibited from sharing with students (<u>See</u> Plaintiff Cert at 24) The CBSE does not grade on the objective standard to test if someone is qualified to safely treat patients, but a "low pass" in a "range" "from 62 to 68" that is ""corresponding to Step 1 Performance starting at the passing standard plus 2 standard errors of measurement"(<u>See</u> Plaintiff Cert at 24)

Plaintiff has also taken "Subject examinations that Defendants will not allow him to pass (<u>See</u> Plaintiff Cert at 25) It appears that these exams are scored using the "Angoff" and "Hofstee" methods (<u>See</u> Plaintiff Cert at 22) In addition to the discriminatory effects of these methods

(which Plaintiff will address later), the exams are scored using "Equated Percent Correct" which do not represent "the amount of content that you have mastered" but its relation to "percentile ranks", as detailed in the table on page 4 of the document Plaintiff has attached (See Plaintiff Cert at 22 ) Each exam has its own passing score set by Defendants utilizing the "Angoff and Hofstee" methods as the example from Defendants website shows the data for Emergency Medicine (See Plaintiff Cert at 22) None of Plaintiffs exams (See Plaintiff Cert at 25) are passing (See Plaintiff Cert at 26) The reason for this is that Plaintiff is assigned an "Equated Percent Correct" score which is decided by Defendants using the Angoff and Hofstee methods and placed on "Percentile Rank" scale being compared to a "norm group" (See Plaintiff Cert at 22) Therefore Plaintiff's Subject Examinations or Shelf Exams are not scored on their own merit to decide if he can safely practice medicine, but compared to a "Norm group' after the passing score set by Defendants on the "equated percent" scale is compared to the percentile ranks of the "norm group" (See Plaintiff Cert at 22)

Defendants have an extensive history of discrimination and being enjoined by multiple courts as detailed in this brief; frequently profit off of denials for things like testing accommodations in which they are **again** currently being sued in the District Court of New York represented by the same attorney in this matter (See Plaintiff Cert at 28)

## LEGAL ARGUMENT

"In issuing a preliminary injunction, a district court considers four factors:(1) the likelihood that the plaintiff will prevail on the merits at final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) [that] the public interest [weighs in favor of granting the injunction].Greater Phila. Chamber of Commerce v. City of Philadelphia, 949 F.3d 116, 133 (3d Cir. 2020) (alterations in original) (quoting Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994))."

Quoting Ramsay v. Nat. Bd. of Medical Examiners , 968 F.3d 251 (3d Cir. 2020) See also Doe v. National Bd. of Med. Exam'rs, 199 F.3d 146, 154-155 (3d Cir. 1999)( "Four factors govern a district court's decision whether to issue a preliminary injunction: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest." American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Bd. of Educ., 84 F.3d 1471, 1477 n. 2 (3d Cir. 1996) (en banc); Gonzales v. National Bd. of Medical Examiners, 225 F.3d 620 (6th Cir. 2000) ("District courts assess four factors in analyzing a preliminary injunction issue: (1) whether the plaintiff has a strong likelihood of succeeding on the merits; (2) whether the plaintiff will suffer irreparable injury absent the injunction; (3) whether issuing the injunction will cause substantial harm to others; and (4) whether the public interest will be furthered by the issuance of the injunction")

## I. Success on the Merits

### A. Jurisdiction

"The district courts shall have original jurisdiction of all civil actions arising under the
Constitution, laws, or treaties of the United States." 28 U.S.C. §§ 1331; United States v.
Sayward, 160 U.S. 493, 16 S.Ct. 371, 40 L. Ed. 508 (1895); Fishback v. Western Union Tel. Co.,
161 U.S. 96, 16 S.Ct. 506, 40 L. Ed. 630 (1896); Halt v. Indiana Manufacturing Co., 176 U.S.
68, 20 S.Ct. 272, 44 L. Ed. 374 (1900). "[A] federal district court may assert personal
jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the
law of that state." Marten v. Godwin, 499 F.3d 290, 296 (3d Cir. 2007) (quoting Provident Nat '1
Bank v. cal. federal Say. & Loan Ass 'n, 819 F.2d 434, 437 (3d Cir.1987)). In New Jersey,
"courts may exercise jurisdiction over a non resident defendant to the uttermost limits permitted
by the United States Constitution." Nicastro v. McIntyre Mach. Am., Ltd., 201 N.J. 48, 72
(2010) (internal quotation marks omitted), rev 'd on other grounds sub nom., I McIntyre Mach.,
Ltd. v. Nicastro, 564 U.S. 873 (2011). "Accordingly in determining whether personal jurisdiction
exists, we ask whether, under the Due Process Clause, the defendant has certain minimum
contacts with [New Jersey] such that the maintenance of the suit does not offend traditional
notions of fair play and substantial justice." O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312,
316 (3d Cir. 2007)

Defendants examinations are required in New Jersey to obtain a medical license
(See N.J. Admin. Code § 13:35-3.1 "Effective December 1994, the standard medical and surgical
licensing examination in the State of New Jersey shall be the United States Medical Licensing
Examination (USMLE)") and Plaintiff has taken his examinations which Defendant, has

collected a fee for in New Jersey where he resides (See Plaintiff Cert. at 23&25) Therefore

Defendants have enough contact with New Jersey for this court to have jurisdiction. See

Ford Motor Co. v Mont Eighth Judicial District Court, 141 S. Ct. 1017, 592 U.S., 209 L. Ed. 2d

225 (2021)( **Holding that Plaintiffs claims that "arise out of or relate to" Defendants**

**business and marketing activities, those activities gave sufficient claim for the states to**

**assert personal jurisdiction over the liability lawsuits; Therefore connection between the**

**plaintiffs' claims and defendants activities in the forum States is close enough to support**

**specific jurisdiction.)**

Defendants, with their extensive history of depriving people of their civil rights have

been sued numerous times. As such, there have been many other courts that have held

Defendants accountable even though their place of business is in Pennsylvania  and they are

incorporated in Washington; connected only  administering examinations in their states. See

Scheibe v. Nat'l Bd. of Med. Examiners, Civ. A. No. 05-180, 2005 WL 1114497, at *3 (W.D.

Wis. May 10, 2005) (Jurisdiction over NBME regardless of being incorporated in Washington

D.C. and having a principle place of business in Pennsylvania ) See also Biank v. Nat'l Bd. of

Med. Examiners, 130 F. Supp. 2d 986, 988 (N.D. Ill. 2000) ; Rush v. National Bd. of Medical

Examiners, 268 F. Supp. 2d 673 (N.D. Tex. 2003); Currier v. National Board of Medical

Examiners, 965 N.E.2d 829, 462 Mass. 1 (2012) (Finding jurisdiction over NBME, a private

nonprofit corporation responsible for providing testing in state responsible under state law);

Gonzalez v. National Bd. of Medical Examiners, 60 F. Supp. 2d 703 (E.D. Mich. 1999); Powell

v. National Bd. of Medical Examiners ,364 F.3d 79 (2d Cir. 2004) (Finding jurisdiction over

NBME by offering examinations in the state of Connecticut) ; See also Gonzales v. National Bd.

11

of Medical Examiners, 225 F.3d 620 (6th Cir. 2000); Price v. National Bd. of Medical

Examiners, 966 F. Supp. 419 (S.D.W. Va. 1997)

### B. Plaintiffs Protected Status

Plaintiff has been diagnosed with both ADHD and multiple learning disabilities (See

Plaintiff Cert 1-13) This disabilities where documented since High School in his IEP (See

Plaintiff Cert at 11&12) and confirmed by Neurophysiologic testing (See Plaintiff Cert at 27)

They substantially limited his life in that he required full time special education throughout high

school and still is limited in areas such as learning for the past 20+ years (See Plaintiff Cert 12-

17) Both of Plaintiffs documented disabilities, are protected under Federal Law , specifically the

ADA.

"Federal courts have consistently recognized that ADHD and learning disabilities are

impairments under the ADA. See, e.g., Rothberg v. LSAC, 300 F.Supp.2d 1093 (D.Colo. 2004);

Bartlett v. N.Y. State Bd. of Law Exam'rs, 2001 WL 930792 (S.D.N.Y. Aug. 15, 2001); Price v.

Nat'l Bd. of Med. Exam'rs, 966 F.Supp. 419 (S.D.W.Va. June 6, 1997).Learning disabilities and

ADHD are clearly impairments within the meaning of the ADA. The DOJ regulations

specifically provide that learning disabilities are mental impairments under the Act. 28 C.F.R. §

35.104(1)(i)(B) ("The phrase physical or mental impairment means . . . [a]ny mental or

psychological disorder such as mental retardation, organic brain syndrome, emotional or mental

illness, and specific learning disabilities."). Love v. Law School Admission Council, Inc., 513 F.

Supp. 2d 206 (E.D. Pa. 2007) See also Ramsay v. Nat. Bd. of Medical Examiners 968 F.3d 251

(3d Cir. 2020); Boggi v. Med. Rev. & Accrediting Council, 415 F. App'x 411, 414 (3d Cir.

2011); Price v. National Bd. of Med. Examiners, 966 F. Supp. 419 (S.D. W.Va. 1997)

## C. Significant Impairment

In order to be disabled under the ADA, Plaintiff must have a physical or mental

impairment that substantially limited his abilities to perform "Major life activities," in turn,

"include but are not limited to.....performing manual tasks...., ......learning, reading,

concentrating, thinking, communicating....." 42 U.S.C. §12102(2). "The ADA defines

"disability" in relevant part as "a physical or mental impairment that substantially limits one or

more major life activities of such individual." 42 U.S.C. § 12102(1)(A). We construe the term

"disability" broadly. Id. § 12102(4)(A). As to the term "impairment," the applicable Department

of Justice ("DOJ") regulations provide that the term "physical or mental impairment" includes

ADHD and "dyslexia and other specific learning disabilities." 28 C.F.R. § 36.105(b)(2). As to

"life activities," the ADA provides that "major life activities include ... reading, concentrating,

thinking, communicating, and working." 42 U.S.C. § 12102(2)(A)." Ramsay v. Nat. Bd. of

Medical Examiners 968 F.3d 251 (3d Cir. 2020)

Plaintiff has stated that he has ADHD and Learning Disabilities and they significantly

affect his life with things such as concentration and visual memory (See Plaintiff Cert at 15)

This is established by the documentation of the treatment of ADHD since 1994 and classification

since 2001which is required to meet the definition of "disabled" and "significantly impaired" See

Powell v. National Bd. of Medical Examiners ,364 F.3d 79 (2d Cir. 2004)("documentation did

not include objective evidence of difficulties she experienced before entering medical school, as

would be expected were the disability a significant functional impairment")

Plaintiff  has also shown a pattern of academic difficulties (See Plaintiff Cert at 13-17)

which is also required See Price v. Nat'l. Bd. of Med. Examiners, 966 F. Supp. 419 (S.D.W. Va.

1997)( "This Court finds that Mr. Price has not exhibited a pattern of substantial academic

difficulties") "Moreover, the regulations provide that the "substantially limits" inquiry "should not demand extensive analysis," Ramsay v. Nat. Bd. of Medical Examiners 968 F.3d 251 (3d Cir. 2020)

### D. Liability

Defendants have violated the Americans with Disabilities Act and its implementing regulation created by the Department of Justice by not scoring Plaintiff exam results on their own merit and not in comparison to others (See Plaintiff Cert at 23) The current CBSE is graded on an "Equated Percent Correct" and compares this score to the performance on USMLE Step 1 to a reference group from 2020 (See Plaintiff Cert at 23) Defendants, not medical schools have set the "low pass" in a "range" from 62 to 68 as stated on the first paragraph of page 4 of documentation available on Defendants website (See Plaintiff Cert at 24)

This score is not "a percentage of content mastered" but a range that "represents  CBSE scores corresponding to Step 1 performance starting at the passing standard plus 2 standard errors of measurement" (See Plaintiff Cert at 24) As Plaintiff has stated, he is required to pass the CBSE (See Plaintiff Cert at 18) which requires a score of 62  (See Plaintiff Cert at 24) and this passing score of 62 is set by Defendants, not medical schools, as it is "corresponding to Step 1 Performance starting at the passing standard plus 2 standard errors of measurement" (See Plaintiff Cert at 24)

Defendants must be held accountable under the implementing regulations of the ADA created by the Department of Justice. Among them is  28 C.F.R. §36.309 which states:

> (b) Examinations.
>
> (1) Any private entity offering an examination covered by this section must assure that -
>
> (i) The examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs

14

sensory, manual, or speaking skills, the **examination results** accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure. rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure):

"The examination results [must] accurately reflect the [Plaintiffs] aptitude or achievement level or whatever other factor the examination purports to measure....." quoting 28 C.F.R. §36.309. Therefore Defendants cannot compare Plaintiffs score to anyone's scores to decide if he meets the minimum standard to safely practice medicine. By doing so, all that the test results are showing is Plaintiffs disabilities as Plaintiff would no longer be disabled if he could score within the average population.

"a clinical diagnosis of a learning disability is typically based upon a comparison between the individual and others in the general population" Ramsay v. Nat. Bd. of Medical Examiners , 968 F.3d 251 (3d Cir. 2020) See Gonzales v. Nat'l Bd. of Med. Exam'rs, 225 F.3d 620, 629 (6th Cir.2000)(finding a medical student was not substantially limited in the major life activity of reading where the clinical tests demonstrated he "read as well as the average person"); Price v. National Bd. of Med. Examiners, 966 F. Supp. 419 (S.D. W.Va. 1997) (holding that three medical students diagnosed with ADHD and learning disabilities failed to show they were substantially limited in their ability to perform a major life activity as compared to most people in the general population, and thus, did not have a disability under the ADA, and were not entitled to any accommodation by the NBME for the USMLE); Rawdin v. Am. Bd. of Pediatrics, 985 F. Supp. 2d 636 (E.D. Pa. 2013) ("a relative impairment is not enough to qualify Dr. Rawdin as disabled because the Court must compare his test scores and test-taking ability against the general population and not against his own expected capabilities"); Rumbin v. Ass'n of Am. Med. Colls., 803 F.Supp.2d 83, 95 (D.Conn.2011) (determining the plaintiff was not

substantially limited as compared to the general population because the record lacked any

evidence regarding whether his reading skills were unusual or the extent to which his skills

departed from the norm); Bartlett v. New York State Board of Law Examiners, 527 U.S. 1031,

119 S. Ct. 2388, 144 L. Ed. 2d 790 (1999); Bartlett v. New York State Bd. of Law Examiners,

156 F.3d 321 (2d Cir. 1998); Bartlett v. New York State Bd. of Law Examiners, 226 F.3d 69 (2d

Cir. 2000); Bartlett v. York State Bd. of Law Examiners, 2 F. Supp. 2d 388 (S.D.N.Y.

1997)("With respect to most major life activities, the plaintiff is compared to "the average person

in the general population." 29 C.F.R. § 1630.2(j)(1). Therefore, to determine whether plaintiff is

substantially impaired in her reading, learning, or even test-taking, I must decide whether, when

compared to the average person in the general population, plaintiff is substantially limited in

these major life activities"); Bartlett v. New York State Board of Law Examiners, 93 Civ. 4986

(SS) (S.D.N.Y. Aug. 15, 2001)( I find that plaintiff is substantially limited in the major life

activity of reading when compared to most people)

     Therefore if Defendants continue to score Plaintiffs exams with a passing score of 62

which is set by Defendants, not medical schools "corresponding to Step 1 Performance starting at

the passing standard plus 2 standard errors of measurement" (See Plaintiff Cert at 24)

and not on their own merit, the examination results will not "accurately reflect the [Plaintiffs]

aptitude or achievement level or whatever other factor the examination purports to measure" 28

C.F.R. §36.309

### E. The Regulation & The ADA

     Defendants are accountable for their actions under the regulation created by the DOJ,

which Plaintiff has cited, 28 C.F.R. §36.309. A government agency has the power to create and

implement regulations interpreting a statue  as "Congress explicitly delegated to [these]

16

administrative agenc[ies] the authority to make specific policy determinations, [courts] must give the[ir] decision[s] controlling weight unless [they are] 'arbitrary, capricious, or manifestly contrary to the statute.'" ABF Freight Sys., Inc. v. NLRB, 510 U.S. 317, 324, 114 S.Ct. 835, 839, 127 L.Ed.2d 152 (1994) (quoting Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 2782-83, 81 L.Ed.2d 694 (1984)). Price v. Nat'l. Bd. of Med. Examiners, 966 F. Supp. 419 (S.D.W. Va. 1997)

These regulation are treated as law as "In applying the foregoing to the case at hand, we note that insofar as the above-quoted regulations are "the equivalent[s] of a 'legislative rule' ... issued by an agency pursuant to statutory authority," they thus have the 'force and effect' of law." PDR Network, LLC v. Carlton & Harris Chiropractic, Inc., 139 S. Ct. 2051, 2055, 204 L. Ed.2d 433 (2019)(quoting Chrysler Corp. v. Brown, 441 U.S. 281, 302-303, 99 S. Ct. 1705, 60 L. Ed.2d 208 (1979) and Batterton v. Francis, 432 U.S. 416, 425, n.9, 97 S. Ct. 2399, 53 L. Ed.2d 448 (1977)). At the very minimum, the regulations are "entitled to substantial deference" and "given controlling weight" unless "it can be shown that they are arbitrary, capricious, or manifestly contrary to the statute." See, n. 8, supra. See also, Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 597-598, 119 S. Ct. 2176, 2185-2186, 144 L. Ed.2d 540 (1999)("Because the Department [of Justice] is the agency directed by Congress to issue regulations implementing Title II, ... its views warrant respect") and Bragdon v. Abbott, 524 U.S. 624, 642, 118 S. Ct. 2196, 141 L. Ed.2d 540 (1998)("It is enough to observe that the well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance'"(quoting Skidmore v. Swift & Co., 323 U.S. 134, 139-140, 65 S. Ct. 161, 89 L. Ed.2d 124 (1944)). quoting Ramsay v. Nat. Bd. of Medical Examiners 968 F.3d 251 (3d Cir. 2020)

Defendants have tried to argue that they don't apply to them and they cannot be held accountable, but the courts have told them otherwise as "although NBME may not have liked the terminology used in the implementing regulations, despite its registered objections, the foregoing language is what was enacted and it is this language which must be followed" Ramsay v. Nat. Bd. of Medical Examiners 968 F.3d 251 (3d Cir. 2020) See also Price v. Nat'l. Bd. of Med. Examiners, 966 F. Supp. 419 (S.D.W. Va. 1997) (Holding that, because Congress authorized the DOJ to make issue regulations for Subchapter III, courts must give their decisions controlling weight unless arbitrary or manifestly contrary to the statute)

Defendants have both conceded and have been found to liable under the ADA and that includes its implementing regulations. "Neither NBME nor MRAC argue that they fall outside the scope of the ADA and the law is clear that both entities must comply. See Love v. Law Sch. Admissions Council, Inc., 513 F. Supp. 2d 206, 223 (E.D. Pa. 2007) (finding that private, non-profit entity responsible for administering test required for admission to law school had to comply with ADA); see also Scheibe v. Nat'l Bd. of Med. Examiners, Civ. A. No. 05-180, 2005 WL 1114497, at *3 (W.D. Wis. May 10, 2005) (citing cases concluding that NBME is subject to ADA); Biank v. Nat'l Bd. of Med. Examiners, 130 F. Supp. 2d 986, 988 (N.D. Ill. 2000) (holding that NBME, "as a private entity offering examinations related to licensing, is subject to ADA under Section 12189") quoting Boggi v. Med. Rev. & Accrediting Council, 415 F. App'x 411, 414 (3d Cir. 2011) Specifically  the "application of  Section 12189, at issue in this case, is covered by the DOJ regulations in 28 C.F.R. part 36" Price v. Nat'l. Bd. of Med. Examiners, 966 F. Supp. 419 (S.D.W. Va. 1997)

The court have held the Defendants responsible for the regulations created by the DOJ under what is known as "Chevron Deference"  in which the court treats the regulation as law and

defers to the interpretation of the statue by the agency  <u>See</u> <u>Chevron USA Inc. v. Natural</u>

<u>Resources Defense Council, Inc.</u>, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)

**(Holding that Government Agencies regulation is given difference when it is a permissible**

**construction of the statue and congress has not spoken of the issue directly**) Chevron later

used this ruling in a case under the ADA in which they were the defendants and it was affirmed

by the Supreme Court  <u>See</u> <u>Chevron USA Inc. v. Echazabal,</u> 536 U.S. 73, 122 S. Ct. 2045, 153 L.

Ed. 2d 82 (2002) **(Holding that a Government Agency has the authority to create and**

**enforce regulations regarding the Americans with Disabilities Act (ADA))**

### F. Not Being a "Place of Public Accommodation" Does Not Matter

As parts of the ADA state that the laws apply to "places" , it is irrelevant as Defendants

have been told that they cannot escape liability on this ground ." We first take up the NBME's

argument that it is not a "place of public accommodation" because it does not maintain a physical

presence in Massachusetts at a particular location or site Here, while Prometric, not the NBME,

provides the physical location of the testing, Prometric is only the arm of the NBME and was

hired or contracted by the NBME to host the exam. Only the NBME, and not Prometric, controls

the conditions under which the exam is administered and whether accommodations may be

granted to examinees taking the exam. The hiring of a separate entity to host the exam is the only

factor that departs from cases involving a traditional physical location. In view of the broad

remedial purposes of the statute and its statutory history, we refuse to let the NBME escape the

reach of the statute by contracting out another to provide a physical site for the services that the

NBME solely provides. Regardless, the active provision of testing services in Massachusetts,

which services by their nature are mobile, is sufficient to bring the NBME within the reach of the

statute. <u>Currier v. National Board of Medical Examiners</u>, 965 N.E.2d 829, 462 Mass. 1 (2012)

### G. Defendants Use the Same Standard to "Decide"
### Who is Disabled and Who is Not

"a clinical diagnosis of a learning disability is typically based upon a comparison between the individual and others in the general population" Ramsay v. Nat. Bd. of Medical Examiners , 968 F.3d 251 (3d Cir. 2020) See Gonzales v. Nat'l Bd. of Med. Exam'rs, 225 F.3d 620, 629 (6th Cir.2000)(finding a medical student was not substantially limited in the major life activity of reading where the clinical tests demonstrated he "read as well as the average person"); Price v. National Bd. of Med. Examiners, 966 F. Supp. 419 (S.D. W.Va. 1997) (holding that three medical students diagnosed with ADHD and learning disabilities failed to show they were substantially limited in their ability to perform a major life activity as compared to most people in the general population, and thus, did not have a disability under the ADA, and were not entitled to any accommodation by the NBME for the USMLE)

Defendants recognize this and they use this as their "standard" when they decide who is "disabled" and who they are going to deny testing accommodations too this week. Specifically In Ramsay, "The Board argue[d] that the District Court did not determine that Ramsay is substantially limited in comparison to most people in the general population Ramsay v. Nat. Bd. of Medical Examiners , 968 F.3d 251 (3d Cir. 2020) Ramsay applied a second time for accommodations  and "The Board denied her request for extra testing time, again concluding that she had not shown she was substantially limited in any functions as compared to most people "Ramsay v. Nat. Bd. of Medical Examiners , 968 F.3d 251 (3d Cir. 2020)

*"With respect to the National Board, it is clear that it followed its standard procedure when it determined that appellant was not entitled to a test accommodation. Its procedures are designed to ensure that individuals with bona fide disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which*

*could provide them with an unfair advantage when taking the medical licensing examination. As administrator of the national exam used by a number of states for licensing medical doctors, the National Board has a duty to ensure that its examination is fairly administered to all those taking it......... Were the National Board to depart from its procedure, it would be altering the substance of the product because the resulting scores would not be guaranteed to reflect each examinee's abilities accurately. Nothing in the record suggests that the National Board's review and rejection of plaintiff's application for an accommodation was anything other than standard procedure. Nor is there evidence that the standard procedure itself was unreasonable or discriminatory in nature"* Powell v. National Bd. of Medical Examiners ,364 F.3d 79 (2d Cir. 2004)

It is irrelevant if this matter is related to the scoring of the examinations in violation of 28 C.F.R. §36.309 as Plaintiff is holding them accountable for, or if a random medical student submitted an application for accommodations on the exam. Defendants will claim the Plaintiff "isnt disabled" to try and get off the hook. Essentially it will be the same process. First, *"The Board* [will] *submit... plaintiffs' applications to independent, highly qualified experts in the fields of ADHD and learning disabilities"* Ramsay v. Nat. Bd. of Medical Examiners , 968 F.3d 251 (3d Cir. 2020) Defendants "experts" will evaluate the materials Plaintiff has submitted to this court and come up with the same conclusion - Plaintiff is disabled under the meaning of the ADA.

Let's see if the information Plaintiff has submitted this court meets the criteria of being "disabled" under the ADA  according to some of Defendants "experts"

"Dr. Stephen Zecker, noting her record of achievement without accommodations, concluded that the documents did not "demonstrate a record of chronic and pervasive problems with inattention, impulsivity, behavioral regulation, or distractibility that has substantially impaired [her]

21

functioning during [her] development or currently." Ramsay v. Nat. Bd. of Medical Examiners , 968 F.3d 251 (3d Cir. 2020)

Zecker first requires "noting her record of achievement without accommodations", Well that's out because the Ramsay Court held that her achievements can't be used to determine if she is disabled. That's one of the main grounds Defendants **lost** the case on. Let's look at the second part: "demonstrate a record of chronic and pervasive problems with inattention, impulsivity, behavioral regulation, or distractibility that has substantially impaired [her] functioning during [her] development or currently." Ramsay v. Nat. Bd. of Medical Examiners , 968 F.3d 251 (3d Cir. 2020) Plaintiffs certification states that but he wants documents and those are located at the exhibits as the first seven exhibits so it looks like Zecker would be satisfied (See Plaintiff Cert at 1-20 and Exhibits A-G)

Next is Dr. Lovett who is looking for "poor academic skills":

"Dr. Benjamin Lovett, who concluded that Ramsay did not show poor academic skills or impairments compared to the general population and thus lacked a condition that would warrant accommodations." Ramsay v. Nat. Bd. of Medical Examiners , 968 F.3d 251 (3d Cir. 2020)

Plaintiff has those also (See Plaintiff Cert at 11-17; Exhibits B-E, G,J,L) so it looks like Lovett would also agree Plaintiff is "disabled" Now two "experts would not help Defendants in this case, so they would keep looking for one that would. Let's see if Dawn Flanagan, Ph.D could help them :

"The NBME referred Gonzales's request and documentation for extended time on the June 1998 Step 1 Examination to Dawn Flanagan, Ph.D., an expert in the field of learning disabilities. Flanagan opined that Gonzales does not have a learning disability in reading and that the data in the area of written language is insufficient to diagnose a written language disorder. The NBME denied Gonzales's request for extended time, stating his impairment did not significantly impair a major life activity within the framework of the ADA.

'Flanagan, Defendant's expert witness, testified at the evidentiary hearing that Ulrey's report did not support a diagnosis of Plaintiff having a reading disorder. She stated that the data she reviewed in terms of Gonzales's cognitive processes and reading achievement provided absolutely no evidence of an impairment..........''all areas that were assessed, all cognitive processes that were assessed that are found to underlie or help us explain or understand reading achievement, he performed in the average to superior range.'' Also, she stated that in nine subtests of verbal ability, verbal expression, and verbal comprehension that "his performance was in the average to superior range across a variety of those tasks." She further testified that in phonological processing, his score was in the average range; in visual auditory learning, he performed in the very superior range; and on an inductive reading task, he performed in the superior range. ......... " She concluded that Gonzales clearly demonstrated average ability in memory span" <u>Gonzales v. National Bd. of Medical Examiners</u>, 225 F.3d 620 (6th Cir. 2000)

So Flanagan wants data to show abnormal test results, which Plaintiff has and has

included in his certification (<u>See</u> Plaintiff Cert at 25 and Exhibit M)

The Neurophysiologic evaluation states:

- Plaintiff has concerns of cognitive decline, difficulty with multi tasking, distractibility, difficulty focusing, difficulty acquiring information from lectures and books, even with the mitigation effects of Vyvanse medication & after trails of other medications including Strattera, Adderall and Concerta

- Neurophysiologic Evaluation Findings (Pertinent) :

    1. Test of Memory Malingering (TOMM) - Of note his failure on trial 1 of the TOMM may be due to a genuine visual memory disorder due to his similar poor performance

    2. Sensory/ Motor Dominate right hand motor control Mildly impaired

    3. IQ scores within normal limits with VCI < PRI 14 **significant**

    4. Attention/ Processing Speed

        Autonomic mental processing speed: **Severely Impaired**

        Controlled mental processing speed : **Severely Impaired**

5.  Higher Order Integrative Functioning

Mental flexibility:

Inhibition: **Severely Impaired**

Inhibition / Switching: **Severely Impaired**

Abstract Reasoning:

Unstructured Problem Solving/ Fluid Reasoning: **well**

**below  expectation**

Total Errors**: Severely Impaired**

Conceptual Responses: **Severely Impaired**

Initiation/ Generation: **Severely Impaired**

6. Memory

Visual Memory

Immediate rote visual memory: **Severely Impaired**

Delayed rote visual memory: **Severely Impaired**

Immediate incidental visual memory: **Severely Impaired**

Delayed incidental visual memory: **Severely Impaired**

Delayed recognition memory discrimination: **Severely Impaired**

Summary

The Patient...with prior dx of ADHD....complaints of memory loss...is an individual...who shows

dysfunction of executive functioning and visual memory...complex attention is impaired...despite

being on ADHD mediation at the time of testing. executive dysfunction is seen in aspects of

behavior inhibition, unstructured problem solving and phonemic fluency.....visual memory is grossly impaired...

Impression

Overall the results of current testing are abnormal and indicate frontal and non-dominant temporal lobe dysfunction. Executive dysfunction appears compatible with his history of inattention and disorganization.

Flanagan determined that "all areas that were assessed, all cognitive processes that were assessed that are found to underlie or help us explain or understand reading achievement, he performed in the average to superior range." in Gonzales  However she couldn't do that in Plaintiffs case as what he stated in his certification matches the testing results (See Plaintiff Cert at 15)

"15. My ADHD and learning disabilities effect my everyday life even with taking medications. I have to be in a room totally silent with no distractions to even think when taking a test or attempting to learn a new concept. Hands on or practical education has always come easy to me, but not academics. Mathematics and Science are very difficult topics for me. When I am sitting in a lecture and the professor is taking, the words are distracting me from reading the slides. If I have to write something down, I can't concentrate on what he is saying while trying to spell all the words properly. By the time I get my note to the paper, I don't know what the next concept was about because I can't write and listen at the same time When I read alone, I can't visualize the concepts that are abstract. Trying to visualize biochemical pathways or anatomical locations are the biggest challenge since my brain is trying to make sense or the words verse the picture or vise versa. I also have a problem with outright memorization. My brain tries to create an image of the concept and if I can't do that. Some things that are not related to visual memory like descriptions of a concept in a book I can remember as long as it does not require an image to explain it. I have to read things multiple times sometimes to remember, but I can remember with multiple, multiple repetition of complicated information.  My ADHD and Learning Disabilities have had a significant impact on my life for as long as I can remember. "

The next "expert" is George Litchford, Ph.D. "Litchford is a clinical psychologist. He is a diplomat in clinical psychology in the State of New York and is a certified school psychologist in the State of New York. Dr. Litchford is also an approved neuropsychological examiner who

performs certain certification reviews for the Office of Disabilities at New York State. He holds

a Directorship of Psychological Services in the Psychology Department at the State University of

New York" Gonzales v. National Bd. of Medical Examiners, 225 F.3d 620 (6th Cir. 2000)

"Litchford, Defendant's other expert witness, testified that:

the reading test scores that were submitted were in the average to above 6average range on the
Wide Range Achievement Test, the Woodcock [sic] Reading Mastery Test and the Woodcock-
Johnson Broad Reading.

In addition, the Woodcock Reading Mastery Test . . . placed his reading total reading score,
reading skill score and reading comprehension score in the average range. The scores were
almost exactly equivalent to his full scale IQ."

Litchford also is looking for test results that are not within the average range stating

Gonzales did not make that criteria. However in Plaintiffs case, Litchford would get exactly what

he was looking for and exactly what Flanagan was looking for - abnormal test results relating to

the alleged disability  (See Plaintiff Cert at 25 and Exhibit M)

Next, Defendants will claim that Plaintiffs "ADHD" is "not real" or "wrong diagnosis" so

they can avoid responsibility for their actions. The final expert is Professor Russell A. Barkley,

Ph. D in Price:

 "Professor Russell A. Barkley, Ph. D., reviewed Mr. Price's application for accommodations.
Professor Barkley concluded that Mr. Price had not provided sufficient documentation to support
a clinical diagnosis of ADHD" Price v. National Bd. of Med. Examiners, 966 F. Supp. 419 (S.D.
W.Va. 1997)

So it looks like Barkley is looking for documentation....... but wait, the court explains

more:

"plaintiffs claims to have ADHD. ADHD is a psychiatric disorder. The Court finds that the
Diagnostic & Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV) accurately
explains the symptoms and nature of ADHD. ADHD's essential feature is a persistent pattern of
inattention and/or hyperactivity-impulsivity that is more frequent and severe than is typically
observed in individuals at a comparable level of development. Some hyperactive-impulsive or
inattentive symptoms that cause impairment must have been present in the individual before he
or she reached seven years of age. Impairment from the symptoms must be present in at least two

26

settings. To be diagnosed with ADHD, an individual must clearly evidence interference with developmentally appropriate social, academic, or occupational functioning. <u>Price v. National Bd. of Med. Examiners</u>, 966 F. Supp. 419 (S.D. W.Va. 1997)

So the now the court is requiring " sufficient documentation to support a clinical diagnosis of ADHD......[in which].......Some hyperactive-impulsive or inattentive symptoms that cause impairment must have been present in the individual before he or she reached seven years of age. Impairment from the symptoms must be present in at least two settings........" As Plaintiff has stated in his certification:

> "My parents tell me that my second grade teacher Mrs. Hendrickson was asked to teach second grade my year because the school was short. She was a "special education" or "resource teacher" or something before and helped students individuality before she stated teaching my class. According to my mom,  Mrs. Hendrickson recognized that there was a problem with me and asked her to take me to the doctor to get evaluated. That's when I was diagnosed with ADHD, in second grade" (<u>See</u> Plaintiff Cert at 1)

That means that Plaintiff needs medical records from his doctor around age 7 to "officially" make the diagnosis. Plaintiff has included  a medical record attached to his certification that says his birthday is "3/28/86" and it has a "consult" dated "1/20/94" (<u>See</u> Plaintiff Cert at 1)  Simple math shows that Plaintiff was 7 years old at the time of this "consult" and as the consult notes read :

"Consult" :.......request from school, home....[illegible]...there is family....classified as ADD, he has virtually every [illegible]......we discussed [illegible] ...and therapy.... [illegible]..... needs Ritalin. He was given a Rx for Ritalin 5mg Bid....3/15/94...Ritalin 5mg #90...TID...(<u>See</u> Plaintiff Cert at 1 and Exhibit A)

It sure looks like Plaintiff established the criteria the court wanted as "request from school home" is two areas and Plaintiff is 7 years old at the time on Plaintiffs chart, but this isn't even including all the other items Plaintiff has submitted and records that he still has at home (<u>See</u> Plaintiffs entire certification) Now it gets interesting because Barkley was hired by

Defendants to help deny these poor kids of their testing accommodations but the court states the

following:

"The Court finds that Professor Barkley's clear and consistent testimony renders him the most
credible witness regarding the diagnosis of ADHD. Furthermore, Professor Barkley helped draft
the DSM-IV, which both parties agree is authoritative in the diagnosis of ADHD. After
considering all of the experts' conclusions, the Court finds Professor Barkley's testimony more
compelling" Price v. National Bd. of Med. Examiners, 966 F. Supp. 419 (S.D. W.Va. 1997)

That means that Defendants "Expert" "wrote the book" that Plaintiff's doctor used to

make the diagnosis, as the Price case was only 3 years after he was diagnosed!

### H. The Defendants & Their "Experts" Concede

"a clinical diagnosis of a learning disability is typically based upon a comparison between

the individual and others in the general population" Ramsay v. Nat. Bd. of Medical Examiners ,

968 F.3d 251 (3d Cir. 2020)This  is the consensus and the standard to segregate the "disabled"

from the "non disabled" when evaluating a disability under the ADA.  The Defendants have

argued this in Ramsay "The Board argues that the District Court did not determine that Ramsay

is substantially limited in comparison to most people in the general population" Ramsay v. Nat.

Bd. of Medical Examiners , 968 F.3d 251 (3d Cir. 2020) They took the same position in

Gonzales v. National Bd. of Medical Examiners, 225 F.3d 620 (6th Cir. 2000) & Price v.

National Bd. of Med. Examiners, 966 F. Supp. 419 (S.D. W.Va. 1997)  The Second Circuit court

ruled in their favor in Powell even stating on the record that  "Nothing in the record suggests that

the National Board's review and rejection of plaintiff's application for an accommodation was

anything other than standard procedure. Nor is there evidence that the standard procedure itself

was unreasonable or discriminatory in nature" Powell v. National Bd. of Medical Examiners ,364

F.3d 79 (2d Cir. 2004)

The Defendants own "experts" also use this standard to decide if students are disabled: "Dr. Benjamin Lovett, who concluded that Ramsay did not show poor academic skills or impairments compared to the general population Ramsay v. Nat. Bd. of Medical Examiners , 968 F.3d 251 (3d Cir. 2020); Dawn Flanagan, Ph.D "all areas that were assessed, all cognitive processes that were assessed that are found to underlie or help us explain or understand reading achievement, he performed in the average to superior range." Gonzales v. National Bd. of Medical Examiners, 225 F.3d 620 (6th Cir. 2000); George Litchford, PhD "the reading test scores that were submitted were in the average to above average range on the Wide Range Achievement Test, the Woodcock [sic] Reading Mastery Test and the Woodcock-Johnson Broad Reading......In addition, the Woodcock Reading Mastery Test . . . placed his reading total reading score, reading skill score and reading comprehension score in the average range. Gonzales v. National Bd. of Medical Examiners, 225 F.3d 620 (6th Cir. 2000)

The Courts, The Defendants and their experts are all correct as "a clinical diagnosis of a learning disability is typically based upon a comparison between the individual and others in the general population" Ramsay v. Nat. Bd. of Medical Examiners , 968 F.3d 251 (3d Cir. 2020) However in this matter, they are refusing so follow their prior position and the law as the current exams that Defendants offer, for example the CBSE is graded on an "Equated Percent Correct" and compares this score to the performance on USMLE Step 1 to a reference group from 2020 (See Plaintiff Cert at 23) Defendants, not medical schools have set the "low pass" in a "range" from 62 to 68 as stated on the first paragraph of page 4 of documentation available on Defendants website (See Plaintiff Cert at 24)

Therefore in order to "Pass" CBSE, as required by his school Plaintiff must score a 62 "corresponding to Step 1 Performance starting at the passing standard plus 2 standard errors of

measurement" (See Plaintiff Cert at 24) As stated on the CBSE Plaintiff took on March 27,2022, Plaintiffs score is shown "along with a range that corresponds to low passing" (See Plaintiff Cert at 23) His score is "corresponding to Step 1 Performance starting at the passing standard plus 2 standard errors of measurement" (See Plaintiff Cert at 24) Plaintiffs exam results specified that the "performance of a 2020 national cohort of students" was utilized to estimate his "probability of passing step 1 within a week" (See Plaintiff Cert at 23) Therefore in order to obtain the passing score of 62 set by Defendants (See Plaintiff Cert at 24) and required by his school (See Plaintiff Cert at 19) he must score a 62 in the range on the "equated percent scale" which "represents CBSE scores corresponding to Step 1 Performance starting at the passing standard plus 2 standard errors of measurement"(See Plaintiff Cert at 24). The data utilized to "convert" the "equated percent correct" however is not public knowledge for the CBSE as stated by Defendants (See Plaintiff Cert at 24) This requires a "table" in which Schools are prohibited from sharing with students (See Plaintiff Cert at 24) The CBSE does not grade on the objective standard to test if someone is qualified to safely treat patients, but a "low pass" in a "range" "from 62 to 68" that is ""corresponding to Step 1 Performance starting at the passing standard plus 2 standard errors of measurement"(See Plaintiff Cert at 24)

"The examination results [must] accurately reflect the [Plaintiffs] aptitude or achievement level or whatever other factor the examination purports to measure....." 28 C.F.R. §36.309. Therefore Defendants cannot compare Plaintiffs score to anyone's scores to decide if he meets the minimum standard to safely practice medicine. By doing so, all that the test results are showing is Plaintiffs disabilities as Plaintiff would no longer be disabled if he could score within the average population.

## I. Deference to Plaintiffs Own Physicians

Plaintiff has presented medical records to this court and " it is within the trial judge's discretion to credit a physician with firsthand observations of a patient over one who only reviewed the patient's records. See United States v. Olhovsky, 562 F.3d 530, 548-49 (3d Cir. 2009). Such a professional has the benefit of seeing how the patient actually acts and speaks and provides a perspective not limited to the cold record. This principle is not unlike the deference an appellate court gives to a trial court who physically sees a witness. Cooper v. Harris, ___ U.S. ___, 137 S. Ct. 1455, 1474, 197 L.Ed.2d 837 (2017). This is why we rarely second-guess a district court's weighing of evidence, see, e.g., United States v. Turner, 718 F.3d 226, 231 (3d Cir. 2013), and why it makes sense for the District Court to credit the professionals who personally met with [Plaintiff]"Ramsay v. Nat. Bd. of Medical Examiners , 968 F.3d 251 (3d Cir. 2020)

"[t]he determination of whether an impairment substantially limits a major life activity requires an individualized assessment." 28 C.F.R. § 36.105(d)(1)(vi). Such assessments benefit from the reports of professionals who know or have personally examined the individual. Because such examinations allow the professional to evaluate the individual's behavior, effort, and candor, DOJ understandably has stated that "[r]eports from experts who have personal familiarity with the candidate should take precedence over those from ... reviewers for testing agencies, who have never personally met the candidate or conducted the requisite assessments for diagnosis and treatment." Nondiscrimination on the Basis of Disability, 75 Fed. Reg. at 56,297. As a result, DOJ has directed that testing entities "shall generally accept" "documentation provided by a qualified professional who has made an individualized assessment of an applicant Ramsay v. Nat. Bd. of Medical Examiners , 968 F.3d 251 (3d Cir. 2020)

"The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability. The question of whether an individual meets the definition of disability under this part should not demand extensive analysis" .quoting Ramsay v. Nat. Bd. of Medical Examiners 968 F.3d 251 (3d Cir. 2020)

### J. The Examinations Offered by Defendants

Plaintiff has emphasized that his exams  specifically the CBSE are compared to control group that took Step 1 prior. As he has stated the CBSE does not grade on the objective standard to test if someone is qualified to safely treat patients, but a "low pass" in a "range" "from 62 to 68" that is ""corresponding to Step 1 Performance starting at the passing standard plus 2 standard errors of measurement"(See Plaintiff Cert at 24) Beyond that, the act of being compared to those test takers is one violation and the second is how the Step 1 score for those test takers is calculated. Defendants utilize the Angoff and Hofstee (and possibly others) methods in scoring as explained in *Three controversies over item disclosure in medical licensure examinations*

"**the United State Medical Licensure Examination (USMLE), administered by the National Board of Medical Examiners (NBME), has turned to the Angoff and Hofstee methods in determining cut score.** The former approach involves a group of subject matter experts setting minimal qualifying requirements (in terms of test score) for a successful candidate, who will later be certified as a medical doctor. The Board's opinion serves as a foundation for the evaluation of each test item and a reference for determining cut score. The latter method asks judges to determine minimum/maximum acceptable scores, along with minimum/maximum fail rates, which serve as the key parameters in determining the final cut score"[1]

As for one of these methods, the Angoff method, is explained in Standard setting: comparison of two methods. BMC medical education,

" In the Angoff method a panel of judges examines each multiple-choice item or item on a checklist (for OSCEs) and estimates the probability that the "minimally competent" or

---

[1] Park, Y. S., & Yang, E. B. (2015). Three controversies over item disclosure in medical licensure examinations. *Medical education online*, *20*(1), 28821.

•

•

"borderline" candidate would answer the item correctly. Then the scores are discussed in the group and consensus is reached if possible. This stage is avoided in the modified approach. Each judge's estimate scores on all items are added up and averaged and the test standard is the average of these means for all the judges. Each standard- setting method has its advantages and disadvantages, and there is no gold standard. The norm reference methods are easy to use and understand, can easily be explained to trainees and variations in test difficulty are automatically corrected for as the pass mark is influenced by the performance of the examinee cohort, The drawbacks of these methods are that some examinees will always fail irrespective of their performance, students can deliberately influence the pass score and that the pass score is not known in advance"[2]

Regarding the Angoff method, "One issue is that content experts who qualify as judges tend to think of examinees who are average or above average, rather than those who are only minimally competent. If the concept of "minimal competence" is not clear to judges, estimates of performance would be likely to reflect that for average or above average examinees and result in an unrealistically high standard"[3] and as Plaintiff has stated in his complaint and in this brief, he cannot be compared with an average population otherwise he wouldn't be disabled und the ADA.

**"The essence of the classical Hofstee method is that <u>judges decide on the minimum and maximum failure rate</u> and acceptable pass mark"** [4] "The Hofstee method will fail to produce a passing score if the judges' estimates fall entirely above or below the <u>score curve.</u> If the judges' estimate of the <u>highest acceptable failure</u> rate is lower than the actual percent of the examinee group who would fail at the score representing judges' estimate of the lowest acceptable passing score, the line that is supposed to intersect the score curve will instead lie entirely under it. Likewise, if the judges' estimate of the <u>lowest acceptable failure rate</u> is higher than the actual percent of the examinee group who would fail at the score representing the

---

[2] George, S., Haque, M. S., & Oyebode, F. (2006). Standard setting: comparison of two methods. *BMC medical education*, 6(1), 1-6.

[3] Bowers, J. J., & Shindoll, R. R. (1989). *A Comparison of the Angoff, Beuk, and Hofstee Methods for Setting Apassing Score*. Iowa City, IA: American College Testing Program.

[4] Burr, S. A., Whittle, J., Fairclough, L. C., Coombes, L., & Todd, I. (2016). Modifying Hofstee standard setting for assessments that vary in difficulty, and to determine boundaries for different levels of achievement. *BMC Medical Education*, 16(1), 1-11.

judges' estimate of the highest acceptable passing score, the line that is supposed to intersect the **score curve** will instead lie entirely above it[5]

All of these methods used by Defendants discriminate against Plaintiff and anyone else who is disable since judges who "think of examinees who are average or above average, rather than those who are only minimally competent" or "decide on the minimum and maximum failure rate" are not taking into account the disabled person who struggles to meet the minimum standard. They only think of the average person taking the examination the CBSE does not grade on the objective standard to test if someone is qualified to safely treat patients, but a "low pass" in a "range" "from 62 to 68" that is ""corresponding to Step 1 Performance starting at the passing standard plus 2 standard errors of measurement"(See Plaintiff Cert at 24)

Plaintiff has also taken "Subject examinations that Defendants will not allow him to pass (See Plaintiff Cert at 25) It appears that these exams are scored using the "Angoff" and "Hofstee" methods (See Plaintiff Cert at 22) In addition to the discriminatory effects of these methods (which Plaintiff will address later), the exams are scored using "Equated Percent Correct" which do not represent "the amount of content that you have mastered" but its relation to "percentile ranks", as detailed in the table on page 4 of the document Plaintiff has attached (See Plaintiff Cert at 22 ) Each exam has its own passing score set by Defendants utilizing the "Angoff and Hofstee" methods as the example from Defendants website shows the data for Emergency Medicine (See Plaintiff Cert at 22)

None of Plaintiffs exams (See Plaintiff Cert at 25) are passing (See Plaintiff Cert at 26) The reason for this is that Plaintiff is assigned an "Equated Percent Correct" score which is decided by Defendants using the Angoff and Hofstee methods and placed on "Percentile Rank"

---

[5] Bowers, J. J., & Shindoll, R. R. (1989). *A Comparison of the Angoff, Beuk, and Hofstee Methods for Setting Apassing Score.* Iowa City, IA: American College Testing Program.

scale being compared to a "norm group" (See Plaintiff Cert at 22) Therefore Plaintiff's Subject

Examinations or Shelf Exams are not scored on their own merit to decide if he can safely

practice medicine, but compared to a "Norm group' after the passing score set by Defendants on

the "equated percent" scale is compared to the percentile ranks of the "norm group" (See Plaintiff

Cert at 22)

Since it has been shown that these methods are utilized to score USMLE Step 1 as stated

in the previous argument, it is for certain that Defendants have discriminated against him double

fold. Once since Step 1 is graded using the Hofstee and Angoff methods, then that score is

compared to the CBSE score to decide passing or failing. This is in addition to 4 shelf exams

also being graded using the Hofstee and Angoff that have been proven to be scored by both

methods (See Plaintiff Cert at 22)

### K. The "Passing Scores" Set By Defendants are Unreasonably High and Prejudice Anyone Disabled

"Although the USMLE was designed for use as a licensing exam, it is common practice

for residency and fellowship programs to use USMLE test scores in evaluating candidates for

admission to their programs." Doe v. National Bd. of Med. Exam'rs, 199 F.3d 146, 154-155 (3d

Cir. 1999) Yes, you have read that correctly. Plaintiff has been fighting to get his exams scored

to the minimum standard to safely practice medicine. However, it is a known fact and public

knowledge that these scores were not and are not used specifically for deciding who gets

licensed. They are used to "screen out" applicants from residency training programs an example

is as stated *Pass/fail scoring of USMLE step 1 and the need for residency selection reform* "With

Step 1 scores deemphasized in future resident selection, programs may seek another method for

screening candidates [6]." The score reporting has changed to Pass/ Fail, as of January 2022, but not how the exam is as graded. Plaintiff has accused Defendants of grading all of the exams using the methods as stated in the complaint and his arguments. The problem is that Plaintiff is not only trying to pass the exam, his scores are being pushed down because the other students in the "2020 reference group" that is used on the CBSE to decide if Plaintiff receives a 62 is not only average students, but average students that were competing against each other. Plaintiff therefore feels the need to address this because of its importance to what that "average population" Plaintiff is being compared to actually consists of.. Not average students, but average students who are competing for the highest score possible.

## II. The Extent of Harm to Plaintiff

"[T]o show irreparable harm a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994) (internal quotation marks and citation omitted). The harm must be "likely" to occur "in the absence of an injunction." Ferring Pharms., Inc. v. Watson Pharms., Inc., 765 F.3d 205, 217 n.11 (3d Cir. 2014) (emphasis omitted) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008))". quoting Ramsay v. Nat. Bd. of Medical Examiners 968 F.3d 251 (3d Cir. 2020)

"The District Court ha[s] a basis to conclude that [Plaintiff] would be irreparably harmed absent an injunction. The Court could reasonably conclude that given [Plaintiffs] disability and that [he] had previously failed [CBSE and likely will fail] Step 1, [he] likely would fail again and be forced to leave medical school.[15] Ramsay, 2019 WL 7372508, at *18. H[is] termination from medical school and its consequences could not later "be redressed by a legal or an equitable

---

[6] Salehi, P. P., Azizzadeh, B., & Lee, Y. H. (2021). Pass/fail scoring of USMLE step 1 and the need for residency selection reform. Otolaryngology–Head and Neck Surgery, 164(1), 9-10.

remedy." Acierno, 40 F.3d at 653 (citation omitted). No damages remedy is available under the

ADA. 42 U.S.C. § 12188(a)(1) (providing that the only remedies available in an ADA action are

those in § 2000a-3(a)); id. § 2000a-3(a) (providing for injunctive relief). Furthermore, because

[CMU] is not a party to this case, the Court could not require it to reinstate her, and the Board

presents no theory for how the Board could redress the termination of Ramsay's medical

education. Moreover, an examiner's refusal to provide accommodations can cause the exam-taker

irreparable harm because doing so jeopardizes her "opportunity to pursue her chosen profession."

Enyart v. Nat'l Conf. of Bar Exam'rs, 630 F.3d 1153, 1166 (9th Cir. 2011); accord Doe v. Pa.

State Univ., 276 F. Supp. 3d 300, 313-14 (M.D. Pa. 2017) (holding that gap in medical school

education and likelihood that the student could not gain acceptance to another school constituted

irreparable harm). Accordingly, the District Court correctly concluded that Ramsay established

she would be irreparably harmed absent an injunction". quoting Ramsay v. Nat. Bd. of Medical

Examiners 968 F.3d 251 (3d Cir. 2020)

"Specifically, if a student does not pass the Step I exam before the beginning of his third

year of medical school, he would normally need to drop out of school during his third year in

order to study properly for the exam, thereby falling behind his peers. Students behind in their

studies normally will not be offered the range and quality of residency or medical specialty

options their peers will be offered. They will normally not be offered interviews for further study

in the more competitive medical specialties, will not have the usual range of geographic or

location (city and school) choices for remaining medical school programs which may be

available, and will be delayed in completion of their medical training. There is no good way to

remedy this injury. Timely Step I testing and passage is required." quoting Rush v. National

Board of Medical Examiners, 268 F. Supp.2d 673 (N.D. Tex. 2003)

### III. Harm to Defendants

"We next consider how the District Court [should] "balanc[ed] the parties' relative harms;

that is, the potential injury to the plaintiff[] without this injunction versus the potential injury to

the defendant with it in place." Issa v. Sch. Dist. of Lancaster, 847 F.3d 121, 143 (3d Cir. 2017).

In balancing the harms, the Court noted the Board's "concern for the fulfillment of its mission to

provide [qualified] physicians," Ramsay, 2019 WL 7372508, at *19........Nonetheless, the Court

appropriately reasoned that granting a preliminary injunction would not undermine the Board's

mission because the injunction would give [Plaintiff] only "the opportunity to move forward" in

h[is] medical career "should [he] succeed in passing h[is] examinations with appropriate

[scoring]" Id. at *19 (emphasis omitted). Moreover, the Board's concerns regarding impacts from

undeserved [scoring] do not apply here because [Plaintiff] has shown a reasonable likelihood that

[Defendants are violating the ADA] Cf. Issa, 847 F.3d at 143 (holding that a defendant could not

assert an interest in continuing to violate a civil rights statute)" quoting Ramsay v. Nat. Bd. of

Medical Examiners 968 F.3d 251 (3d Cir. 2020)

### IV. Public Interest

"Finally, we consider the District Court's finding that "the public interest favors this

preliminary injunction." Id. The Court [should] concluded that an injunction furthers the public

interest in ADA compliance and serves to increase the number of qualified physicians. Ramsay,

2019 WL 7372508, at *19. We agree. "In enacting the ADA, Congress demonstrated its view

that the public has an interest in ensuring the eradication of discrimination on the basis of

disabilities." Enyart, 630 F.3d at 1167; see Issa, 847 F.3d at 143 (concluding that it was in the

public interest for covered entities to comply with a civil rights statute). Further, the injunction

allows [Plaintiff ] to continue h[is] medical education and therefore serves the public interest in

training more physicians. "Although it is true that the public also has an interest in ensuring the integrity of licensing exams," Enyart, 630 F.3d at 1167, [Plaintiff] has shown a reasonable likelihood that the ADA affords h[im proper scoring], and there is no evidence that providing h[im] the requ[red scoring] will jeopardize the test's integrity. Thus, the public interest weighs in favor of an injunction" quoting Ramsay v. Nat. Bd. of Medical Examiners 968 F.3d 251 (3d Cir. 2020) "The injunction will not disserve the public interest but will further the public interest in prohibiting discrimination by public entities, such as the National Board of Medical Examiners, on the basis of disability by fulfilling the ADA's requirement that entities offering licensing examinations [scored legally] to disabled individuals." Rush v. National Board of Medical Examiners, 268 F. Supp.2d 673 (N.D. Tex. 2003)

### Conclusion

In conclusion the Plaintiff respectfully requests that this Court grant his application for Injunctive Relief against the Defendants in order to stop the violations of the Americans with Disabilities Act and allow him to continue his medical education by scoring his exams on the bases of his achievement, not his comparison to others.

Dated: 9/23/2022

Jason A. Zangara, MPH, MA
573 Sidorske Avenue
Manville, New Jersey 08835
(908) 672-0626
firefighterjazzyj@yahoo.com

Plaintiff, Pro Se