UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

JASON A. ZANGARA                                    )
                                                    )
      Plaintiff                             )        Civil No. 3:22-cv-01559-GC-LHG
                                                    )
  v.                                             )
                                                    )
                                                    )
National Board of Medical Examiners (NBME)          )
                                                    )
      Defendants                            )

---

### PLAINTIFFS REPLY BRIEF IN SUPPORT OF APPLICATION
### FOR PRELIMINARY INJUNCTION

---

JASON A. ZANGARA PRO SE
573 SIDORSKE AVENUE
MANVILLE, NJ 08835
(908)672-0626
ATTORNEY FOR PLAINTIFF

## Table of Contents

**Page**

Statement.........................................................................................................................1

**I. Response to Defendants "Background"**.............................................................**4**

**II. Response to: I. Preliminary Injunction Standard**..........................................**28**

**III. Response to: II.  Mr. Zangara Has Not Made and Cannot Make a "Clear Showing"**
     **That He Is Likely to Succeed on the Merits**..........................................**29**

**A. Response to A. Mr. Zangara's ADA Claim is Time Barred**...............................**33**

**B. Response to:  B. In All Events, Mr. Zangara's ADA Claim Is Meritless**.........................**38**

**III. Response to: III Mr. Zangara Will Not Be Harmed**......................................**44**

**IV. Defendants Admit Plaintiff is Correct in Two Places in Their Brief**...............................**50**

**V. The "Undue Burden"**..........................................................................................**52**

**VI. Response to: IV. A Preliminary Injunction Would Harm NBME** ..................**58**

**VII. Response to V. An Injunction would Not Serve the Public Interest**..........................**59**

Conclusion.....................................................................................................................**61**

## __Statement__

Plaintiff apologizes for not going thru this brief completely to edit and create a table of cases but he ran out of time. He was not served with the Defendants Opposition Brief until Thursday when he was supposed to be served Monday giving him only 4 days.



As this court is aware this is an ongoing issue with Defendants as they know that they cannot win honestly so they have to resort to these tactics. Plaintiff cannot keep waiting and apply for an extension to answer because this has already gone on too long. Luckily Defendants have been sued so many times there is a mountain of information available showing that their attorneys just "recycle" the same garbage in practically every case that Plaintiff was able to predict the majority of what their arguments were going to be two weeks ago. They have so many Appellate  opinions anything possibly involving the ADA has been addressed already in

1

practically every Circuit along with the dozens of District Courts have weighed in on their arguments.

In fact, Defendants are so busy with litigation that the same attorney in this matter, Adam Mandelsberg, asked for an extension to answer this motion calming he needed more time for this motion when in fact he wasn't working on the response for this court at all. He was at the courthouse in the Eastern District of New York dealing with another medical student that applied for an injunction against Defendants, in which they also violated the ADA and he attempted the same arguments he did in this court.



Fortunately, in this Circuit, the Third Circuit judges have already rejected the arguments that have been made by Defendants and Mr. Mandelsberg in the <u>Ramsay</u> case which contradicts practically everything he has presented to this court as Plaintiff will address. It is apparent however that Defendants are apparently using Mr. Mandelsberg as "a rubber stamp" so they could use this court to overturn <u>Ramsay</u>. The other attorney that was in attendance in the

Sampson case in New York was Caroline Mew as shown above, the attorney who lost Ramsay in the Third Circuit in 2020. That's where Mr. Mandelsberg's baseless arguments are coming from.

       In addition to their arguments, Plaintiff address how much of Morrison's certification is a "sham" and how Defendants attempted to ignore everything including the exhibits that Plaintiff has presented to the court and frame this as some kid of "accommodation case" in which as the court can see, it is not. Defendants are going through great lengths to cover up the fact that they are grading their exams not on the test takers own merit, but based on how the last group scored. This is all contradicted by the lies that Morrison has submitted which Plaintiff will address also.

       Defendants also prove that they are hiding something when they get towards the end of their brief and their argument has changed from *"Plaintiff is wrong"* to *"well the court still cant stop us because changing the exam scoring will create an "undue burden" on us"* Well, duh, if you're already complying with the ADA what do you have to change????

## I. Response to Defendants "Background"

It is clear that Plaintiff and his classmates back in 10th grade, all of which were special education students could have filed a more accurate brief then Defendants have submitted to this court. It has absolutely nothing to do with what this matter is about or what he has asked the court to do. It is truly sad that Plaintiff has to take the time to respond and the court has to take the time to read what they have submitted. On top of that the incompetence or perjury, whichever it may be of "Carol Morrison" adding such misrepresentations to this record only complicates this matter further.

**This is not an accommodation case** and Plaintiff has made it crystal clear and very detailed that this matter involves the scoring all of Defendants examinations which are scored illegally under the regulations created by the Department of Justice (28 C.F.R. §36.309) which implement the ADA. Plaintiff has been under the protection of the ADA for over 22 years and is more than aware of how and when to request accommodations for an examination, which is longer than the employees of NBME have been working there; along with their attorney who was in either 4th or 5th grade so neither are in any position to tell this court what Plaintiff is asking or what this case is about. Plaintiff has asked to court to stop a discriminatory act, not grant him "extra time" on an exam.

Plaintiff has brought this action to include 'all examinations offered by Defendants" as stated multiple times in multiple places. These include, but are not limited to the following: The Comprehensive Basic Science Examination (CBSE), Comprehensive Clinical Science Examination (CCSE), NBME Subject Examinations (aka "Shelf Exams") United States Medical Licensing Examination (USMLE) Step 1, Step 2 and Step 3.

Case 3:22-cv-01559-RK-JBD   Document 26   Filed 10/24/22   Page 7 of 68 PageID: 843

Defendants must ensure that "The examination [CBSE, CCSE, Shelf or Subject, USMLE Steps 1, 2,& 3] is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual or speaking skills, the examination accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual or speaking skills (except where those skills are the factors that the examination purports to measure)" 28 C.F.R. §36.309.

As for Morrison, she first **commits perjury** by stating that only a school can purchase an exam (See Morrison Decl. ¶ 9.) **withholds from the court, and does not include in her certification** that Plaintiff took his most recent CBSE on March 22, 2022 (See Plaintiff Cert 23 & Exhibit J) **Which Plaintiff purchased directly from Defendants as documented by the receipt for order number O-0001894270 specifying "Jason Zangara" as the buyer which was paid for with his visa card ending in 4489 (See Planitff Cert. at 29 & Exhibit O) Plaintiff has accused Defendants of scoring their examinations including this one by deciding Plaintiffs passing or scoring based on his comparison to others and not on their own merit. The ADA allows him to pursue this injunctive relief based on this exam taken after the score reporting was changed and their current scoring practice of scoring the CBSE, USMLE Steps and all other exams based on his comparison to others.**

Next Morrison commits perjury again by calming that schools set the passing score (See Morrison Decl. ¶ 7.)  after Plaintiff had correctly stated that Defendants set the passing scores (See Plaintiff Cert at 26) which was confirmed by the Student Performance Assessment Committee at his school when Plaintiff questioned the scoring (See Plaintiff Cert at 30  & Exhibit P)

5

**spac@cmumed.org** <spac@cmumed.org>
**To:** firefighterjazzyj@yahoo.com
**Cc:** aayubi@cmumed.org,mboegels@hotmail.com,students@cmumed.org,spac@cmumed.org
Wed, Oct 13, 2021 at 9:13 AM
Dear mr. Zangara,

The SPAC states that the SPAC cannot interfere with rules or requirements of gradings of exams. As the SPAC cannot influence gradings, there is no possibility to appeal with the SPAC itself.

He should appeal to the administrators of the exams (NBME, CBSE or USMLE) to ask for special individual grading requirements.


Kind Regards

Student Performance Assessment Committee (SPAC)
Dr. Marijn Bögels, Chair
Dr. Ali Ayubi, Member

**Caribbean Medical University**
Toll Free: +1 888 877 4268
Direct: +1 224 444 4700
Fax: +1 302 397 2092
Email: aayubi@cmumed.org


This matches the information published by Defendants in *"Common Questions about NBME CBSE/CBSSA Score Report Changes"* that Plaintiff has submitted in **which Defendants didn't even respond too or offer any explanation in their brief or Morrison's Certification** (See Plaintiff Cert at 24 & Exhibit K)

> **What scores on the equated percent correct scale correspond to the USMLE Step 1 low-pass range?**
> The low-pass range goes from 62 to 68 on the equated percent correct scale.  This range represents CBSE scores corresponding to Step 1 performance starting at the passing standard plus 2 standard errors of measurement.

This also matches the information that Plaintiff has submitted proving the Subject Examinations are graded by judges who set the "Equated Percent Correct Score" using the Modified Angoff and Hofstee methods to choose the passing score, in which also **Defendants did not respond too, deny or offer any explanations as to this document in their brief or Morrison's Certification** (See Plaintiff Cert at 22 & Exhibit I)

6

**SUBJECT EXAMINATION PROGRAM**

EMERGENCY MEDICINE ADVANCED CLINICAL EXAMINATION

GRADING GUIDELINES



The NBME conducted webcast standard setting studies for the Emergency Medicine Subject Examination with medical school faculty. For each study, medical school faculty who were past or present clerkship directors (100% for 2015 and 88% for 2019) in Emergency Medicine participated as expert judges in webcast sessions that utilized the internet and conference calling to train participants in the standard setting procedure. Judges reviewed the content and rated the difficulty of each item on a current form of the examination. The study employed both a Modified Angoff content-based procedure and the Hofstee Compromise standard setting method. These two procedures together provide proposed passing standards that are based on an in-depth item-by-item analysis of the examination content, as well as a more global analysis of the content. The results were summarized and the proposed standards were expressed as the proportion of the content required for a candidate to pass and to receive honors status. Table 1 provides a summary of the medical school faculty who served as expert judges and their school information for each of the webcast studies conducted by the NBME.

**Table 1 – Demographics of Expert Judges and Schools Participating in Emergency Medicine Webcast Studies**

| Standard Setting Study | Number of Judges | Years of Experience | Number of Schools | Use CDEM Curriculum | Traditional School Curriculum | Integrated School Curriculum | School Clerkship Length |
|---|---|---|---|---|---|---|---|
| 2015 | 27 | 1 – 20 | 26 | 93% | 22% | 56% | 2 – 4 weeks |
| 2019 | 24 | 2 – 20 | 24 | 71% | 38% | 58% | 2 – 8 weeks |

The data shown below represent a compilation of the opinions of the medical school faculty who participated in each study. The results reported are on the Equated Percent Correct score scale that became effective August 2015. The study results are provided to assist you in setting fair and valid passing and honors standards for this examination.

Table 2 provides a summary of the results for passing scores from the Modified Angoff and Hofstee Compromise procedures. The recommended minimum passing score based on the 2019 Angoff results is a subject exam score of 61, which is higher than the recommended standard in 2015. This score was slightly below the acceptable range of minimum passing scores (63 to 72) computed from the 2019 Hofstee results. The recommended minimum passing score based on the 2019 Hofstee results is a subject exam score of 68, which is higher than the 2015 Hofstee results.

**Table 2 – Emergency Medicine Grading Guidelines for Passing (Equated Percent Correct Scores)**

| Standard Setting Study | Modified Angoff Recommended Passing Score | Hofstee Compromise Range of Acceptable Minimum Passing Scores | Hofstee Compromise Recommended Passing Score |
|---|---|---|---|
| 2015 | 59 | 54 to 66 | 62 |
| 2019 | 61 | 63 to 72 | 68 |

Table 3 provides a summary of the Hofstee results for honors. The 2019 study results indicate that the minimum acceptable score for honors should fall between a score of 86 to 92. The range of minimum acceptable Hofstee scores for honors based on the 2019 study is smaller than the range in 2015, but the maximum score is the same.

**Table 3 – Emergency Medicine Grading Guidelines for Honors (Equated Percent Correct Scores)**

| Standard Setting Study | Hofstee Compromise Range of Acceptable Minimum Honors Scores |
|---|---|
| 2015 | 80 to 92 |
| 2019 | 86 to 92 |

Morrison also falsely claims that Plaintiffs Examinations are not graded in comparison to

others (See Morrison Decl. ¶ 11.) and claims they are graded using an "equated percent correct"

(See Morrison Decl. ¶ 13) **However she has published a paper herself on behalf of**

**Defendants detailing what thier "equated percent correct" actually means[1]**

> **Equated percent correct scores would provide score users with...norm-referenced interpretations supported by scaled scores.**

---

[1] **Morrison, C., Ross, L., Baker, G., & Maranki, M. (2019). Implementing a New Score Scale for the Clinical Science Subject Examinations: Validity and Practical Considerations. Medical science educator, 29(3), 841–847. https://doi.org/10.1007/s40670-019-00747-9**

The purpose of this paper is to describe the implementation of equated percent correct scores for the clinical science subject examination program to improve score interpretability and to prevent score misuse. Seven examinations were included in the rescaling project: clinical neurology, family medicine, medicine, obstetrics and gynecology, pediatrics, psychiatry, and surgery.[**See Plaintiff Cert at 25 &Exhibit L**] The psychometric and practical considerations that arose during this project are discussed.

Equated percent correct scores are based on the concept of a domain score calculated using item response theory (IRT) In this case, a domain is defined as a collection of items that represent the content outline of the particular clinical science examination. All of the items on the form the student took and all of the items that constitute the domain are put on the **same scale...**

The Rasch model is a widely used IRT model that considers only one item characteristic, difficulty, when **determining the probability of a student answering an item correctly. All of the items on the forms included in the content domain and on the forms taken by the students for each subject examination were calibrated using the Rasch model and put on a common scale...**

The Rasch model was used to calculate the probability $P_i(\theta)$ that a student with proficiency $\theta$ based on the particular examination form he/she took would answer domain item $i$ correctly; $b_i$ represents the difficulty of item $i$

$$P_i(\theta)=e(\theta-bi)/1+e(\theta-bi)(i=1,2,\ldots,n)$$
$$1$$

An equated percent correct score ($\pi$) was then calculated that represents the percentage of items in the domain that a student with proficiency $\theta$ would answer correctly.

$$\pi|\theta=(1n\sum ni=1Pi(\theta))\times100(i=1,2,\ldots,n)$$
$$2$$

Equated percent correct scores were then rounded to a whole number and ranged from 0 to 100.

These math equations are **_far_** from "a percentage of content mastered" that Defendants keep claiming is how the examinations are graded. In addition to this Morrison specifically stated that "prior to early 2022, his scores were reported as a scaled score" (See Morrison Decl. ¶ 13) but this article she wrote is talking about "equated percent correct" being calculated using

"scaling" and probability" as stated above along with "**Equated percent correct scores would**

**provide score users with...norm-referenced results.**

What Morrison is describing in her is not a percentage of something. **<u>This</u>** is an example

of a  percentage of something put in proper context and usage

"Rose Cipollone had "`voluntarily and unreasonably encounter[ed] a known danger by
smoking cigarettes' " and that 80% of the responsibility for her injuries was attributable to
her. See 893 F. 2d, at 554 (summarizing jury findings)."

<u>Cipollone v. Liggett Group, Inc.</u>, 505 U.S. 504, 112 S. Ct. 2608, 120 L. Ed. 2d 407
(1992).


Following this, Morrison then goes on to explain in her paper:

NBME staff conducted numerous webcasts prior to and after the new scores were
implemented. **Psychometric staff explained how to interpret the new scores
and...locate passing scores** that schools use to make decisions about student
performance... [Then] NBME psychometric staff demonstrated that the score equivalency
table allowed them to find the equated percent correct score that was [the] minimum
passing score....Other users were concerned about finding equivalent percentile ranks on
the new scale. Again, NBME psychometric staff showed them how to find equivalent
ranks using the new norm tables and the score [table]


Finally the last line of the article reads: **<u>*NBME has subsequently implemented equated*</u>**

**<u>*percent correct scores*</u>** for the remaining clinical science subject examinations **<u>*and for the basic*</u>**

**<u>*science subject examinations.*</u>** As Plaintiff has stated, the new exams are not "a percentage of

content mastered" but "**Equated percent correct scores [that] provide score users**

**with...norm-referenced results"** in which the tables for the CBSE are not allowed to be

**shared with students or the public** (<u>See</u> Plaintiff Cert at 24 & Exhibit K)

**May I share the CBSE conversion table with my students**?
No, the conversion table is not intended to be shared with students. It was created and provided to help
faculty and learning specialists adjust during the transition from the 3-digit scores to equated percent
correct (EPC) scores.

This is proven by Plaintiff took his most recent CBSE on March 22, 2022 (See Plaintiff Cert 23 & Exhibit J) Which Plaintiff purchased directly from Defendants as documented by the receipt for order number O-0001894270 specifying "Jason Zangara" as the buyer which was paid for with his visa card ending in 4489 (See Plaintiff Cert. at 29 & Exhibit O) His exam was scored using an "Equated percent correct" that was compared a norm-referenced group. Plaintiffs exam results specified that the "performance of a 2020 national cohort of students" was used as the norm-referenced group and was used to estimate his "probability of passing step 1 within a week" (See Plaintiff Cert at 23) Defendants have set the "low pass" in a "range" from 62 to 68 as stated on the first paragraph of page 4 of documentation available on Defendants website (See Plaintiff Cert at 24)

**What scores on the equated percent correct scale correspond to the USMLE Step 1 low-pass range?**
The low-pass range goes from 62 to 68 on the equated percent correct scale.  This range represents CBSE scores corresponding to Step 1 performance starting at the passing standard plus 2 standard errors of measurement.

This range is "corresponding to Step 1 Performance starting at the passing standard plus 2 standard errors of measurement" (See Plaintiff Cert at 24) Therefore in order to "Pass" CBSE, as required by his school Plaintiff must score a 62 "corresponding to Step 1 Performance starting at the passing standard plus 2 standard errors of measurement" (See Plaintiff Cert at 24).

Defendants have attempted to argue that Plaintiffs school decides a passing score and the school is the one who requires the examination so they are off the hook. This is incorrect because **the courts do not hold the medical boards of all 50 states accountable for Defendants actions because <u>they</u> require the examinations to get licenses, <u>the courts hold Defendants liable</u> because they are the ones who actually create and administer the exams under the ADA and its implementing regulation 28 C.F.R. 36.309 which states:**

(b) Examinations.

(1) Any private entity offering an examination covered by this section must assure that -

(i) The examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the **examination results** accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure);

Defendants are the ones liable regardless of where the exam is administered or who buy it as explained in by the DOJ in their Amicus Curiae brief submitted to the Third Circuit in Rawdin v. Am. Bd. of Pediatrics 582 F. App'x 114 (3d Cir. 2014):

"28 C.F.R. 36.309 require testing entities to do more than simply provide reasonable accommodations. .....Section 309 and its implementing regulation shift the burden away from the plaintiff and **onto the testing entity to develop and administer the examination** in a way that will best ensure the results accurately reflect that individual's aptitude or achievement level, rather than disability. **If the plaintiff can show that the results of the examination reflect his disability, rather than his skill or knowledge, the "best ensure" standard requires the testing entity to determine whether there is a testing alternative that, while still testing the same factors or knowledge the test is designed to measure, permits the person with a disability the opportunity to demonstrate the abilities measured by the test, as opposed to a test that reflects the manifestations of his disability.[2]**

Morrison although clearly lying on other matters appears to be telling the truth in this case as she certifies it is not medical schools who develop and administer examinations it is the Defendants who develop and administer all of their examinations (See Morrison Decl. ¶ 2)

---

[2] https://www.justice.gov/sites/default/files/crt/legacy/2014/03/19/rawdinbrief.pdf

> 2.   NBME is a non-profit organization whose mission is to help protect the public health through the development and administration of high-quality examinations for health professionals.

Since Defendants have now certified that they developed and administer the examinations "Section 309 and its implementing regulation shift the burden away from the plaintiff and onto the testing entity to develop and administer the examination in a way that will best ensure the results accurately reflect that individual's aptitude or achievement level, rather than disability."[3] "Only the NBME, and not Prometric,[or Plaintiffs school] controls the conditions under which the exam is administered and [developed]...we refuse to let the NBME escape... for the services that the NBME solely provide. Currier v. National Board of Medical Examiners, 965 N.E.2d 829, 462 Mass. 1 (2012)

None of the courts have allowed Defendant NBME to avoid liability because "someone else required or gave their exams" See Ramsay v. Nat. Bd. of Medical Examiners 968 F.3d 251 (3d Cir. 2020); Doe v. National Bd. of Med. Exam'rs, 199 F.3d 146, 154-155 (3d Cir. 1999); Katz v. Nat'l Bd. of Med. Exam'rs, 751 F. App'x 231 (3d Cir. 2018); Powell v. National Bd. of Medical Examiners , 364 F.3d 79 (2d Cir. 2004);  Jenkins v. Nat'l Bd. of Med. Exam'rs, No. 08-5371, 2009 U.S. App. LEXIS 2660 (6th Cir. Feb. 11, 2009); Gonzales v. National Bd. of Medical Examiners, 225 F.3d 620 (6th Cir. 2000); Biank v. Nat'l Bd. of Med. Examiners, 130 F. Supp. 2d 986, 988 (N.D. Ill. 2000) ; Currier v. National Board of Medical Examiners, 965 N.E.2d 829, 462 Mass. 1 (2012) ; Gonzalez v. National Bd. of Medical Examiners, 60 F. Supp.

---

[3] https://www.justice.gov/sites/default/files/crt/legacy/2014/03/19/rawdinbrief.pdf

2d 703 (E.D. Mich. 1999); <u>Wright v. NBME</u>, 2021WL 5028463, *9 (D. Colo. 2021); <u>Black v. Nat'l Bd. of Med. Examiners</u>, 281 F. Supp. 3d 1247, 1249-50 (S.D. Fla. 2017); <u>Berger v. Nat'l Bd. of Med. Exam'rs</u>, No. 1:19-cv-99, 2019 U.S. Dist. LEXIS 145666 (S.D. Ohio Aug. 27, 2019); <u>Price v. National Bd. of Medical Examiners</u>, 966 F. Supp. 419 (S.D.W. Va. 1997); <u>Rush v. National Board of Medical Examiners</u>, 268 F. Supp.2d 673 (N.D. Tex. 2003); <u>Scheibe v. Nat'l Bd. of Med. Examiners</u>, Civ. A. No. 05-180, 2005 WL 1114497, at *3 (W.D. Wis. May 10, 2005)

"although NBME may not have liked the terminology used in the implementing regulations, despite its registered objections, the foregoing language is what was enacted and it is this language which must be followed" <u>Ramsay v. Nat. Bd. of Medical Examiners</u> 968 F.3d 251 (3d Cir. 2020) <u>See</u> also <u>Price v. Nat'l. Bd. of Med. Examiners</u>, 966 F. Supp. 419 (S.D.W. Va. 1997) (Holding that, because Congress authorized the DOJ to make issue regulations for Subchapter III, courts must give their decisions controlling weight unless arbitrary or manifestly contrary to the statute <u>See</u> also  <u>Love v. Law Sch. Admissions Council</u>, Inc., 513 F. Supp. 2d 206, 223 (E.D. Pa. 2007) (finding that private, non-profit entity responsible for administering test required for admission to law school had to comply with ADA); see also <u>Scheibe v. Nat'l Bd. of Med. Examiners</u>, Civ. A. No. 05-180, 2005 WL 1114497, at *3 (W.D. Wis. May 10, 2005) (citing cases concluding that NBME is subject to ADA); <u>Biank v. Nat'l Bd. of Med. Examiners</u>, 130 F. Supp. 2d 986, 988 (N.D. Ill. 2000) (holding that NBME, "as a private entity offering examinations related to licensing, is subject to ADA under Section 12189") quoting <u>Boggi v. Med. Rev. & Accrediting Council</u>, 415 F. App'x 411, 414 (3d Cir. 2011) Specifically  the "application of  Section 12189, at issue in this case, is covered by the DOJ regulations in 28 C.F.R. part 36" <u>Price v. Nat'l. Bd. of Med. Examiners</u>, 966 F. Supp. 419 (S.D.W. Va. 1997)

"In applying the foregoing to the case at hand, we note that insofar as the above-quoted regulations are "the equivalent[s] of a 'legislative rule' ... issued by an agency pursuant to statutory authority," they thus have the 'force and effect' of law." PDR Network, LLC v. Carlton & Harris Chiropractic, Inc., 139 S. Ct. 2051, 2055, 204 L. Ed.2d 433 (2019)(quoting Chrysler Corp. v. Brown, 441 U.S. 281, 302-303, 99 S. Ct. 1705, 60 L. Ed.2d 208 (1979) and Batterton v. Francis, 432 U.S. 416, 425, n.9, 97 S. Ct. 2399, 53 L. Ed.2d 448 (1977)). At the very minimum, the regulations are "entitled to substantial deference" and "given controlling weight" unless "it can be shown that they are arbitrary, capricious, or manifestly contrary to the statute." See, n. 8, supra. See also, Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 597-598, 119 S. Ct. 2176, 2185-2186, 144 L. Ed.2d 540 (1999)("Because the Department [of Justice] is the agency directed by Congress to issue regulations implementing Title II, ... its views warrant respect") and Bragdon v. Abbott, 524 U.S. 624, 642, 118 S. Ct. 2196, 141 L. Ed.2d 540 (1998)("It is enough to observe that the well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance'"(quoting Skidmore v. Swift & Co., 323 U.S. 134, 139-140, 65 S. Ct. 161, 89 L. Ed.2d 124 (1944)). quoting Ramsay v. Nat. Bd. of Medical Examiners 968 F.3d 251 (3d Cir. 2020)

The court have held the Defendants responsible for the regulations created by the DOJ under what is known as "Chevron Deference" in which the court treats the regulation as law and defers to the interpretation of the statue by the agency See Chevron USA Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984) **(Holding that Government Agencies regulation is given difference when it is a permissible construction of the statue and congress has not spoken of the issue directly)** Chevron later used this ruling in a case under the ADA in which they were the defendants and it was affirmed

by the Supreme Court  See Chevron USA Inc. v. Echazabal, 536 U.S. 73, 122 S. Ct. 2045, 153 L. Ed. 2d 82 (2002) **(Holding that a Government Agency has the authority to create and enforce regulations regarding the Americans with Disabilities Act (ADA))**

## The Fraudulent Documents

Now back to Morrison, who on behalf of defendants is attempting to commit fraud upon this court by submitting the documentation attached to her certification. She first claims that "Attached at Exhibit M is a true and correct copy of a sample Examinee Performance Report for the CBSE reflecting current score reporting" and submits a document. However this document was altered with the material fact that is the subject of this litigation after Defendants were served with Plaintiffs complaint. The Defendants, did not think though because they obviously didn't realize that even though they were served in early July; **Plaintiffs documents were already in the courts possession on March 18, 2022 as shown by dates on the documents (the UPS overnight receipt) and the filings in the clerk's office; so this "updated document" wasn't created yet. The one attached to Plaintiffs original complaint is the original one which the court already had. (See next page)**



16

The second fraudulent item attached to Morrison's looks and seems legit and appears to have taken a lot of effort. That effort is justifiable in a twisted business way as if the court grants Plaintiff the injunction he has asked for, fewer people, especially those who are disabled won't be taking Defendants exams over and over again. This means less money for the Defendants which is why they have such an extensive history of discrimination. Their business model is: fail as many people as possible and charge them to take the exam again.

On that note, what Morrison has submitted to this court is like a Gucci bag from Canal street in New York City. It looks really nice, everyone thinks it's a real Gucci bag, it must be real Gucci bag right? Wrong. When do you find out it's <u>not</u> a real Gucci bag? **<u>When it doesn't function</u>** like a Gucci bag when the girl loads it up with all her stuff and it rips. Let's see if the " Canal Street Gucci Bag" Morrison and Defendants have submitted actually functions.

Morrison makes this statement in her certification (<u>See</u> Morrison Decl. ¶ 18)

> 18.    Attached at Exhibit A is a true and correct copy of a CBSE Score Interpretation Guide and Roster Report for Caribbean Medical University School of Medicine for February 11, 2022.

She is referencing the two documents that appear at Exhibit A which is the Alleged "Score Interpretation Guide"  for a CBSE that Plaintiff took on February 11,2022[4] and the "Roster" of him allegedly taking the exam. Any competent person can see that Defendants want us to assume the "Guide" "Interprets" the "February 11th exam" Morrison and Defendants want the reader to see this and assume Plaintiff is wrong. This explanation looks all formal even though its content is totally wrong but **since the person who created this "Canal Street Gucci**

---

[4] Keep in mind that this is NOT Plaintiffs most recent CBSE, Plaintiff took his most recent CBSE on March 22, 2022 (See Plaintiff Cert 23 & Exhibit J) which Morrison has not included with her Certification even though she includes records all the way back to 2017

**Bag" was so concerned how the content and the tables looked, <u>they never bothered to see if they actually funtioned properly</u>**

Morrison presents this document as Plaintiffs score on an exam taken on February 11,2022 which states that Plaintiff received a "174" so let's compare this to the table that she claims is the " Score Interpretation Guide"



Keep in mind that Plaintiff scored a "174" and Plaintiff was diagnosed with ADHD in second grade (<u>See</u> Plaintiff Cert at 1 & Exhibit A) Classified under Section 504, given an Individual Education Plan (IEP), placed in full time special education (<u>See</u> Plaintiff Cert at 11&12, Exhibits B&C) struggled through college (<u>See</u> Plaintiff Cert at 14 & Exhibit E) Is significantly limited in everyday life in the areas of including but not limited to thinking concentrating, learning & reading (<u>See</u> Plaintiff Cert at 15) took 10 years to get an Associate's Degree and 12 to get a Bachelors in which his GPA was 2.7 (<u>See</u> Plaintiff Cert at 16 & Exhibit F) and struggled through medical school where he has a 2.04 (before adjustment) GPA (<u>See</u> Plaintiff Cert at 17 & Exhibit G)

Regardless of all of these circumstances, Plaintiff still managed to score a "174" Which he has been told wasn't passing on this exam. (<u>See</u> Morrison Decl. ¶ 28)

# SUBJECT EXAMINATION PROGRAM

COMPREHENSIVE BASIC SCIENCE EXAMINATION

SCORE REPORT



ID: 2138
Name: Zangara Jason Andrew
665060 - Caribbean Medical University School of M

Test Date: February 11, 2022

## YOUR PERFORMANCE

Your CBSE Score
## 174

Because the Comprehensive Basic Science Examination (CBSE) and the United States Medical Licensing Examination® (USMLE®) Step 1 cover very similar content, CBSE performance can be used in conjunction with other information to assess readiness for Step 1. Your CBSE score represents an estimate of your performance on Step 1 if you had taken both exams under the same conditions and with the same level of knowledge. Estimated performance based on taking CBSE is not a guarantee of your future performance on Step 1. Many factors, including changing levels of knowledge and testing conditions, may result in a Step 1 score that is higher or lower than your estimated score.

## YOUR PERFORMANCE COMPARED TO OTHER EXAMINEES

The chart below represents the distribution of Step 1 scores for examinees from US and Canadian medical schools taking Step 1 for the first time between January 1, 2019 and December 31, 2019. Reported scores range from 1-300 with a mean of 232 and a standard deviation of 19.



If you tested repeatedly under the same conditions on a different set of items covering the same content, without learning or forgetting, your CBSE score would fall within one standard error of the estimate (SEE) of your current score two-thirds of the time. The SEE on this exam is 8 points.

Your CBSE score +/- SEE: 166 – 182

Page 1 of 4

When Plaintiff score is placed on the tables that Morrison and Defendants have provided certification (See Morrison Decl. ¶ 18) the results are hilarious because there is no way that

**Plaintiff scored in the 88th and 80th percentiles! That means as written on the tables that 88% and 80% of the stidents who took the exam scored at or less then him on this exam. Plaintiff WISHES he could score in the 88th and 80th percentiles on exams, he would have any residency he wanted and would be set for life!!!!!**

SUBJECT EXAMINATION PROGRAM

COMPREHENSIVE BASIC SCIENCE EXAMINATION

2019-2020 ACADEMIC YEAR NORMS – YEAR 1 EXAMINEES

NBME

**Interpreting Academic Norms**

- Norms are provided to aid in the interpretation of examinee performance.
- They make it possible to compare examinees' scores with the performance of a norm group.
- Norm group characteristics:
  - Examinees from LCME-accredited medical schools with a graduation year of 2023 who took a form of this examination during the academic year from 7/1/2019 through 6/30/2020. If an examinee took CBSE multiple times for progress testing or other purposes during the first year of medical school, only the final attempt in the current academic year is included.

| Academic Years | Number of Schools | Number of Examinees | Mean | SD |
|---|---|---|---|---|
| 2019-2020 | 22 | 1,772 | 146.9 | 24.4 |

**Using the Table**

- To use the table, locate an examinee's score in the column labeled "CBSE Score" and note the entry in the adjacent column labeled "Percentile Ranks." This number indicates the percentage of examinees that scored at or below the examinee's CBSE score.

| CBSE Score | Percentile Ranks | CBSE Score | Percentile Ranks |
|---|---|---|---|
| 240 and above | 100 | 164 | 80 |
| 238 | 100 | 162 | 79 |
| 236 | 100 | 160 | 77 |
| 234 | 100 | 158 | 74 |
| 232 | 99 | 156 | 71 |
| 230 | 99 | 154 | 68 |
| 228 | 99 | 152 | 65 |
| 226 | 99 | 150 | 61 |
| 224 | 99 | 148 | 58 |
| 222 | 99 | 146 | 54 |
| 220 | 99 | 144 | 50 |
| 218 | 99 | 142 | 45 |
| 216 | 98 | 140 | 42 |
| 214 | 98 | 138 | 38 |
| 212 | 98 | 136 | 35 |
| 210 | 98 | 134 | 32 |
| 208 | 98 | 132 | 29 |
| 206 | 98 | 130 | 26 |
| 204 | 98 | 128 | 22 |
| 202 | 97 | 126 | 19 |
| 200 | 97 | 124 | 15 |
| 198 | 97 | 122 | 14 |
| 196 | 96 | 120 | 11 |
| 194 | 96 | 118 | 9 |
| 192 | 96 | 116 | 8 |
| 190 | 95 | 114 | 7 |
| 188 | 94 | 112 | 5 |
| 186 | 94 | 110 | 4 |
| 184 | 93 | 108 | 4 |
| 182 | 92 | 106 | 3 |
| 180 | 91 | 104 | 2 |
| 178 | 90 | 102 | 1 |
| 176 | 89 | 100 | 1 |
| 174 | 88 | 98 | 1 |
| 172 | 86 | 96 | 0 |
| 170 | 85 | 94 | 0 |
| 168 | 83 | 92 | 0 |
| 166 | 82 | 90 and below | 0 |

SEPT_2021

20

# SUBJECT EXAMINATION PROGRAM

COMPREHENSIVE BASIC SCIENCE EXAMINATION

2020-2021 ACADEMIC YEAR NORMS – YEAR 1 EXAMINEES



**Interpreting Academic Norms**

- Norms are provided to aid in the interpretation of examinee performance.
- They make it possible to compare examinees' scores with the performance of a norm group.
- Norm group characteristics:
  - Examinees from LCME-accredited medical schools with a graduation year of 2024 who took a form of this examination during the academic year from 7/1/2020 through 6/30/2021. If an examinee took CBSE multiple times for progress testing or other purposes during the first year of medical school, only the final attempt in the current academic year is included.

| Academic Years | Number of Schools | Number of Examinees | Mean | SD |
|---|---|---|---|---|
| 2020-2021 | 24 | 2,616 | 158.8 | 20.5 |

**Using the Table**

- To use the table, locate an examinee's score in the column labeled "CBSE Score" and note the entry in the adjacent column labeled "Percentile Ranks." This number indicates the percentage of examinees that scored at or below the examinee's CBSE score.

| CBSE Score | Percentile Ranks | CBSE Score | Percentile Ranks |
|---|---|---|---|
| 240 and above | 100 | 164 | 64 |
| 238 | 100 | 162 | 59 |
| 236 | 100 | 160 | 54 |
| 234 | 100 | 158 | 49 |
| 232 | 100 | 156 | 45 |
| 230 | 100 | 154 | 41 |
| 228 | 100 | 152 | 37 |
| 226 | 100 | 150 | 33 |
| 224 | 100 | 148 | 30 |
| 222 | 99 | 146 | 26 |
| 220 | 99 | 144 | 22 |
| 218 | 99 | 142 | 19 |
| 216 | 99 | 140 | 17 |
| 214 | 99 | 138 | 15 |
| 212 | 99 | 136 | 13 |
| 210 | 99 | 134 | 11 |
| 208 | 99 | 132 | 9 |
| 206 | 98 | 130 | 7 |
| 204 | 98 | 128 | 6 |
| 202 | 98 | 126 | 6 |
| 200 | 98 | 124 | 5 |
| 198 | 97 | 122 | 4 |
| 196 | 96 | 120 | 3 |
| 194 | 96 | 118 | 3 |
| 192 | 95 | 116 | 2 |
| 190 | 94 | 114 | 2 |
| 188 | 92 | 112 | 1 |
| 186 | 91 | 110 | 1 |
| 184 | 90 | 108 | 1 |
| 182 | 89 | 106 | 0 |
| 180 | 87 | 104 | 0 |
| 178 | 84 | 102 | 0 |
| 176 | 83 | 100 | 0 |
| 174 | 80 | 98 | 0 |
| 172 | 77 | 96 | 0 |
| 170 | 74 | 94 | 0 |
| 168 | 71 | 92 | 0 |
| 166 | 68 | 90 and below | 0 |

OCT_2021

As it can be seen this "Canal Street Gucci Bag" is a fake as Defendants didn't consider someone taking the time to actually test the tables that they and Morrison provided.

The next item on Morrison's certification is the following statement (<u>See</u> Morrison Decl. ¶ 18):

> 12.    Likewise, Step 1 of the USMLE is not scored on a "curve."  An examinee's score is based on the number of correct answers the examinee provides on the exam, not on how his or her performance compares to other examinees.

Morrison is correct as Plaintiff has not accused Defendants of grading his exam compared to the other people taking the exam at the same time as him, he has accused Defendants of scoring his exam based on comparing him to other people that have **already** taken the exam. Plaintiffs last CBSE was on March 22,2022  and he was compared to the "performance of a 2020 national cohort of students"(<u>See</u> Plaintiff Cert at 23)  and he must get a 62 to pass the CBSE which is based on the passing score of the 2020 group.  He has also stated that Defendant precious Steps are also scored the same way.

Defendants are aware of this and have gone through great lengths to try and stop this court from ruling against them. Again, they have created fraudulent documents and Plaintiff will show you the reader how you can verify this online because even the best criminals, don't always cover their tracks and make mistakes. Defendants had posted on their website the new "falling" score report for USMLE Step 1. They obviously modified it thinking that Plaintiff couldn't show the court what the real report looks like and not the one created after the start of this litigation. What was changed of course? You guessed it! The disputed facts in this litigation! They have forgotten however that they can remove something from their website, put **they can't remove it from the public domain.** The correct score report that is available online is the one that looks like this one:



As you can see, the chart shows a group of people who took their exam in 2020 and the passing score on that 2020 exam is the black line. Defendants are saying "you scored at the orange line" while also saying "you failed because you didn't score at or above the black line" The key is what established the black line? The pass mark of the 2020 group. There is no interpretation to be made, nothing listed saying "equated percent correct" "content mastered"

23

"predicted score" It is spelled out as simple as possible. It says "you didn't pass this exam because you didn't score above the black line like the rest of the people in 2020 did". There is no "well, it's this" as their Attorney will claim. It can't be made any simpler, when you Step 1 or any exams offered by Defendants, you must score like the last group.

This is exactly how the CBSE is graded, even using the same 2020 group who took Step 1, therefore Plaintiff is accurate in his allegations. The passing 62 on the "equated percent correct scale" is not the "percentage of content you have mastered" or "how many questions you got correct" but then passing line set by the exam from 2020  (<u>See</u> Plaintiff Cert at 24)



**What scores on the equated percent correct scale correspond to the USMLE Step 1 low-pass range?**
The low-pass range goes from 62 to 68 on the equated percent correct scale.  This range represents CBSE scores corresponding to Step 1 performance starting at the passing standard plus 2 standard errors of measurement.

Defendants of course knew Plaintiff would get a hold of this document so they obviously changed it. However the correct versions is still on websites such as this one **including the originals of both documents shown above before they were altered for this litigation**

https://www.yousmle.com/how-to-read-the-new-pass-fail-step-1-and-nbme-self-assessment-performance-reports/#Predicted_Step_1_Score_for_NBME_CBSSA_30



There is also this site called "The Way Back Machine" which will show you all the updates of a posted document and of the prior updates so you can get the previous versions of any documents or websites that you want



As you can see this documents very damaging and destroys any arguments that Defendants could make because this is all over the internet already. You already know what they did, they updated the document on their website to be able to claim Plaintiff is wrong which was created after Plaintiff filed this litigation. What do you think they changed? Only what will help them in wining this case:



As stated though even good criminals leave clues of their crimes behind so even though

Defendants uploaded this one to their website, they are not very computer savvy because the

original and correct version is still live from their server at this link (which Plaintiff encourages

the court to keep checking so if it disappears it supports Plaintiffs arguments even more that they

are trying to hide it)

https://www.usmle.org/sites/default/files/2021-08/STEP1_sample_fail_report_Jan_26_2022.pdf

27

## II. Response to: I. Preliminary Injunction Standard

"In issuing a preliminary injunction, a district court considers four factors:(1) the likelihood that the plaintiff will prevail on the merits at final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) [that] the public interest [weighs in favor of granting the injunction].Greater Phila. Chamber of Commerce v. City of Philadelphia, 949 F.3d 116, 133 (3d Cir. 2020) (alterations in original) (quoting Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994))." Quoting Ramsay v. Nat. Bd. of Medical Examiners , 968 F.3d 251 (3d Cir. 2020) See also Doe v. National Bd. of Med. Exam'rs, 199 F.3d 146, 154-155 (3d Cir. 1999)( "Four factors govern a district court's decision whether to issue a preliminary injunction: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest." American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Bd. of Educ., 84 F.3d 1471, 1477 n. 2 (3d Cir. 1996) (en banc); Gonzales v. National Bd. of Medical Examiners, 225 F.3d 620 (6th Cir. 2000) ("District courts assess four factors in analyzing a preliminary injunction issue: (1) whether the plaintiff has a strong likelihood of succeeding on the merits; (2) whether the plaintiff will suffer irreparable injury absent the injunction; (3) whether issuing the injunction will cause substantial harm to others; and (4) whether the public interest will be furthered by the issuance of the injunction")

Defendants have attempted to claim that Winter v. Nat'l Res. Def. Council, Inc., 555 U.S. 7, 20, 22 (2008) is the standard for an injunction, Plaintiff will address the Winter case

28

specifically and why it does not help them in this matter later in this brief. Plaintiff does point

out however that he has been emphasizing the importance and the public interest in this case.

Until Defendants are sitting in a court room under oath explaining step by step how they are

grading their exams, the public is in danger. Plaintiff has proven without even going to trial that

there is substantial evidence that Defendants (1) Are lying (2) Do not have a minimum standard

(3) Have failed to show the court real time what any of the documentation Plaintiff has submitted

actually means and has just ignored it, providing their own narrative.

Therefore it is in the public interest to drag them into a court room and have them explain

themselves. It is the public interest that overrule whatever interest or protections they may

"think" that they have.   "In awarding a preliminary injunction a court must "conside[r] . . . the

overall public interest." <u>Trump v International Refugee Assistance Project</u>, 582 U. S. ____

(2017)

### III. Response to: II.  Mr. Zangara Has Not Made and Cannot Make a "Clear Showing" That He Is Likely to Succeed on the Merits

Defendants seem to raise three issues and demand the court rule in their favor to dismiss

Plaintiffs complaint. Even so, as detailed later, each exam Plaintiff takes is a separate violation.

Therefore Plaintiff can keep dragging Defendants back to court followed by appeals to the Third

Circuit every time Defendants violate the ADA but Defendants fail to comprehend that. Instead

since they think this is going to be the end of Plaintiff, he will just ride off into the sunset and

they "win".

This confidence in their practically weekly lawsuits is what is going to bury them because

when they come across the judge that they piss off by telling him or her "Our argument

"compels" you to rule in our favor" that's going to be the end of them. There is nothing that

"compels" a judge to rule in a parties favor and the judge can quite frankly rule however they

29

they want; If it is upheld on appeal is a different story. The only argument that might justify their

position is  the doctrine of *Stare Decisis* but "stare decisis is "'not an inexorable command,'"

<u>Pearson v. Callahan</u>, 555 U. S. 223, 233 (2009), quoting <u>Franchise Tax Bd. of California v.</u>

<u>Hyatt</u>, 139 S. Ct. 1485, 587 U.S., 203 L. Ed. 2d 768 (2019). So Defendants "demands" for this

court to be "compelled" to do anything is incorrect.

Defendants claim that they are only going to focus on  statute of limitations. That is

however their choice to wave the jurisdiction argument as they did on page 11 and  not raise this

argument here; so they waived it to this court and on appeal.

NBME focuses here on the statute of limitations issue, and on Mr. Zangara's

inability to prevail on the merits of his ADA claim even if it were timely.

In addition to this, here in the Third Circuit, if a Defendant attempts to litigate a case on

the merits or asks the court for relief, they wave the "Personal Jurisdiction" argument. They have

done both here, argued their case on the merits and asked the court to deny Plaintiffs application

for an injunction. As explained in <u>In re: Asbestos Products Liability Litigation (No. VI)</u>, No. 17-

3471 (3d Cir. 2019):

("[P]ersonal jurisdiction may be conferred by consent of the parties, expressly or by
failure to object." (citing <u>Petrowski v. Hawkeye Security Ins. Co</u>., 350 U.S. 495, 496
(1956))). Simply put, **"[t]he actions of the defendant may amount to a legal
submission to the jurisdiction of the court"** even where a defendant has raised the
defense. <u>Ins. Corp. of Ireland, Ltd</u>., 456 U.S. at 704–05; see also <u>Yeldell v. Tutt</u>, 913
F.2d 533, 539 (8th Cir. 1990)......."As this Court has explained, **"a party is deemed to
have consented to personal jurisdiction if the party actually litigates the underlying
merits or demonstrates a willingness to engage in extensive litigation in the forum."**
<u>In re Tex. E. Transmission Corp. PCB Contamination Ins. Coverage Litig</u>., 15 F.3d 1230,
1236 (3d Cir. 1994). "**In particular, where a party seeks affirmative relief from a
court, it normally submits itself to the jurisdiction of the court with respect to the
adjudication of claims arising from the same subject matter."** <u>Bel-Ray Co. v.
Chemrite (Pty) Ltd.</u>, 181 F.3d 435, 443 (3d Cir. 1999) (citing <u>Adam v. Saenger</u>, 303 U.S.
59, 67 (1938))."

**See In re: Asbestos Products Liability Litigation (No. VI), No. 17-3471 (3d Cir. 2019) (Holding that behavior consistent with waiver, and which indicates an intent to litigate the case on the merits, is sufficient to constitute waiver, regardless of whether the parties also express a contrary intent in writing. As the Third Circuit succinctly explained, "[t]he law is clear that words alone are insufficient to preserve a personal jurisdiction defense where conduct indicates waiver.")**

Plaintiff however is required to show that he is going to win so he will prove this court has personal jurisdiction as Plaintiff has stated before  "[A] federal district court may assert personal jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the law of that state." Marten v. Godwin, 499 F.3d 290, 296 (3d Cir. 2007) (quoting Provident Nat '1 Bank v. cal. federal Say. & Loan Ass 'n, 819 F.2d 434, 437 (3d Cir.1987)). In New Jersey, "courts may exercise jurisdiction over a non resident defendant to the uttermost limits permitted by the United States Constitution." Nicastro v. McIntyre Mach. Am., Ltd., 201 N.J. 48, 72 (2010) (internal quotation marks omitted), rev 'd on other grounds sub nom., I McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873 (2011). "Accordingly in determining whether personal jurisdiction exists, we ask whether, under the Due Process Clause, the defendant has certain minimum contacts with [New Jersey] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 316 (3d Cir. 2007)

Defendants examinations are required in New Jersey to obtain a medical license (See N.J. Admin. Code § 13:35-3.1 "Effective December 1994, the standard medical and surgical licensing examination in the State of New Jersey shall be the United States Medical Licensing Examination (USMLE)")  and Plaintiff has taken his examinations which Defendant, has

collected a fee for in New Jersey where he resides (See Plaintiff Cert. at 23&25) Therefore
Defendants have enough contact with New Jersey for this court to have jurisdiction. See
Ford Motor Co. v Mont Eighth Judicial District Court, 141 S. Ct. 1017, 592 U.S., 209 L. Ed. 2d
225 (2021)( **Holding that Plaintiffs claims that  "arise out of or relate to" Defendants
business and marketing activities, those activities gave sufficient claim for the states to
assert personal jurisdiction over the liability lawsuits; Therefore connection between the
plaintiffs' claims and defendants activities in the forum States is close enough to support
specific jurisdiction.)**

      Defendants, with their extensive history of depriving people of their civil rights have
been sued numerous times. As such, there have been many other courts that have held
Defendants accountable even though their place of business is in Pennsylvania  and they are
incorporated in Washington; connected only  administering examinations in their states. See
Scheibe v. Nat'l Bd. of Med. Examiners, Civ. A. No. 05-180, 2005 WL 1114497, at *3 (W.D.
Wis. May 10, 2005) (Jurisdiction over NBME regardless of being incorporated in Washington
D.C. and having a principle place of business in Pennsylvania ) See also Biank v. Nat'l Bd. of
Med. Examiners, 130 F. Supp. 2d 986, 988 (N.D. Ill. 2000) ; Rush v. National Bd. of Medical
Examiners, 268 F. Supp. 2d 673 (N.D. Tex. 2003); Currier v. National Board of Medical
Examiners, 965 N.E.2d 829, 462 Mass. 1 (2012) (Finding jurisdiction over NBME, a private
nonprofit corporation responsible for providing testing in state responsible under state law);
Gonzalez v. National Bd. of Medical Examiners, 60 F. Supp. 2d 703 (E.D. Mich. 1999); Powell
v. National Bd. of Medical Examiners ,364 F.3d 79 (2d Cir. 2004) (Finding jurisdiction over
NBME by offering examinations in the state of Connecticut) ; See also Gonzales v. National Bd.
of Medical Examiners, 225 F.3d 620 (6th Cir. 2000); Price v. National Bd. of Medical

Examiners, 966 F. Supp. 419 (S.D.W. Va. 1997). Therefore, this court and any court in any one of the 50 states of this country have jurisdiction to hold Defendants accountable for their repeated violations of the ADA.

### A. Response to A. Mr. Zangara's ADA Claim is Time Barred

Next, Defendants seem to attempt to exploit plaintiffs learning issues by saying "he's been trying to pass this exam for 6 years, we get off the hook because he should have complained 6 years ago" If you read the statement in Defendants brief you will see that they didn't cite where Plaintiff made the quote they wanted so they had to create one:

> *see id.* at 6 ("I want to be a doctor and have been held up for the past 6 years.") Because he challenges a purported scoring methodology that has allegedly kept him from "passing" the CBSE examination "for the past almost 6 years," his claim accrued "almost 6 years" ago and is barred by the two-year statute of limitations.

If you read Defendants statement on page 11 of their brief carefully you will notice how the quotes are only around the following:

1. "I want to be a Doctor and have been held up for the past 6 years"

2. "passing"

3. "for the past almost 6 years"

4. "almost 6 years ago

There are no quotes around any of the other words because they are not Plaintiffs words, that's why Defendants can not a statement made by Plaintiff that states what they are telling the court.

As stated in his IEP "Relative weaknesses were Jason's short term memory, psychomotor speed and the ability to synthesize concrete parts into meaningful wholes" (See Plaintiff Cert at 12 & Exhibit "C")

Plaintiff has stated that one of the issues that he has difficulty is with visual memory in his certification:

..........Trying to visualize biochemical pathways or anatomical locations are the biggest challenge since my brain is trying to make sense o[f] the words verse[s] the picture or vise versa. I also have a problem with outright memorization. My brain tries to create an image of the concept and if I can't do that. Some things that are not related to visual memory like descriptions of a concept in a book I can remember as long as it does not require an image to explain it............. (See Plaintiff Cert at 15)

He requested a Neurophysiologic evaluation on his own because he had complaints of things like "difficult[y] acquiring information from textbooks and lectures" (See Plaintiff Cert at 27& Exhibit M)  Plaintiff failed the "Test of Memory Malingering, a memory test that shows the test-taker fifty simple pictures of everyday objects. The test-taker is then shown the same pictures one-by-one alongside "distractor" pictures and has to choose which of the two he has seen before. This is done three times" United States v. Pervis, 937 F.3d 546 (5th Cir. 2019). According to the report, Plaintiff failed the first trial but the second was within normal limits which is expected See United States v. Pervis, 937 F.3d 546 (5th Cir. 2019) ("The simplicity and repetition of the images are such that virtually anyone, even those with severe mental impairment, will do reasonably well and will do better in successive trials")

"[T]he test is well-established and information about its processes is readily available. According to Pearson Education, Inc., the distributors of the TOMM, the test "is a 50-item visual recognition test" that "consists of two learning trials and an optional retention trial, and provides two cutoff scores": (1) performance that is below chance, and (2) performance that is below established norms of scores attained by head injured and cognitively impaired patients. Pearson Clinical, Test of Memory Malingering (TOMM), ......Essentially, the test identifies the extent to which an individual is able to remember whether particular visual items had been presented to him during the learning trials. If that individual's scores are below chance or below typical scores

of impaired patients, malingering may be inferred."United States v. Arterberry, No. 05-CR-81165, 2015 U.S. Dist. LEXIS 26706 (E.D. Mich. Mar. 5, 2015)

As stated in the Examination Findings "his failure of Trial 1 of the TOMM may be due to a genuine visual memory disorder due to his similarly poor performance on other measures of visual memory"  (See Plaintiff Cert at 27& Exhibit M)  This test identified data to support Plaintiffs difficulty "Trying to visualize biochemical pathways or anatomical locations" (See Plaintiff Cert at 15) This has a substantial impact on his life in the area of learning subjects such as Chemistry and Anatomy as detailed in his certification (See Plaintiff Cert at 14 & Exhibit E)

Defendants allegations are dispelled by the exhibits attached to Morrison's Certification, as it appears the exam has not been scored the same over a 6 year period.   (See Morrison Decl. ¶ 21 & 18):



On top of that, The new score reporting was implemented February 23, 2022 and Plaintiff

filed this action less than a month later (<u>See</u> Plaintiff Cert at 24)



Plaintiffs most recent CBSE was completed in March after he filed this action. That exam

was taken after the scoring of the examination was changed on February 23,2022 (<u>See</u> Plaintiff

Cert at 24) Since the scoring was not completed until February 23, 2022, that is where Plaintiffs

statute of limitations begins to start from <u>for</u> <u>that</u> <u>exam</u>[5]. <u>See</u> <u>Disabled in Action v. SEPTA</u>, 539

F.3d 199 (3d Cir. 2008) **(Holding that the accrual date of a discrimination claim under the**

**ADA begins after modifications and the discriminatory act occurred, not when Plaintiff**

**discovered plans to make modifications that could result in that discriminatory act)**

---

[5] The scoring for the "Shelf Exams" took place in 2021 which are also subjected to the statue of limitations, however they are all within the "two year limit" (<u>See</u> Plaintiff Cert at 25) constituting a separate claim from any attempts of the CBSE; Since Plaintiff has accused Defendants of scoring all of their examinations in violation of the ADA and its implementing regulations.

In any event, each administration of the exam that Defendants administer and do not change their current scoring constitutes a new violation of the ADA. "What matters is that [Plaintiffs] allegations, based on the [NBME's] **actual implementation of its policy**,[See Plaintiff Cert at 24] stated a cognizable claim**" Lewis v. City of Chi., 560 U.S. 205, 130 S. Ct. 2191, 176 L.Ed.2d 967 (2010) See Lewis v. City of Chi., 560 U.S. 205, 130 S. Ct. 2191, 176 L.Ed.2d 967 (2010)** (**Holding that each use of an exam constitutes a separate, actionable use of an allegedly discriminatory practice and started a new statute of limitations clock**)

"In common parlance a right accrues when it comes into existence." United States v. Lindsay, 346 U.S. 568, 569, 74 S. Ct. 287, 98 L. Ed. 300. The "standard rule" is that a claim accrues "when the plaintiff has ' "a complete and present cause of action." ' " Wallace v. Kato, 549 U.S. 384, 388, 127 S. Ct. 1091, 166 L. Ed. 2d 973; Cada v. Baxter Healthcare Corp., 920 F.2d 446, 449-50 (7th Cir.1990) (statute of limitations in discrimination case began to run when plaintiff discovered injury), *cert. denied,* 501 U.S. 1261, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991); Soignier v. American Bd. of Plastic Surgery, 92 F.3d 547 (7th Cir. 1996)(District Court correctly ruled that the two-year statute of limitations began to run when the Board administered the exam) See also Gabelli v. SEC, 568 U.S. 442, 133 S. Ct. 1216, 185 L.Ed.2d 297 (2013) **(Holding that a statue of limitations clock "begins to tick" when the event occurs)**

The exact case Plaintiff has cited, Disabled in Action v. SEPTA, 539 F.3d 199 (3d Cir. 2008) has been used by the Third Circuit involving Defendants in Katz v. Nat'l Bd. of Med. Exam'rs, 751 F. App'x 231 (3d Cir. 2018). As the Third Circuit explained:

> "On appeal, Katz challenges the District Court's grant of summary judgment in favor of the defendants on his ADA and Section 504 claims, which are subject to Pennsylvania's two-year statute of limitations on personal injury actions. See **Disabled in Action of Pa. v. Se. Pa. Transp. Auth., 539 F.3d 199, 208 (3d Cir. 2008)**; cf. also Soignier v. Am. Bd. of Plastic Surgery, 92 F.3d 547, 551 n.3 (7th Cir. 1996) (**same statute of limitations applies to claims brought under Title II or Title III of the ADA)....Any cause of**

**action based on that alleged discrimination accrued...at the latest, when Katz took the exam.**

Therefore each administration of the exam Plaintiff has taken in the past two years from the filing date is a separate claim and in addition to that, exams taken after the change in the policy and all exams Plaintiff takes in the future are separate claims against Defendants.

As for the only case that Defendants cite, Taylor v. Henderson, 632 F. App'x 70 (3d Cir. 2015). The correct representation of the case is as follows: Taylor pursued three separate denials of Parole 2008, 2012 and 2014 and this was remanded back to the District Court when dismissal was attempted. As the appeals court realized, each denial is a new claim as the same case in this matter, each time Plaintiff  has or will take a new exam, each time his exam is scored illegally, gives rise to a another claim. Taylor, when read correctly does not help Defendants at all, it only confirms Plaintiffs position.

## B. Response to:  B. In All Events, Mr. Zangara's ADA Claim Is Meritless

"We first address [Plaintiff]'s likelihood of success on the merits of h[is] ADA claim. "On this factor, a sufficient degree of success for a strong showing exists if there is a reasonable chance or probability, of winning" on her ADA claim. Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J., 910 F.3d 106, 115 (3d Cir. 2018)" Ramsay v. Nat'l Bd. of Med. Examiners, 968 F.3d 251, 256 (3d Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021). "The ADA defines "disability" in relevant part as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). We construe the term "disability" broadly. Id. § 12102(4)(A). As to the term "impairment," the applicable Department of Justice ("DOJ") regulations provide that the term "physical or mental impairment" includes ADHD and "dyslexia and other specific learning disabilities." 28 C.F.R. § 36.105(b)(2).

As to "life activities," the ADA provides that "major life activities include ... reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Finally, the regulations explain that "[a]n impairment is a disability ... if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." Ramsay v. Nat'l Bd. of Med. Examiners, 968 F.3d 251, 256 (3d Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021)  "The Board argues that the District Court [should] not determine that [Plaintiff] is substantially limited in comparison to most people in the general population." Ramsay v. Nat'l Bd. of Med. Examiners, 968 F.3d 251, 256 (3d Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021)

"Here, the District Court [should] rel[y] on such diagnostic information to conclude that [Planitff] had ADHD and [learning disabilities] that caused h[im] to read [concentrate, remember] and write with more difficulty than most people. For example, Dr. [Jasdeep Hundal's] diagnostic assessments showed that [Plaintiff]  had [severely] abnormal functionalities in thinking, processing speed, attention, and sequencing[See Plaintiff Cert at 25 and Exhibit M]. Indeed, some of the [Attention/ Processing Speed, Visual Memory, Higher Order Integrative Functioning] tests Dr. [Hundal] administered placed [Plaintiff] in less than the [first] percentile as compared to individuals h[is] age. This is exactly the type of data DOJ contemplates as showing a learning disability that substantially limits an individual as compared to others in the general population. Equal Employment Provisions, 76 Fed. Reg. at 17,009; Title II and Title III Regulations, 81 Fed. Reg. at 53,230. Further, [Plaintiff] explained in h[is] personal statement that [he] had struggled with reading and writing [memory, and concentration] tasks in comparison to h[is] classmates since elementary school.[See Plaintiff Cert at 15] [and had been classified as special education in high school (See Plaintiff Cert at 11&12, Exhibits B&C)] Thus, the Court's

finding that [Plaintiffs'  ADHD and [learning disabilities] constituted a disability [should be] based on evidence that these conditions substantially limit h[is] reading and writing [memory, and concentration] in comparison to most people. See Pryer v. C.O. 3 Slavic, 251 F.3d 448, 453 n.4 (3d Cir. 2001) (inferring the district court's reasoning where it was "otherwise apparent from the record" Ramsay v. Nat'l Bd. of Med. Examiners, 968 F.3d 251, 256 (3d Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021)

"Moreover, the regulations provide that the "substantially limits" inquiry "should not demand extensive analysis," 28 C.F.R. § 36.105(d)(1)(ii), and that "[t]he comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical evidence," id. § 36.105(d)(1)(vii). Accordingly, the District Court's reliance on evidence that [Plaintiffs'  reading, processing, and writing skills were abnormally low by multiple measures provided a sufficient comparison of h[is] abilities to those of the general population to support the finding of disability Ramsay v. Nat'l Bd. of Med. Examiners, 968 F.3d 251, 256 (3d Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021)

"Section 309 of Title III of the Americans with Disabilities Act provides that any person that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals. 42 U.S.C.S. § 12189. Courts apply the same substantive standard to claims brought under the Rehabilitation Act and Title III of the ADA Under regulations implementing § 12189, the [CBSE, CCSE, Subject] United States Medical Licensing Examination Step 1[2&3] exam must be administered in a way that best

ensures that its results will accurately reflect a disabled examinee's aptitude rather than his disability. 28 C.F.R. § 36.309(b)(1)(i). The court defers to such regulations as reasonable interpretations of the statute." Katz v. Nat'l Bd. of Med. Exam'rs, 751 F. App'x 231 (3d Cir. 2018)

"The Department of Justice issued a regulation interpreting the statute, 28 C.F.R. § 36.309, and requiring a private entity offering a licensing examination to assure that "the examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, **the examination results** accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manul, or speaking skills." 28 C.F.R. § 36.309(b)(1)(i). The parties have referred to this as the "best ensure" standard. The Ninth Circuit held the regulation was entitled to Chevron deference, and that the "best ensure" standard applies. 630 F.3d at 1162." Enyart v. Nat'l Conference of Bar Exam'rs, Inc., 823 F. Supp. 2d 995 (N.D. Cal. 2011)

"We defer to an agency's interpretation of a statute it is charged with administering if the statute "is silent or ambiguous with respect to the specific issue" and the agency's interpretation is "based upon a permissible construction of the statute." Contract Mgmt., Inc. v. Rumsfeld, 434 F.3d 1145, 1146-47 (9th Cir. 2006)  (quoting Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)). We hold that 28 C.F.R. § 36.309 is entitled to Chevron deference. Enyart v. Nat'l Conference of Bar Exam'rs, Inc., 823 F. Supp. 2d 995 (N.D. Cal. 2011) Specifically  the "application of  Section 12189, at issue in this case, is covered by the DOJ regulations in 28 C.F.R. part 36" Price v. Nat'l. Bd. of Med. Examiners, 966 F. Supp. 419 (S.D.W. Va. 1997)

41

"although NBME may not have liked the terminology used in the implementing regulations, despite its registered objections, the foregoing language is what was enacted and it is this language which must be followed" Ramsay v. Nat. Bd. of Medical Examiners 968 F.3d 251 (3d Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021). See also Price v. Nat'l. Bd. of Med. Examiners, 966 F. Supp. 419 (S.D.W. Va. 1997) (Holding that, because Congress authorized the DOJ to make issue regulations for Subchapter III, courts must give their decisions controlling weight unless arbitrary or manifestly contrary to the statute)  "Neither NBME nor MRAC argue that they fall outside the scope of the ADA and the law is clear that both entities must comply. See Love v. Law Sch. Admissions Council, Inc., 513 F. Supp. 2d 206, 223 (E.D. Pa. 2007) (finding that private, non-profit entity responsible for administering test required for admission to law school had to comply with ADA); see also Scheibe v. Nat'l Bd. of Med. Examiners, Civ. A. No. 05-180, 2005 WL 1114497, at *3 (W.D. Wis. May 10, 2005) (citing cases concluding that NBME is subject to ADA); Biank v. Nat'l Bd. of Med. Examiners, 130 F. Supp. 2d 986, 988 (N.D. Ill. 2000) (holding that NBME, "as a private entity offering examinations related to licensing, is subject to ADA under Section 12189") quoting Boggi v. Med. Rev. & Accrediting Council, 415 F. App'x 411, 414 (3d Cir. 2011)

*"The ADA prohibits, inter alia, use of [NBME's] tests that "screen out or tend to screen out an individual with a disability or a class of individuals with disabilities [do to]..."failing to select and administer tests...in the most effective manner to ensure that, when such test is administered to a [individual] who has a disability that impairs sensory, manual, or speaking skills, such test results accurately reflect the skills, aptitude, or whatever other factor such test purports to measure, rather than reflecting the impaired sensory, manual, or speaking skills of such [individual]. . ")..[such] "claims are cognizable under the ADA."*

**Raytheon Co. v. Hernandez, 540 U.S. 44, 53, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003)."**

**Quoting EEOC v. Kronos, Inc., 620 F.3d 287 (3d Cir. 2010).** See Raytheon Co. v. Hernandez,

540 U.S. 44, 124 S. Ct. 513, 157 L. Ed. 2d 357 (2003) (defining "discriminate" to include

"utilizing standards, criteria, or methods of administration . . . that have the effect of

discrimination on the basis of disability" and "**using...tests...that screen out or tend to screen**

**out an individual with a disability"**) "ADA regulations "prohibit NBME from administering

the USMLE without ensuring that the scores reported 'accurately reflect the applicant's aptitude

or achievement level or whatever other factor the test purports to measure, rather than reflecting

the applicant's [disability]." [1 at ¶ 46 (quoting 28 C.F.R. § 36.309(b)(1)(i).] In this regard,

Plaintiff is exactly right: Porch v. Univ. of Ill. at Chi., Sch. of Med., No. 21-cv-3848, 2022 U.S.

Dist. LEXIS 138202 (N.D. Ill. Aug. 2, 2022); Baaske v. City of Rolling Meadows, 191 F. Supp.

2d 1009, 1012 (N.D. Ill. 2002) ("The [NBME], as a private entity offering examinations related

to licensing, is subject to the ADA under Section 12189"); Cunningham v. Univ. of New Mexico

Bd. of Regents, 531 F. App'x 909, 920 (10th Cir. 2013) (affirming dismissal of medical student's

ADA and Rehabilitation Act claims against the University in part because "[i]nsofar as [plaintiff]

needed an accommodation, it would have been in the area of taking the examinations that the

Board administered—examinations that are not under the control or purview of UNM").

    Therefore, as it can be seen clear as day Defendants are liable for their all of their exams

being designed to screen out those that are disabled by comparing them to others. Plaintiff has

proven this in the prior section of this brief "*Response to Defendants "Background""*" On top of

this, he has also shown without a doubt how much trouble Defendants are going through to cover

this up; with the fraudulent documents attached to Morrison's certification and the score reports

that were altered after Plaintiff filed this litigation against them.

### III. Response to: III Mr. Zangara Will Not Be Harmed

Plaintiff has brought this action against Defendants and has accused them of scoring <u>all</u> of their examinations is a discriminatory manner in violation of the ADA and its implementing regulations. These include, but are not limited to the following: The Comprehensive Basic Science Examination (CBSE), Comprehensive Clinical Science Examination (CCSE), NBME Subject Examinations (aka "Shelf Exams") United States Medical Licensing Examination (USMLE) Step 1, Step 2 and Step 3.

Defendants claim that "this case does not involve the USMLE" however Plaintiff has brought this action and Defendants will not "tell" anyone "what' Plaintiff did or why he did it. This is nothing more than a desperate attempted to suggest to the court the cases **that they have** **<u>lost</u> and the same law firm arguing this case <u>lost</u>** especially <u>Ramsay v. Nat'l Bd. of Med.</u> <u>Examiners</u>, 968 F.3d 251, 256 (3d Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021), the biggest threat to them and their biggest loss cannot be used against them. It does not matter that Plaintiff is not scheduled for or has not taken USMLE. Plaintiff will have to take USMLE Steps <u>See</u> N.J. Admin. Code § 13:35-3.1 ("Effective December 1994, the standard medical and surgical licensing examination in the State of New Jersey shall be the United States Medical Licensing Examination (USMLE)") and **the ADA applies even if they start offering** **culinary or automotive exams. If they are scored in a discriminatory manner, they are** **illegal**.

Defendants attempted this same argument in Ramsay and it was rejected by the court. As stated on page 30 of "DEFENDANT NBME'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION"[6] referenced by footnote 20 to this statement:

"Ms. Ramsay has thus failed to establish that she is likely to suffer imminent and non-

---

[6] Case 2:19-cv-02002-WB Document 17 Filed 08/30/19 Page 30 of 33

44

speculative irreparable harm in the absence of preliminary injunctive relief."

The footnote on page 30 states:

> Ms. Ramsay's requested preliminary injunction seeks extra time accommodations not only on Step 1, but also on Step 2 CK, Step 2 CS, and Step 3 of the USMLE. There is clearly no risk of imminent (much less irreparable) harm with respect to those exams. According to Ms. Ramsay, her school is requiring her to take the Step 1 exam by March 2, 2020. She will need to complete Step 2 CK and Step 2 CS to participate in the residency Match, but she has acknowledged that she cannot participate in the 2020 Match in all events, see Pl. Br. at 21, so there is no possible urgency relating to taking the other Step exams. Ms. Ramsay is not even eligible to take the Step 3 examination, which is taken after the candidate has passed the other Steps, graduated from medical school and obtained the MD degree. The USMLE program recommends that, for Step 3 eligibility, candidates should have completed or be near completion of at least one year of postgraduate training in an accredited US graduate medical education residency program. See supra at 5.

**The Third Circuit affirmed the ruling granting Ramsay her injunction and rejected Defendants argument even though she had not yet taken USMLE Step 1, 2 or 3** <u>See Ramsay v. Nat'l Bd. of Med. Examiners</u>,Civil Action No. 19-CV-2002 (E.D. Pa. Dec. 30, 2019) and <u>Ramsay v. Nat'l Bd. of Med. Examiners</u>, 968 F.3d 251, 256 (3d Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021)

**The Third Circuit also ruled that Ramsay met the standard for "irreparable harm" affirming the grant of the injunction for the District Court even though she had not taken the other exams and also rejected the same "speculation argument"[7] that Defendants have made here even citing the same case on page 29 of** "DEFENDANT NBME'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION"[8] <u>See</u> <u>Ramsay v. Nat'l Bd. of Med. Examiners</u>,Civil Action No. 19-CV-2002 (E.D. Pa. Dec. 30, 2019) and <u>Ramsay v. Nat'l Bd. of Med. Examiners</u>, 968 F.3d 251, 256 (3d Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021),

---

[7]

[8] Case 2:19-cv-02002-WB Document 17 Filed 08/30/19 Page 29 of 33

"It is also speculative whether Ms. Ramsay [will] pass Step 1.......Baer v. Nat'l Bd. of Med. Exam's, 392 F. Supp. 2d 42, 49 (D. Mass.2005) ("[I]t is not certain that [plaintiff] will suffer the predicted harm; she may pass the test.")"

In this matter Defendants have stated the same thing and used the same argument that failed in Ramsay on page 17 of their Opposition brief in this matter[9]

"it is speculative whether Mr. Zangara will pass or fail the CBSE if he re-tests. If he studies and learns the materials, he might well pass. See Baer v. Nat'l Bd. of Med. Exam'rs, 392 F. Supp. 2d 42, 49 (D. Mass. 2005) ("[I]t is not certain that [plaintiff] will suffer the predicted harm; she may pass the test.").

Defendants next claim that Plaintiff has attained a GPA of 1.5 which is incorrect as the transcript Plaintiff has provided shows **his GPA is 2.04 and that is not including what it will be when the discrepancy he pointed out is fixed** (See Plaintiff Cert at 17 and Exhibit G) The "courts of this circuit" been **overruled** by Ramsay holding that the risk of failing Defendants examinations in the future Ramsay v. Nat'l Bd. of Med. Examiners, 968 F.3d 251, 256 (3d Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021),, in which the Third Circuit Stated:

"The District Court ha[s] a basis to conclude that [Plaintiff] would be irreparably harmed absent an injunction. The Court could reasonably conclude that given [Plaintiffs] disability and that [he] had previously failed [CBSE and likely will fail] Step 1, [he] likely would fail again and be forced to leave medical school.[15] Ramsay, 2019 WL 7372508, at *18. H[is] termination from medical school and its consequences could not later "be redressed by a legal or an equitable remedy." Acierno, 40 F.3d at 653 (citation omitted). No damages remedy is available under the ADA. 42 U.S.C. § 12188(a)(1) (providing that the only remedies available in an ADA action are those in § 2000a-3(a)); id. § 2000a-3(a) (providing for injunctive relief). Furthermore, because [CMU] is not a party to this case, the Court could not require it to reinstate her, and the Board presents no theory for how the Board could redress the termination of [Plaintiffs] medical education. Moreover, an examiner's refusal to provide [proper scoring] can cause the exam-taker irreparable harm because doing so jeopardizes her "opportunity to pursue her chosen profession." Enyart v. Nat'l Conf. of Bar Exam'rs, 630 F.3d 1153, 1166 (9th Cir. 2011); accord Doe v. Pa. State Univ., 276 F. Supp. 3d 300, 313-14 (M.D. Pa. 2017) (holding that gap in medical school education and likelihood that the student could not gain acceptance to another school constituted irreparable harm). Accordingly, the District Court correctly concluded that [Plaintiff] established she would be irreparably harmed absent an injunction". quoting Ramsay v. Nat. Bd. of Medical Examiners 968 F.3d 251 (3d Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021),

[9] Case 3:22-cv-01559-GC-LHG Document 25 Filed 10/17/22 Page 21 of 24 PageID: 774

Defendants tried this same argument years prior in <u>Rush v. National Board of Medical Examiners</u>, 268 F. Supp.2d 673 (N.D. Tex. 2003) and it was rejected by the court when the injunction was granted. In addition to the issue of possible expulsion of the student, the court concluded:

> "Students behind in their studies normally will not be offered the range and quality of residency or medical specialty options their peers will be offered. They will normally not be offered interviews for further study in the more competitive medical specialties, will not have the usual range of geographic or location (city and school) choices for remaining medical school programs which may be available, and will be delayed in completion of their medical training. There is no good way to remedy this injury. Timely Step I testing and passage is required." quoting <u>Rush v. National Board of Medical Examiners</u>, 268 F. Supp.2d 673 (N.D. Tex. 2003)

Defendants attempt to use a collection of cases to state that Plaintiff does not meet the requirements for an Injunction and his claims are speculative. They use <u>Ferring Pharmaceuticals, Inc. v. Watson Pharmaceuticals, Inc.</u>, 765 F.3d 205, 212-217 (3d Cir. 2014),[10] <u>Adams v. Freedom Forge Corp.</u>, 204 F.3d 475, 488 (3d Cir.2000)[11]; <u>Winter v. Nat'l Res. Def. Council, Inc.</u>, 555 U.S. 7, 20, 22 (2008)[12]; <u>B.P.C. v. Temple Univ., No.</u> 13-7595, 2014 WL 4632462, *5 (E.D. Pa. Sept. 16, 2014)[13]; <u>Mahmood v.Nat'l Bd. of Med. Exam'rs</u>, 2012 WL 5364689 (E.D. Pa. 2012)[14]; <u>Acierno v. New Castle County</u>, 40 F.3d 645, 653 (3d Cir. 1994)[15]; <u>Reilly v. City of Harrisburg</u>, 858 F.3d 173, 179 (3d Cir. 2017)[16]

**All of these cases were used by Defendants for the same arguments, <u>argued by the same attorneys representing them in this matter</u> were rejected by the courts in Ramsay;**

---

[10] Case 3:22-cv-01559-GC-LHG Document 25 Filed 10/17/22 Page 20 of 24 PageID: 773
[11] Case 3:22-cv-01559-GC-LHG Document 25 Filed 10/17/22 Page 21 of 24 PageID: 774
[12] Case 3:22-cv-01559-GC-LHG Document 25 Filed 10/17/22 Page 13 of 24 PageID: 766
[13] Case 3:22-cv-01559-GC-LHG Document 25 Filed 10/17/22 Page 22 of 24 PageID: 775
[14] Case 3:22-cv-01559-GC-LHG Document 25 Filed 10/17/22 Page 22 of 24 PageID: 775
[15] Case 3:22-cv-01559-GC-LHG Document 25 Filed 10/17/22 Page 14 of 24 PageID: 767
[16] Case 3:22-cv-01559-GC-LHG Document 25 Filed 10/17/22 Page 13 of 24 PageID: 766

when Defendants attempted to misrepresent that they applied, just as they are

misrepresenting to this court that they apply. Ferring Pharmaceuticals, Inc. v. Watson

Pharmaceuticals, Inc., 765 F.3d 205, 212-217 (3d Cir. 2014)[17], Adams v. Freedom Forge Corp.,

204 F.3d 475, 488 (3d Cir.2000)[18]; Winter v. Nat'l Res. Def. Council, Inc., 555 U.S. 7, 20, 22

(2008)[19]; B.P.C. v. Temple Univ., No. 13-7595, 2014 WL 4632462, *5 (E.D. Pa. Sept. 16,

2014)[20]; Mahmood v.Nat'l Bd. of Med. Exam'rs, 2012 WL 5364689 (E.D. Pa. 2012)[21]; Acierno

v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994)[22]; Reilly v. City of Harrisburg, 858 F.3d

173, 179 (3d Cir. 2017)[23]

       The Third Circuit used the cases that Defendants misrepresented and used them properly

to reject Defendants arguments. **This allowed Ramsay to have her injunction on All of**

**Defendants examinations even though (1) She hadn't taken them yet (2) She might not pass**

**them (3) They held up her education and her process of getting licensed all of which proved**

**irreparable harm.** As explained by the court

> "We next determine whether Ramsay proved irreparable harm. "[T]o show irreparable
> harm a plaintiff must demonstrate potential harm which cannot be redressed by a legal or
> an equitable remedy following a trial." **Acierno v. New Castle County, 40 F.3d 645, 653
> (3d Cir. 1994)** (internal quotation marks and citation omitted). The harm must be "likely"
> to occur "in the absence of an injunction." **Ferring Pharms., Inc. v. Watson Pharms.,
> Inc., 765 F.3d 205, 217 n.11 (3d Cir. 2014)** (emphasis omitted) (quoting **Winter v. Nat.
> Res. Def. Council, Inc., 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)**)

> The District Court had a basis to conclude that [plaintiff] would be irreparably harmed
> absent an injunction. The Court could reasonably conclude that given [Plaintiffs]
> disability and that she had previously failed [Defendants Exam]  she likely would fail
> again .......Moreover, an examiner's refusal to provide [proper scoring] can cause the
> exam-taker irreparable harm because doing so jeopardizes her "opportunity to pursue her

---

[17] Case 2:19-cv-02002-WB Document 17 Filed 08/30/19 Page 28 of 33
[18] Case 2:19-cv-02002-WB Document 17 Filed 08/30/19 Page 19 of 33
[19] Case 2:19-cv-02002-WB Document 17 Filed 08/30/19 Page 18 of 33
[20] Case 2:19-cv-02002-WB Document 17 Filed 08/30/19 Page 28 of 33
[21] Case 2:19-cv-02002-WB Document 17 Filed 08/30/19 Page 28 of 33
[22] Case 2:19-cv-02002-WB Document 17 Filed 08/30/19 Page 19 of 33
[23] Case 2:19-cv-02002-WB Document 17 Filed 08/30/19 Page 18 of 33

chosen profession." Enyart v. Nat'l Conf. of Bar Exam'rs, 630 F.3d 1153, 1166 (9th Cir. 2011); accord Doe v. Pa. State Univ., 276 F. Supp. 3d 300, 313-14 (M.D. Pa. 2017) (holding that gap in medical school education and likelihood that the student could not gain acceptance to another school constituted irreparable harm). Accordingly, the District Court correctly concluded that [Plaintiff] established she would be irreparably harmed absent an injunction. quoting Ramsay v. Nat. Bd. of Medical Examiners 968 F.3d 251 (3d Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021),

Ramsay is not the only court that has rejected Defendants same arguments and resulted in

an injunction entered against them. This also happened In Berger v. Nat'l Bd. of Med. Exam'rs,

No. 1:19-cv-99, 2019 U.S. Dist. LEXIS 145666 (S.D. Ohio Aug. 27, 2019)

"The harm alleged by Mr. Berger is thus factually unsupported and entirely speculative. As this Court has noted in analogous cases, such speculative harm cannot support a preliminary injunction"[24]

In Burger, the court rejected the same cases used in Ramsay and granted Burger his

injunction against the Defendants anyway. In this matter it is clear that the Third Circuit has

already held and overruled Defendants baseless arguments and it is improper and unprecedented

for them to ask a District Court to overrule their loss that set the precedent in this Circuit.

**Defendants and their attorneys are nothing more than sore losers who are trying to get this**

**court to rule in their favor so they get a "second bite at the apple" that Jessica Ramsay got**

**to eat, not them.**

### IV. Defendants Admit Plaintiff is Correct in Two Places in Their Brief

Defendants are attempting a "broad coverage" approach to their legal strategy thinking

Plaintiff is just going to go away. Besides the fact that they have twisted this into some

"accommodation case" which is not, as Plaintiff has proven, they have tried to cover all of their

bases. They know that Plaintiff is right and they know that there is a strong possibility that the

---

[24] Case: 1:19-cv-00099-KLL Doc #: 27 Filed: 07/24/19 Page: 24 of 29 PAGEID #: 385

judge reading this brief will actually see through their lies and conclude *"wait they are not passing Plaintiff on these exams because he's not scoring like everyone else"*.

      If that happens they are stuck, they know it's true but they go further in their arguments and claim *"even it is true, it's a burden on us to score the exams legally, you can't make us do that"* They make the argument to cover all of their basis. The point is that if Defendants are doing what they are supposed to be doing, why do you have to make the argument? Why Defend something that isn't there? They leave clues they are lying and their position changes at multiple places in their brief

      Page 2 stating they are grading the exams properly:

        There is no basis for the Court to enjoin NBME from doing something that it does not do and has never done.  Simply stated, Mr. Zangara is wrong about how the

      Page 10 stating if the court grants what Plaintiff has asked, to grade their exams based on the test takers own merit not in comparison to others, they have to change something:

        F.3d 645, 653 (3d Cir. 1994) (citation omitted).  Mr. Zangara is seeking such a mandatory injunction (*i.e.*, an order that directs NBME to change the way the CBSE and other NBME exams are scored).  As noted, his requested relief is entirely misguided

      On page 14 they then try and relate this to accommodations somehow (which Plaintiff has shown, he never asked or told the court he wanted any accommodations He asked to be scored like everyone else) but the second part of this gives them up when it reads "there is no basis for scoring his performance any differently then other examinees"

addressed by way of the accommodations he received when he tested, and there is
no basis for scoring his performance any differently than other examinees.  This is a
further reason why his ADA claim fails.

Plaintiff has asked the court to make Defendants score his exams on their own merit to the minimum standard to safely practice medicine and not on the bases of comparing his scores to others. What is there to change if Defendants are already scoring them this way?

 They continue to frame this as some accommodation case on page 15 but it's what is stated in the same sentence that gives them up further -  "requiring a testing entity to change their scoring methodology "  followed by "does not cause an undue burden to the testing entity"
The question is what burden do you have if you are grading the exams legally anyway?

if requiring a testing entity to change its scoring methodology could ever be a rea-
sonable accommodation that does not cause an undue burden to the testing entity,[6]

At the bottom of page 15, they change their legal strategy from "*we are scoring the exams they way we are supposed to"*  to "*well if the court doesn't buy the rest of our lies and arguments we still have to stop this lawsuit from reducing our profits so we are going to take this position"* that position is that they get to keep a discriminatory exam in place because granting Plaintiffs requested relief, (grading the test takers exam on their own merit not in comparison to others, to the minimum standard to practice medicine) would alter the exam.

[6]  *See, e.g., Krpan v. Registry of Interpreters for the Deaf*, 167 F. Supp. 3d 774, 791 (E.D. Va. 2016) (requested changes to exam format would fundamentally alter the exam); *Falchenberg v. N.Y. State Dep't of Educ.*, 642 F. Supp. 2d 156, 163-64 (S.D.N.Y. 2008) (exempting plaintiff from demonstrating same level of competency in measured skills as other examinees would fundamentally alter the nature of the test), *aff'd*, 338 F. App'x 11 (2d Cir. 2009).

-15-

The question is: If Plaintiff didn't ask them to change what the minimum standard is, or what that minimum standard is in his injunction, what modifications do the Defendants have to make? Plaintiff has not and does not take the position of requiring defendants to lower the standard for any of their exams. He never argued that, he never requested that and his proposed injunction does not state that, as Defendants still retain that power.

They concede again and make an argument on page 19 as a reason why "its against the public interest" to grant Plaintiff injunction claiming that they have to "alter something" Again, if they are grading the exams already "properly" then what do they have to change?

> ADA (he has not) and that he is likely to succeed on the merits of his claim (he is
> not).  It is *not* in the public interest to alter the scoring of standardized tests—in this

It is clear that Defendants are hiding the fact that Plaintiff is right! How much more proof could the average person want? In addition to everything else that Plaintiff has briefed showing the lies and misrepresentations of Morrison's certification now this, what has to be altered if they are already doing what they are supposed to be doing when Plaintiff hasn't asked for any alterations other then scoring their exams properly?

### V. The "Undue Burden"

Defendants have now claimed that the grading their exams as Plaintiff has asked them, will create an "Undue Burden" Again, if they are grading their exams properly, what undue burden is there to change it? Defendants have been placed in a tough spot because either way, they have to admit how they are grading their exams and what exams would changes would need to be made and how is it an "undue burden" They have so far, <u>not</u> shown the court any of this. They have ignored the documents Plaintiff has presented to the court from **<u>their own website</u>** (<u>See</u> Plaintiff Cert at 24) (explaining Defendants set the passing score of the CBSE to 62 and that

62 is "corresponding to Step 1 Performance starting at the passing standard plus 2 standard errors of measurement") also (See Plaintiff Cert at 22) (Showing Defendants subject examinations are scored using percentiles and the "Angoff" and "Hofstee" methods) and have not even mentioned these documents in their Brief.

This is because they know they are scoring all of their exams in violation of the ADA and their entire defense is nothing more than a sham. If it wasn't they would have presented a defense like this (and this is totally made up for this motion)

- Our Exams are scored using this computer program

- Plaintiff is asking us to grade the exams on their own merit

- Our software doesn't do that, it compares it to others and you pass if you score like them

- To score the exams as Plaintiff is asking, we have to buy new software

- To implement that with all of our exams, it will cost $10 Million and take 3 years

That is an example of an "undue hardship" in an accommodations case, but **Plaintiff isn't and hasn't requested accommodations, he has accused Defendants of having a discriminatory practice in place** of grading the test takers exams and deciding passing or failing only based on how they are compared to others. An accommodations case is for an individual, Plaintiff is challenging the practice that affects everyone disabled. That's the difference. As 28 C.F.R. §36.309 states:

> (b) Examinations.
>
> (1) Any private entity offering an examination covered by this section must assure that -
>
> (i) The examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs

sensory, manual, or speaking skills, the **examination results** accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure);

The DOJ has set a different standard as explained in by the DOJ in their Amicus Curiae brief submitted to the Third Circuit in <u>Rawdin v. Am. Bd. of Pediatrics</u> 582 F. App'x 114 (3d Cir. 2014):

"28 C.F.R. 36.309 require testing entities to do more than simply provide reasonable accommodations...Section 309 and its implementing regulation shift the burden away from the plaintiff and **onto the testing entity to develop and administer the examination** in a way that will best ensure the results accurately reflect that individual's aptitude or achievement level, rather than disability. **If the plaintiff can show that the results of the examination reflect his disability, rather than his skill or knowledge, the "best ensure" standard requires the testing entity to determine whether there is a testing alternative that, while still testing the same factors or knowledge the test is designed to measure, permits the person with a disability the opportunity to demonstrate the abilities measured by the test, as opposed to a test that reflects the manifestations of his disability.[25]**

The "undue burden" does not apply and in this case the ADA requires more than some sort of an accommodation. It requires them under the "best ensure" standard to come up with another way to score disabled test takers. "The examination results [must] accurately reflect the [Plaintiffs] aptitude or achievement level or whatever other factor the examination purports to measure....." quoting 28 C.F.R. §36.309. Therefore Defendants cannot compare Plaintiffs score to anyone's scores to decide if he meets the minimum standard to safely practice medicine. By doing so, all that the test results are showing is Plaintiffs disabilities.

---

[25] https://www.justice.gov/sites/default/files/crt/legacy/2014/03/19/rawdinbrief.pdf

Defendants, however cannot be allowed to keep a discriminatory test in place under the ADA because it creates a "undue burden" as *The ADA prohibits, inter alia, use of [NBME's] tests that "screen out or tend to screen out an individual with a disability or a class of individuals with disabilities [do to]..."failing to select and administer tests...in the most effective manner to ensure that, when such test is administered to a [individual] who has a disability that impairs sensory, manual, or speaking skills, such test results accurately reflect the skills, aptitude, or whatever other factor such test purports to measure, rather than reflecting the impaired sensory, manual, or speaking skills of such [individual]. . ")..[such] "claims are cognizable under the ADA."* Raytheon Co. v. Hernandez, 540 U.S. 44, 53, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003)." Quoting EEOC v. Kronos, Inc., 620 F.3d 287 (3d Cir. 2010). See Raytheon Co. v. Hernandez, 540 U.S. 44, 124 S. Ct. 513, 157 L. Ed. 2d 357 (2003) (defining "discriminate" to include "utilizing standards, criteria, or methods of administration . . . that have the effect of discrimination on the basis of disability" and "using...tests...that screen out or tend to screen out an individual with a disability")

The only exception to the ADA for discriminatory tests that would create an "undue burden" are ones that are relevant and are proven relevant to the position that they are testing for. Since Defendants exams are used to get a paid position as a resident (**which is funded by congress**) in order complete the training to obtain a medical license, they must be show to be correlated with physician performance, and the passing score must be shown to measure the minimum qualifications necessary, not comparison to a group that has take the exam prior to claim the "undue burden" burden defense

"Although the USMLE was designed for use as a licensing exam, it is common practice for residency and fellowship programs to use USMLE test scores in evaluating candidates for

admission to their programs" <u>Doe v. National Bd. of Med. Exam'rs</u>, 199 F.3d 146, 154-155 (3d Cir. 1999)[26] **<u>See</u> <u>Lanning v. Southeastern Pennsylvania Transp. Auth.</u>, 181 F.3d 478 (3d Cir. 1999). (Holding that a discriminatory cutoff score on an entry level employment examination must be shown to measure the minimum qualifications necessary for successful performance of the job in question**); **<u>See also</u> <u>Griggs v. Duke Power Co.</u>, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)(Holding that discriminatory tests are impermissible unless shown to be predicative of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated.)** <u>See</u> also <u>Albemarle Paper Co. v. Moody</u>, 422 U.S. 405, 95 S. Ct. 2362, 45 L. Ed. 2d 280 (1975).( "[D]iscriminatory tests are impermissible unless shown, by professionally acceptable methods, to be **"predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated**."...[Albemarle] compared test scores with subjective supervisorial rankings......The fact that the best of those employees working near the top of a line of progression score well on a test does not necessarily mean that that test, or some particular cutoff score on the test, is a permissible measure of the minimal qualifications of new workers entering lower level jobs..... we agree with the Court of Appeals that the District Court erred in concluding that Albemarle had proved the job relatedness of its testing program..)

Therefore Defendants examinations must be supported evidence supporting their correlation and unfortunately, they are not ("In agreement with other studies, we found **no**

---

[26] **Medical Resident: An individual who has completed medical school and is in training to become a licensed physician**. Residents generally train in a specialty for three to five years (although some specialties require a preliminary year of general medical training before specialty training commences). Obtaining a medical residency is competitive; medical students in their final year apply to residency programs in a particular location and specialty. **Medical residents are paid a salary during residency**, but this salary is generally a fraction of what they will earn after completing their residency. citing Heisler, E. J., Panangala, S. V., Mendez, B. H., Villagrana, M. A., & Mitchell, A. (2018). Federal Support for Graduate Medical Education: An Overview. CRS Report R44376, Version 9. Updated. Congressional Research Service.

correlation between **NBME scores and performance during residency**")[27] ("USMLE scores

are not effective indicators of a physician's success during residency.")[28] ("Our study finds that

USMLE Step 2 is not a reliable predictor of residency performance")[29] ("During the eight years

of the study period......There was a **non-significant correlation** between clinical performance

and the Step 1 score. **Conclusion:** Neither USMLE Step 1 nor Step 2 Clinical Knowledge were

good predictors of the actual clinical performance of residents during their training")[30](" (Step 1,

2 CK, grades, AOA) was not associated with residency clinical performance on milestones.

Isolated correlations were found between specific milestones (eg, higher surgical grade increased

wound care score), but most had **no correlation with residency performance**.")[31]

Therefore Defendants cannot claim an "undue burden defense" because the exam could

only stay in place if it was "significantly correlated with important elements of work behavior

which comprise or are relevant to the job or jobs for which candidates are being evaluated"

Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S. Ct. 2362, 45 L. Ed. 2d 280 (1975) and it is

not and they have not show how any "undue burden" would affect them.

### VI. Response to: IV. A Preliminary Injunction Would Harm NBME

"We next consider how the District Court [should] "balanc[ed] the parties' relative

harms; that is, the potential injury to the plaintiff[] without this injunction versus the potential

---

[27] Borowitz, S. M., Saulsbury, F. T., & Wilson, W. G. (2000). Information collected during the residency match process does not predict clinical performance. Archives of pediatrics & adolescent medicine, 154(3), 256-260.
[28] Miller, B., Dewar, S. B., & Nowalk, A. (2019). Lack of Correlation Between USMLE Scores and Performance in Pediatrics Residency Training Based on ACGME Milestones Ratings
Academic Pediatrics, 19(6), e34.
[29] Udawatta, M., Preet, K., Lagman, C., French, A. M., Bruton, C., Bergsneider, M., ... & Yang, I. (2020). United States Medical Licensing Examination Step 2 scores do not predict American Board of Neurological Surgery scores: a single-institution experience. Journal of the Neurological Sciences, 408, 116556.
[30] Sajadi-Ernazarova, K., Ramoska, E. A., & Saks, M. A. (2020). USMLE Scores Do Not Predict the Clinical Performance of Emergency Medicine Residents. Mediterranean Journal of Emergency Medicine & Acute Care, 1(2).
[31] Burkhardt, J. C., Parekh, K. P., Gallahue, F. E., London, K. S., Edens, M. A., Humbert, A. J., ... & Hopson, L. R. (2020). A critical disconnect: Residency selection factors lack correlation with intern performance. *Journal of graduate medical education*, *12*(6), 696-704.

injury to the defendant with it in place." <u>Issa v. Sch. Dist. of Lancaster</u>, 847 F.3d 121, 143 (3d Cir. 2017). In balancing the harms, the Court noted the Board's "concern for the fulfillment of its mission to provide [qualified] physicians," Ramsay, 2019 WL 7372508, at *19........Nonetheless, the Court appropriately reasoned that granting a preliminary injunction would not undermine the Board's mission because the injunction would give [Plaintiff] only "the opportunity to move forward" in h[is] medical career "should [he] succeed in passing h[is] examinations with appropriate [scoring]" Id. at *19 (emphasis omitted). Moreover, the Board's concerns regarding impacts from undeserved [scoring] do not apply here because [Plaintiff] has shown a reasonable likelihood that [Defendants are violating the ADA] Cf. Issa, 847 F.3d at 143 (holding that a defendant could not assert an interest in continuing to violate a civil rights statute)" quoting <u>Ramsay v. Nat. Bd. of Medical Examiners</u> 968 F.3d 251 (3d Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021)

As the Third Circuit explained in Ramsay there would be no harm to NBME. The only harm that could come to them is lost revenue from less exams being taken Why would that happen? As Plaintiff has stated, if they score the exams **correctly** and not decide passing or failing based on an exam takers comparison to others, then those who are disabled and meet the minimum standard to safely practice medicine can pass the first time. Defendants lose money when this happens because when they pass the first time, they do not have to retake it. That is the only harm Defendants will experience on their part. That harm is self inflected.

### VII. Response to V. An Injunction would Not Serve the Public Interest

"Finally, we consider the District Court's finding that "the public interest favors this preliminary injunction." Id. The Court [should] concluded that an injunction furthers the public interest in ADA compliance and serves to increase the number of qualified physicians. Ramsay,

2019 WL 7372508, at *19. We agree. "In enacting the ADA, Congress demonstrated its view that the public has an interest in ensuring the eradication of discrimination on the basis of disabilities." Enyart, 630 F.3d at 1167; see Issa, 847 F.3d at 143 (concluding that it was in the public interest for covered entities to comply with a civil rights statute). Further, the injunction allows [Plaintiff ] to continue h[is] medical education and therefore serves the public interest in training more physicians. "Although it is true that the public also has an interest in ensuring the integrity of licensing exams," Enyart, 630 F.3d at 1167, [Plaintiff] has shown a reasonable likelihood that the ADA affords h[im proper scoring], and there is no evidence that providing h[im] the requ[red scoring] will jeopardize the test's integrity. Thus, the public interest weighs in favor of an injunction" quoting Ramsay v. Nat. Bd. of Medical Examiners 968 F.3d 251 (3d Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021) "The injunction will not disserve the public interest but will further the public interest in prohibiting discrimination by public entities, such as the National Board of Medical Examiners, on the basis of disability by fulfilling the ADA's requirement that entities offering licensing examinations [scored legally] to disabled individuals." Rush v. National Board of Medical Examiners, 268 F. Supp.2d 673 (N.D. Tex. 2003)

On the last page of Defendants brief, they either forgot their position a few pages earlier or are hoping that the reader didn't notice them switch their positions from few pages earlier on page 16 when they claim:

> Much of Mr. Zangara's preliminary injunction argument relates to whether he is disabled within the meaning of the ADA. However, for present purposes only, NBME does not contest that Mr. Zangara is disabled within the meaning of the ADA.

59

It is therefore assumed with the adequate documentation that Plaintiff has supplied that Defendants have agreed that Plaintiff is covered by the ADA as stated on page 16. Defendants therefore, do not contest this point and it should not be used to deny Plaintiffs relief that he has requested.

As for the additional argument the Defendants have raised, "the altering of standardize tests", Plaintiff has already briefed in the *"Defendants Admit Plaintiff is Correct in Two Places in Their Brief"* and "*Undue Burden*" sections of this brief. The Defendants <u>do not</u> and <u>never will</u> have an interest in preventing the court from enjoining them from violating the ADA and not having a minimum standard in place to test future physicians as  "In awarding a preliminary injunction a court must "conside[r] . . . the overall public interest." <u>Trump v International Refugee Assistance Project</u>, 582 U. S. ____ (2017) <u>See</u> <u>also</u> <u>Issa v. Sch. Dist. of Lancaster</u>, 847 F.3d 121, 143 (3d Cir. 2017) (holding that a defendant could not assert an interest in continuing to violate a civil rights statute)"

**Conclusion**

In conclusion the Plaintiff respectfully requests that this Court grant his application for Injunctive Relief against the Defendants in order to stop the violations of the Americans with Disabilities Act and allow him to continue his medical education by scoring his exams on the bases of his achievement, not his comparison to others.

He requests the court realize how much trouble Defendants are going through to fight this injunction when they claimed Plaintiff is wrong and they are complying with the ADA.

Plaintiff also reminds the court that he is not asking for any accommodations, special treatment or for any money.

Dated: 10/23/2022

Jason A. Zangara, MPH, MA
573 Sidorske Avenue
Manville, New Jersey 08835
(908) 672-0626
firefighterjazzyj@yahoo.com

Plaintiff, Pro Se

61

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

JASON A. ZANGARA               )      Civil No. 3:22-cv-01559-GC-LHG
                               )      **SUPPLEMENTAL**
      Plaintiff            )      **CERTIFICATION IN SUPPORT OF**
                               )      **APPLICATION FOR**
  v.                     )      **PRELIMINARY INJUNCTION**
                               )      **PURSUANT TO RULE 65**
                               )
National Board of Medical Examiners (NBME)    )
                               )
      Defendants

I,  Jason A. Zangara, Plaintiff Pro Se in the above captioned matter sworn and state the following:

29. Attached is a true and accurate copy of the CBSE receipt purchased on March 26,2022 (cut and paste from yahoo mail) (See Exhibit O)

30. Attached is a true and accurate copy of the email I received from the Student Performance Assessment Committee (cut and paste from yahoo mail) (See Exhibit P)

I further certify that the above statements are true, the attached documents are true and accurate copies and I am aware that if they are willingly false, I am aware that I am subject to punishment.

Jason A. Zangara, Pro Se
573 Sidorske Avenue
Manville, N.J. 08835
(908) 672-0626
Attorney for Plaintiff

1

# EXHIBIT O

**NBME Customer First - No Reply** <customerfirstnoreply@nbme.org>
**To:** firefighterjazzyj@yahoo.com
Sat, Mar 26 at 8:58 AM

Dear Jason Zangara,

Thank you for placing your order! Your order number placed on 03/26/2022 is  O-0001894270

View the next steps for completing your registration in the Order Details section below. Please keep this email for future reference.

## General Information

| Buyer Information: Jason Zangara | Payment Information: Visa Ending: xxxx-4489 | Order Date: 03/26/2022 | Order Total: $60.00 |
|---|---|---|---|

## Order Details

| Product | Exam Price | Your Price | Exam Registration | Exam Details |
|---|---|---|---|---|
| Comprehensive Basic Science Self-Assessment (CBSSA) | $60.00 | $60.00 | R-06245869 | Form: Form 28 \| Pacing: 4 \| Expires: June 24, 2022 at 7:58 AM |

You must start and complete your assessment before June 24, 2022 at 8:58 AM; otherwise, the time allotted will expire.

You may launch a sample assessment to preview the exam experience.

Please do not reply to this email, as mail sent to this address cannot be answered. If you have any questions about your order, please visit our website or contact customer service.

Thank you.

NBME

*This email message and any attachments may contain privileged and/or confidential business information and are for the sole use of the intended recipient(s). Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please notify the sender immediately by reply email and destroy all copies of the original message and any attachments.*

3

# EXHIBIT P

**spac@cmumed.org** <spac@cmumed.org>
To:firefighterjazzyj@yahoo.com
Cc:aayubi@cmumed.org,mboegels@hotmail.com,students@cmumed.org,spac@cmumed.org
Wed, Oct 13, 2021 at 9:13 AM
Dear mr. Zangara,

The SPAC states that the SPAC cannot interfere with rules or requirements of gradings of exams. As the SPAC cannot influence gradings, there is no possibility to appeal with the SPAC itself.

He should appeal to the administrators of the exams (NBME, CBSE or USMLE) to ask for special individual grading requirements.


Kind Regards

Student Performance Assessment Committee (SPAC)
Dr. Marijn Bögels, Chair
Dr. Ali Ayubi, Member

**Caribbean Medical University**
Toll Free: +1 888 877 4268
Direct: +1 224 444 4700
Fax: +1 302 397 2092
Email: aayubi@cmumed.org