# Exhibit

# S

Caution
As of: October 10, 2022 6:39 PM Z

## *Ramsay v. Nat'l Bd. of Med. Examiners*

United States Court of Appeals for the Third Circuit

July 1, 2020, Argued; July 31, 2020, Filed

No. 20-1058

**Reporter**
968 F.3d 251 *; 2020 U.S. App. LEXIS 24307 **; 2020 WL 4431789

JESSICA RAMSAY v. NATIONAL BOARD OF
MEDICAL EXAMINERS, Appellant

**Subsequent History**; US Supreme Court certiorari
denied by *Bd. of Med. Examiners v. Ramsay, 2021 U.S.
LEXIS 1263 (U.S., Mar. 8, 2021)*

**Prior History:** [**1] On Appeal from the United States
District Court for the Eastern District of Pennsylvania.
(D.C. No. 2-19-cv-02002). District Judge: Honorable J.
Curtis Joyner.

*Ramsay v. Nat'l Bd. of Med. Examiners, 2019 U.S. Dist.
LEXIS 222782, 2019 WL 7372508 (E.D. Pa., Dec. 30,
2019)*

## Core Terms

accommodations, disability, district court, regulations,
substantial limitation, general population, testing,
impairment, major life activity, injunction, dyslexia,
preliminary injunction, learning disability, public interest,
processing, irreparable harm, achievement, clinical,
license, argues, medical school, functionalities,
evidentiary, percentile, abnormal, harmed, speed,
weigh, exam

## Case Summary

### Overview
HOLDINGS: [1]-Where after the National Board of
Medical Examiners denied a medical student testing
accommodations for dyslexia and ADHD, the student
sued the Board under the ADA, the student was
properly awarded a preliminary injunction, requiring the
Board to provide her the requested testing
accommodations; [2]-The student established that she
was likely to prevail on the merits of her ADA claim
because her evidence showed that, despite her

academic achievements, she had an impairment that
substantially limited a major life activity; [3]-The student
showed that she would be irreparably harmed without
an injunction by evidence that, given her disability and
her prior failure of the test, she would likely fail again
and be forced to leave medical school; [4]-The balance
of the harms favored an injunction since it provided the
student with an opportunity to move forward with her
career.

### Outcome
Decision affirmed.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of
Review > Abuse of Discretion

Civil Procedure > Appeals > Standards of
Review > Clearly Erroneous Review

Civil Procedure > Appeals > Standards of
Review > De Novo Review

Civil
Procedure > Remedies > Injunctions > Preliminary
& Temporary Injunctions

Civil Procedure > Appeals > Standards of
Review > Questions of Fact & Law

*HN1*[ ] **Standards of Review, Abuse of Discretion**

Appellate courts employ a tripartite standard of review
for preliminary injunctions. Appellate courts review the
district court's findings of fact for clear error. Legal
conclusions are assessed de novo. The ultimate
decision to grant or deny the injunction is reviewed for

968 F.3d 251, *251; 2020 U.S. App. LEXIS 24307, **1

abuse of discretion.

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Balance of Hardships

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

*HN2*[⬇] **Grounds for Injunctions, Balance of Hardships**

In issuing a preliminary injunction, a district court considers four factors: (1) the likelihood that the plaintiff will prevail on the merits at final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) that the public interest weighs in favor of granting the injunction.

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > Major Life Activities

Labor & Employment Law > ... > Scope & Definitions > Disabilities Under ADA > Records of Impairments

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > Mental & Physical Impairments

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > Substantial Limitations

*HN3*[⬇] **Mental & Physical Impairments, Major Life Activities**

The ADA defines "disability" as a physical or mental impairment that substantially limits one or more major life activities of such individual. *42 U.S.C.S. § 12102(1)(A)*. Courts construe the term disability broadly. *42 U.S.C.S. § 12102(4)(A)*. As to the term "impairment," the applicable Department of Justice regulations provide that the term physical or mental impairment includes ADHD and dyslexia and other specific learning disabilities. *28 C.F.R. § 36.105(b)(2)*. As to "life activities," the ADA provides that major life activities

include reading, concentrating, thinking, communicating, and working. *42 U.S.C.S. § 12102(2)(A)*. The regulations explain that an impairment is a disability if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. *28 C.F.R. § 36.105(d)(1)(v)*. Accordingly, not every impairment will constitute a disability, but an impairment will meet the definition of disability if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. *28 C.F.R. § 36.105(d)(1)(v)*.

Civil Rights Law > ... > Protection of Disabled Persons > Americans With Disabilities Act > Scope

*HN4*[⬇] **Protection of Disabled Persons, Americans With Disabilities Act**

In general, the comparison to most people in the general population in the learning disability context under the ADA means a comparison to other people in the general population, not a comparison to those similarly situated. This does not mean that disability cannot be shown where an impairment, such as a learning disability, is clinically diagnosed based in part on a disparity between an individual's aptitude and that individual's actual versus expected achievement, taking into account the person's chronological age, measured intelligence, and age-appropriate education.

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > Major Life Activities

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > Substantial Limitations

*HN5*[⬇] **Mental & Physical Impairments, Major Life Activities**

The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures. *28 C.F.R. § 36.105(d)(1)(viii)*.

Administrative Law > Agency Rulemaking > Rule Application & Interpretation

968 F.3d 251, *251; 2020 U.S. App. LEXIS 24307, **1

Governments > Legislation > Interpretation

*HN6*[⤓] **Agency Rulemaking, Rule Application & Interpretation**

The preamble to a regulation may be used as an aid in determining the meaning of a regulation.

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > Major Life Activities

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > Substantial Limitations

Labor & Employment Law > ... > Disparate Impact > Evidence > Statistical Evidence

*HN7*[⤓] **Mental & Physical Impairments, Major Life Activities**

The regulations provide that the substantially limits inquiry should not demand extensive analysis, *28 C.F.R. § 36.105(d)(1)(ii)*, and that the comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical evidence, *§ 36.105(d)(1)(v)*.

Business & Corporate Compliance > ... > Disability Discrimination > Reasonable Accommodations > Interactive Process

*HN8*[⤓] **Reasonable Accommodations, Interactive Process**

The regulation defining disability, *28 C.F.R. § 36.105*, does not bar consideration of past accommodations. Indeed, § 36.309(b)(1)(v) provides that when considering requests for accommodations the testing entity gives considerable weight to documentation of past accommodations. Moreover, as the preamble to the applicable regulations states, a recent history of past accommodations is critical to an understanding of the applicant's disability and the appropriateness of testing accommodations.

Civil Procedure > Judicial Officers > Judges > Discretionary Powers

*HN9*[⤓] **Judges, Discretionary Powers**

It is within the trial judge's discretion to credit a physician with firsthand observations of a patient over one who only reviewed the patient's records.

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > Major Life Activities

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > Substantial Limitations

*HN10*[⤓] **Mental & Physical Impairments, Major Life Activities**

The regulations mandate that the determination of whether an impairment substantially limits a major life activity requires an individualized assessment. *28 C.F.R. § 36.105(d)(1)(vi)*. Because such examinations allow the professional to evaluate the individual's behavior, effort, and candor, the U.S. Department of Justice (DOJ) has stated that reports from experts who have personal familiarity with the candidate should take precedence over those from reviewers for testing agencies, who have never personally met the candidate or conducted the requisite assessments for diagnosis and treatment. As a result, DOJ has directed that testing entities shall generally accept documentation provided by a qualified professional who has made an individualized assessment of an applicant that supports the need for the modification, accommodation, or aid requested and provide the accommodation.

Labor & Employment Law > ... > Scope & Definitions > Disabilities Under ADA > Mental & Physical Impairments

*HN11*[⤓] **Disabilities Under ADA, Mental & Physical Impairments**

Because such examinations allow the professional to evaluate the individual's behavior, effort, and candor, DOJ understandably has stated that reports from experts who have personal familiarity with the candidate should take precedence over those from reviewers for

968 F.3d 251, *251; 2020 U.S. App. LEXIS 24307, **1

testing agencies, who have never personally met the candidate or conducted the requisite assessments for diagnosis and treatment. As a result, DOJ has directed that testing entities shall generally accept documentation provided by a qualified professional who has made an individualized assessment of an applicant that supports the need for the modification, accommodation, or aid requested and provide the accommodation.

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > Major Life Activities

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > Substantial Limitations

*HN12*[⬇] Mental & Physical Impairments, Major Life Activities

The threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis. *28 C.F.R. § 36.105(d)(1)(ii)*.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

*HN13*[⬇] Standards of Review, Clearly Erroneous Review

A finding of fact is clearly erroneous when it is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data. Appellate courts examine the entire record to determine whether there is evidentiary support for a finding, not just the evidence a district court cites.

Administrative Law > Judicial Review > Standards of Review > Clearly Erroneous Standard of Review

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

*HN14*[⬇] Standards of Review, Clearly Erroneous Standard of Review

Where there are two permissible views of the evidence,

the factfinder's choice between them cannot be clearly erroneous.

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Irreparable Harm

*HN15*[⬇] Grounds for Injunctions, Irreparable Harm

To show irreparable harm to obtain injunctive relief, a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The harm must be likely to occur in the absence of an injunction.

Education Law > ... > Disability Discrimination > Americans With Disabilities Act > Remedies

*HN16*[⬇] Americans With Disabilities Act, Remedies

No damages remedy is available under the ADA. *42 U.S.C.S. § 12188(a)(1)* provides that the only remedies available in an ADA action are those in *42 U.S.C.S. § 2000a-3(a) & 2000a-3(b)* provides for injunctive relief.

**Counsel:** Lawrence D. Berger, Reisman Carolla Gran & Zuba, Haddonfield, NJ; Mary C. Vargas [ARGUED], Stein & Vargas, Washington, DC, Counsel for Plaintiff-Appellee Jessica Ramsay.

Robert A. Burgoyne [ARGUED], Caroline M. Mew, Perkins Coie, Washington, DC; Alison R. Caditz, Perkins Coie, Seattle, WA, Counsel for Defendant-Appellant National Board of Medical Examiners.

**Judges:** Before: GREENAWAY, JR., SHWARTZ, and RENDELL, Circuit Judges.

**Opinion by:** SHWARTZ

# Opinion

[*253] SHWARTZ, Circuit Judge.

Medical student Jessica Ramsay sought testing accommodations for dyslexia and attention deficit hyperactivity disorder ("ADHD") from the National Board of Medical Examiners ("the Board"). The Board denied

968 F.3d 251, *253; 2020 U.S. App. LEXIS 24307, **1

her requests, and she sued under the *Americans with Disabilities Act ("ADA")*. The District Court granted a preliminary injunction, requiring the [*254] Board to provide her accommodations. We will affirm.

I

A

The Board administers the United States Medical Licensing Examination ("USMLE"). The USMLE has three components, or "Steps," that medical students must pass before they can apply for a medical [**2] license. Step 1 is a computer-based, multiple choice exam that assesses a student's grasp of scientific concepts. Students typically take Step 1 before their final year of medical school. Step 2 has two parts: Clinical Knowledge ("CK"), a computer-based, multiple choice exam that assesses medical knowledge and clinical science, and Clinical Skills ("CS") that assesses students in a clinical setting. Step 2 must be taken before graduation. Step 3 is a computer-based exam that assesses the application of medical and scientific knowledge to the practice of medicine. Step 3 must be taken before applying for a medical license.

Ramsay, while a third-year medical student at Western Michigan University ("WMed"), requested an accommodation, namely extra testing time, for Step 1 and Step 2 CK. The basis of her request was that she had ADHD and dyslexia. She submitted to the Board:

• a diagnosis of ADHD and probable dyslexia by her family physician, Dr. Alan Smiy, made when she was an undergraduate;

• records of accommodations provided by her undergraduate institution and by WMed;

• evaluations from Charles Livingston, a licensed social worker, who administered several assessments that supported [**3] a diagnosis of ADHD and a likelihood of dyslexia and showed, in his opinion, that Ramsay had "relatively low attention and concentration and very low processing speed," although "[h]er native intelligence has been some compensation for low abilities in the identified areas";

• her MCAT scores, taken without accommodations, placing her in the 67th and 31st percentiles for verbal reasoning and writing, respectively;

• academic records and other standardized test scores, taken without accommodations, showing a high level of achievement; and

• a personal statement attesting that she struggled from an early age with maintaining concentration,

reading, and writing, but that she achieved academic success through mitigating strategies, informal accommodations from teachers, and accommodations from her undergraduate and medical schools.

The Board provided Ramsay's materials to an outside reviewer, Dr. Stephen Zecker, who opined that Ramsay was not "substantially limited in functioning in a manner that warrants accommodations." App. 766. The Board also reviewed Ramsay's documentation and, noting her record of achievement without accommodations, concluded that the documents did not "demonstrate a [**4] record of chronic and pervasive problems with inattention, impulsivity, behavioral regulation, or distractibility that has substantially impaired [her] functioning during [her] development or currently." App. 1126. Based on Dr. Zecker's recommendation and the Board's review of Ramsay's materials, the Board denied her request.

Thereafter, Ramsay took Step 1 without accommodations in her third year, but she failed by one point. Because WMed requires students to pass Step 1 by the [*255] beginning of their fourth year, she took a leave of absence.

Ramsay renewed her request for extra testing time and submitted an evaluation and test data from neuropsychologist Dr. Alan Lewandowski. Dr. Lewandowski met with Ramsay, conducted assessments, found that she had abnormal functionalities in thinking, processing speed, attention, and sequencing, and concluded that she had ADHD. Ramsay also submitted a letter from her treating psychiatrist, Dr. Bruce Ruekberg, who concurred with Mr. Livingston's and Dr. Lewandowski's assessments, stating that she had abnormal scanning and processing speed that impaired her reading and written expression. The Board denied her request for extra testing time, again concluding [**5] that she had not shown she was substantially limited in any functions as compared to most people.[1]

Ramsay sought reconsideration of the Board's denial. As additional support, she provided an evaluation by Dr. Robert D. Smith, a psychologist and neuropsychologist. Dr. Smith met with Ramsay, reviewed her records, and performed similar assessments. He reported that the

---

[1] The Board granted Ramsay's requests for additional break time and a separate testing room as accommodations for migraines and deep vein thrombosis.

assessments revealed that she had abnormally low abilities in processing information, writing, and reading, indicating dyslexia and ADHD. Among other things, his testing revealed that Ramsay, as compared to others in her age group, was in the fourth percentile in reading comprehension and fluency, second percentile in word reading speed, and first percentile in oral reading fluency.

The Board provided Ramsay's file to outside expert Dr. Benjamin Lovett, who concluded that Ramsay did not show poor academic skills or impairments compared to the general population and thus lacked a condition that would warrant accommodations. Based on Dr. Lovett's recommendation and further review, the Board denied Ramsay's request for reconsideration.

B

Ramsay sued the Board in May 2019, alleging that it had violated the ADA.[2] The next month, WMed [**6] informed Ramsay that it could extend her leave only until March 2020, "with the expectation that [she] will sit for the USMLE Step 1 exam in a manner that allows [her] to return to the WMed curriculum by that date." App. 1520. WMed informed Ramsay that if she did not pass Step 1 and return by March 2020, she would be dismissed or could voluntarily withdraw, but readmission would not be guaranteed.[3] Ramsay accepted WMed's conditional extension of leave.

Because Ramsay had to pass Step 1 to avoid dismissal, she sought a preliminary injunction to require the Board to grant her accommodations. The District Court held a three-day evidentiary hearing featuring testimony from, among others, Ramsay, Dr. Smith, Dr. Zecker, and Dr. Lovett.

For the reasons explained in its careful and thorough opinion, the District Court granted Ramsay a preliminary injunction and required the Board to provide Ramsay with double the testing time on Step 1, [*256] Step 2 CK, any written or reading portions of Step 2 CS, and Step 3. *Ramsay v. Nat'l Bd. of Med. Exam'rs, No. 19*

CV-2002, 2019 U.S. Dist. LEXIS 222782, 2019 WL 7372508 (E.D. Pa. Dec. 31, 2019). The Court found that all the experts were qualified, but that the testimony and reports of the experts who met with Ramsay were more persuasive. *2019 U.S. Dist. LEXIS 222782, [WL] at *17.* Those experts stated that their assessments [**7] and evaluations all showed that Ramsay had low reading, writing, and processing abilities. *2019 U.S. Dist. LEXIS 222782, [WL] at *15-16.* The Court also found that the Board's experts' analyses contradicted applicable regulations by focusing too much on Ramsay's academic achievements, substituting their own opinions for those of experts who met with Ramsay, and placing too demanding a burden on Ramsay. *2019 U.S. Dist. LEXIS 222782, [WL] at *17-18.* Based on this evidence and the governing law, the Court found that Ramsay had a disability under the ADA. *2019 U.S. Dist. LEXIS 222782, [WL] at *18.*

The Court also found that: (1) Ramsay established irreparable harm because she would likely be forced to withdraw from WMed if she could not take Step 1 with accommodations and pass, (2) the balance of equities tipped in her favor because granting her accommodations would not undermine the Board's interests in fair and accurate testing, and (3) it was in the public interest for the ADA to be followed and to increase the number of physicians. *2019 U.S. Dist. LEXIS 222782, [WL] at *18-19.* The Board appeals.[4]

II[5]

---

[4] After the Board filed its appeal, Ramsay passed Step 1 with accommodations. This appeal, however, is not moot because (1) the District Court's injunction extends to Steps 2 and 3, which Ramsay has not yet taken, and (2) as to Step 1, if we vacated the injunction, the Board could invalidate her score or prevent her from submitting the score to residency programs. See *Chafin v. Chafin, 568 U.S. 165, 172, 133 S. Ct. 1017, 185 L. Ed. 2d 1 (2013)* (explaining that a case is not moot if the parties "'continue to have a personal stake' in the ultimate disposition of the lawsuit" (quoting *Lewis v. Continental Bank Corp., 494 U.S. 472, 473, 110 S. Ct. 1249, 108 L. Ed. 2d 400 (1990)*).

[5] The District Court had jurisdiction under *28 U.S.C. § 1331.* We have jurisdiction under *28 U.S.C. § 1292(a)(1).* HN1[⬆] "We employ a tripartite standard of review for . . . preliminary injunctions. We review the District Court's findings of fact for clear error. Legal conclusions are assessed de novo. The ultimate decision to grant or deny the injunction is reviewed for abuse of discretion." *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J., 910 F.3d 106, 114 (3d Cir. 2018)* (omission in original) (quoting *K.A. ex rel. Ayers v. Pocono Mountain Sch.*

---

[2] Ramsay also alleged a *Rehabilitation Act* claim, *29 U.S.C. § 794,* but the parties agree that only her ADA claim is relevant to the preliminary injunction.

[3] The Board contends that Ramsay only had to take, not pass, Step 1 to remain enrolled in school. Given that WMed students must pass Step 1 by the beginning of their fourth year, however, Ramsay could not continue into her fourth year at WMed without passing Step 1.

968 F.3d 251, *256; 2020 U.S. App. LEXIS 24307, **7

*HN2*[⬆] In issuing a preliminary injunction, a district court considers four factors:

> (1) the likelihood that the plaintiff will prevail on the merits at final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) [**8] the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) [that] the public interest [weighs in favor of granting the injunction].

*Greater Phila. Chamber of Commerce v. City of Philadelphia, 949 F.3d 116, 133 (3d Cir. 2020)* (alterations in original) (quoting *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994)).*

**A**

We first address Ramsay's likelihood of success on the merits of her ADA claim. "On this factor, a sufficient degree of success for a strong showing exists if there is a reasonable chance or probability, of winning" on her ADA claim. *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J., 910 F.3d 106, 115 (3d Cir. 2018)* [*257] (internal quotation marks and citation omitted). The ADA provides in relevant part:

> Any person that offers examinations . . . related to applications, licensing, certification, or credentialing for . . . professional . . . purposes shall offer such examinations . . . in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals.

*42 U.S.C. § 12189.* The issue here is whether Ramsay has a "disability" that entitles her to an accommodation. *Ramsay, 2019 U.S. Dist. LEXIS 222782, 2019 WL 7372508, at *8.*

*HN3*[⬆] The ADA defines "disability" in relevant part as "a physical or mental impairment that substantially limits one or more major life activities of such individual." *42 U.S.C. § 12102(1)(A).* We construe the term "disability" broadly. *Id. § 12102(4)(A).* As to the term "impairment," the applicable [**9] Department of Justice ("DOJ") regulations[6] provide that the term "physical or mental

impairment" includes ADHD and "dyslexia and other specific learning disabilities." *28 C.F.R. § 36.105(b)(2).* As to "life activities," the ADA provides that "major life activities include . . . reading, concentrating, thinking, communicating, and working." *42 U.S.C. § 12102(2)(A).* Finally, the regulations explain that "[a]n impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." *28 C.F.R. § 36.105(d)(1)(v).* Accordingly, "'[n]ot every impairment will constitute a disability . . . ,' but [an impairment] will meet the definition [of disability] if 'it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.'" *J.D. by Doherty v. Colonial Williamsburg Found., 925 F.3d 663, 670 (4th Cir. 2019)* (quoting *28 C.F.R. § 36.105(d)(1)(v)).*

**1**

The Board argues that the District Court did not determine that Ramsay is substantially limited in comparison to most people in the general population.[7] We first address the concept of "most people in the general population" in the learning disability context. *HN4*[⬆] In general,

> [t]he comparison to most people in the general population . . . mean[s] a comparison [**10] to other people in the general population, not a comparison to those similarly situated. For example, the ability of an individual with an amputated limb to perform a major life activity is compared to other people in the general [*258]

*Carlton & Harris Chiropractic, Inc., 139 S. Ct. 2051, 2055, 204 L. Ed. 2d 433 (2019)* (quoting *Perez v. Mortg. Bankers Ass'n, 575 U.S. 92, 97, 135 S. Ct. 1199, 191 L. Ed. 2d 186 (2015));* accord *Pa. Dep't of Human Servs. v. United States, 897 F.3d 497, 505 (3d Cir. 2018)).* The regulations "are entitled to substantial deference." *Helen L. v. DiDario, 46 F.3d 325, 331 (3d Cir. 1995).*

---

[7] Relatedly, the Board argues that the District Court improperly considered Ramsay's work ethic and study habits, which the Board argues are improper considerations because "working hard does not show that [Ramsay] is substantially impaired." Appellant's Br. at 47. *HN5*[⬆] However, "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures." *28 C.F.R. § 36.105(d)(1)(viii).* Accordingly, in deciding whether Ramsay was disabled, the Court could appropriately consider and discount that she compensated for her very weak reading and writing abilities by devoting more effort to her assignments than most students.

---

*DOJ, 279 F. Supp. 3d 505, 513-14 (2018).*

[6] In *42 U.S.C. §§ 12186(b)* and *12206,* the ADA authorizes DOJ to issue regulations implementing the public accommodations provisions of the ADA. Such regulations have "the force and effect of law." See *PDR Network, LLC v.*

968 F.3d 251, *258; 2020 U.S. App. LEXIS 24307, **10

population, not to other amputees. This does not mean that disability cannot be shown where an impairment, such as a learning disability, is clinically diagnosed based in part on a disparity between an individual's aptitude and that individual's actual versus expected achievement, taking into account the person's chronological age, measured intelligence, and age-appropriate education. Individuals diagnosed with dyslexia or other learning disabilities will typically be substantially limited in performing activities such as learning, reading, and thinking when compared to most people in the general population . . . .

Regulations to Implement the Equal Employment Provisions of the Americans with *Disabilities Act, as Amended, 76 Fed. Reg. 16,978, 17,009 (Mar. 25, 2011)* (explanation by the Equal Employment Opportunity Commission ("EEOC")); *see* Amendment of Americans with Disabilities Act Title II and Title III Regulations to Implement ADA Amendments Act of 2008, *81 Fed. Reg. 53,204, 53,230 (Aug. 11, 2016)* (DOJ "concur[ring] with" EEOC's "view").[8] Thus, a clinical diagnosis of [**11] a learning disability is typically based upon a comparison between the individual and others in the general population who are of similar age and have received age-appropriate education.

Here, the District Court relied on such diagnostic information to conclude that Ramsay had ADHD and dyslexia that caused her to read and write with more difficulty than most people. For example, Dr. Smith's and Dr. Lewandowski's diagnostic assessments showed that Ramsay had abnormal functionalities in thinking, processing speed, attention, and sequencing. Indeed, some of the reading tests Dr. Smith administered placed Ramsay in less than the fifth percentile as compared to individuals her age. This is exactly the type of data DOJ contemplates as showing a learning disability that substantially limits an individual as compared to others in the general population. Equal Employment Provisions, 76 Fed. Reg. at 17,009; Title II and Title III

Regulations, 81 Fed. Reg. at 53,230. Further, Ramsay explained in her personal statement that she had struggled with reading and writing tasks in comparison to her classmates since elementary school. Thus, the Court's finding that Ramsay's ADHD and dyslexia constituted a disability was based on evidence that these conditions substantially limit her reading and writing [**12] in comparison to most people. See *Pryer v. C.O. 3 Slavic, 251 F.3d 448, 453 n.4 (3d Cir. 2001)* (inferring the district court's reasoning where it was "otherwise apparent from the record").[9]

*HN7*[↑] Moreover, the regulations provide that the "substantially limits" inquiry "should not demand extensive analysis," *28 C.F.R. § 36.105(d)(1)(ii),* and that "[t]he comparison of an individual's performance of a major life activity to the performance [*259] of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical evidence," *id. § 36.105(d)(1)(vii).* Accordingly, the District Court's reliance on evidence that Ramsay's reading, processing, and writing skills were abnormally low by multiple measures provided a sufficient comparison of her abilities to those of the general population to support the finding of disability.[10]

2

Next, the Board argues that the District Court erred by giving "considerable weight" to Ramsay's past accommodations when determining that she has a disability. Appellant's Br. at 45 (quoting *28 C.F.R. § 36.105(b)(1)(v)).* According to the Board, a court should

_____

[8] *HN6*[↑] "[T]he preamble to a regulation may be used as an aid in determining the meaning of a regulation." *Conn. Gen. Life Ins. Co. v. Comm'r, 177 F.3d 136, 145 (3d Cir. 1999)* (quoting *Penns. Human Dept. of Pub. Welfare v. United States ex rel. Rell, 48 F.3d 544 n.3 (3d Cir. 1999));* see also *Hagel Wang-cw v. Dir., OWCP, 470 F.3d 1064, 1076 (3d Cir. 2006)* (holding that an administrative law judge's "reference to the preamble to the regulations . . . unquestionably supports the reasonableness of his decision to assign less weight to [an expert's] opinion").

[9] We further disagree with the Board's contention that the District Court never found that Ramsay was substantially limited as compared to the general population because when the Court concluded that Ramsay was disabled, it defined disability as a substantial limitation as compared to most people in the general population. *Ramsay, 2019 U.S. Dist. LEXIS 122782, 2019 WL 7372508, at *7-8.*

[10] The Board relies on *Bibber v. National Board of Osteopathic Medical Examiners, Inc., Civ. A. No. 15-4987, 2016 U.S. Dist. LEXIS 48181, 2016 WL 1404157 (E.D. Pa. Apr. 11, 2016),* but it is distinguishable. There, the district court held that the plaintiff was not disabled because "a mountain of evidence," including some of the same diagnostic assessments that Ramsay took, "suggest[ed] that Bibber's reading and processing abilities [were] average when compared to the general population." *2016 U.S. Dist. LEXIS 48181, [WL] at *8.* In contrast, Ramsay's scores on the same assessments were lower, and she explained at the hearing how she reads in a manner that is different from the average person.

968 F.3d 251, *259; 2020 U.S. App. LEXIS 24307, **12

consider past accommodations only after finding the individual is disabled. This argument fails.

*HN8*[↑] The regulation defining disability, § 36.105, does not bar consideration of past accommodations. Indeed, § 36.309(b)(1)(v) provides [**13] that "[w]hen considering requests for . . . accommodations . . . the [testing] entity gives considerable weight to documentation of past . . . accommodations." Moreover, as the preamble to the applicable regulations states, "a recent history of past accommodations is critical to an understanding of the applicant's disability and the appropriateness of testing accommodations." *Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 75 Fed. Reg. 56,236, 56,298 (Sept. 15, 2010)* (to be codified at 28 C.F.R. pt. 36). Thus, the District Court did not err in considering Ramsay's past accommodations.

3

The Board also argues that the District Court wrongly believed that the statute and regulations compelled it to defer to experts who met with and tested Ramsay. While the Court viewed Ramsay's experts more favorably and found the Board's experts unpersuasive, there is no indication that the Court believed that it was compelled to defer to Ramsay's experts. Rather, the Court discounted the Board's experts because they (1) never met with Ramsay, (2) engaged in too demanding an analysis of whether Ramsay had a disability, and (3) focused too much on Ramsay's academic achievements. *Ramsay, 2019 U.S. Dist. LEXIS 222782, 2019 WL 7372508, at *17-18.* The Court's reasoning was within its discretion and supported by the regulations.

*HN9*[↑] First, it is within the trial judge's discretion [**14] to credit a physician with firsthand observations of a patient over one who only reviewed the patient's records. *See United States v. Dibayskyy, 542 F.3d 530, 548-49 (3d Cir. 2008).* Such a professional has the benefit of seeing how the patient actually acts and speaks and provides a perspective not limited to the cold record. This principle is not unlike the deference an appellate court gives to a trial court who physically sees a witness. *Cooper v. Harris, 137 S. Ct. 455, 1474-1475, 197 L. Ed. 2d 837 (2017).* This is why we rarely second-guess a district court's weighing of evidence, *see, e.g., United [*260] States v. Turner, 718 F.3d 226, 231 (3d Cir. 2013),* and why it makes sense for the District Court to credit the professionals who personally met with Ramsay.

*HN10*[↑] Second, the regulations mandate that "[t]he determination of whether an impairment substantially limits a major life activity requires an individualized assessment." *28 C.F.R. § 36.105(d)(1)(vi).* Such assessments benefit from the reports of professionals who know or have personally examined the individual. *HN11*[↑] Because such examinations allow the professional to evaluate the individual's behavior, effort, and candor, DOJ understandably has stated that "[r]eports from experts who have personal familiarity with the candidate should take precedence over those from . . . reviewers for testing agencies, who have never personally met the candidate or conducted [**15] the requisite assessments for diagnosis and treatment." *Nondiscrimination on the Basis of Disability, 75 Fed. Reg. at 56,297.* As a result, DOJ has directed that testing entities "shall generally accept" "documentation provided by a qualified professional who has made an individualized assessment of an applicant that supports the need for the modification, accommodation, or aid requested . . . and provide the accommodation." *Id.* Thus, the Court's decision to weigh Ramsay's experts more favorably than those of the Board was consistent with DOJ regulations.[11]

*HN12*[↑] Third, "the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis." *28 C.F.R. § 36.105(d)(1)(ii).* The Court could reasonably have concluded that the Board's experts were too demanding in what they required to prove a disability, for example, by demanding evidence of a lifetime of academic struggles, and "substituting their own opinions" for those of Ramsay's healthcare providers. *Ramsay, 2019 U.S. Dist. LEXIS 222782, 2019 WL 7372508, at *17.* In fact, the Board's reliance on Ramsay's academic achievement was contrary to the regulations that explain that "someone with a learning disability may achieve a

_____

[11] The Board argues before us that a 2011 settlement agreement between it and DOJ eliminates the preference to be given to professionals who personally examined the individual. The Board did not make this argument before the District Court, so we do not fault the Court for not considering it. In any event, the Board is wrong. First, the settlement addresses the Board's obligations and not a court's considerations under the regulations when deciding whether an individual has a disability. Second, while the agreement states that the Board need not defer to the conclusions of such professionals, that does not mean it is relieved of showing in litigation why those professionals are unworthy of credence. Third, even if the agreement had any bearing on the regulations, which it does not, it expired in 2014.

968 F.3d 251, *260; 2020 U.S. App. LEXIS 24307, **15

high level of academic success, but may nevertheless be substantially limited in one or more major life activities, including, [**16] but not limited to, reading, writing, speaking, or learning because of the additional time or effort he or she must spend to read, write, speak, or learn compared to most people." 29 C.F.R. § 35.105(d)(3)(iii).[12] Because Ramsay's high academic performance does not foreclose her from having a disability, [*261] the Court reasonably discounted the Board's experts' opinions, which focused mostly on Ramsay's academic accomplishments and ignored evidence of her limitations. Ramsay, 2019 U.S. Dist. LEXIS 222782, 2019 WL 7372508, at *18.

In sum, nothing in the District Court's discussion indicates that it held that the statute and regulations "compel" deference to Ramsay's experts. Rather, the Court found that Ramsay's experts provided facts more probative to the relevant inquiries under the ADA, and its decision to view these witnesses more favorably is consistent with the regulations. Thus, we will not disturb how the Court chose to weigh evidence.

4

The additional errors the Board identifies in the Court's factual findings do not amount to clear error. HN13[↑] "A finding of fact is clearly erroneous when it is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." VICI Racing, LLC v. T-Mobile USA, Inc., 763 F.3d 273, 283 (3d Cir. 2014) (internal quotation [**17] marks and citation omitted). We examine the entire record to determine whether there is evidentiary support for a finding, not just the evidence a district court cites. See N.J. Rifle, 910 F.3d at 120 n.24.

First, the Board argues that the District Court erred in finding that the Board's consultants found that Dr. Smith's assessments were valid and credible. Contrary

to the Board's assertion, the record supports the Court's finding. Both of the Board's consultants testified that they had no reason to doubt that the assessments were properly administered, that the results were accurate, and that the data could be useful, although they disagreed with Dr. Smith's interpretation of the results. The credibility of evidence is different from the inferences a factfinder can draw from that evidence, so the Court's finding that all experts agreed the assessments were credible was supported by the consultants' testimony, even if the Board's consultants reached different conclusions from the test results themselves.[13]

Second, the Board argues that the District Court erred in finding that Ramsay could not finish reading and had to guess on about a third of the questions on Step 1 because the time Ramsay spent on each question shows [**18] that "she had time to read every question." Appellant's Br. at 61 (emphasis omitted) (citing Ramsay, 2019 U.S. Dist. LEXIS 222782, 2019 WL 7372508, at *3). The record does not contradict the Court's finding. The Board's evidence does not indicate how much time Ramsay spent reading each question. Rather, it shows only that she spent, on average, seventeen seconds more on the questions she got incorrect. Further, Ramsay testified that she took a pass through the questions before answering them, answered the ones she felt she could, and repeated that strategy until she was left with a few questions she could not answer even after multiple reads. Her strategy provides a reasonable explanation for why the time spent on correct versus incorrect answers was similar. The Court was free to credit Ramsay's testimony over the inferences that the Board argued should be [*262] drawn from its measurements. See Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd., 462 F.3d 249, 271 (3d Cir. 2006) (HN14[↑]) "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."

[12] When discussing this proposition, the Court quoted 29 C.F.R. § 1630.2(j)(4)(iii), promulgated by the EEOC, which does not implement the operative ADA title here. 42 U.S.C. § 1.6 (providing EEOC authority to implement the employment provisions of the ADA). Nonetheless, DOJ has issued an identical regulation. Compare 28 C.F.R. § 36.105(d)(3)(iii), with 29 C.F.R. § 1630.2(j)(4)(iii). Thus, there was no legal error "infecting" the Court's weighing of experts. Bedrosian v. United States, 912 F.3d 144, 152 (3d Cir. 2018) (quoting U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC, 138 S. Ct. 960, 968 n.7, 200 L. Ed. 2d 218 (2018)).

[13] In making this finding, the District Court misquoted one piece of evidence, a letter from the Board. The Court stated that the Board found Ramsay's expert assessment to be valid. Ramsay, 2019 U.S. Dist. LEXIS 222782, 2019 WL 7372508, at *4 (quoting App. 1512). The letter, however, was referring to Ramsay's expert accepting the assessments as valid. Accordingly, the letter does not support the Court's finding because it does not embody the Board's view. Nonetheless, other evidence in the record supports the finding, as explained above, so there is no clear error. N.J. Rifle, 910 F.3d at 120 n.24.

968 F.3d 251, *262; 2020 U.S. App. LEXIS 24307, **18

(quoting *Scully v. US WATS, Inc.*, 238 F.3d 497, 506 (3d Cir. 2001))).

Finally, the Board argues that the District Court erred in finding that Ramsay had received informal accommodations in her early school years. Ramsay testified about, and her mother relayed to Dr. Smith information concerning, [**19] these informal accommodations. While the Board asserts that there is no written record of these informal accommodations, Ramsay's corroborated testimony provided "minimum evidentiary support" for the Court's finding, so there was no clear error.[14] *VICI Racing*, 763 F.3d at 284 (citation omitted).

B

We next determine whether Ramsay proved irreparable harm. HN15[↑] "[T]o show irreparable harm a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994) (internal quotation marks and citation omitted). The harm must be "likely" to occur "in the absence of an injunction." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 217 n.11 (3d Cir. 2014) (emphasis added) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 22, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)).

The District Court had a basis to conclude that Ramsay would be irreparably harmed absent an injunction. The Court could reasonably conclude that given Ramsay's disability and that she had previously failed Step 1, she likely would fail again and be forced to leave medical school.[15] *Ramsay*, 2019 U.S. Dist. LEXIS 222782, 2019 WL 7372508, at *18. Her termination from medical school and its consequences could not later be

---

[14] Aside from her mother's statements to Dr. Smith, Ramsay's report cards from elementary school are also consistent with her testimony because her teachers noted she needed "help . . . with the switching of letters," App. 871, and "to focus on getting her work done on time," App. 875.

[15] The letter from WMed provided a basis for the District Court to conclude that she would be dismissed from the medical school if she did not pass Step 1. The letter offered to extend Ramsay's leave until "March 2, 2020, with the expectation that [she] will sit for the USMLE Step 1 exam in a manner that allows [her] to return to" WMed. App. 1520. As noted above, WMed students must pass Step 1 by the beginning of their fourth year. Thus, to return to school, Ramsay had to pass Step 1.

redressed by a legal or an equitable remedy." *Acierno*, 40 F.3d at 653 (citation omitted). HN16[↑] No damages remedy is available under the ADA. 42 U.S.C. § 12188(a)(1) (providing that the only remedies available in an ADA action are those in § 2000a-3(a)); id. § 2000a-3(a) (providing for injunctive [**20] relief). Furthermore, because WMed is not a party to this case, the Court could not require it to reinstate her, and the Board presents no theory for how the Board could redress the termination of Ramsay's medical education. Moreover, an examiner's refusal to provide accommodations can cause the exam-taker irreparable harm because doing so jeopardizes her "opportunity to pursue her chosen profession." *Enyart v. Nat'l Conf. of Bar Exam'rs*, 630 F.3d 1153, 1166 (9th Cir. 2011); accord *Doe v. Pa. State Univ.*, 276 F. Supp. 3d 300, 313-14 (M.D. Pa. 2017) (holding that gap in medical school education and likelihood that the student could not gain acceptance to another school constituted irreparable [*263] harm). Accordingly, the District Court correctly concluded that Ramsay established she would be irreparably harmed absent an injunction.

C

We next consider how the District Court "balanc[ed] the parties' relative harms; that is, the potential injury to the plaintiff[] without this injunction versus the potential injury to the defendant with it in place." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017). In balancing the harms, the Court noted the Board's "concern for the fulfillment of its mission to provide [qualified] physicians," *Ramsay*, 2019 U.S. Dist. LEXIS 222782, 2019 WL 7372508, at *19, and that accommodations "can affect the comparability of the resulting scores and scores achieved under standard testing conditions," 2019 U.S. Dist. LEXIS 222782, [WL] at *19 (quoting App. [**21] 931). Nonetheless, the Court appropriately reasoned that granting a preliminary injunction would not undermine the Board's mission because the injunction would give Ramsay only "the opportunity to move forward" in her medical career "should she succeed in passing her examinations with appropriate accommodations." 2019 U.S. Dist. LEXIS 222782, [WL] at *19 (emphasis omitted). Moreover, the Board's concerns regarding impacts from undeserved accommodations do not apply here because Ramsay has shown a reasonable likelihood that she deserves accommodations. Cf. *Issa*, 847 F.3d at 143 (holding that a defendant could not assert an interest in continuing to violate a civil rights statute).

D

968 F.3d 251, *263; 2020 U.S. App. LEXIS 24307, **21

Finally, we consider the District Court's finding that "the public interest favors this preliminary injunction." Id. The Court concluded that an injunction furthers the public interest in ADA compliance and serves to increase the number of qualified physicians. Ramsay, 2019 U.S. Dist. LEXIS 222782, 2019 WL 7372508, at *19. We agree. "In enacting the ADA, Congress demonstrated its view that the public has an interest in ensuring the eradication of discrimination on the basis of disabilities." Enyart, 630 F.3d at 1167; see Issa, 847 F.3d at 143 (concluding that it was in the public interest for covered entities to comply with a civil rights statute). Further, the injunction [**22] allows Ramsay to continue her medical education and therefore serves the public interest in training more physicians. "Although it is true that the public also has an interest in ensuring the integrity of licensing exams," Enyart, 630 F.3d at 1167, Ramsay has shown a reasonable likelihood that the ADA affords her accommodations, and there is no evidence that providing her the requested accommodations will jeopardize the test's integrity. Thus, the public interest weighs in favor of an injunction.

III

For the foregoing reasons, we will affirm the District Court's preliminary injunction.[16]

---

End of Document

---

[16] Given our conclusion that the District Court correctly held that Ramsay has shown a likelihood of success on the merits of her claim that she has a disability for which she is entitled to accommodations, we will affirm the preliminary injunction requiring the Board to provide the accommodations on Step 2 CK, any written or reading portions of Step 2 CS, and Step 3.