UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| Jason A. Zangara | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 3:22-1559 (RK) (JBD) |
| | ) | |
| v. | ) | |
| | ) | **PLAINTIFFS BRIEF** |
| | ) | **IN SUPPORT OF APPLICATION** |
| National Board of Medical Examiners (NBME) | ) | **PURSUANT TO RULE 65** |
| | ) | |
| Defendants | ) | |

## Introduction

Plaintiff makes this application to the court for the purpose of requesting an Order to

Show Cause why a Preliminary Injunction Should Not Issue against Defendants due to the

irreparable harm being caused by the day by not having his exams scored properly. A delay in

medical education constitutes irreparable harm as held in Ramsay v. Nat'l Bd. of Med.

Examiners, 968 F.3d 251, 256 (3d Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255

(2021)

Plaintiff has also requested the court issue a Temporary Restraining Order as there is a

substantial public interest in this case and this court has held that the standard for both is the

same See Zangara v. Nat'l Bd. of Med. Examiners, Civil Action 22-1559, 6 (D.N.J. Apr. 6, 2023)

"The standard for granting a TRO is the same as that for a preliminary injunction. Thompson v.

Dep't of Corr., No. 19-16391, 2022 U.S. Dist. LEXIS 234326, at *39 (D.N.J. Dec. 30, 2022)

(citing Nutrasweet Co. v. Vit-Mar Enters., 112 F.3d 689, 693 (3d Cir. 1997). "

Plaintiff makes this application after the court ruled in its opinion on July 21, 2023 that

he could not have the original application reconsidered since the amended complaint was not yet

"filed". He is simultaneously filing the amended complaint as ordered by the court with the clerk at the same time he is presenting this application.

### Background of the Request

In late February / early March of last year, Defendants changed the scoring on the Comprehensive Basic Science Exam (CBSE) to a "Percent Correct" score which is a "shell term" for a percentage hidden behind a statistical process. As explained in the complaint, Defendants take this "Percent Correct" and compare it to a cohort of students that took the USMLE prior and decide if a student passes or not.

At the same time, the scoring which was a three digit score for the USMLE was now reported as "Pass / Fail" but the process to decide passing was the same, they just omitted the number for "Pass" or "Fail" on the score report.

Defendants have argued from day one that "the exam is not curved" and "Percent correct is how many questions you got right". They know they lose money if their scoring methods come to public light because they can no longer fail people and profit off of them retaking the exams.

In addition to the exams mentioned, Defendants offer "Subject" of "Shelf" exams that they decide the grads for passing. These exams are graded in a manner which is also discriminatory because judges are not taking into consideration disabled students and creating "cut scores" and "curves" as also detailed in the complaint.

Plaintiff has supplied much evidence in the complaint that Defendants are illegally comparing the scores of disabled people to non disabled people. This has nothing to do with if they met the minimum standard to practice medicine as the State medical boards are assuming they are assessing for. Therefore it is essential that they be stopped in the name of the public interest and to uphold the rights of the disabled.

2

## The Discovery

During the writing of this application Plaintiff made a discovery when reading one of

Defendants prior cases where the District Court in Ohio granted an Injunction against them. This

case is Berger v. Nat'l Bd. of Med. Examiners, Case No. 1:19-cv-99, 2 (S.D. Ohio Aug. 27,

2019). After another reading of Berger  (since Plaintiff doesn't always understand everything

unless reading it multiple times) Defendants argument of "the score you got is only based on

your performance" as represented to this court is **proven** to be incorrect.

The statistical term plaintiff has been arguing appears to be called "scaling" and it was

reported in Berger. It is irrelevant that the score report shows "Pass/Fail" on Step 1, it is still,

along with all other Step Exams and Subject Exams created by Defendants  scored using a scaled

score to a comparison group.  As stated 3 times in Berger:

" Mr. Berger has taken the USMLE Step 1 without accommodations. A passing score was set at
192. Mr. Berger passed with a **scaled score** of 198. (PX 38)." Berger v. Nat'l Bd. of Med.
Examiners, Case No. 1:19-cv-99, 2 (S.D. Ohio Aug. 27, 2019)

"Mr. Berger failed his April 2017 administration of the USMLE Step 2 CK, receiving a **scaled
score** of 151, with a passing score set at 209 and most scores falling between 190 and 270. (Doc.
30, Tr. 99:1-8); (PX 44)." Berger v. Nat'l Bd. of Med. Examiners, Case No. 1:19-cv-99, 29 (S.D.
Ohio Aug. 27, 2019)

"Mr. Berger failed his August 2018 administration of the USMLE Step 2 CK, receiving a **scaled
score** of 166, with a passing score set at 209 and most scores falling between 190 and 270. (Doc.
30, Tr. 107:11-23); (PX 51)." Berger v. Nat'l Bd. of Med. Examiners, Case No. 1:19-cv-99, 33
(S.D. Ohio Aug. 27, 2019)

Plaintiff points this out now so the court remembers this when Defendants respond to this

application claiming "we don't scale or curve our exams".

## LEGAL ARGUMENT

"In issuing a preliminary injunction, a district court considers four factors:(1) the

likelihood that the plaintiff will prevail on the merits at final hearing; (2) the extent to which the

plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) [that] the public interest [weighs in favor of granting the injunction].Greater Phila. Chamber of Commerce v. City of Philadelphia, 949 F.3d 116, 133 (3d Cir. 2020) (alterations in original) (quoting Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994))." Quoting Ramsay v. Nat. Bd. of Medical Examiners , 968 F.3d 251 (3d Cir. 2020) See also Doe v. National Bd. of Med. Exam'rs, 199 F.3d 146, 154-155 (3d Cir. 1999)( "Four factors govern a district court's decision whether to issue a preliminary injunction: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest." American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Bd. of Educ., 84 F.3d 1471, 1477 n. 2 (3d Cir. 1996) (en banc); Gonzales v. National Bd. of Medical Examiners, 225 F.3d 620 (6th Cir. 2000) ("District courts assess four factors in analyzing a preliminary injunction issue: (1) whether the plaintiff has a strong likelihood of succeeding on the merits; (2) whether the plaintiff will suffer irreparable injury absent the injunction; (3) whether issuing the injunction will cause substantial harm to others; and (4) whether the public interest will be furthered by the issuance of the injunction")

"As stated above, the Court can only grant a preliminary injunction if Plaintiff has established a likelihood of success on the merits, that he is likely to suffer irreparable harm, that the threatened injury outweighs the injury Defendant would suffer under the injunction, and that the injunction would not be adverse to the public interest. Ramsay v. Nat'l Bd. of Med. Exam'rs,

968 F.3d 251, 256 (3d Cir. 2020)."(quoting <u>Zangara v. Nat'l Bd. of Med. Examiners</u>, Civil Action 22-1559 (D.N.J. Apr. 6, 2023))

## <u>1. Prevail on the Merits</u>

### A. Jurisdiction

"As this Court has explained, "a party is deemed to have consented to personal jurisdiction if the party actually litigates the underlying merits or demonstrates a willingness to engage in extensive litigation in the forum." <u>In re Tex. E. Transmission Corp. PCB Contamination Ins. Coverage Litig.</u>, 15 F.3d 1230, 1236 (3d Cir. 1994). "<u>In re: Asbestos Products Liability Litigation (No. VI)</u>, No. 17-3471 (3d Cir. 2019):

> "On September 26, 2022, Plaintiff filed a motion for a preliminary injunction seeking relief identical to what he sought in his Complaint...On October 17, 2022, Defendant opposed the motion, arguing against the merits of Plaintiffs injunction request " <u>Zangara v. Nat'l Bd. of Med. Examiners</u>, Civil Action 22-1559 (D.N.J. Jul. 21, 2023)

>> ("Defendant alleges that an examinee's score on the CBSE is based on the number of correct answers they provide on the exam and are not based on a comparison of how the examinee performed compared to other examinees. (Id. at ¶ 10.) Contrary to Plaintiff's allegations, Defendant alleges that the CBSE and other NBME examinations are not scored on a curve. (Id. at¶ 11.)" <u>Zangara v. Nat'l Bd. of Med. Examiners</u>, Civil Action 22-1559 (D.N.J. Apr. 6, 2023))

> "On April 7, 2023, Plaintiff filed the subject motion for reconsideration and/or to transfer the case to the Eastern District of Pennsylvania where Defendant is headquartered. (ECF No. 42.) " <u>Zangara v. Nat'l Bd. of Med. Examiners</u>, Civil Action 22-1559 (D.N.J. Jul. 21, 2023)

"Defendants opposed transfer to the [Eastern District of Pennsylvania]  Court but did not raise a personal jurisdiction defense in their opposition papers." <u>In re: Asbestos Products Liability Litigation (No. VI)</u>, No. 17-3471 (3d Cir. 2019):

> "Defendant initially failed to respond, and on July 11, 2023, the Court ordered Defendant to file any opposition to Plaintiffs motion by July 14, 2023. (ECF No. 47.) On July 14, 2023, Defendant filed a brief submission opposing reconsideration and transfer.

(ECF No. 48.)" Zangara v. Nat'l Bd. of Med. Examiners, Civil Action 22-1559 (D.N.J. Jul. 21, 2023)

"In particular, where a party seeks affirmative relief from a court, it normally submits itself to the jurisdiction of the court with respect to the adjudication of claims arising from the same subject matter." Bel-Ray Co. v. Chemrite (Pty) Ltd., 181 F.3d 435, 443 (3d Cir. 1999) (citing Adam v. Saenger, 303 U.S. 59, 67 (1938))." In re: Asbestos Products Liability Litigation (No. VI), No. 17-3471 (3d Cir. 2019):

> "Plaintiff has already wasted the time, energy, and money of NBME by asserting meritless claims in this action. Now, his proposed amended complaint is a 184-page, 836-paragraph pleading with 86 separate counts. (Dkt. 38-3) "[D]ismissal in lieu of transfer best serves 'the interests of justice' where it is clear that transfer would be 'a futile waste of judicial and party resources.'" Sciore v. Phung, No. 19-13775, 2022 WL950261, at *17 (D.N.J. Mar. 30, 2022)" (Document 48 page 2 filed 7/14/2023)

"[P]ersonal jurisdiction may be conferred by consent of the parties, expressly or by failure to object." (citing Petrowski v. Hawkeye Security Ins. Co., 350 U.S. 495, 496 (1956))). Simply put, "[t]he actions of the defendant may amount to a legal submission to the jurisdiction of the court" even where a defendant has raised the defense. Ins. Corp. of Ireland, Ltd., 456 U.S. at 704–05; see also Yeldell v. Tutt, 913 F.2d 533, 539 (8th Cir. 1990)....... In re: Asbestos Products Liability Litigation (No. VI), No. 17-3471 (3d Cir. 2019) See **In re: Asbestos Products Liability Litigation (No. VI), No. 17-3471 (3d Cir. 2019) (Holding that behavior consistent with waiver, and which indicates an intent to litigate the case on the merits, is sufficient to constitute waiver, regardless of whether the parties also express a contrary intent in writing. As the Third Circuit succinctly explained, "[t]he law is clear that words alone are insufficient to preserve a personal jurisdiction defense where conduct indicates waiver.")**

## B. Plaintiffs Protected Status

Plaintiff has been diagnosed with both ADHD and multiple learning disabilities (See Complaint Paragraphs 14-43) These disabilities have documented since High School in his IEP (See and confirmed by Neurophysiologic testing (See Complaint Paragraphs 14-43)They substantially limited his life in that he required full time special education throughout high school and still is limited in areas such as learning for the past 20+ years. Both of Plaintiffs documented disabilities, are protected under Federal Law , specifically the ADA.

"Federal courts have consistently recognized that ADHD and learning disabilities are impairments under the ADA. See, e.g., Rothberg v. LSAC, 300 F.Supp.2d 1093 (D.Colo. 2004); Bartlett v. N.Y. State Bd. of Law Exam'rs, 2001 WL 930792 (S.D.N.Y. Aug. 15, 2001); Price v. Nat'l Bd. of Med. Exam'rs, 966 F.Supp. 419 (S.D.W.Va. June 6, 1997).Learning disabilities and ADHD are clearly impairments within the meaning of the ADA. The DOJ regulations specifically provide that learning disabilities are mental impairments under the Act. 28 C.F.R. § 35.104(1)(i)(B) ("The phrase physical or mental impairment means . . . [a]ny mental or psychological disorder such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities."). Love v. Law School Admission Council, Inc., 513 F. Supp. 2d 206 (E.D. Pa. 2007) See also Ramsay v. Nat. Bd. of Medical Examiners 968 F.3d 251 (3d Cir. 2020); Boggi v. Med. Rev. & Accrediting Council, 415 F. App'x 411, 414 (3d Cir. 2011); Price v. National Bd. of Med. Examiners, 966 F. Supp. 419 (S.D. W.Va. 1997)

## C. Significant Impairment

### 1. "Substantially Limited"

In order to be disabled under the ADA, Plaintiff must have a physical or mental impairment that substantially limited his abilities to perform  "Major life activities," in turn,

7

"include but are not limited to.....performing manual tasks...., ......learning, reading, concentrating, thinking, communicating....." 42 U.S.C. §12102(2). "The ADA defines "disability" in relevant part as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). We construe the term "disability" broadly. Id. § 12102(4)(A). As to the term "impairment," the applicable Department of Justice ("DOJ") regulations provide that the term "physical or mental impairment" includes ADHD and "dyslexia and other specific learning disabilities." 28 C.F.R. § 36.105(b)(2). As to "life activities," the ADA provides that "major life activities include ... reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A)." Ramsay v. Nat. Bd. of Medical Examiners 968 F.3d 251 (3d Cir. 2020)

Plaintiff has stated that he has ADHD and Learning Disabilities and they significantly affect his life with things such as concentration and visual memory (See Complaint Paragraphs 14-43). This is established by the documentation of the treatment of ADHD since 1994 and classification since 2001which is required to meet the definition of "disabled" and "significantly impaired" See Powell v. National Bd. of Medical Examiners ,364 F.3d 79 (2d Cir. 2004)("documentation did not include objective evidence of difficulties she experienced before entering medical school, as would be expected were the disability a significant functional impairment")

Plaintiff has also shown a pattern of academic difficulties(See Complaint Paragraphs 14-43) which is also required See Price v. Nat'l. Bd. of Med. Examiners, 966 F. Supp. 419 (S.D.W. Va. 1997)( "This Court finds that Mr. Price has not exhibited a pattern of substantial academic difficulties") "Moreover, the regulations provide that the "substantially limits" inquiry "should

not demand extensive analysis," <u>Ramsay v. Nat. Bd. of Medical Examiners</u> 968 F.3d 251 (3d Cir.

2020)

## 2. Not "Substantially Limited"

The "Substantially Limited" Requirement is not actually a requirement for this action

since this is not an accommodation case, but Plaintiff has made the argument anyway. However

as Plaintiff has argued and Defendants have confirmed in a prior reply brief in this action

> *"Mr. Zangara is not seeking testing accommodations in this lawsuit, on the USMLE or any other test that NBME develops or administers."* (citing document 29, page 1 filed 11/10/2022*)*

As explained in 28 C.F.R. §36.105:

> "Where an individual is not challenging a public accommodation's failure to provide reasonable modifications under § 36.302, it is generally unnecessary to proceed under the "actual disability" or "record of" prongs, which require a showing of an impairment that substantially limits a major life activity or a record of such an impairment. In these cases, the evaluation of coverage can be made solely under the "regarded as" prong of the definition of "disability," which does not require a showing of an impairment that substantially limits a major life activity or a record of such an impairment"

Therefore Plaintiff qualifies to be covered by the act in not one but **both** ways listed in

the regulation.

## D. Liability

Defendants have violated numerous State and Federal Laws including but not limited to

the Americans with Disabilities Act and its implementing regulations created by the Department

of Justice by not scoring Plaintiff exam results on their own merit and not in comparison to

others (<u>See</u> Complaint Paragraphs 45-121) As briefly written by the this court in a prior opinion,

Plaintiff explained the grading of the Comprehensive Basic Science Exam:

Plaintiff asserts that Defendant, and not his medical school, have set the "low pass" score

for the CBSE as 62 to 68. (API, 6.) Plaintiff alleges:

> Therefore in order to "Pass" CBSE, as required by his school[,] Plaintiff must
> score a 62 "corresponding to Step 1 Performance starting at the passing standard
> plus 2 standard errors of measurement[.]" (*See* [Pl.'s Cert.] at 24[.]) As stated on
> the CBSE Plaintiff took on March 27, 2022, Plaintiff['s] score is shown "along
> with a range that corresponds to low passing[.]" (*See* [Pl.'s Cert.] at 23[.]) His
> score is "corresponding to Step 1 Performance starting at the passing standard plus
> 2 standard errors of measurement[.]" (*See* [Pl.'s Cert.] at 24[.]) Plaintiff['s] exam
> results specified that the "performance of a 2020 national cohort of students" was
> utilized to estimate his "probability of passing step 1 within a week[.]" (*See* [Pl.'s
> Cert.] at 23[.]) Therefore in order to obtain the passing score of 62 set by
> Defendants (*See* [Pl.'s Cert.] at 24) and required by his school (*See* [Pl.'s Cert.] at
> 19) he must score a 62 in the range on the "equated percent scale" which
> "represents CBSE scores corresponding to Step 1 Performance starting at the
> passing standard plus 2 standard errors of measurement[.]" (*See* [Pl.'s Cert.] at
> 24). The data utilized to "convert" the "equated percent correct" however is not
> public knowledge for the CBSE as stated by Defendants[.] (*See* [Pl.'s Cert.] at
> 24[.]) This requires a "table" in which Schools are prohibited from sharing with
> students[.] (*See* [Pl.'s Cert.] at 24) The CBSE does not grade on the objective
> standard to test if someone is qualified to safely treat patients, but a "low pass" in
> a "range" "from 62 to 68" that is "corresponding to Step 1 Performance starting at
> the passing standard plus 2 standard errors of measurement[.]" (See [Pl.'s Cert.] at
> 24)[.]
> (API, 7.)

*Zangara v. Nat'l Bd. of Med. Examiners*, Civil Action 22-1559, 3-4 (D.N.J. Apr. 6, 2023)

One of these regulations and Plaintiffs strongest argument is the implementing

regulations for title III of the Americans with Disabilities Act. New Jersey has the same

provision under its equivalent of the act also using the same language so Defendants are liable

under state law as well[1]. As stated n 28 C.F.R. §36.309 :

---

[1] Plaintiff will focus on the federal law for the purpose of this application as there are more
references and court opinions then for the state law for briefing. Defendants also are liable under
more than just the ADA and Plaintiff will address this later in this brief.

(b) Examinations.

>   (1) Any private entity offering an examination covered by this section must assure that -
>
>   (i) The examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the **examination results** accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure);

"The examination results [must] accurately reflect the [Plaintiffs] aptitude or achievement level or whatever other factor the examination purports to measure....." quoting 28 C.F.R. §36.309.  Therefore Defendants cannot compare Plaintiffs score to anyone's scores to decide if he meets the minimum standard to safely practice medicine. By doing so, all that the test results are showing is Plaintiffs disabilities as Plaintiff would no longer be disabled if he could score within the average population.

"a clinical diagnosis of a learning disability is typically based upon a comparison between the individual and others in the general population" Ramsay v. Nat. Bd. of Medical Examiners , 968 F.3d 251 (3d Cir. 2020) See Gonzales v. Nat'l Bd. of Med. Exam'rs, 225 F.3d 620, 629 (6th Cir.2000)(finding a medical student was not substantially limited in the major life activity of reading where the clinical tests demonstrated he "read as well as the average person"); Price v. National Bd. of Med. Examiners, 966 F. Supp. 419 (S.D. W.Va. 1997) (holding that three medical students diagnosed with ADHD and learning disabilities failed to show they were substantially limited in their ability to perform a major life activity as compared to most people in the general population, and thus, did not have a disability under the ADA, and were not entitled to any accommodation by the NBME for the USMLE); Rawdin v. Am. Bd. of Pediatrics, 985 F. Supp. 2d 636 (E.D. Pa. 2013) ("a relative impairment is not enough to qualify Dr. Rawdin

as disabled because the Court must compare his test scores and test-taking ability against the general population and not against his own expected capabilities"); <u>Rumbin v. Ass'n of Am. Med. Colls.</u>, 803 F.Supp.2d 83, 95 (D.Conn.2011) (determining the plaintiff was not substantially limited as compared to the general population because the record lacked any evidence regarding whether his reading skills were unusual or the extent to which his skills departed from the norm); <u>Bartlett v. New York State Board of Law Examiners</u>, 527 U.S. 1031, 119 S. Ct. 2388, 144 L. Ed. 2d 790 (1999); <u>Bartlett v. New York State Bd. of Law Examiners</u>, 156 F.3d 321 (2d Cir. 1998); <u>Bartlett v. New York State Bd. of Law Examiners</u>, 226 F.3d 69 (2d Cir. 2000); <u>Bartlett v. York State Bd. of Law Examiners</u>, 2 F. Supp. 2d 388 (S.D.N.Y. 1997)("With respect to most major life activities, the plaintiff is compared to "the average person in the general population." 29 C.F.R. § 1630.2(j)(1). Therefore, to determine whether plaintiff is substantially impaired in her reading, learning, or even test-taking, I must decide whether, when compared to the average person in the general population, plaintiff is substantially limited in these major life activities"); <u>Bartlett v. New York State Board of Law Examiners</u>, 93 Civ. 4986 (SS) (S.D.N.Y. Aug. 15, 2001)( I find that plaintiff is substantially limited in the major life activity of reading when compared to most people)

Therefore if Defendants continue to score Plaintiffs exams with a passing score of 62 which is set by Defendants, not medical schools "corresponding to Step 1 Performance starting at the passing standard plus 2 standard errors of measurement" and not on their own merit, the examination results will not "accurately reflect the [Plaintiffs] aptitude or achievement level or whatever other factor the examination purports to measure" 28 C.F.R. §36.309

### E. The Regulation & The ADA

Defendants are accountable for their actions under the regulation created by the DOJ, which Plaintiff has cited, 28 C.F.R. §36.309. A government agency has the power to create and implement regulations interpreting a statue  as "Congress explicitly delegated to [these] administrative agenc[ies] the authority to make specific policy determinations, [courts] must give the[ir] decision[s] controlling weight unless [they are] 'arbitrary, capricious, or manifestly contrary to the statute.'" ABF Freight Sys., Inc. v. NLRB, 510 U.S. 317, 324, 114 S.Ct. 835, 839, 127 L.Ed.2d 152 (1994) (quoting Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 2782-83, 81 L.Ed.2d 694 (1984)). Price v. Nat'l. Bd. of Med. Examiners, 966 F. Supp. 419 (S.D.W. Va. 1997)

These regulation are treated as law as "In applying the foregoing to the case at hand, we note that insofar as the above-quoted regulations are "the equivalent[s] of a 'legislative rule' ... issued by an agency pursuant to statutory authority," they thus have the 'force and effect' of law." PDR Network, LLC v. Carlton & Harris Chiropractic, Inc., 139 S. Ct. 2051, 2055, 204 L. Ed.2d 433 (2019)(quoting Chrysler Corp. v. Brown, 441 U.S. 281, 302-303, 99 S. Ct. 1705, 60 L. Ed.2d 208 (1979) and Batterton v. Francis, 432 U.S. 416, 425, n.9, 97 S. Ct. 2399, 53 L. Ed.2d 448 (1977)). At the very minimum, the regulations are "entitled to substantial deference" and "given controlling weight" unless "it can be shown that they are arbitrary, capricious, or manifestly contrary to the statute." See, n. 8, supra. See also, Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 597-598, 119 S. Ct. 2176, 2185-2186, 144  L. Ed.2d 540 (1999)("Because the Department [of Justice] is the agency directed by Congress to issue regulations implementing Title II, ... its views warrant respect") and Bragdon v. Abbott, 524 U.S. 624, 642, 118 S. Ct. 2196, 141 L. Ed.2d 540 (1998)("It is enough to observe that the well-reasoned views of the

agencies implementing a statute 'constitute a body of experience and informed judgment to

which courts and litigants may properly resort for guidance'"(quoting <u>Skidmore v. Swift & Co.</u>,

323 U.S. 134, 139-140, 65 S. Ct. 161, 89 L. Ed.2d 124 (1944)). quoting <u>Ramsay v. Nat. Bd. of</u>

<u>Medical Examiners</u> 968 F.3d 251 (3d Cir. 2020)

  Defendants have tried to argue that they don't apply to them and they cannot be held

accountable, but the courts have told them otherwise as "although NBME may not have liked the

terminology used in the implementing regulations, despite its registered objections, the foregoing

language is what was enacted and it is this language which must be followed" <u>Ramsay v. Nat.</u>

<u>Bd. of Medical Examiners</u> 968 F.3d 251 (3d Cir. 2020) <u>See</u> also <u>Price v. Nat'l. Bd. of Med.</u>

<u>Examiners</u>, 966 F. Supp. 419 (S.D.W. Va. 1997) (Holding that, because Congress authorized the

DOJ to make issue regulations for Subchapter III, courts must give their decisions controlling

weight unless arbitrary or manifestly contrary to the statute)

  Defendants have both conceded and have been found to liable under the ADA and that

includes its implementing regulations. "Neither NBME nor MRAC argue that they fall outside

the scope of the ADA and the law is clear that both entities must comply. See <u>Love v. Law Sch.</u>

<u>Admissions Council</u>, Inc., 513 F. Supp. 2d 206, 223 (E.D. Pa. 2007) (finding that private, non-

profit entity responsible for administering test required for admission to law school had to

comply with ADA); see also <u>Scheibe v. Nat'l Bd. of Med. Examiners</u>, Civ. A. No. 05-180, 2005

WL 1114497, at *3 (W.D. Wis. May 10, 2005) (citing cases concluding that NBME is subject to

ADA); <u>Biank v. Nat'l Bd. of Med. Examiners</u>, 130 F. Supp. 2d 986, 988 (N.D. Ill. 2000) (holding

that NBME, "as a private entity offering examinations related to licensing, is subject to ADA

under Section 12189") quoting <u>Boggi v. Med. Rev. & Accrediting Council</u>, 415 F. App'x 411,

414 (3d Cir. 2011) Specifically  the "application of  Section 12189, at issue in this case, is

14

covered by the DOJ regulations in 28 C.F.R. part 36" <u>Price v. Nat'l. Bd. of Med. Examiners</u>, 966 F. Supp. 419 (S.D.W. Va. 1997)

The court have held the Defendants responsible for the regulations created by the DOJ under what is known as "Chevron Deference" in which the court treats the regulation as law and defers to the interpretation of the statue by the agency  <u>See</u> <u>Chevron USA Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984) **(Holding that Government Agencies regulation is given difference when it is a permissible construction of the statue and congress has not spoken of the issue directly)** Chevron later used this ruling in a case under the ADA in which they were the defendants and it was affirmed by the Supreme Court  <u>See</u> <u>Chevron USA Inc. v. Echazabal</u>, 536 U.S. 73, 122 S. Ct. 2045, 153 L. Ed. 2d 82 (2002) **(Holding that a Government Agency has the authority to create and enforce regulations regarding the Americans with Disabilities Act (ADA))**

### F. The Claim

" To state a claim under either the ADA or the RA, [Plaintiff] must allege that he is a qualified individual with a disability, who was precluded from participating in a program, service, or activity, or otherwise was subject to discrimination, by reason of his disability" <u>Furgess v. Pa. Dep't of Corr.</u>, 933 F.3d 285, 288-89 (3d Cir. 2019)

1. "A qualified individual with a disability"

> "(i) The definition of "disability" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. (ii) An individual may establish coverage under any one or more of the three prongs of the definition of disability in paragraph (a)(1) of this section, the "actual disability" prong in paragraph (a)(1)(i) of this section, the "record of" prong in paragraph (a)(1)(ii) of this section, or the "regarded as" prong in paragraph (a)(1)(iii) of this section. (iii) Where an individual is not challenging a public accommodation's failure to provide reasonable modifications under § 36.302, it is generally unnecessary to proceed under the "actual disability" or "record of" prongs, which require a showing of an impairment that substantially limits a

major life activity or a record of such an impairment. In these cases, the evaluation of coverage can be made solely under the "regarded as" prong of the definition of "disability," which does not require a showing of an impairment that substantially limits a major life activity or a record of such an impairment. An individual may choose, however, to proceed under the "actual disability" or "record of" prong regardless of whether the individual is challenging a public accommodation's failure to provide reasonable modifications" 28 CFR § 36.105

2. "Who was precluded from participating in a program, service, or activity, or

otherwise was subject to discrimination, by reason of his disability"

"(a) Denial of participation. A public accommodation shall not subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation. "28 CFR § 36.202

Next Plaintiff must show that he will be affected by Defendants actions, in this case the

exclusion from passing his exams based on their current scoring methods. He can prove this in

three ways as explained by Judge Beetlestone in Doe v. Perkiomen Valley Sch. Dist as applied to

title II of the ADA and Section 504 of the Rehabilitation Act:

"Plaintiff must then show that he "will be excluded from participation in or denied the benefits of services, programs, or activities of the public entity, or subjected to discrimination by the public entity." Furgess , 933 F.3d at 288-89 ; 42 U.S.C. § 12132. To satisfy this element, a plaintiff may advance "one of three theories of liability: disparate treatment, disparate impact, or failure to make a reasonable accommodation." Payan v. Los Angeles Cmty. Coll. Dist. , 11 F.4th 729, 738 (9th Cir. 2021) (quoting Davis v. Shah , 821 F.3d 231, 260 (2d Cir. 2016) (citation omitted)); B.C. v. Mount Vernon Sch. Dist. , 837 F.3d 152, 158 (2d Cir. 2016) ("Exclusion or discrimination may take the form of disparate treatment, disparate impact, or failure to make a reasonable accommodation."). Doe v. Perkiomen Valley Sch. Dist., 585 F. Supp. 3d 668, 687 (E.D. Pa. 2022)

It is well settled as intended by Congress that the same protections apply interchangeably

between titles I, II & III of the ADA and the Rehabilitation act which has been confirmed by the

courts. See Furgess v. Pa. Dep't of Corr., 933 F.3d 285, 288-89 (3d Cir. 2019) ("We consider the

Title II and Section 504 claims together because "the substantive standards for determining

liability are the same."); <u>Doe v. Perkiomen Valley Sch. Dist.</u>, 585 F. Supp. 3d 668, 686 (E.D. Pa.

2022) ("[C]ase law on Section 504 "is an appropriate guide to interpret the ADA" and vice versa.

Henry H. Perritt Jr., Americans with Disabilities Act Handbook § 1.02 (5th ed. 2018); see also

Berardelli , 900 F.3d at 110 (observing that the ADA and Section 504 "have been constant

companions in our case law as it has developed to effect those rights"); Helen L. , 46 F.3d at

334-35 (applying the Supreme Court's analysis of Section 504 to the ADA).)

Defendants are aware of this as the Third Circuit has held this in <u>Katz v. Nat'l Bd. of</u>

<u>Med. Exam'rs</u>:

> "Courts apply the same substantive standard to claims brought under the Rehabilitation
> Act and Title III of the ADA Under regulations implementing § 12189, the United States
> Medical Licensing Examination Step 1 exam must be administered in a way that best
> ensures that its results will accurately reflect a disabled examinee's aptitude rather than
> his disability. 28 C.F.R. § 36.309(b)(1)(i). The court defers to such regulations as
> reasonable interpretations of the statute." <u>Katz v. Nat'l Bd. of Med. Exam'rs</u>, 751 F. App'x
> 231 (3d Cir. 2018)

In addition to the same ruling in <u>Ramsay v. Nat'l Bd. of Med. Examiners</u>:

> "[T]he standards adopted by titles II and III of the ADA are generally the same as those
> required under the RHA and that for this reason, Courts typically consider the merits of
> claims under both statutes together. Powell, supra, (citing <u>Henrietta D. v. Bloomberg</u>, 331
> F.3d 261, 272 (2d Cir. 2003)); <u>K.N. v. Gloucester City Board of Education</u>, 379 F. Supp.
> 3d 334, 354-355 (D.N.J. 2019). See also, <u>Bragdon v. Abbott</u>, 524 U.S. 624, 631-632, 118
> S. Ct. 2196, 2202, 141 L. Ed.2d 540, 553 (1998)("The ADA's definition of disability is
> drawn almost verbatim from the definition of "handicapped individual" included in the
> Rehabilitation Act of 1973, ... and the definition of "handicap" contained in the Fair
> Housing Amendments Act of 1988." (internal citations omitted)." quoting <u>Ramsay v.</u>
> <u>Nat'l Bd. of Med. Examiners</u>, CIVIL ACTION NO. 19-CV-2002, 20 n.6 (E.D. Pa. Dec.
> 30, 2019) affirmed by <u>Ramsay v. Nat'l Bd. of Med. Examiners</u>, 968 F.3d 251, 256 (3d
> Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021)

As explained by the Department of Justice in the commentary to the regulation, the

testing provision of Title III covers Title II also:

Examinations and Courses. The Department received one comment requesting that it specifically include language regarding examinations and courses in the title II regulation. Because section 309 of the ADA 42 U.S.C. 12189, reaches "[a]ny person that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or post secondary education, professional, or trade purposes," public entities also are covered by this section of the ADA. Indeed, the requirements contained in title II (including the general prohibitions against discrimination, the program access requirements, the reasonable modifications requirements, and the communications requirements) apply to courses and examinations administered by public entities that meet the requirements of section 309. While the Department considers these requirements to be sufficient to ensure that examinations and courses administered by public entities meet the section 309 requirements, the Department acknowledges that the title III regulation, because it addresses examinations in some detail, is useful as a guide for determining what constitutes discriminatory conduct by a public entity in testing situations. See 28 CFR 36.309.

Plaintiff can therefore proceed to prove not an accommodation claim, but a "Desperate Impact" claim under Title III of the ADA (28 CFR § 36.301) since "Both disparate treatment and disparate impact claims are cognizable under the ADA." Raytheon Co. v. Hernandez, 540 U.S. 44, 53, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003):

§ 36.301 Eligibility criteria.

(a) General.  A public accommodation shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered.

§ 36.309 Examinations and courses.
(b) Examinations.
(1) Any private entity offering an examination covered by this section must assure that -

(i) The examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills

18

(except where those skills are the factors that the examination purports to measure);

### G. Disparate Impact

Historically a Disparate Impact case had been related to Title VII of the Civil Rights act but the courts have expended it to the ADA. The reason is "that the ADA's protections extend beyond "deliberate discrimination" Doe v. Perkiomen Valley Sch. Dist., 585 F. Supp. 3d 668, 687 (E.D. Pa. 2022). As explained by Judge Beetlestone:

> "In Alexander v. Choate , the Supreme Court found that, in passing Section 504, "[d]iscrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect.... [M]uch of the conduct that Congress sought to alter in passing the Rehabilitation Act would be difficult if not impossible to reach were the Act construed to proscribe only conduct fueled by a discriminatory intent." 469 U.S. 287, 297, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). On this basis, the Court "assume[d] without deciding that § 504 reaches at least some conduct that has an unjustifiable disparate impact upon the handicapped." Id. at 299, 105 S.Ct. 712.

> Ten years later, the Third Circuit relied on Choate's reasoning to hold that the ADA's protections extend beyond "deliberate discrimination":

> Because the ADA evolved from an attempt to remedy the effects of "benign neglect" resulting from the "invisibility" of the disabled, Congress could not have intended to limit the Act's protections and prohibitions to circumstances involving deliberate discrimination. Such discrimination arises from "affirmative animus" which was not the focus of the ADA or section 504.... "[M]uch of the conduct that Congress sought to alter in passing the Rehabilitation Act [and the ADA] would be difficult if not impossible to reach were the Act[s] construed to proscribe only conduct fueled by a discriminatory intent." Alexander v. Choate , 469 U.S. at 296-97, 105 S.Ct. at 718. Thus, we will not eviscerate the ADA by conditioning its protections upon a finding of intentional or overt "discrimination."
> Helen L. , 46 F.3d at 335. Helen L. may not have used the words "disparate impact," but its holding that the ADA's protections extend beyond cases involving "deliberate," "intentional," and "overt" discrimination as well as "affirmative animus," amounts to the same thing. See Raytheon Co. v. Hernandez , 540 U.S. 44, 52, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003) (explaining that disparate impact claims may succeed "without evidence of the employer's subjective intent to discriminate that is required in a 'disparate-treatment' case"). Indeed, in the context of a claim brought under Title I of the ADA, the Supreme Court has held that "[b]oth disparate-treatment and disparate-impact claims are cognizable under the ADA." Id. at 53, 124 S.Ct. 513 (citing 42 U.S.C. § 12112(b) ). Although Raytheon fell under Title I of the ADA, the reasoning in Helen L.

leads inexorably to the conclusion that disparate impact claims are cognizable under Title II of the ADA and, hence, under Section 504

Doe v. Perkiomen Valley Sch. Dist., 585 F. Supp. 3d 668, 687-88 (E.D. Pa. 2022)

"[T]he standards adopted by titles II and III of the ADA are generally the same as those required under the RHA and that for this reason, Courts typically consider the merits of claims under both statutes together" Ramsay v. Nat'l Bd. of Med. Examiners, CIVIL ACTION NO. 19-CV-2002, 20 n.6 (E.D. Pa. Dec. 30, 2019) affirmed by Ramsay v. Nat'l Bd. of Med. Examiners, 968 F.3d 251, 256 (3d Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021)

In 2009, the Third Circuit then explained the interchangeability between Title I and the Rehabilitation Act:

"Under the ADA's Title I, an employer's failure to transfer a disabled employee to a vacant position constitutes discrimination. Id. After the ADA went into effect, Congress amended the Rehabilitation Act by incorporating the ADA's substantive standards for determining whether a covered employer has engaged in illegal discrimination. This conforming amendment was codified at 29 U.S.C. § 794(d), which provides as follows:

(d) Standards used in determining violation of section. The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 ( 42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 ( 42 U.S.C. 12201-12204 and 12210)"

The next year the Third Circuit Interpreted the language and intent of these sections as applied to a claim of "Disparate Impact" regarding testing in E.E.O.C. v. Kronos Inc., 620 F.3d 287, 296 (3d Cir. 2010)

"The ADA prohibits, inter alia, use of employment tests that "screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the . . . test . . ., as used by the [employer], is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6); see also42 U.S.C. § 12112(b)(7) (defining "discriminate" to include "failing to select and administer tests concerning employment in the most effective manner to ensure that, when such test is administered to a job applicant or employee who has a disability that impairs sensory,

manual, or speaking skills, such test results accurately reflect the skills, aptitude, or whatever other factor of such applicant or employee that such test purports to measure, rather than reflecting the impaired sensory, manual, or speaking skills of such employee or applicant. . . ."). "Both disparate treatment and disparate impact claims are cognizable under the ADA." Raytheon Co. v. Hernandez, 540 U.S. 44, 53, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003). Quoting E.E.O.C. v. Kronos Inc., 620 F.3d 287, 296 (3d Cir. 2010)

## H. Title VII

Since the courts have imported the framework for a Desperate Impact claim from Title

VII Plaintiff will prove his claims by the same framework.

"Under the disparate-impact statute, a plaintiff establishes a prima facie violation by

showing that an employer uses "a particular employment practice that causes a disparate impact

on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(k)(1)(A)(i). An

employer may defend against liability by demonstrating that the practice is "job related for the

position in question and consistent with business necessity." Ricci v. DeStefano, 557 U.S. 557,

129 S. Ct. 2658, 174 L. Ed. 2d 490 (2009).

The key is that in order to keep their exams in place, Defendants must prove their exams

are related to job performance. Unfortunately, as Plaintiff his directly pled in his complaint, they

are not (See Paragraph 123 ("In agreement with other studies, we found no correlation between

NBME scores and performance during residency")[2] ("USMLE scores are not effective indicators

of a physician's success during residency.")[3] ("Our study finds that USMLE Step 2 is not a

reliable predictor of residency performance")[4] ("During the eight years of the study

period......There was a non-significant correlation between clinical performance and the Step 1

---

[2] Borowitz, S. M., Saulsbury, F. T., & Wilson, W. G. (2000). Information collected during the residency match process does not predict clinical performance. Archives of pediatrics & adolescent medicine, 154(3), 256-260.
[3] Miller, B., Dewar, S. B., & Nowalk, A. (2019). Lack of Correlation Between USMLE Scores and Performance in Pediatrics Residency Training Based on ACGME Milestones Ratings Academic Pediatrics, 19(6), e34

[4] Udawatta, M., Preet, K., Lagman, C., French, A. M., Bruton, C., Bergsneider, M., ... & Yang, I. (2020). United States Medical Licensing Examination Step 2 scores do not predict American Board of Neurological Surgery scores: a single-institution experience. Journal of the Neurological Sciences, 408, 116556.

score. **Conclusion:** Neither USMLE Step 1 nor Step 2 Clinical Knowledge were good predictors

of the actual clinical performance of residents during their training")[5](" (Step 1, 2 CK, grades,

AOA) was not associated with residency clinical performance on milestones. Isolated

correlations were found between specific milestones (eg, higher surgical grade increased wound

care score), but most had no correlation with residency performance.")[6])

    This was established in <u>Griggs v. Duke Power Co.</u>, 401 U.S. 424, 91 S.Ct. 849, 28

L.Ed.2d 158 (1971) and explained in <u>Ricci v. DeStefano</u>:

> "The Griggs Court stated that the "touchstone" for disparate-impact liability is the lack of
> "business necessity": "If an employment practice which operates to exclude [minorities]
> cannot be shown to be related to job performance, the practice is prohibited." Ibid.; see
> also id., at 432, 91 S.Ct. 849 (employer's burden to demonstrate that practice has "a
> manifest relationship to the employment in question"); Albemarle Paper Co. v. Moody,
> 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Under those precedents, if an
> employer met its burden by showing that its practice was job-related, the plaintiff was
> required to show a legitimate alternative that would have resulted in less discrimination.
> Ibid. (allowing complaining party to show "that other tests or selection devices, without a
> similarly undesirable racial effect, would also serve the employer's legitimate interest")
> <u>Ricci v. DeStefano</u>, 557 U.S. 557, 129 S. Ct. 2658, 174 L. Ed. 2d 490 (2009).

    Plaintiff has plead the academic argument directly in his complaint the shows the exams

exclude the lowest scores by using the Angoff and Hofstee which allow judges to establish "cut

scores and "percent correct" used in all of Defendants examinations (<u>See</u> paragraphs  45-121).

He will now show the mathematical argument which applies to the USMLE Steps and the

Subject Examinations including the Comprehensive Basic Science Examination CBSE as they

are all scores the same way - based on a cohort that took the exam prior and converted (which is

also detailed in Plaintiffs Complaint)

---

[5] Sajadi-Ernazarova, K., Ramoska, E. A., & Saks, M. A. (2020). USMLE Scores Do Not Predict the Clinical
Performance of Emergency Medicine Residents. Mediterranean Journal of Emergency Medicine & Acute Care,
1(2).
[6] Burkhardt, J. C., Parekh, K. P., Gallahue, F. E., London, K. S., Edens, M. A., Humbert, A. J., ... & Hopson, L. R.
(2020). A critical disconnect: Residency selection factors lack correlation with intern performance. *Journal of
graduate medical education*, *12*(6), 696-704.

The Equal Employment Opportunity Commission (EEOC) has created a standard or "rule" that has been proven to show an exam has a "disparate impact" on a particular group. This is known as the "80 percent rule" which has been adopted by the courts. Plaintiff has applied this rule to data available regarding Defendants USMLE exam (which is the comparison group to decide if someone passes the Comprehensive Basic Science Exam (CBSE)). This data includes the 2019 results for everyone who took the exam and a study done specifically relating to a group of disabled students.

The disabled group was a group of medical students that Defendants, NBME denied testing accommodations to, therefore they took the exam without them. This puts them in the same situation as Plaintiff - disabled, but no accommodations

*"Mr. Zangara is not seeking testing accommodations in this lawsuit, on the USMLE or any other test that NBME develops or administers."* (citing document 29, page 1 filed 11/10/2022)

Whatever "group" Plaintiff and these students are according to Defendants (since they claim "they are not disabled") didn't do so well on the exam. The study group had a shocking fail rate of 32% when the overall fail rate was only 4% of the overall 22,146 students that took the exam. When calculated using the "80% Rule" the results show Defendants scoring has a "disparate impact" on this group regardless of what they are referred to by Defendants (but referred to as disabled by the rest of the world) The calculation is as follows:

32% of disabled failed with 68% passing[7]

4% of all test takers failed with 96% passing[8]

---

[7] Petersen, K. H., Jain, N. R., Case, B., Jain, S., & Meeks, L. M. (2022). Impact of USMLE Step-1 accommodation denial on US medical schools: A national survey. PloS one, 17(4), e0266685. https://doi.org/10.1371/journal.pone.0266685
[8] United States Medical Licensing Examination | Performance Data [Internet]. [cited 2023 Jul 22]. https://www.usmle.org/performance-data [Ref list]

68% of 96% is 65.28% which is well below the 80% requirement

65.28% is far less than the required 80%  so it is apparent that Defendants exam scoring

falls "well below the 80-percent standard set by the EEOC to implement the disparate-impact

provision of Title VII. See 29 CFR § 1607.4(D) (2008) (selection rate that is less than 80 percent

"of the rate for the group with the highest rate will generally be regarded by the Federal

enforcement agencies as evidence of adverse impact"); Watson, 487 U.S., at 995-996, n. 3, 108

S.Ct. 2777 (plurality opinion) (EEOC's 80-percent standard is "a rule of thumb for the courts").

Ricci v. DeStefano, 557 U.S. 557, 129 S. Ct. 2658, 174 L. Ed. 2d 490 (2009)

"Ultimately, nearly one-third (32%) of SWD who were denied and took the exam without

accommodations failed Step-1. This is particularly notable when compared to the overall Step-1

failure rate of 4–5% during the 2018–2019 academic year"[9] Therefore, for this reason in addition

to the academic evidence in the complaint regarding Defendants scoring methods, the available

data at this time shows "tests that "tend to screen out an individual with a disability or a class of

individuals with disabilities" "E.E.O.C. v. Kronos Inc., 620 F.3d 287, 296 (3d Cir. 2010)  and

therefore are discriminatory See Raytheon Co. v. Hernandez, 540 U.S. 44, 124 S. Ct. 513, 157 L.

Ed. 2d 357 (2003) (defining "discriminate" to include "utilizing standards, criteria, or methods of

administration . . . that have the effect of discrimination on the basis of disability" and

"using...tests...that screen out or tend to screen out an individual with a disability")

"Although the USMLE was designed for use as a licensing exam, it is common practice

for residency and fellowship programs to use USMLE test scores in evaluating candidates for

---

[9] Petersen, K. H., Jain, N. R., Case, B., Jain, S., & Meeks, L. M. (2022). Impact of USMLE Step-1 accommodation denial on US medical schools: A national survey. PloS one, 17(4), e0266685. https://doi.org/10.1371/journal.pone.0266685

admission to their programs[10]" Doe v. National Bd. of Med. Exam'rs, 199 F.3d 146, 154-155 (3d Cir. 1999)  See Lanning v. Southeastern Pennsylvania Transp. Auth., 181 F.3d 478 (3d Cir. 1999). (Holding that a discriminatory cutoff score on an entry level employment examination must be shown to measure the minimum qualifications necessary for successful performance of the job in question);  See also Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)(Holding that discriminatory tests are impermissible unless shown to be predicative of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated.) See also Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S. Ct. 2362, 45 L. Ed. 2d 280 (1975).( "[D]iscriminatory tests are impermissible unless shown, by professionally acceptable methods, to be "predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated."...[Albemarle] compared test scores with subjective supervisorial rankings......The fact that the best of those employees working near the top of a line of progression score well on a test does not necessarily mean that that test, or some particular cutoff score on the test, is a permissible measure of the minimal qualifications of new workers entering lower level jobs..... we agree with the Court of Appeals that the District Court erred in concluding that Albemarle had proved the job relatedness of its testing program..)

---

[10] [10] **Medical Resident: An individual who has completed medical school and is in training to become a licensed** physician. Residents generally train in a specialty for three to five years (although some specialties require a preliminary year of general medical training before specialty training commences). Obtaining a medical residency is competitive; medical students in their final year apply to residency programs in a particular location and specialty. **Medical residents are paid a salary during residency**, but this salary is generally a fraction of what they will earn after completing their residency. citing Heisler, E. J., Panangala, S. V., Mendez, B. H., Villagrana, M. A., & Mitchell, A. (2018). Federal Support for Graduate Medical Education: An Overview. CRS Report R44376, Version 9. Updated. Congressional Research Service.

## II. The Extent of Harm to Plaintiff

"[T]o show irreparable harm a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994) (internal quotation marks and citation omitted). The harm must be "likely" to occur "in the absence of an injunction." Ferring Pharms., Inc. v. Watson Pharms., Inc., 765 F.3d 205, 217 n.11 (3d Cir. 2014) (emphasis omitted) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008))". quoting Ramsay v. Nat. Bd. of Medical Examiners 968 F.3d 251 (3d Cir. 2020)

"The District Court ha[s] a basis to conclude that [Plaintiff] would be irreparably harmed absent an injunction. The Court could reasonably conclude that given [Plaintiffs] disability and that [he] had previously failed [CBSE and likely will fail] Step 1, [he] likely would fail again and be forced to leave medical school.[15] Ramsay, 2019 WL 7372508, at *18. H[is] termination from medical school and its consequences could not later "be redressed by a legal or an equitable remedy." Acierno, 40 F.3d at 653 (citation omitted). No damages remedy is available under the ADA. 42 U.S.C. § 12188(a)(1) (providing that the only remedies available in an ADA action are those in § 2000a-3(a)); id. § 2000a-3(a) (providing for injunctive relief). Furthermore, because [CMU] is not a party to this case, the Court could not require it to reinstate her, and the Board presents no theory for how the Board could redress the termination of [Plaintiffs] medical education. Moreover, an examiner's refusal to provide accommodations can cause the exam-taker irreparable harm because doing so jeopardizes her "opportunity to pursue her chosen profession." Enyart v. Nat'l Conf. of Bar Exam'rs, 630 F.3d 1153, 1166 (9th Cir. 2011); accord Doe v. Pa. State Univ., 276 F. Supp. 3d 300, 313-14 (M.D. Pa. 2017) (holding that gap in medical school education and likelihood that the student could not gain acceptance to another school constituted

irreparable harm). Accordingly, the District Court correctly concluded that Ramsay established she would be irreparably harmed absent an injunction". quoting Ramsay v. Nat. Bd. of Medical Examiners 968 F.3d 251 (3d Cir. 2020)

"Specifically, if a student does not pass the Step I exam before the beginning of his third year of medical school, he would normally need to drop out of school during his third year in order to study properly for the exam, thereby falling behind his peers. Students behind in their studies normally will not be offered the range and quality of residency or medical specialty options their peers will be offered. They will normally not be offered interviews for further study in the more competitive medical specialties, will not have the usual range of geographic or location (city and school) choices for remaining medical school programs which may be available, and will be delayed in completion of their medical training. There is no good way to remedy this injury. Timely Step I testing and passage is required." quoting Rush v. National Board of Medical Examiners, 268 F. Supp.2d 673 (N.D. Tex. 2003)

### III. Harm to Defendants

"We next consider how the District Court [should] "balanc[ed] the parties' relative harms; that is, the potential injury to the plaintiff[] without this injunction versus the potential injury to the defendant with it in place." Issa v. Sch. Dist. of Lancaster, 847 F.3d 121, 143 (3d Cir. 2017). In balancing the harms, the Court noted the Board's "concern for the fulfillment of its mission to provide [qualified] physicians," Ramsay, 2019 WL 7372508, at *19........Nonetheless, the Court appropriately reasoned that granting a preliminary injunction would not undermine the Board's mission because the injunction would give [Plaintiff] only "the opportunity to move forward" in h[is] medical career "should [he] succeed in passing h[is] examinations with appropriate [scoring]" Id. at *19 (emphasis omitted). Moreover, the Board's concerns regarding impacts from

undeserved [scoring] do not apply here because [Plaintiff] has shown a reasonable likelihood that

[Defendants are violating the ADA] Cf. Issa, 847 F.3d at 143 (holding that a defendant could not

assert an interest in continuing to violate a civil rights statute)" quoting Ramsay v. Nat. Bd. of

Medical Examiners 968 F.3d 251 (3d Cir. 2020)

### IV. Public Interest

"Finally, we consider the District Court's finding that "the public interest favors this

preliminary injunction." Id. The Court [should] concluded that an injunction furthers the public

interest in ADA compliance and serves to increase the number of qualified physicians. Ramsay,

2019 WL 7372508, at *19. We agree. "In enacting the ADA, Congress demonstrated its view

that the public has an interest in ensuring the eradication of discrimination on the basis of

disabilities." Enyart, 630 F.3d at 1167; see Issa, 847 F.3d at 143 (concluding that it was in the

public interest for covered entities to comply with a civil rights statute). Further, the injunction

allows [Plaintiff] to continue h[is] medical education and therefore serves the public interest in

training more physicians. "Although it is true that the public also has an interest in ensuring the

integrity of licensing exams," Enyart, 630 F.3d at 1167, [Plaintiff] has shown a reasonable

likelihood that the ADA affords h[im proper scoring], and there is no evidence that providing

h[im] the requ[red scoring] will jeopardize the test's integrity. Thus, the public interest weighs in

favor of an injunction" quoting Ramsay v. Nat. Bd. of Medical Examiners 968 F.3d 251 (3d Cir.

2020)

"The injunction will not disserve the public interest but will further the public interest in

prohibiting discrimination by public entities, such as the National Board of Medical Examiners,

on the basis of disability by fulfilling the ADA's requirement that entities offering licensing

examinations [scored legally] to disabled individuals." <u>Rush v. National Board of Medical Examiners</u>, 268 F. Supp.2d 673 (N.D. Tex. 2003)

### Conclusion

"[I]n a situation where factors of irreparable harm, interests of third parties and public considerations strongly favor the moving party, an injunction might be appropriate 'even though plaintiffs did not demonstrate as strong a likelihood of ultimate success as would generally be required.' ") (quoting <u>Del.River Port Auth. v. Transamerican Trailer Transp. Inc.</u> , 501 F.2d 917, 923 (3d Cir. 1974) ) "<u>Doe v. Perkiomen Valley Sch. Dist.</u>, 585 F. Supp. 3d 668, 684 (E.D. Pa. 2022)

"A finding that a plaintiff has shown a likelihood of success on the merits depends on whether it has "a reasonable probability of success." <u>Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff</u> , 669 F.3d 359, 366 (3d Cir. 2012). This "requires a showing significantly better than negligible but not necessarily more likely than not." Reilly , 858 F.3d at 179 n.3. "[T]he movant need only prove a 'prima facie case,' not a 'certainty' she'll win." <u>Issa v. Sch. Dist. of Lancaster</u> , 847 F.3d 121, 131 (3d Cir. 2017).

"Because of the public interest in ensuring that physicians are qualified to practice medicine, the NBME claims a duty to disclose the manner in which the[ir exams are] administered and the meaning of the resulting score. <u>Doe v. National Board of Medical Examiners</u>, 199 F.3d 146, 154 n.4 (3d Cir. 1999)

Therefore, Plaintiff respectfully requests the court grant this application.

Dated:7 /26/2023

Jason A. Zangara, MPH, MA
573 Sidorske Avenue
Manville, New Jersey 08835
(908) 672-0626
firefighterjazzyj@yahoo.com

Plaintiff, Pro Se