RECEIVED

AUG 1 1 2023

AT 8:30_____M
CLERK, U.S. DISTRICT COURT - DNJ

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

Jason A. Zangara                         )
                                         )
          Plaintiff,                     )          Civil No. 3:22-1559 (RK) (JBD)
                                         )
     v.                                  )
                                         )          **PLAINTIFFS REPLY BRIEF**
                                         )          **IN SUPPORT OF APPLICATION**
National Board of Medical Examiners (NBME) )        **PURSUANT TO RULE 65**
                                         )
          Defendants                     )          **RETURNABLE AUGUST 21,2023**

### Introduction

205670, at *1 (D.N.J. Jan. 24, 2022) (citation omitted). The Court must accept Mr.

Zangara's allegations as true and construe disputed facts in his favor. *Norkunas v.*

*Southern Pennsylvania Transp. Auth.*, No. 19-627, 2019 WL 6337913, at *2 (D.N.J.

(Quoting Defendants Opposition Brief page 14)

### The Illusion

In 1992 20th Century Fox released a movie entitled "My Cousin Vinny" staring Joe Pesci

as an Attorney for the wrongfully accused. When discussing the case with his client at the county

jail he pulls out a deck of playing cards. He then explains that the Prosecutors case is made up of

"bricks" that at face value comprise his entire case and that the Prosecutor will show these

"bricks" to the jury. Vinny then states the obvious that since his clients are innocent the "bricks"

are an illusion because when turned sideways they are flat, the illusion disappears.

1

In this matter, Defendants have submitted a brief and certification to this court attempting to influence the court in the same manner. Their brief and certification lists lengthy legal arguments and issues that, if taken at face value could lead the reader to believe that they are accurate and that they should "win" this motion. However, when they are turned sideways, the illusion disappears as Vinny suggests because written on the side of them on page 24 is the following:

---

[9] Although it is not addressing this issue for the purposes of the pending motion, NBME does not concede that a "disparate impact" theory applies in this case.

Plaintiffs' entire application to this court for this motion is based on a "disparate impact" framework as he briefed in the roughly 30 pages presented which defendants have completely ignored and did not address. Therefore, they have left the framework of Plaintiffs application unopposed and unbriefed. They have also admitted that this is not an accommodations case but briefed it anyway as a distraction:

> *"Mr. Zangara is not seeking testing accommodations in this lawsuit, on the USMLE or any other test that NBME develops or administers." (citing document 29, page 1 filed 11/10/2022)*

In the words of Vinny Gambini - *"His whole case is an illusion, a magic trick"*

## <u>Argument</u>

## I. The Precedential Cases

In this matter, there are two cases from the Third Circuit that are the precedential cases that Defendants attorney, Mr. Mandelsberg, is aware of, but continues to ignore or acknowledge that surround the issues involving this case[1] Those cases are <u>In re: Asbestos Products Liability</u>

---

[1] Plaintiff references to Defendants attorney directly since this has nothing to do with the Defendants themselves. The Rules of Professional Conduct from the American Bar Association and the New Jersey Bar Association (which

Litigation (No. VI), No. 17-3471 (3d Cir. 2019) and Ramsay v. Nat'l Bd. of Med. Examiners, 968

F.3d 251, 256 (3d Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021)[2]

     The purpose of acknowledging and utilizing these cases is to uphold the doctrine of

*"stare decisis"* in which prior cases are used to decide matters that have already been decided. It

would be impossible for a judge to be required to "know" (and unreasonable to require a judge to

"know") every case of every area of law. Therefore, the courts rely on the "trust" of the attorneys

as officers of the court to brief them on the precedential and applicable cases to assist them in

making their rulings. However, in this matter these cases are being omitted and not cited for what

their "holdings" actually are. "Persuasive" or "Non Precedential" cases from other jurisdictions

are being used by Defendants Attorney on their behalf for tactical reasons instead of conceding

to, acknowledging and utilizing the Precedential cases in this circuit. As this court is aware it is

unacceptable for Defendants to use persuasive cases from another jurisdiction if the courts of this

circuit have already decided a matter to be binding on the lower courts.

     As the Third Circuit explains the different types of opinions in their Internal Operating

Procedures:

---

are required to be followed when practicing law before this court), impose the obligation on Mr. Mandelsberg **personally (not his clients)** to inform the court of the correct & controlling cases that apply to this matter. This is true even if it jeopardizes their legal defense. Mr. Mandelsberg is an officer of the court and those obligations supersede any owed to a client. See Rule 3.3 Candor Toward The Tribunal- [4] *"Legal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal. A lawyer…must recognize…. pertinent legal authorities. Furthermore, as stated in paragraph (a)(2), an advocate has a duty to disclose directly adverse authority in the controlling jurisdiction"*

[2] Ramsay was lost by this same firm and the same lawyers on this matter assisting Mr. Mandelsberg, who are Robert Burgoyne & Caroline Mew. Mr. Burgoyne has already made an appearance in this matter in the Third Circuit and it is guaranteed he will be arguing the ruling on this motion before the Third Circuit again. Mr. Mandelsberg has cut and paste most of his arguments from their original brief, all of which were rejected by the Third Circuit, for the same reasons having nothing to do with if this is a desperate impact or an accommodations case. For this reason, it further proves that Ramsey is the Precedential case in this matter as the same arguments were presented and overruled in this Circuit. Ramsey as an accommodations case, but since the arguments made by Defendants have nothing to do with accommodations, they were imported into this matter. The key is that as Plaintiff has explained and shows in his complaint by attaching copies of their briefs and the opinion of the Third Circuit, these arguments were already decided by and rejected by the Third Circuit.

CHAPTER 5. OPINIONS

5.1  Forms of Opinions.

There are two forms of opinions: precedential and not precedential. A majority of the panel determines whether an opinion is designated as precedential or not precedential, unless a majority of the active judges of the court decides otherwise. The face of an opinion states whether it is precedential or not precedential.

5.2  Precedential Opinions.

An opinion, whether signed or per curiam, is designated as precedential when it has precedential or institutional value. Precedential opinions are posted on the court's internet website

5.3  Not Precedential Opinions.

An opinion, whether signed or per curiam, that appears to have value only to the trial court or the parties is designated as not precedential and unless otherwise provided by the court, it is posted on the court's internet website. A not precedential opinion may be issued without regard to whether the panel=s decision is unanimous and without regard to whether the panel affirms, reverses, or grants other relief. The first page of a not precedential opinion contains a footnote stating: "This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent."

*"No matter how sympathetic the party or how clever the lawyer, most litigation is resolved by stare decisis, where the decisions of the past control the future. Generally, courts apply stare decisis in one of two ways. First, courts apply governing precedent by adopting the same legal position as the court previously adopted in an earlier case (horizontal stare decisis). Alternatively, courts also apply decisions of higher courts with supervisory jurisdiction (vertical stare decisis).[3] ....... See Or. Natural Desert Ass'n v. U.S. Forest Serv., 550 F.3d 778, 785 (9th Cir. 2008) ("As every first-year law student knows, the doctrine of stare decisis is often the determining factor in deciding cases brought before any court.")*

Therefore, Plaintiff respectfully requests this court utilize this doctrine and recognize that In re: Asbestos Products Liability Litigation (No. VI), No. 17-3471 (3d Cir. 2019) and Ramsay v. Nat'l Bd. of Med. Examiners, 968 F.3d 251, 256 (3d Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021) are the controlling, Precedential cases in this matter. He requests the court deny Defendants jurisdiction argument and the multiple other arguments, such as the

---

[3] Mead, J. W. (2011). Stare decisis in the inferior courts of the United States. Nev. LJ, 12, 787.

4

requirements for an injunction and the "speculation argument" as the holdings in Ramsay contradict[4].

## II. Response to: Morrison's Certification

Defendants claim that they can (1) submit a certification by Morrison (2) not allow her to be cross examined by Plaintiff (3) disallow any evidence he puts forward because he is "not an expert" depriving him of his right to prove they are lying about how the exams are scored. Unfortunately, the Federal Rules of Evidence allow Plaintiff to advance "expert" publications as a "learned treatise" to impeach Morrison's "testimony" as stated in Rule 803 of the Federal Rules of Evidence:

*The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:*

> *(18) Statements in Learned Treatises, Periodicals, or Pamphlets. A statement contained in a treatise, periodical, or pamphlet if:*

> *(A) the statement is called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination; and*

> *(B) the publication is established as a reliable authority by the expert's admission or testimony, by another expert's testimony, or by judicial notice.*

As Plaintiff has directly Pled in his complaint Morrisons own words in her published paper in 2019, *"Implementing a New Score Scale for the Clinical Science Subject Examinations" Validity and Practical Considerations[5]"* contradict her "testimony" in her certification. Morrison states in that equated percent correct scores are not the "percentage of content mastered" or "how

---

[4] In its prior opinion this court relied on Ramsay as the standard for a preliminary injunction under these circumstances in this case on Plaintiffs prior application ("As stated above, the Court can only grant a preliminary injunction if Plaintiff has established a likelihood of success on the merits, that he is likely to suffer irreparable harm, that the threatened injury outweighs the injury Defendant would suffer under the injunction, and that the injunction would not be adverse to the public interest. Ramsay v. Nat'l Bd. of Med. Exam'rs, 968 F.3d 251, 256 (3d Cir. 2020)."(quoting Zangara v. Nat'l Bd. of Med. Examiners, Civil Action 22-1559 (D.N.J. Apr. 6, 2023))

[5] Morrison, C., Ross, L., Baker, G., & Maranki, M. (2019). Implementing a New Score Scale for the Clinical Science Subject Examinations: Validity and Practical Considerations. Medical science educator, 29(3), 841–847. https://doi.org/10.1007/s40670-019-00747-9

many questions a test taker gets correct" she tells **the whole** definition of what an "equated

percentage correct" actually means:

> Equated percent correct scores are based on the concept of a domain score
> calculated using item response theory (IRT) In this case, a domain is
> defined as a collection of items that represent the content outline of the
> particular clinical science examination. All of the items on the form the
> student took and all of the items that constitute the domain are put on the
> **same scale...**

> The Rasch model is a widely used IRT model that considers only one item
> characteristic, difficulty, when **determining the probability of a student
> answering an item correctly. All of the items on the forms included in
> the content domain and on the forms taken by the students for each
> subject examination were calibrated using the Rasch model and put
> on a common scale...**

> The Rasch model was used to calculate the probability $P_i(\theta)$ that a student
> with proficiency $\theta$ based on the particular examination form he/she took
> **would answer** domain item $i$ correctly; $b_i$ represents the difficulty of
> item $i$

$$Pi(\theta)=e(\theta-bi)/1+e(\theta-bi)(i=1,2,.....,n)$$

1

> An equated percent correct score ($\pi$) was then calculated that represents
> the percentage of items in the domain that a student with
> proficiency $\theta$ **would answer** correctly.

$$\pi|\theta=(1n\sum ni=1Pi(\theta))\times100(i=1,2,.....,n)$$

Defendants claim Morrison is an expert therefore, "the publication is established as a

reliable authority by the expert's admission" Rule 803. Since this a motion for a preliminary

injunction as Plaintiff has applied to the court pursuant to Rule 65 " [E]vidence that is received

on the motion and that would be admissible at trial becomes part of the trial record" Rule 65 (a)

6

2 and will be used to impeach Morrison as a witness See Maggipinto v. Reichman, 607 F.2d 621

(3d Cir. 1979)(Holding learned treatises exception to Rule 803 can be used to impeach medical

expert); Jacober v. St. Peter's Medical Center, 608 A.2d 304 (N.J. 1992) (Holding learned

treatises may be introduced as substantive evidence for impeachment of expert)

　　Morrison is hiding the fact that the exams are not scored independently by exploiting the

federal perjury statue to withhold the other half of the information. As explained in an article

form the Washington University Law Review:

> "The federal perjury statute does not contemplate a scenario in which a defendant (or
> declarant, deponent, witness, or interviewee) withholds truthful information in an attempt
> to mislead the questioner and alter the outcome of a judicial proceeding—in sum, not
> telling the "whole truth." But, in Bronston v. United States, the Supreme Court
> considered just this situation, holding that the language of the federal perjury statute does
> not contemplate a defendant who intentionally omits material information. Instead, the
> Court broadly ruled that "literally truthful" answers are categorically forbidden from
> being the basis of perjury. The Court placed the burden on the questioner to elicit the
> desired answer from a witness when confronted with a literally truthful, yet unresponsive
> and misleading answer."[6]

　　The Circuit courts however have taken a different approach; See United States v. Boskic,

545 F.3d 69, 71, 93 (1st Cir. 2008) (upholding a false statement conviction for concealing

information on a refugee application); United States v. Larranaga, 787 F.2d 489, 498 (10th Cir.

1986) (upholding a false statement conviction for knowingly submitting false board meeting

minutes to a grand jury); United States v. Stephens, 779 F.2d 232, 237 (5th Cir. 1985) (affirming

a false statement conviction on the basis of the defendant's omission of loans from his financial

statement); United States v. Walsh, 119 F.3d 115, 117–19 (2d Cir. 1997) (concluding that the trial

court was correct in convicting the defendant of making a false statement when he failed to

disclose a pre-existing loan and home equity line of credit on a home mortgage application);

United States v. Rapoport, 545 F.2d 802, 806–07 (2d Cir. 1976) (upholding conviction in a false

---

[6] Robbins, I. P. (2019). Perjury by Omission. Wash. UL Rev., 97, 267.

statement case involving omissions of finder's fees); <u>Robinson v. United States</u>, 345 F.2d 1007,

1009–11 (10th Cir. 1965) (affirming the defendant's conviction in a false statement case

involving the defendant's failure to disclose liabilities on a loan application).

In addition to this Defendants own documentation (attached to Plaintiffs complaint as

Exhibit L) proves they are using controversial methods Angoff and Hofstee to score their subject

examinations and the USMLE Steps:

> **"the United State Medical Licensure Examination (USMLE), administered by the National Board of Medical Examiners (NBME), has turned to the Angoff and Hofstee methods in determining cut score.** The former approach involves a group of subject matter experts setting minimal qualifying requirements (in terms of test score) for a successful candidate, who will later be certified as a medical doctor. The Board's opinion serves as a foundation for the evaluation of each test item and a reference for determining cut score. The latter method asks judges to determine minimum/maximum acceptable scores, along with minimum/maximum fail rates, which serve as the key parameters in determining the final cut score[7]

These arguments were ignored by Defendants in their reply brief and exhibit L was also

ignored in which they offered no rebuttal. They cannot dodge responsibly when peer reviewed

articles contradict Morison's words, including her own article in which it states clear as day in

the "conflicts of interest" section that ***"The authors are employed by the National Board of***

***Medical Examiners"***[8]and their documents state in plain English that they are conducting studies

to decide passing scores using the same methods Plaintiff is accusing them of:

---

[7] "Three controversies over item disclosure in medical licensure examinations" Park, Y. S., & Yang, E. B. (2015). Three controversies over item disclosure in medical licensure examinations. Medical education online, 20(1), 28821.
[8] Morrison, C., Ross, L., Baker, G., & Maranki, M. (2019). Implementing a New Score Scale for the Clinical Science Subject Examinations: Validity and Practical Considerations. Medical science educator, 29(3), 841–847. https://doi.org/10.1007/s40670-019-00747-9



## SUBJECT EXAMINATION PROGRAM
### EMERGENCY MEDICINE ADVANCED CLINICAL EXAMINATION
### GRADING GUIDELINES



The NBME conducted webcast standard setting studies for the Emergency Medicine Subject Examination with medical school faculty. For each study, medical school faculty who were past or present clerkship directors (100% for 2015 and 88% for 2019) in Emergency Medicine participated as expert judges in webcast sessions that utilized the internet and conference calling to train participants in the standard setting procedure. Judges reviewed the content and rated the difficulty of each item on a current form of the examination. The study employed both a Modified Angoff content-based procedure and the Hofstee Compromise standard setting method. These two procedures together provide proposed passing standards that are based on an in-depth item-by-item analysis of the examination content, as well as a more global analysis of the content. The results were summarized and the proposed standards were expressed as the proportion of the content required for a candidate to pass and to receive honors status. Table 1 provides a summary of the medical school faculty who served as expert judges and their school information for each of the webcast studies conducted by the NBME.

Table 1 – Demographics of Expert Judges and Schools Participating in Emergency Medicine Webcast Studies

| Standard Setting Study | Number of Judges | Years of Experience | Number of Schools | Use CDEM Curriculum | Traditional School Curriculum | Integrated School Curriculum | School Clerkship Length |
|---|---|---|---|---|---|---|---|
| 2015 | 27 | 1 – 20 | 26 | 93% | 22% | 56% | 2 – 4 weeks |
| 2019 | 24 | 2 – 20 | 24 | 71% | 38% | 58% | 2 – 8 weeks |

The data shown below represent a compilation of the opinions of the medical school faculty who participated in each study. The results reported are on the Equated Percent Correct score scale that became effective August 2015. The study results are provided to assist you in setting fair and valid passing and honors standards for this examination.

Table 2 provides a summary of the results for passing scores from the Modified Angoff and Hofstee Compromise procedures. The recommended minimum passing score based on the 2019 Angoff results is a subject exam score of 61, which is higher than the recommended standard in 2015. This score was slightly below the acceptable range of minimum passing scores (63 to 72) computed from the 2019 Hofstee results. The recommended minimum passing score based on the 2019 Hofstee results is a subject exam score of 68, which is higher than the 2015 Hofstee results.

Table 2 – Emergency Medicine Grading Guidelines for Passing (Equated Percent Correct Scores)

| Standard Setting Study | Modified Angoff Recommended Passing Score | Hofstee Compromise Range of Acceptable Minimum Passing Scores | Hofstee Compromise Recommended Passing Score |
|---|---|---|---|
| 2015 | 59 | 54 to 66 | 62 |
| 2019 | 61 | 63 to 72 | 68 |

Table 3 provides a summary of the Hofstee results for honors. The 2019 study results indicate that the minimum acceptable score for honors should fall between a score of 86 to 92. The range of minimum acceptable Hofstee scores for honors based on the 2019 study is smaller than the range in 2015, but the maximum score is the same.

Table 3 – Emergency Medicine Grading Guidelines for Honors (Equated Percent Correct Scores)

| Standard Setting Study | Hofstee Compromise Range of Acceptable Minimum Honors Scores |
|---|---|
| 2015 | 80 to 92 |
| 2019 | 86 to 92 |

## III. Response to: "I. PRELIMINARY INJUNCTION STANDARD"

"[T]he Court can only grant a preliminary injunction if Plaintiff has established a likelihood of success on the merits, that he is likely to suffer irreparable harm, that the threatened

injury outweighs the injury Defendant would suffer under the injunction, and that the injunction would not be adverse to the public interest. <u>Ramsay v. Nat'l Bd. of Med. Exam'rs</u>, 968 F.3d 251, 256 (3d Cir. 2020)."(quoting <u>Zangara v. Nat'l Bd. of Med. Examiners</u>, Civil Action 22-1559 (D.N.J. Apr. 6, 2023))

 <u>See</u> also <u>Doe v. National Bd. of Med. Exam'rs</u>, 199 F.3d 146, 154-155 (3d Cir. 1999)( "Four factors govern a district court's decision whether to issue a preliminary injunction: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest." <u>American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Bd. of Educ.</u>, 84 F.3d 1471, 1477 n. 2 (3d Cir. 1996) (en banc) and <u>Gonzales v. National Bd. of Medical Examiners</u>, 225 F.3d 620 (6th Cir. 2000) ("District courts assess four factors in analyzing a preliminary injunction issue: (1) whether the plaintiff has a strong likelihood of succeeding on the merits; (2) whether the plaintiff will suffer irreparable injury absent the injunction; (3) whether issuing the injunction will cause substantial harm to others; and (4) whether the public interest will be furthered by the issuance of the injunction")

**IV. Response to: "II. MR. ZANGARA HAS NOT MADE AND CANNOT MAKE A "CLEAR SHOWING" THAT HE IS LIKELY TO SUCCEED ON THE MERITS**
- **Mr. Zangara has not established personal jurisdiction**
- **Legal standard**
- **2. Mr. Zangara's amended jurisdictional allegations**
- **3. Mr. Zangara has failed to state a basis for exercising general jurisdiction over NBME**
- **4. Mr. Zangara has failed to state a basis for exercising specific jurisdiction over NBME "**

**Jurisdiction**

Plaintiff has shown directly in the complaint that Defendants have multiple business contacts and all of the other courts did not dismiss any other action on the grounds of lack of jurisdiction naming the actual cases (See Ramsay v. Nat'l Bd. of Med. Examiners, 968 F.3d 251, 256 (3d Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021); Doe v. National Bd. of Med. Exam'rs, 199 F.3d 146, 154-155 (3d Cir. 1999); Katz v. Nat'l Bd. of Med. Exam'rs, 751 F. App'x 231 (3d Cir. 2018); Powell v. National Bd. of Medical Examiners , 364 F.3d 79 (2d Cir. 2004);  Jenkins v. Nat'l Bd. of Med. Exam'rs, No. 08-5371, 2009 U.S. App. LEXIS 2660 (6th Cir. Feb. 11, 2009); Gonzales v. National Bd. of Medical Examiners, 225 F.3d 620 (6th Cir. 2000); Biank v. Nat'l Bd. of Med. Examiners, 130 F. Supp. 2d 986, 988 (N.D. Ill. 2000) ; Currier v. National Board of Medical Examiners, 965 N.E.2d 829, 462 Mass. 1 (2012) ; Gonzalez v. National Bd. of Medical Examiners, 60 F. Supp. 2d 703 (E.D. Mich. 1999); Wright v. NBME, 2021 WL 5028463, *9 (D. Colo. 2021); Black v. Nat'l Bd. of Med. Examiners, 281 F. Supp. 3d 1247, 1249-50 (S.D. Fla. 2017); Berger v. Nat'l Bd. of Med. Exam'rs, No. 1:19-cv-99, 2019 U.S. Dist. LEXIS 145666 (S.D. Ohio Aug. 27, 2019); Price v. National Bd. of Medical Examiners, 966 F. Supp. 419 (S.D.W. Va. 1997); Rush v. National Board of Medical Examiners, 268 F. Supp.2d 673 (N.D. Tex. 2003); Scheibe v. Nat'l Bd. of Med. Examiners, Civ. A. No. 05-180, 2005 WL 1114497, at *3 (W.D. Wis. May 10, 2005). Plaintiff has stated multiple times over and over again that Defendants have waived their "Personal Jurisdiction defense". Again, by arguing the merits of this case, they have continued to waive that argument.

The holding of In re: Asbestos Products Liability Litigation (No. VI), No. 17-3471 (3d Cir. 2019) supersedes any argument Defendants attempt to put forward as they continue to argue the merits of the case. They should have opposed the current motion (and the prior motion for an injunction) solely on the grounds of jurisdiction and stopped, not continuing to argue the merits.

11

They should have filed a motion based on Rule 12 solely on the grounds of lack of jurisdiction and asked the court to rule before the answering first injunction (waiving one chance) and before answering this injunction application (waiving a second chance).

On top of this, Defendants didn't object to the filing of the amended complaint on the grounds of lack of personal jurisdiction or file a motion to dismiss in opposition on these grounds See DiLoreto v. Borough of Oaklyn, 744 F. Supp. 610 (D.N.J. 1990) (See Fed.R.Civ.P. 12(h); Fed.R.Civ.P. 8(c) ("a party shall set forth affirmatively ... [any] matter constituting an avoidance or affirmative defense") (emphasis added). Thus, "the filing of an amended complaint will not revive the right to present by motion defenses that were available but were not asserted in a timely fashion prior to amendment." 5A C. Wright & A. Miller Federal Practice and Procedure § 1388 at p. 736 (2d ed. 1990)") ; City of Las Cruces v. The Lofts at Alameda, LLC, 591 F. Supp. 3d 1038 (D.N.M. 2022); Rowley v. McMillan , 502 F.2d 1326, 1333 (4th Cir. 1974); Lim-bright v. Hofmeister, 2010 WL 1740905, *2 (E.D.Ky.2010) ("The filing of an amended complaint will not revive the right to present by motion defenses that were available but were not asserted in a timely fashion prior to the amendment of the pleading."); Burton v. Ghosh, 961 F.3d 960 (7th Cir. 2020); Townsend Farms v. Goknur Gida A.S., No. SACV150837DOCJCGX, 2016 WL 10570248, at *6 (C.D. Cal. Aug. 17, 2016); Brooks v. Caswell, No. 3:14-CV-01232-AC, 2016 WL 866303, at *3 (D. Or. Mar. 2, 2016); Regents of Univ. of California v. Triple S Steel Holdings Inc., No. SACV161408DOCFFMX, 2016 WL 11002545, at *2 (C.D. Cal. Nov. 1, 2016); Sears Petroleum & Transport Corp. v. Ice Ban Am., Inc., 217 F.R.D. 305, 307 (N.D.N.Y. 2003); Pascal v. Concentra, Inc., Case No. 19-cv-02559-JCS (N.D. Cal. Aug. 21, 2020)

Defendants chose to continue arguing the merits on both applications therefore waving any objection to a jurisdictional argument. "[T]he actions of the defendant may amount to a legal

12

submission to the jurisdiction of the court" even where a defendant has raised the defense. <u>Ins. Corp. of Ireland, Ltd.</u>, 456 U.S. at 704–05; see also <u>Yeldell v. Tutt</u>, 913 F.2d 533, 539 (8th Cir. 1990)....... <u>In re: Asbestos Products Liability Litigation (No. VI)</u>, No. 17-3471 (3d Cir. 2019) (See <u>In re: Asbestos Products Liability Litigation (No. VI)</u>, No. 17-3471 (3d Cir. 2019) (Holding that behavior consistent with waiver, and which indicates an intent to litigate the case on the merits, is sufficient to constitute waiver, regardless of whether the parties also express a contrary intent in writing. As the Third Circuit succinctly explained, "[t]he law is clear that words alone are insufficient to preserve a personal jurisdiction defense where conduct indicates waiver.")

Therefore, the holding of <u>In re: Asbestos Products Liability Litigation (No. VI)</u>, No. 17-3471 (3d Cir. 2019) requires Defendants baseless objections to jurisdiction be disregarded.

### IV. Response to: "II. MR. ZANGARA HAS NOT MADE AND CANNOT MAKE A "CLEAR SHOWING" THAT HE IS LIKELY TO SUCCEED ON THE MERITS
- ### B. Mr. Zangara's Claims Are Meritless

As Defendants have stated:

> *"Mr. Zangara is not seeking testing accommodations in this lawsuit, on the USMLE or any other test that NBME develops or administers." (citing document 29, page 1 filed 11/10/2022)*

Therefore, Plaintiff will not be responding to the accommodation arguments on pages 20-24 of their brief as they have nothing to do with this application and are only a diversion[9]. The issue before this court on this motion is a "Disparate Impact" claim that Plaintiff has already

---

[9] Since Plaintiff is not requesting accommodations, he is not required to proceed under the "disabled or substantially limited" requirement See 28 C.F.R. §36.105 "Where an individual is not challenging a public accommodation's failure to provide reasonable modifications under § 36.302, it is generally unnecessary to proceed under the "actual disability" or "record of" prongs, which require a showing of an impairment that substantially limits a major life activity or a record of such an impairment. In these cases, the evaluation of coverage can be made solely under the "regarded as" prong of the definition of "disability," which does not require a showing of an impairment that substantially limits a major life activity or a record of such an impairment"

briefed the court on. Defendants have chosen not to respond to those arguments or address any of

the authorities that Plaintiff has cited as indicated on page 24 of their brief:

---

[9] Although it is not addressing this issue for the purposes of the pending motion, NBME does not concede that a "disparate impact" theory applies in this case.

Plaintiff has carried, and met the requirements of arguing a disparate impact claim which

has been unopposed[10].

" To state a claim under either the ADA or the RA, [Plaintiff] must allege that he is a

qualified individual with a disability, who was precluded from participating in a program,

service, or activity, or otherwise was subject to discrimination, by reason of his disability"

Furgess v. Pa. Dep't of Corr., 933 F.3d 285, 288-89 (3d Cir. 2019)

    1. "A qualified individual with a disability"

> "(i) The definition of "disability" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. (ii) An individual may establish coverage under any one or more of the three prongs of the definition of disability in paragraph (a)(1) of this section, the "actual disability" prong in paragraph (a)(1)(i) of this section, the "record of" prong in paragraph (a)(1)(ii) of this section, or the "regarded as" prong in paragraph (a)(1)(iii) of this section. (iii) Where an individual is not challenging a public accommodation's failure to provide reasonable modifications under § 36.302, it is generally unnecessary to proceed under the "actual disability" or "record of" prongs, which require a showing of an impairment that substantially limits a major life activity or a record of such an impairment. In these cases, the evaluation of coverage can be made solely under the "regarded as" prong of the definition of "disability," which does not require a showing of an impairment that substantially limits a major life activity or a record of such an impairment. An individual may choose, however, to proceed under the "actual disability" or "record of" prong regardless of whether the individual is challenging a public accommodation's failure to provide reasonable modifications" 28 CFR § 36.105

---

[10] Plaintiff will briefly summarize the arguments contained in his original brief all of which Defendants have not opposed. He requests the court rely on those arguments in their entirety as they are more detailed then this summary.

2. "Who was precluded from participating in a program, service, or activity, or otherwise was subject to discrimination, by reason of his disability"

> "(a) Denial of participation. A public accommodation shall not subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation. "28 CFR § 36.202

Plaintiff can therefore proceed to prove a "Desperate Impact" claim under Title III of the ADA (28 CFR § 36.301) since "Both disparate treatment and disparate impact claims are cognizable under the ADA." Raytheon Co. v. Hernandez, 540 U.S. 44, 53, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003). He has established that he is a qualified individual with a disability by meeting the requirement of showing a disability as detailed in the complaint and by the provision that allows him to proceed without doing this which is 28 C.F.R. §36.105

"Under the disparate-impact statute, a plaintiff establishes a prima facie violation by showing that an employer uses "a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(k)(1)(A)(i). An employer may defend against liability by demonstrating that the practice is "job related for the position in question and consistent with business necessity." Ricci v. DeStefano, 557 U.S. 557, 129 S. Ct. 2658, 174 L. Ed. 2d 490 (2009).

The key is that in order to keep their exams in place, Defendants must prove their exams are related to job performance. Unfortunately, as Plaintiff his directly pled in his complaint, they are not (See Paragraph 123 ("In agreement with other studies, we found no correlation between NBME scores and performance during residency")[11] ("USMLE scores are not effective

---

[11] Borowitz, S. M., Saulsbury, F. T., & Wilson, W. G. (2000). Information collected during the residency match process does not predict clinical performance. Archives of pediatrics & adolescent medicine, 154(3), 256-260.

indicators of a physician's success during residency.")[12] ("Our study finds that USMLE Step 2 is

not a reliable predictor of residency performance")[13] ("During the eight years of the study

period......There was a non-significant correlation between clinical performance and the Step 1

score. Conclusion: Neither USMLE Step 1 nor Step 2 Clinical Knowledge were good predictors

of the actual clinical performance of residents during their training")[14](" (Step 1, 2 CK, grades,

AOA) was not associated with residency clinical performance on milestones. Isolated

correlations were found between specific milestones (eg, higher surgical grade increased wound

care score), but most had no correlation with residency performance.")[15])

This was established in <u>Griggs v. Duke Power Co.</u>, 401 U.S. 424, 91 S.Ct. 849, 28

L.Ed.2d 158 (1971) and explained in <u>Ricci v. DeStefano</u>:

> "The Griggs Court stated that the "touchstone" for disparate-impact liability is the lack of
> "business necessity": "If an employment practice which operates to exclude [minorities]
> cannot be shown to be related to job performance, the practice is prohibited." Ibid.; see
> also id., at 432, 91 S.Ct. 849 (employer's burden to demonstrate that practice has "a
> manifest relationship to the employment in question"); Albemarle Paper Co. v. Moody,
> 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Under those precedents, if an
> employer met its burden by showing that its practice was job-related, the plaintiff was
> required to show a legitimate alternative that would have resulted in less discrimination.
> Ibid. (allowing complaining party to show "that other tests or selection devices, without a
> similarly undesirable racial effect, would also serve the employer's legitimate interest")
> <u>Ricci v. DeStefano</u>, 557 U.S. 557, 129 S. Ct. 2658, 174 L. Ed. 2d 490 (2009).

The Equal Employment Opportunity Commission (EEOC) has created a standard or

"rule" that has been proven to show an exam has a "disparate impact" on a particular group. This

---

[12] Miller, B., Dewar, S. B., & Nowalk, A. (2019). Lack of Correlation Between USMLE Scores and Performance in Pediatrics Residency Training Based on ACGME Milestones Ratings Academic Pediatrics, 19(6), e34

[13] Udawatta, M., Preet, K., Lagman, C., French, A. M., Bruton, C., Bergsneider, M., ... & Yang, I. (2020). United States Medical Licensing Examination Step 2 scores do not predict American Board of Neurological Surgery scores: a single-institution experience. Journal of the Neurological Sciences, 408, 116556.
[14] Sajadi-Ernazarova, K., Ramoska, E. A., & Saks, M. A. (2020). USMLE Scores Do Not Predict the Clinical Performance of Emergency Medicine Residents. Mediterranean Journal of Emergency Medicine & Acute Care, 1(2).
[15] Burkhardt, J. C., Parekh, K. P., Gallahue, F. E., London, K. S., Edens, M. A., Humbert, A. J., ... & Hopson, L. R. (2020). A critical disconnect: Residency selection factors lack correlation with intern performance. *Journal of graduate medical education*, *12*(6), 696-704.

is known as the "80 percent rule" which has been adopted by the courts. Plaintiff has applied this rule to data available regarding Defendants USMLE exam (which is the comparison group to decide if someone passes the Comprehensive Basic Science Exam (CBSE)). This data includes the 2019 results for everyone who took the exam and a study done specifically relating to a group of disabled students.

The disabled group was a group of medical students that Defendants, NBME denied testing accommodations to, therefore they took the exam without them. This puts them in the same situation as Plaintiff - disabled, but no accommodations

> *"Mr. Zangara is not seeking testing accommodations in this lawsuit, on the USMLE or any other test that NBME develops or administers."* (citing document 29, page 1 filed 11/10/2022)

Whatever "group" Plaintiff and these students are according to Defendants (since they claim "they are not disabled") didn't do so well on the exam. The study group had a shocking fail rate of 32% when the overall fail rate was only 4% of the overall 22,146 students that took the exam! When calculated using the "80% Rule" the results show Defendants scoring has a "disparate impact" on this group regardless of what they are referred to by Defendants (but refered to as disabled by the rest of the world) The calculation is as follows:

32% of disabled failed with 68% passing[16]

4% of all test takers failed with 96% passing[17]

68% of 96% is 65.28% which is well below the 80% requirement

---

[16] Petersen, K. H., Jain, N. R., Case, B., Jain, S., & Meeks, L. M. (2022). Impact of USMLE Step-1 accommodation denial on US medical schools: A national survey. PloS one, 17(4), e0266685. https://doi.org/10.1371/journal.pone.0266685
[17] United States Medical Licensing Examination | Performance Data [Internet]. [cited 2023 Jul 22]. https://www.usmle.org/performance-data [Ref list]

17

65.28% is far less than the required 80%  so it is apparent that Defendants exam scoring

falls "well below the 80-percent standard set by the EEOC to implement the disparate-impact

provision of Title VII. See 29 CFR § 1607.4(D) (2008) (selection rate that is less than 80 percent

"of the rate for the group with the highest rate will generally be regarded by the Federal

enforcement agencies as evidence of adverse impact"); Watson, 487 U.S., at 995-996, n. 3, 108

S.Ct. 2777 (plurality opinion) (EEOC's 80-percent standard is "a rule of thumb for the courts").

Ricci v. DeStefano, 557 U.S. 557, 129 S. Ct. 2658, 174 L. Ed. 2d 490 (2009)

"Ultimately, nearly one-third (32%) of SWD who were denied and took the exam without

accommodations failed Step-1. This is particularly notable when compared to the overall Step-1

failure rate of 4–5% during the 2018–2019 academic year"[18] Therefore, for this reason in

addition to the academic evidence in the complaint regarding Defendants scoring methods, the

available data at this time shows "tests that "tend to screen out an individual with a disability or a

class of individuals with disabilities" "E.E.O.C. v. Kronos Inc., 620 F.3d 287, 296 (3d Cir. 2010)

and therefore are discriminatory See Raytheon Co. v. Hernandez, 540 U.S. 44, 124 S. Ct. 513,

157 L. Ed. 2d 357 (2003) (defining "discriminate" to include "utilizing standards, criteria, or

methods of administration . . . that have the effect of discrimination on the basis of disability"

and "using...tests...that screen out or tend to screen out an individual with a disability")

As briefly written by this court in a prior opinion, Plaintiff explained the grading of the

Comprehensive Basic Science Exam and how it is scored based on the USMLE Step 1

Comparison Group **pointing to all of Defendants own documents as the evidence for this**

**conclusion. This evidence is attached to the complaint as exhibits and specifically pled as**

**paragraphs 45-121 (See Complaint Paragraphs 45-121)**

---

[18] Petersen, K. H., Jain, N. R., Case, B., Jain, S., & Meeks, L. M. (2022). Impact of USMLE Step-1 accommodation denial on US medical schools: A national survey. PloS one, 17(4), e0266685. https://doi.org/10.1371/journal.pone.0266685

"Plaintiff asserts that Defendant, and not his medical school, have set the "low pass"

score for the CBSE as 62 to 68. (API, 6.) Plaintiff alleges:

> Therefore in order to "Pass" CBSE, as required by his school[,] Plaintiff must
> score a 62 "corresponding to Step 1 Performance starting at the passing standard
> plus 2 standard errors of measurement[.]" (*See* [Pl.'s Cert.] at 24[.]) As stated on
> the CBSE Plaintiff took on March 27, 2022, Plaintiff[']s score is shown "along
> with a range that corresponds to low passing[.]" (*See* [Pl.'s Cert.] at 23[.]) His
> score is "corresponding to Step 1 Performance starting at the passing standard plus
> 2 standard errors of measurement[.]" (*See* [Pl.'s Cert.] at 24[.]) Plaintiff[']s exam
> results specified that the "performance of a 2020 national cohort of students" was
> utilized to estimate his "probability of passing step 1 within a week[.]" (*See* [Pl.'s
> Cert.] at 23[.]) Therefore in order to obtain the passing score of 62 set by
> Defendants (*See* [Pl.'s Cert.] at 24) and required by his school (*See* [Pl.'s Cert.] at
> 19) he must score a 62 in the range on the "equated percent scale" which
> "represents CBSE scores corresponding to Step 1 Performance starting at the
> passing standard plus 2 standard errors of measurement[.]" (*See* [Pl.'s Cert.] at
> 24). The data utilized to "convert" the "equated percent correct" however is not
> public knowledge for the CBSE as stated by Defendants[.] (*See* [Pl.'s Cert.] at
> 24[.]) This requires a "table" in which Schools are prohibited from sharing with
> students[.] (*See* [Pl.'s Cert.] at 24) The CBSE does not grade on the objective
> standard to test if someone is qualified to safely treat patients, but a "low pass" in
> a "range" "from 62 to 68" that is "corresponding to Step 1 Performance starting at
> the passing standard plus 2 standard errors of measurement[.]" (*See* [Pl.'s Cert.] at
> 24)[.]
> (API, 7.)

*Zangara v. Nat'l Bd. of Med. Examiners*, Civil Action 22-1559, 3-4 (D.N.J. Apr. 6, 2023)

What the court found in Burger *"Mr. Berger has taken the USMLE Step 1 without*

*accommodations. A passing score was set at 192. Mr. Berger passed with a **scaled score** of 198.*

*(PX 38). " Berger v. Nat'l Bd. of Med. Examiners, Case No. 1:19-cv-99, 2 (S.D. Ohio Aug. 27,*

*2019)* is exactly what the truth of this matter is – NBME is taking the percentage of correct

answers a student gets on an exam and scaling them to a comparison group of other students.

Morrison is obviously in fear of losing her job for her inability to create a legal exam that does

not discriminate under the ADA which is why she is neglecting to tell the court about her

19

publication; or provide **actual data and equations proving the Defendants position** hence an "Illusion" defense.

On top of this, they have not produced a shred of evidence as to how USMLE Steps 1 , 2 & 3 are actually scored. Defendants entire brief is nothing more then a magic show to try and get this court to forget what this application is for – an injunction against defendants for all of there examinations including USMLE Steps and subject examinations. The Third Circuit held that a Plaintiff can move of an injunction against NBME for exams that they are not even eligible to take yet and they have rejected the arguments contained in briefs coming form the same law firm from the same attorneys fighting this See Plaintiffs Complaint:

- Defendants attempted to argue in  Ramsay v. Nat'l Bd. of Med. Examiners, 968 F.3d 251, 256 (3d Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021) that Ramsay was not entitled to a injunction for exams she was not ready to take

- "Plaintiff's medical school did not mention the other US-MLE exams (Step 2 CK, Step 2 CS, and Step 3), seeAppx1513-1525, and the district court never explained why she would be irreparably harmed if she could not immediately obtain an order granting extra time on those exams (one of which she will likely not take for at least two years)." 2020 U.S. 3RD CIR. BRIEFS LEXIS 468 * at Footnote 13 (See Plaintiff Cert. at Exhibit R)

- This argument was rejected by the Third Circuit  court: "Given our conclusion that the District Court correctly held that Ramsay has shown a likelihood of success on the merits of her claim that she has a disability for which she is entitled to accommodations, we will affirm the preliminary injunction requiring the Board to provide the accommodations on Step 2 CK, any written or reading portions of Step 2 CS, and Step 3." 968 F.3d 2020 U.S. App. LEXIS 24307 **; 2020 WL 4431789 at footnote 16 (See Plaintiff Cert. at Exhibit S)

These arguments and Morrisons contradictions as stated in the prior section of this brief are precisely why Plaintiff has and will succeed on the merits of this case.

20

## V. Response to: "III. MR. ZANGARA HAS NOT SHOWN IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY INJUNCTIVE RELIEF"

### The Speculation Argument

"Plaintiff alleges that he will be irreparably harmed because he will not be able to pass the Step 1 exam under the current grading system, and therefore, without the preliminary injunction, will fall behind his peers, be disadvantaged in his continuing studies, and be delayed in completing his medical training. (API, at 37.) Zangara v. Nat'l Bd. of Med. Examiners, Civil Action 22-1559, 4 (D.N.J. Apr. 6, 2023)

As Plaintiff has stated in multiple paragraphs in his complaint (even attaching Defendants Appellate Brief as Exhibit R to the complaint and the Ramsay opinion as Exhibit S to the complaint) Defendants "speculation augment" has been rejected by the Third Circuit, hence is overruled Precedentially for this application. See Plaintiffs Complaint:

- Defendants attempted to argue in   Ramsay v. Nat'l Bd. of Med. Examiners, 968 F.3d 251, 256 (3d Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021) that Ramsay was not entitled to a injunction for exams she was not ready to take

- "Plaintiff's medical school did not mention the other US-MLE exams (Step 2 CK, Step 2 CS, and Step 3), seeAppx1513-1525, and the district court never explained why she would be irreparably harmed if she could not immediately obtain an order granting extra time on those exams (one of which she will likely not take for at least two years)." 2020 U.S. 3RD CIR. BRIEFS LEXIS 468 * at Footnote 13 (See Plaintiff Cert. at Exhibit R)

- This argument was rejected by the Third Circuit court: "Given our conclusion that the District Court correctly held that Ramsay has shown a likelihood of success on the merits of her claim that she has a disability for which she is entitled to accommodations, we will affirm the preliminary injunction requiring the Board to provide the accommodations on Step 2 CK, any written or reading portions of Step 2 CS, and Step 3." 968 F.3d 2020 U.S. App. LEXIS 24307 **; 2020 WL 4431789 at footnote 16 (See Plaintiff Cert. at Exhibit S)

- Defendants have attempted to argue that  The speculative nature of Plaintiff's alleged future harm did not warrant injunctive relief in Ramsay v. Nat'l Bd. of Med. Examiners, 968 F.3d 251, 256 (3d Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021):"Courts have held that alleged harm is speculative where it is unclear a plaintiff

would fail")." 2020 U.S. 3RD CIR. BRIEFS LEXIS 468 * at Footnote 14 (See Plaintiff
Cert. at Exhibit R)

- This Argument was also rejected by the Third Circuit: "Accordingly, the District Court
  correctly concluded that Ramsay established she would be irreparably harmed absent an
  injunction" 2020 U.S. App. LEXIS 24307 **; 2020 WL 4431789 (See Plaintiff Cert. at
  Exhibit R)

The Third Circuit has rejected the Defendants arguments of not showing "irreparable harm'

in Ramsay holding that a delay in medical education itself, no matter what the circumstances

constitutes "irreparable harm"  (See Ramsay "[A]n examiner's refusal to provide

accommodations can cause the exam-taker irreparable harm because doing so jeopardizes her

"opportunity to pursue her chosen profession." Enyart v. Nat'l Conf. of Bar Exam'rs, 630 F.3d

1153, 1166 (9th Cir. 2011); accord Doe v. Pa. State Univ., 276 F. Supp. 3d 300, 313-14 (M.D. Pa.

2017) (holding that gap in medical school education and likelihood that the student could not

gain acceptance to another school constituted irreparable harm). Accordingly, the District Court

correctly concluded that Ramsay established she would be irreparably harmed absent an

injunction". quoting Ramsay v. Nat. Bd. of Medical Examiners 968 F.3d 251 (3d Cir. 2020); also

Rush v. National Board of Medical Examiners, 268 F. Supp.2d 673 (N.D. Tex. 2003)

("Specifically, if a student does not pass the Step I exam before the beginning of his third year of

medical school, he would normally need to drop out of school during his third year in order to

study properly for the exam, thereby falling behind his peers. Students behind in their studies

normally will not be offered the range and quality of residency or medical specialty options their

peers will be offered. They will normally not be offered interviews for further study in the more

competitive medical specialties, will not have the usual range of geographic or location (city and

school) choices for remaining medical school programs which may be available, and will be

delayed in completion of their medical training. There is no good way to remedy this injury.

Timely Step I testing and passage is required.")[19]

## VI. Response to: "IV. A PRELIMINARY INJUNCTION WOULD HARM NBME"

### The Briefs

In 2004 a study was conducted and pubished in the Journal of the Royal Society of

Medicine entitled "The Deceptive Brian"[20]. In the study it was hypothised that the human brian

would take longer and require more resources to tell a lie or be deceptive as opposed to being

truthfull:

> "[a] truthful response comprises a form of baseline, or pre-potent response—information
> that we would expect to be forthcoming if an honest person were asked the question, or if
> the liar were distracted or fatigued. We might, therefore, hypothesize that responding with
> a lie demands something 'extra', and that it will engage executive prefrontal systems
> more than does telling the truth. Hence, we have a hypothesis that we can test by means
> of functional neuroimaging[21]

> That hypothosis was shown to be correct:

---

[19] Again, another case has been cited incorrectly in this matter which is <u>Sampson v. Nat'l Bd. of Med.</u>
<u>Exam'rs</u>, 2023 WL 3162129, at *1-2 (2d Cir. 2023). Mr. Mandelsberg was the same attorney in that matter that not
only got an Injunction granted against his clients, but set the stage so it would be reversed on appeal. However, what
seemed like a victory was far from it because shocking and in an unprecedented move. The case was remanded in a
summery order not because the Circuit Court believed on the merits that Sampson didn't deserve testing
accommodations, but so the District Court could join NBME in another suit against his school for <u>actual damages</u>
for delaying Sampson's medical education ("Likewise, because Sampson apparently cannot continue his medical
studies at Stony Brook without passing Step 1, the court may consider whether NBME is a necessary party in the
Stony Brook case. See Fed. R. Civ. P. 19(a)(1)(A). <u>Sampson v. Nat'l Bd. of Med. Exam'rs</u>, 2023 WL 3162129, at
*1-2 (2d Cir. 2023)) (As stated in that complaint "Sampson also seeks declaratory relief and damages including but
not limited to economic costs to redress the harms he has suffered, as well as reasonable attorneys' fees and costs"
<u>Sampson v. Stony Brook University et al</u> Docket # 2:22-cv-04490 (2022)) Mr. Mandelsberg along with the two
attorrieys helping him (Robert Burgoyne & Caroline Mew, the two Attorneys who lost <u>Ramsay</u>) panicked of the
repercussions of this precedent and immediately gave Sampson everything he asked for to end the litigation
<u>Sampson v. Nat'l Bd. of Med. Examiners</u> 22-CV-05120 (JMA) (AYS) (E.D.N.Y. Dec. 2, 2022) (dk 52) It had nothing
to do with the misrepresentations he has made to this court. It is speculated however that there might have been a
mixed motive in which NBME forced Sampson though litigation forcing hm to hire an attorney as the docket shows
a pending application for attorney's fees against NBME.
[20] Spence S. A. (2004). The deceptive brain. Journal of the Royal Society of Medicine, 97(1), 6–9.
https://doi.org/10.1177/014107680409700133
[21] Spence S. A. (2004). The deceptive brain. Journal of the Royal Society of Medicine, 97(1), 6–9.
https://doi.org/10.1177/014107680409700133

Our analyses revealed that, whether the participants were inside or outside the scanner, response time was about 200 ms longer for lying than for truth-telling. In the scanned sample, lie responses were associated with increased activation in several prefrontal regions, including ventrolateral prefrontal and anterior cingulate cortices. These data support the hypothesis that prefrontal systems exhibit greater activation when the participant is called upon to generate experimental 'lies' and they show that, on average, a longer processing time is required to answer with a lie[22].

The meaning of this study is that, as hypothesized the human brain requires more resources and takes longer to process a lie or a deception. In addition to this, when the brain's resources are depleted (for example in a situation such as the person is tired, distracted, not eaten, low oxygen, blood flow etc.) they can not create a deception or lie easily ( "[a] truthful response comprises a form of baseline, or pre-potent response—information that we would expect to be forthcoming if an honest person were asked the question, or if the liar were distracted or fatigued."[23])

When Defendants attorney had to oppose Plaintiffs original application for an injunction, he knew he was going to attending the hearings & trial for a preliminary injunction <u>Sampson v. Nat'l Bd. of Med. Examiners</u> 22-CV-05120 (JMA) (AYS) so he asked for an extension for an entire month (dk#22). Plaintiff opposed this request (dk#23) and the judge only gave him 2 weeks (dk#24). The opposition was submitted at the last minute at 7:49 pm when the clerk's office was already closed (dk#25) On page 16 of that brief it is claimed that defendants are grading the exams the way they are supposed to but on page 19 they claim they would have to "alter the scoring".

On page 24 of the current brief at the end of the second argument the following statement is made:

---

[22] Spence S. A. (2004). The deceptive brain. Journal of the Royal Society of Medicine, 97(1), 6–9. https://doi.org/10.1177/014107680409700133
[23] Spence S. A. (2004). The deceptive brain. Journal of the Royal Society of Medicine, 97(1), 6–9. https://doi.org/10.1177/014107680409700133

24

is simply wrong, as discussed above.[10] He demands that his score be determined based on his individual performance, which is exactly how NBME scores the exams it administers. NBME cannot be found to have violated the ADA (or any other law) based on something that it has never done.

What is interesting is how the argument again changes the same way it did in the prior brief (dk#25) as it does at the end of the brief on page 27

> a preliminary injunction…."). Entering a preliminary injunction that requires NBME to somehow alter the manner in which it scores all its examinations, including exams that jurisdictions rely upon to make licensure decisions for healthcare professionals, in order to respond to allegations that have no factual or legal basis, would obviously result in significant harm to NBME.

They key is what time was this brief filed with the court? On the last day after the clerk's office had closed at 9:35pm (dk#54). *"[A] truthful response comprises a form of baseline, or pre-potent response—information that we would expect to be forthcoming if …the liar were distracted or fatigued… and they show that, on average, a longer processing time is required to answer with a lie "[24])*

At 7:49 and 9:35 pm the author's brain is tired, fatigued and distracted from working so late in which he cannot continue the deception of the claim that the exams are graded correctly in a situation such as this one.

> "A recurring theme in the psychology of deception is the difficulty of deceiving in high-stake situations: information previously divulged must be remembered, emotions and behaviors controlled, information managed. These are quintessentially executive functions. Hence, much of the liar's behavior may be

---

[24] Spence S. A. (2004). The deceptive brain. Journal of the Royal Society of Medicine, 97(1), 6–9. https://doi.org/10.1177/014107680409700133

25

seen, from a cognitive neurobiological perspective, as an exercise in behavioral control, making use of limited cognitive resources[25].[26]

## Non-Existent Harm

Defendants claim on page 24 that they are doing what they are supposed to be doing so they couldn't be harmed if their position is correct. They then change their position on 27 (just as they did in the original brief filed for their first opposition) and claim they will allegedly experience harm but do not say what that harm is. Since they cannot point to anything specifically, that they will experience it is shown that harm on their part is nonexistent.

"We next consider how the District Court [should] "balanc[ed] the parties' relative harms; that is, the potential injury to the plaintiff[] without this injunction versus the potential injury to the defendant with it in place." Issa v. Sch. Dist. of Lancaster, 847 F.3d 121, 143 (3d Cir. 2017). In balancing the harms, the Court noted the Board's "concern for the fulfillment of its mission to provide [qualified] physicians," Ramsay, 2019 WL 7372508, at *19........Nonetheless, the Court appropriately reasoned that granting a preliminary injunction would not undermine the Board's mission because the injunction would give [Plaintiff] only "the opportunity to move forward" in h[is] medical career "should [he] succeed in passing h[is] examinations with appropriate [scoring]" Id. at *19 (emphasis omitted). Moreover, the Board's concerns regarding impacts from undeserved [scoring] do not apply here because [Plaintiff] has shown a reasonable likelihood that [Defendants are violating the ADA] Cf. Issa, 847 F.3d at 143 (holding that a defendant could not

---

[25] Spence S. A. (2004). The deceptive brain. Journal of the Royal Society of Medicine, 97(1), 6–9. https://doi.org/10.1177/014107680409700133
[26] Plaintiff is a student who has not done well on Defendants examinations. He is a student that can actually apply what the exams are actually testing for. He can also formulate scientific and academic arguments based on established research and scientific principals – arguments that are notably absent from every argument made on behalf of Defendants.

assert an interest in continuing to violate a civil rights statute)" quoting <u>Ramsay v. Nat. Bd. of Medical Examiners</u> 968 F.3d 251 (3d Cir. 2020)

### VII. Response to: "V. AN INJUNCTION WOULD NOT SERVE THE PUBLIC INTEREST."

"Plaintiff further alleges that the preliminary injunction will serve the public interest by upholding the ADA's objective of eliminating discrimination based on disability and serve the public interest by training more physicians. (API, 38-39.)" <u>Zangara v. Nat'l Bd. of Med. Examiners</u>, Civil Action 22-1559, 4 (D.N.J. Apr. 6, 2023)

"Finally, we consider the District Court's finding that "the public interest favors this preliminary injunction." Id. The Court [should] concluded that an injunction furthers the public interest in ADA compliance and serves to increase the number of qualified physicians. Ramsay, 2019 WL 7372508, at *19. We agree. "In enacting the ADA, Congress demonstrated its view that the public has an interest in ensuring the eradication of discrimination on the basis of disabilities." Enyart, 630 F.3d at 1167; see Issa, 847 F.3d at 143 (concluding that it was in the public interest for covered entities to comply with a civil rights statute). Further, the injunction allows [Plaintiff] to continue h[is] medical education and therefore serves the public interest in training more physicians. "Although it is true that the public also has an interest in ensuring the integrity of licensing exams," Enyart, 630 F.3d at 1167, [Plaintiff] has shown a reasonable likelihood that the ADA affords h[im proper scoring], and there is no evidence that providing h[im] the requ[red scoring] will jeopardize the test's integrity. Thus, the public interest weighs in favor of an injunction" quoting <u>Ramsay v. Nat. Bd. of Medical Examiners</u> 968 F.3d 251 (3d Cir. 2020)

"The injunction will not disserve the public interest but will further the public interest in prohibiting discrimination by public entities, such as the National Board of Medical Examiners,

on the basis of disability by fulfilling the ADA's requirement that entities offering licensing examinations [scored legally] to disabled individuals." Rush v. National Board of Medical Examiners, 268 F. Supp.2d 673 (N.D. Tex. 2003)

### Conclusion

"[I]n a situation where factors of irreparable harm, interests of third parties and public considerations strongly favor the moving party, an injunction might be appropriate 'even though plaintiffs did not demonstrate as strong a likelihood of ultimate success as would generally be required.' ") (quoting Del.River Port Auth. v. Transamerican Trailer Transp. Inc. , 501 F.2d 917, 923 (3d Cir. 1974) ) "Doe v. Perkiomen Valley Sch. Dist., 585 F. Supp. 3d 668, 684 (E.D. Pa. 2022)

"A finding that a plaintiff has shown a likelihood of success on the merits depends on whether it has "a reasonable probability of success." Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff , 669 F.3d 359, 366 (3d Cir. 2012). This "requires a showing significantly better than negligible but not necessarily more likely than not." Reilly , 858 F.3d at 179 n.3. "[T]he movant need only prove a 'prima facie case,' not a 'certainty' she'll win." Issa v. Sch. Dist. of Lancaster , 847 F.3d 121, 131 (3d Cir. 2017).

"Because of the public interest in ensuring that physicians are qualified to practice medicine, the NBME claims a duty to disclose the manner in which the[ir exams are] administered and the meaning of the resulting score. Doe v. National Board of Medical Examiners, 199 F.3d 146, 154 n.4 (3d Cir. 1999)

Therefore, Plaintiff respectfully requests the court grant this application.

28

Dated: 8/11/2023

Jason A. Zangara, MPH, MA
573 Sidorske Avenue
Manville, New Jersey 08835
(908) 672-0626
firefighterjazzyj@yahoo.com

Plaintiff, Pro Se

29