UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

Jason Zangara                                    )
                                                 )
      Plaintiff,                            )        Civil No. 3:22-1559 (RK) (JBD)
                                                 )
 v.                                              )
                                                 )
                                                 )
National Board of Medical Examiners (NBME)       )
                                                 )
      Defendants                            )

---

### Plaintiffs Opposition Brief to Defendants Motion to Dismiss

---

JASON A. ZANGARA PRO SE
573 SIDORSKE AVENUE
MANVILLE, NJ 08835
(908)672-0626
ATTORNEY FOR PLAINTIFF

## Table of Contents

**Page**

Table of Authorities.................................................................................................iii

Introduction.................................................................................................................1

Argument.....................................................................................................................2

**I. Defendants Refuse to Acknowledge the Doctrine of "stare decisis"**........................2

**II . Plaintiffs Allegations Were Already Allowed by the Court**....................................4

**III. Jurisdiction – Defendants Arguments are Barred by the Holding in**
  **In re: Asbestos Products Liability Litigation (No. VI),**
  **No. 17-3471 (3d Cir. 2019)** .................................................................................6

**IV. Successive Motions to Dismiss – Defendants Motion is Barred by the Holding**
  **in Leyse v. Bank of Am. Nat'l Ass'n, 804 F.3d 316, 320 (3d Cir. 2015)** ...............9

**V. The Application of Leyse v. Bank of Am. Nat'l Ass'n, 804 F.3d 316, 320 (3d Cir.**
  **2015) & Rule 12(h)(2) to the filing of an Amended Complaint**.............................10

**VI. Plaintiffs Amended Complaint Already Survived a Motion to Dismiss**..............12

**VII. The Disparate Impact Claim**............................................................................13

  **A. Plaintiff Must Establish the Claim**................................................................13

    **1. Disparate Impact**..........................................................................16

    **2. Title VII Framework Under Title III of the ADA**...........................18

  **B. Plaintiff Must Establish & Meet the Pleading Requirements**
    **of that Claim**..................................................................................23

**VIII. Defendants are State and Federal Actors**...........................................................31

**IX. Defendants Are Considered Employers**................................................................38

**X. Disputed Facts and Meaning of the Documents**.....................................................39

**XI. Step 1 and Disparate Impact**...............................................................................40

**XII. The CCSE**...........................................................................................................42

i

**XIII. The USMLE Steps**......................................................................................46

**XIV. The New Jersey Law Against Discrimination**......................................47

**XV. The Statements by Defendants Attorney**................................................49

Conclusion.................................................................................................................55

## Table of Authorities

**Cases**                                                                                     **Pages**

A.A. Mastrangelo, Inc. v. Comm'r of Dep't of Envtl. Prot.,
90 N.J. 666, 683 (1982)……………………………………………………….…48

Accord Rhoades, Inc. v. United Air Lines, Inc.,
340 F.2d 481 (3d Cir.1965) ………………………………………………………....51

Adam v. Saenger,
303 U.S. 59, 67 (1938) …………………………………………………………………7

Albemarle Paper Co. v. Moody,
422 U.S. 405, 95 S. Ct. 2362, 45 L. Ed. 2d 280 (1975) …………………………..................19,22

Albers v. Bd. of Cty. Comm'rs of Jefferson Cty.,
771 F.3d 697, 703 (10thCir. 2014) ……………………………………………....……11

Alexander v. Choate
469 U.S. 287, 297, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) …………………………..……16,17

B.C. v. Mount Vernon Sch. Dist. ,
837 F.3d 152, 158 (2d Cir. 2016) …………………………………………………..……14

Batterton v. Francis,
432 U.S. 416, 425, n.9, 97 S. Ct. 2399, 53 L. Ed.2d 448 (1977) ………………………..……31

Beazer E., Inc. v. Mead Corp.,
525 F.3d 255, 263 (3d Cir. 2008) …………………………………………………..……10

Bell Atl. Corp. v. Twombly,
550 U.S. 544, 556 (2007) …………………………………………………………………24,42,50

Bell v. United Princeton Properties, Inc.,
884 F.2d 713, 720 (3d Cir. 1989) ………………………………………………….....…50

Bel-Ray Co. v. Chemrite (Pty) Ltd.,
181 F.3d 435, 443 (3d Cir. 1999) ………………………………………………………7

Bergen Pines Cnty. Hosp. v. N.J. Dep't of Human Servs.,
 96 N.J. 456, 477 (1984) …………………………………………………...…………48

Berger v. Nat'l Bd. of Med. Exam'rs,
No. 1:19-cv-99, 2019 U.S. Dist. LEXIS 145666 (S.D. Ohio Aug. 27, 2019) …........……………9

Biank v. Nat'l Bd. of Med. Examiners,
130 F. Supp. 2d 986, 988 (N.D. Ill. 2000) ……………………………………………8,30,49

Black v. Nat'l Bd. of Med. Examiners,
 281 F. Supp. 3d 1247, 1249-50 (S.D. Fla. 2017)……………………………………………8

Bocobo v. Radiology Consultants of South Jersey, P.A.,
2005 WL 3158053, at *3 (D.N.J. Nov. 21, 2005) ………………………………………51

Boggi v. Med. Rev. & Accrediting Council,
415 F. App'x 411, 414 (3d Cir. 2011) ……………………….............………………30,49

Bragdon v. Abbott,
524 U.S. 624, 631-632, 118 S. Ct. 2196, 2202, 141 L. Ed.2d 540, 553 (1998) ………....……15,32

Brill v. Guardian Life Ins. Co. of America,
142 N.J. 520, 540 (N.J. 1995) …………………………………….....................………45,46,50

Brooks v. Caswell,
No. 3:14-CV-01232-AC, 2016 WL 866303, at *3 (D. Or. Mar. 2, 2016) ………………………11

Burton v. Ghosh,
961 F.3d 960 (7th Cir. 2020) ………………….........................……………………11

Castleberry v. STI Grp. ,
863 F.3d 259, 266 (3d Cir. 2017) …………………………….........................……24,43

Chevron USA Inc. v. Echazabal,
536 U.S. 73, 122 S. Ct. 2045, 153 L. Ed. 2d 82 (2002) …………………..…………………… 32,48

Chevron USA Inc. v. Natural Resources Defense Council, Inc.,
467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984) ………………….………………32,47

Chrysler Corp. v. Brown,
441 U.S. 281, 302-303, 99 S. Ct. 1705, 60 L. Ed.2d 208 (1979) ………………..………………31

City of Las Cruces v. The Lofts at Alameda, LLC,
591 F. Supp. 3d 1038 (D.N.M. 2022) ………………......................………………………11

Clements v. Diamond State Port Corporation,
2004 WL 2223303, at *6 (D. Del. Sept. 30, 2004) ………………..……………………51

Cruzan v. Missouri Department of Health,
497 U.S. 261 (1990) …………………………….....................................……………… 34,38

Cty. of Suffolk v. Stone & Webster Eng'g Corp.,
106 F.3d 1112, 1117 (2d Cir. 1997) …………………………………….................………10

Currier v. National Board of Medical Examiners,
965 N.E.2d 829, 462 Mass. 1 (2012) ……………………………………...............……8,30,48

Davis v. Shah ,
821 F.3d 231, 260 (2d Cir. 2016) ……………………………….....................…………14

DiLoreto v. Borough of Oaklyn,
744 F. Supp. 610 (D.N.J. 1990) ……………………………………….....................……11

Dobbs v. Jackson Women's Health Organization,
142 S. Ct. 2228, 597 U.S., 213 L. Ed. 2d 545 (2022) ……………………………...……………34

Doe v. National Bd. of Med. Exam'rs,
199 F.3d 146, 154-155 (3d Cir. 1999) ………………………………….........……………8,22,38

Doe v. Perkiomen Valley Sch. Dist.,
585 F. Supp. 3d 668, 686 (E.D. Pa. 2022) ……………………………….…………………14,16,17

E.E.O.C. v. Kronos Inc.,
620 F.3d 287, 296 (3d Cir. 2010) …………………………….................……………………18,22

EF Operating Corp. v. American Bldgs.,
993 F.2d 1046, 1050 (3d Cir. 1993) cert. denied, 510 U.S. 868, 114 S.Ct. 193,
126 L.Ed.2d 151 (1993) ……………………………….......................................…………………51

English v. Dyke,
23 F.3d 1086, 1090-91 (6ᵗʰ Cir. 1994) ……………….....................………………………………11

Fowler v. UPMC Shadyside ,
578 F.3d 203, 213 (3d Cir. 2009) …………………………….................……………………4,25,43

Furgess v. Pa. Dep't of Corr.,
933 F.3d 285, 288-89 (3d Cir. 2019) ………………………….........…………………………13,14,43

Gelman v. State Farm Mut. Auto. Ins. Co.,
583 F.3d 187, 190 (3d Cir. 2009) ……………………………….....................…………………4

Glick v. White Motor Company,
458 F.2d 1287, 1291 (3d Cir. 1972) ……………………………….................………………51

Gonzales v. National Bd. of Medical Examiners,
 225 F.3d 620 (6th Cir. 2000) ……………………………………….....................………………8

Gonzalez v. National Bd. of Medical Examiners,
60 F. Supp. 2d 703 (E.D. Mich. 1999) ………………………….............………………8

Griggs v. Duke Power Co.,
401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) ……………………………………19,22

Grillo v. BA Mortgage, LLC,
2004 U.S. Dist. LEXIS 20347 at *9 (E.D. Pa. Oct. 4, 2004) ……………………………12

Henrietta D. v. Bloomberg,
331 F.3d 261, 272 (2d Cir. 2003) ……………….............…………………………………15

Hoxworth v. Blinder, Robinson Co.,
903 F.2d 186, 204-05 n. 29 (3d Cir. 1990) ……………….............……………………………44

In re Adoption of N.J.A.C. 7:26B,
128 N.J. 442, 449 (1992) …………………………………….............………………………48

In re ATI Tech., Inc. Sec. Litig.,
216 F.Supp.2d 418, 430 (E.D.Pa. 2002) …………………….............……………………44,46

 In re Burlington Coat Factory Sec. Litig.,
114 F.3d 1410, 1434 (3d Cir. 1997) …………………….............……………………12

In re Distribution of Liquid Assets Upon Dissolution of Union Cty. Reg. High Sch. Dist. No. 1,
168 N.J. 1, 11 (2001) ………………………………………………………………….………48

In re Election Law Enforcement Comm'n Advisory Op. No. 01-2008,
201 N.J. 254, 262 (2010) ………………………………………………………...…………48

In re N.J.A.C. 7:1B-1.1 et seq.,
No. A-3514-11 and A-4098-11(consol.), slip op. (N.J. App. Div. Mar. 21, 2013) ……………48

In re Petition of N.J. Am. Water Co.,
169 N.J. 181, 188 (2001) …………….............…………………………………….………48

In re Spring Ford Industries, Inc.,
2005 WL 984180, at *6 (Bankr. E.D. Pa. Apr. 19, 2005) …………………………………50

In re Tex. E. Transmission Corp. PCB Contamination Ins. Coverage Litig.,
15 F.3d 1230, 1236 (3d Cir. 1994) …………………………….............……………………6

In Re Viropharma, Inc.,
2003 WL 1824914 (E.D.Pa. 2003) …………………………………….......................45,46

In re: Asbestos Products Liability Litigation (No. VI),
No. 17-3471 (3d Cir. 2019) …………………………….....................…………6,7,8,9

Ins. Corp. of Ireland, Ltd.,
456 U.S. at 704–05………………………………….......................……………….8

Jacober v. St. Peter's Medical Center,
608 A.2d 304 (N.J. 1992) …………………….....................………………………55

Jenkins v. Nat'l Bd. of Med. Exam'rs, No. 08-5371,
2009 U.S. App. LEXIS 2660 (6th Cir. Feb. 11, 2009) …………………………………8

Jersey Cent. Power Light Co. v. Township of Lacey,
772 F.2d 1103, 1109-10 (3d Cir. 1985) ……………….................…………………………50

Jin Fuey Moy v. United States,
254 U.S. 189 (1920) …………………………………….......................……35,36,38
.
K.N. v. Gloucester City Board of Education,
379 F. Supp. 3d 334, 354-355 (D.N.J. 2019) ……………………….......……………………15

Katz v. Nat'l Bd. of Med. Exam'rs,
751 F. App'x 231 (3d Cir. 2018) ……………………………….....................…….8,15,23

Kramer v. Time Warner,
937 F.2d 767, 774 (2d Cir. 1991) ……………………….....................……………45,46

Kounelis v. Sherrer,
396 F. Supp. 2d 525, 529-30 (D.N.J. 2005) ……………………….......……………………12

Lanning v. Southeastern Pennsylvania Transp. Auth.,
181 F.3d 478 (3d Cir. 1999) …………………………………......................…………22

Leyse v. Bank of Am. Nat'l Ass'n,
804 F.3d 316, 320 (3d Cir. 2015) ……………………………….................……….9,10,11

Lim-bright v. Hofmeister,
2010 WL 1740905, *2 (E.D.Ky.2010) …………………………….................……………11

Love v. Law Sch. Admissions Council, Inc.,
513 F. Supp. 2d 206, 223 (E.D. Pa. 2007) ……………………………......…………30,44

Maggipinto v. Reichman,
607 F.2d 621 (3d Cir. 1979) …………………………….......................…………55

Mala v. Crown Bay Marina, Inc.,
704 F.3d 239, 245 (3d Cir. 2013) …………………....................……………………………4

Malleus v. George,
641 F.3d 560, 563 (3d Cir. 2011) …………………....................……………………………4

Martinez v. UPMC Susquehanna,
986 F.3d 261, 266 (3d Cir. 2021) …………………………....................……………………25,42,43

Moore v. East Cleveland,
431 U.S. 494, 503 (1977) …………………………….....................................………………38

Mullin v. Balicki,
875 F.3d 140, 157 n.63 (3d Cir. 2017) ……………………….....................……………………10

N.J. Ass'n of Sch. Adm'rs v. Schundler,
211 N.J. 535, 549 (2012) ……………………………….....................................……………48

N.J. Guild of Hearing Aid Dispensers v. Long,
75 N.J. 544, 561 (1978) …………………………….....................................……………48

N.J. Soc'y for Prevention of Cruelty to Animals v. N.J. Dep't of Agric.,
196 N.J. 366, 385 (2008) ……………………………….....................................……………48

Newark v. Natural Res. Council,
82 N.J. 530, 539-40, cert. denied, 449 U.S. 983, 101 S. Ct. 400,
66 L. Ed. 2d 245 (1980) ……………………….....................................……………48

Okpor v. Ocasio,
Civil No. 05-5313(RMB), 7 (D.N.J. Aug. 24, 2006) …………………………………...……12,56

Olmstead v. L.C. ex rel. Zimring,
527 U.S. 581, 597-598, 119 S. Ct. 2176, 2185-2186, 144  L. Ed.2d 540 (1999) ………………32

Or. Natural Desert Ass'n v. U.S. Forest Serv.,
550 F.3d 778, 785 (9th Cir. 2008) ……………………….....................……………………………3

Oran v. Stafford,
226 F.3d 275, 289 (3d Cir. 2000) ……………………….....................……………………………44,46

Pascal v. Concentra, Inc.,
Case No. 19-cv-02559-JCS (N.D. Cal. Aug. 21, 2020) …………………………………………11

Payan v. Los Angeles Cmty. Coll. Dist. ,
11 F.4th 729, 738 (9th Cir. 2021) ………………………………….....................……………14

PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.,
139 S. Ct. 2051, 2055, 204 L. Ed.2d 433 (2019) ………………………..………………………31

Petrowski v. Hawkeye Security Ins. Co.,
350 U.S. 495, 496 (1956) ……………………….....................................……………………8

Phillips v. Cty. of Allegheny ,
515 F.3d 224, 234 (3d Cir. 2008) ……………………………….....................…………25,43

Powell v. National Bd. of Medical Examiners ,
364 F.3d 79 (2d Cir. 2004) …………………………………….....................................……8

Price v. National Bd. of Medical Examiners,
966 F. Supp. 419 (S.D.W. Va. 1997) ………………………………….............…………9,30,49

Puntolillo v.New Hampshire Racing Comm'n,
375 F. Supp. 1089 (D.N.H. 1974) ……………………………….......................…………39

Ramsay v. Nat'l Bd. of Med. Examiners, 968 F.3d 251, 256 (3d Cir. 2020) cert. denied,
141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021)…....................................……8,15,17,26,30,32,49

Ramsay v. Nat'l Bd. of Med. Examiners,
CIVIL ACTION NO. 19-CV-2002, 20 n.6 (E.D. Pa. Dec. 30, 2019) ……..………………15,17

Rawdin v. Am. Bd. of Pediatrics
582 F. App'x 114 (3d Cir. 2014) ……………………….....................…….……………29

Raytheon Co. v. Hernandez,
540 U.S. 44, 124 S. Ct. 513, 157 L. Ed. 2d 357 (2003) ……………………………16,17,18,22

Regents of Univ. of California v. Triple S Steel Holdings Inc.,
No. SACV161408DOCFFMX, 2016 WL 11002545, at *2 (C.D. Cal. Nov. 1, 2016) …………11

Ricci v. DeStefano,
557 U.S. 557, 129 S. Ct. 2658, 174 L. Ed. 2d 490 (2009) …....................13,18,19,20,21,5,31,41

Rochin v. California,
342 U. S. 165 (1952) …………………….....................................…………………33,34,37,38

Rowley v. McMillan ,
502 F.2d 1326, 1333 (4th Cir. 1974) ……………………….................………………………11

Rush v. National Board of Medical Examiners,
268 F. Supp.2d 673 (N.D. Tex. 2003) …………………….....................……………………9

Scheibe v. Nat'l Bd. of Med. Examiners,
Civ. A. No. 05-180, 2005 WL 1114497, at *3 (W.D. Wis. May 10, 2005) ……...…………9,30,49

Schreane v. Seana,
506 F. App'x 120, 122 (3d Cir. 2012) …………………………….............……………… 4,6

Sciore v. Phung,
No. 19-13775, 2022 WL950261, at *17 (D.N.J. Mar. 30, 2022) ……………………………7

Sears Petroleum & Transport Corp. v. Ice Ban Am., Inc.,
217 F.R.D. 305, 307 (N.D.N.Y. 2003) ……………………………….............…………11

Shane v. Fauver,
213 F.3d 113, 115 (3d Cir. 2000) …………………………………….......................……12

Skidmore v. Swift & Co.,
323 U.S. 134, 139-140, 65 S. Ct. 161, 89 L. Ed.2d 124 (1944) …………...…………………30

Skinner v. Oklahoma ex rel. Williamson,
316 U. S. 535 (1942) …………………………….............……………………………33,37

Smith v. Borow,
No. 3: 19-cv-08553-GC-TJB (D.N.J. May 13, 2022) …………………………………4,5

Swierkiewicz v. Sorema N.A. ,
534 U.S. 506, 508, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ……………………………23,24,42,43

Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.,
576 U.S. 519 (2015) ……………………………………….............…………………13

Townsend Farms v. Goknur Gida A.S.,
No. SACV150837DOCJCGX, 2016 WL 10570248, at *6 (C.D. Cal. Aug. 17, 2016) …………11

U.S. v. Boggi,
74 F.3d 470, 478 (3d Cir. 1996) …....................……………………………………44

United States v. Butler,
496 F.Appx 158, 160-161 (3d Cir. 2012) ……………….............………………………51

United States v. Doremus,
249 U.S. 86 (1919) ……………………………………………………………………35

United States v. Moore,
423 U.S. 122 (1975) ………………………………….............................…………36,38

<u>Veizaga v. National Bd. for Respiratory Therapy,</u>
21 Fair Empl. Prac. Cas. 246 (N.D. IlM. 1977) ……………...…………………………39

<u>Versarge v. Township of Clinton N.J.,</u>
984 F.2d 1359, 1370 (3d Cir. 1993) ……………………...………....……………………50

<u>Washington v. Glucksberg,</u>
521 U.S. 702, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997) …………………………...……34,38

<u>Washington v. Harper,</u>
494 U. S. 210, 229, 236 (1990) …………………….....……....……………………33,34,37,38

<u>Winston v. Lee,</u>
470 U. S. 753, 766–767 (1985) …………………….....................……....……………33,37

<u>Wright v. Holbrook,</u>
794 F.2d 1152, 1156 (3d Cir. 1986) …………………….....……....……………………44

<u>Wright v. NBME,</u>
2021WL 5028463, *9 (D. Colo. 2021) …………………....…………………………………8

<u>Yeldell v. Tutt,</u>
913 F.2d 533, 539 (8th Cir. 1990) …………………….....……....……………………8

<u>Zangara v. Nat'l Bd. of Med. Examiners,</u>
Civil Action 22-1559 (D.N.J. Apr. 6, 2023) …………….....…………………………1,2,6,7

<u>Zangara v. Nat'l Bd. of Med. Examiners,</u>
Civil Action 22-1559 (D.N.J. Jul. 21, 2023) ………………………………….......………6,7

**<u>Rules</u>**

Fed. R. Civ.P. 8(a)(1) …………….....……………………………………………………5

Fed.R.Civ.P. 8(a)(2) …………….....……………………………………………………5

Fed.R.Civ.P. 8(c) …………….....……………………………………………......………11

Fed.R.Civ.P. 8(d) ……...…....……………………….....………………………………5

Fed.R.Civ.P. 12(b)(6) …...…………………………………………………4,6,10,12,18,5,46

Fed.R.Civ.P. 12(g)(2) …...…………………………………………………………10,11

Fed.R.Civ.P. 12(h) …...…………………………………………………………….......…10,11

Fed. R. Ev. Rule 201 …….……………………………………………………......52

Fed. R. Ev. Rule 401 ……………………………………………………..………52

Fed. R. Ev. Rule 402 ………………………………………………….…....…52

Fed. R. Ev. Rule 403 …………………………………………………………53

Fed. R. Ev. Rule 801…………………………………………………..…………53

Fed. R. Ev. Rule 803 ………………………………………….………………52

Fed. R. Ev. Rule 820 …………………………………………...…...……53

Fed. R. Ev. Rule 901 …………………………………………...……………52

Fed. R. Ev. Rule 902…………………………………………....…………52

Fed. R. Ev. Rule 1002 ……………………………………………...……………53

Fed. R. Ev. Rule 1004 ……………………………………...…...……………53

Rules of Professional Conduct Rule 3.3 …….…..................………...…………2,9,10,47

Rules of Professional Conduct Rule 3.7…………………………………………52

**Statutes**

28 U.S.C. § 1915(e)(2)(B) ……………………………………...……………4

28 U.S.C. § 1915(e)(2)(B)(ii) ……………………………………………4,6

28 U.S.C. § 1927………………………………………………..........…...56

29 U.S.C. § 794(d) ………………………………..………………17

42 U.S.C. § 12112(b) …………………………………...…………17

42 U.S.C. § 12112(b)(6) ……………………………………17

42 U.S.C. § 12112(b)(7) ……………………………………17

42 U.S.C. § 12132 ………………………………...…………14

42 U.S.C. §12189 …………………………………………15,23,30,49

42 U.S.C. § 2000e-2(k)(1)(A)(i) ...……………………………………...……18,25

Controlled Substances Act (CSA or Act), 84 Stat. 1242, 21 U.S.C. § 801 et seq., ..……………36

The Narcotic Drug Act of December 17, 1914, c. 1, 38 Stat. 785, § 1. ..…………………….35,36

## Regulations

28 CFR § 36.105...…………………………………………......…………………13,43

28 CFR § 36.202...…………………………………………….......……………………14

28 CFR § 36.301 ...……………………………………………......……………………16

28 CFR § 36.309 ...……………………………….............………15,16,28,29,32,47

28 CFR § 36.309(b)(1)(i) ...…………………………………………….……………23

29 CFR § 1607.4(D) (2008) ...………………………………………….…………21,41

N.J. Admin. Code § 13:13-4.5 ...…………………………………………...……………47

## Publications

5A C. Wright & A. Miller Federal Practice and Procedure § 1388 at p. 736 (2d ed. 1990)...………………………………………….............…………………………11

5C Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1388 (3d ed.2004)...... ...………………………………......................…………………………11

Borowitz, S. M., Saulsbury, F. T., & Wilson, W. G. (2000). Information collected during the residency match process does not predict clinical performance. Archives of pediatrics & adolescent medicine, 154(3), 256-260. ...…………………….……………………………19

Burkhardt, J. C., Parekh, K. P., Gallahue, F. E., London, K. S., Edens, M. A., Humbert, A. J., ... & Hopson, L. R. (2020). A critical disconnect: Residency selection factors lack correlation with intern performance. *Journal of graduate medical education*, *12*(6), 696-704. ..………………19

Heisler, E. J., Panangala, S. V., Mendez, B. H., Villagrana, M. A., & Mitchell, A. (2018). Federal Support for Graduate Medical Education: An Overview. CRS Report R44376, Version 9. Updated. Congressional Research Service. ...………………………………….....…………22,37,39

Henry H. Perritt Jr., Americans with Disabilities Act Handbook § 1.02 (5th ed. 2018) ..………14

Mead, J. W. (2011). Stare decisis in the inferior courts of the United States. Nev. LJ, 12, 787.

Miller, B., Dewar, S. B., & Nowalk, A. (2019). Lack of Correlation Between USMLE Scores and Performance in Pediatrics Residency Training Based on ACGME Milestones Ratings Academic Pediatrics, 19(6), e34.....……………………………………………………………….......……3

Morrison, C., Ross, L., Baker, G., & Maranki, M. (2019). Implementing a New Score Scale for the Clinical Science Subject Examinations: Validity and Practical Considerations. Medical science educator, 29(3), 841–847. https://doi.org/10.1007/s40670-019-00747-9..……..………53

Petersen, K. H., Jain, N. R., Case, B., Jain, S., & Meeks, L. M. (2022). Impact of USMLE Step-1 accommodation denial on US medical schools: A national survey. PloS one, 17(4), e0266685. https://doi.org/10.1371/journal.pone.0266685..……………………………………………21,22,41

Sajadi-Ernazarova, K., Ramoska, E. A., & Saks, M. A. (2020). USMLE Scores Do Not Predict the Clinical Performance of Emergency Medicine Residents. Mediterranean Journal of Emergency Medicine & Acute Care, 1(2) ..……………………………….......……………………19

Three controversies over item disclosure in medical licensure examinations" Park, Y. S., & Yang, E. B. (2015). Three controversies over item disclosure in medical licensure examinations. Medical education online, 20(1), 28821..…………………………………………………………26

Udawatta, M., Preet, K., Lagman, C., French, A. M., Bruton, C., Bergsneider, M., ... & Yang, I. (2020). United States Medical Licensing Examination Step 2 scores do not predict American Board of Neurological Surgery scores: a single-institution experience. Journal of the Neurological Sciences, 408, 116556..……………………………………………….......……19

Violato, C. A Brief History of the Regulation of Medical Practice: Hammurabi to the National Board of Medical Examiners (2016) ..……………………………………………………34,35,37

## References

http://centennial.fsmb.org/medical-licensure-prior-1900.html..……………………………35

https://www.justice.gov/sites/default/files/crt/legacy/2014/03/19/rawdinbrief.pdf..………29,31

United States Medical Licensing Examination | Performance Data [Internet]. [cited 2023 Jul 22].

https://www.usmle.org/performance-data [Ref list] ..…………………………………………41

**Introduction & Background**

As the court found in its April 6, 2023 opinion:

Plaintiff, a current medical student, alleges that Defendant NBME is not complying with the requirements of the ADA because of the manner in which several required medical exams are scored. (*Id.*) More specifically, Plaintiff asserts that the exams offered by NBME, such as the Comprehensive Basic Science Exam ("CBSE"), are "discriminatory against [Plaintiff] and others because [the exams] do not give [medical students] a fair chance to provide that [they] are competent in what [the students] are being tested on." (*Id.*) The Complaint ultimately requests that the Court enjoin Defendant from grading any of Plaintiff's exams, or the exams of others who have disabilities "on a curve and deciding passing or failing based on comparing [Plaintiff] to others." (*Id.* at 6.) Plaintiff further requests that all exams that he has already taken and will take in the future be "evaluated [on their] own merit to determine if [Plaintiff] meet[s] the objective requirements to practice medicine, not where [Plaintiff] stand[s] compar[ed] to other test takers." (*Id.*)…..

Zangara v. Nat'l Bd. of Med. Examiners, Civil Action 22-1559, 3-4 (D.N.J. Apr. 6, 2023)

This action is based upon all of the examinations required to obtain licensure as a physician including the USMLE Steps 1, 2 &3 and all subject examinations offered by Defendants. The next examination Plaintiff needs to pass to continue his medical education is the Comprehensive Basic Science Examination (CBSE). This brief, Plaintiffs arguments and Complaint should not be construed to only apply to the CBSE. As the CBSE scoring process is a bit complicated, Plaintiffs copies the court's interpretation of his accusations. His allegations of the scoring process for the other exams (such as the subject examinations and the USMLE Steps) are noted throughout the brief and the complaint.

…..Plaintiff asserts that Defendant, and not his medical school, have set the "low pass" score for the CBSE as 62 to 68. (API, 6.) Plaintiff alleges:

Therefore in order to "Pass" CBSE, as required by his school[,] Plaintiff must score a 62 "corresponding to Step 1 Performance starting at the passing standard plus 2 standard errors of measurement[.]" (*See* [Pl.'s Cert.] at 24[.]) As stated on the CBSE Plaintiff took on March 27, 2022, Plaintiff['s] score is shown "along with a range that corresponds to low passing[.]" (*See* [Pl.'s Cert.] at 23[.]) His score is "corresponding to Step 1 Performance starting at the passing standard plus 2 standard errors of measurement[.]" (*See* [Pl.'s Cert.] at 24[.]) Plaintiff['s] exam results specified that the "performance of a 2020 national cohort of students" was utilized to estimate his "probability of passing step

l within a week[.]" (*See* [Pl.'s Cert.] at 23[.]) Therefore in order to obtain the passing score of 62 set by Defendants (*See* [Pl.'s Cert.] at 24) and required by his school (*See* [Pl.'s Cert.] at 19) he must score a 62 in the range on the "equated percent scale" which "represents CBSE scores corresponding to Step l Performance starting at the passing standard plus 2 standard errors of measurement[.]" (*See* [Pl.'s Cert.] at 24). The data utilized to "convert" the "equated percent correct" however is not public knowledge for the CBSE as stated by Defendants[.] (*See* [Pl.'s Cert.] at 24[.]) This requires a "table" in which Schools are prohibited from sharing with students[.] (*See* [Pl.'s Cert.] at 24) The CBSE does not grade on the objective standard to test if someone is qualified to safely treat patients, but a "low pass" in a "range" "from 62 to 68" that is "corresponding to Step 1 Performance starting at the passing standard plus 2 standard errors of measurement[.]" (See [Pl.'s Cert.] at 24)[.](API, 7.)

<u>Zangara v. Nat'l Bd. of Med. Examiners</u>, Civil Action 22-1559, 3-4 (D.N.J. Apr. 6, 2023)

## <u>Argument</u>

### I. Defendants Refuse to Acknowledge the Doctrine of *"stare decisis"*

Defendants in their arguments refuse to adhere to and acknowledge the well-established doctrine of *"stare decisis"* in their moving brief. "Stare Decisis" is a doctrine in which prior cases are used to decide matters that have already been decided. It would be impossible for a judge to be required to "know" (and unreasonable to require a judge to "know") every case of every area of law. Therefore, the courts rely on the "trust" of the attorneys as officers of the court to brief them on the precedential and applicable cases to assist them in making their rulings.

However, in this matter these cases are being omitted and not cited for what their "holdings" actually are. "Persuasive" or "Non Precedential" cases from other jurisdictions are being used by Defendants Attorney[1] on their behalf for tactical reasons instead of conceding to, acknowledging and utilizing the Precedential cases in this circuit. As this court is aware it is

---

[1] Plaintiff references to Defendants attorney directly since this has nothing to do with the Defendants themselves. The Rules of Professional Conduct from the American Bar Association and the New Jersey Bar Association (which are required to be followed when practicing law before this court), impose the obligation on Mr. Mandelsberg **personally** (**not his clients**) to inform the court of the correct & controlling cases that apply to this matter. This is true even if it jeopardizes their legal defense. Mr. Mandelsberg is an officer of the court and those obligations supersede any owed to a client. <u>See</u> Rule of Professional Conduct Rule 3.3 Candor Toward The Tribunal- [4] *"Legal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal. A lawyer…must recognize…. pertinent legal authorities. Furthermore, as stated in paragraph (a)(2),  an advocate has a duty to disclose directly adverse authority in the controlling jurisdiction"*

unacceptable for Defendants to use persuasive cases from another jurisdiction if the courts of this circuit have already decided a matter to be binding on the lower courts.

As the Third Circuit explains the different types of opinions in their Internal Operating Procedures:

**CHAPTER 5.   OPINIONS**

**5.1   Forms of Opinions.**

There are two forms of opinions: precedential and not precedential.  A majority of the panel determines whether an opinion is designated as precedential or not precedential, unless a majority of the active judges of the court decides otherwise. The face of an opinion states whether it is precedential or not precedential.

**5.2   Precedential Opinions.**

An opinion, whether signed or per curiam, is designated as precedential when it has precedential or institutional value. Precedential opinions are posted on the court's internet website.

**5.3   Not Precedential Opinions.**

An opinion, whether signed or per curiam, that appears to have value only to the trial court or the parties is designated as not precedential and unless otherwise provided by the court, it is posted on the court's internet website. A not precedential opinion may be issued without regard to whether the panel=s decision is unanimous and without regard to whether the panel affirms, reverses, or grants other relief. The first page of a not precedential opinion contains a footnote stating: "This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent."

*"No matter how sympathetic the party or how clever the lawyer, most litigation is resolved by stare decisis, where the decisions of the past control the future. Generally, courts apply stare decisis in one of two ways. First, courts apply governing precedent by adopting the same legal position as the court previously adopted in an earlier case (horizontal stare decisis). Alternatively, courts also apply decisions of higher courts with supervisory jurisdiction (vertical stare decisis).[2]……. See Or. Natural Desert Ass'n v. U.S. Forest Serv., 550 F.3d 778, 785 (9th Cir. 2008) ("As every first-year law student knows, the doctrine of stare decisis is often the determining factor in deciding cases brought before any court.")*

---

[2] Mead, J. W. (2011). Stare decisis in the inferior courts of the United States. Nev. LJ, 12, 787.

Therefore, Plaintiff respectfully requests this court utilize this doctrine and recognize the controlling legal authorities  and precedential cases in this matter despite Defendants objections.

## II . Plaintiffs Allegations Were Already Allowed by the Court

Defendants have brought motion to dismiss Plaintiffs claims pursuant to Rule 12(b) alleging that they are without merit. Plaintiff has applied for and has been granted permission to proceed  In Forma Pauperis <u>and</u> his original complaint was ordered to be filed (dk#5) The presiding judge of the matter at the time,  Hon  Georgette Castner effectively analyzed the complaint for deficiencies as she has done in the past for multiple other cases before making her decision. As Judge Castner explained in <u>Smith v. Borow</u>, No. 3: 19-cv-08553-GC-TJB (D.N.J. May 13, 2022).

"As noted in the September 10, 2020 decision granting Plaintiff's in forma pauperis application, the Court is required "to screen Smith's Complaint pursuant to 28 U.S.C. § 1915(e)(2)(B)." (ECF No. 4 at 2-3.) "The legal standard for dismissing a complaint for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) is the same as that for dismissing a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6)." <u>Schreane v. Seana</u>, 506 F. App'x 120, 122 (3d Cir. 2012).

When considering a Rule 12(b)(6) motion, a district court conducts a three-part analysis. <u>Malleus v. George</u>, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must `tak[e] note of the elements a plaintiff must plead to state a claim.'" Id. (quoting <u>Ashcroft        v. Iqbal</u>, 556 U.S. 662, 675). "Second, the court should identify allegations that, `because they are no more than conclusions, are not entitled to the assumption of truth.'" Id. (quoting Iqbal, 556 U.S. at 679). The court must accept as true all well- pleaded factual allegations and construe the complaint in the light most favorable to the plaintiff. <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted).

Third, the court must determine whether the well-pleaded facts "plausibly give rise to an entitlement for relief." Malleus, 641 F.3d at 563 (quoting Iqbal, 556 U.S. at 679); see also Fowler, 578 F.3d at 211. A complaint that does not demonstrate more than a "mere possibility of misconduct" must be dismissed. <u>Gelman v. State Farm Mut. Auto.   Ins. Co.</u>, 583 F.3d 187, 190 (3d Cir. 2009) (quoting Iqbal, 556 U.S. at 679). Although courts construe pro se pleadings less stringently than formal pleadings drafted by attorneys, pro se litigants are still required to "allege sufficient facts in their complaints to support a claim." <u>Mala v. Crown Bay Marina, Inc.</u>, 704 F.3d 239, 245 (3d Cir. 2013) (citation omitted).

Federal Rule of Civil Procedure 8 sets forth general rules of pleading, and requires (1) "a short and plain statement of the grounds for the court's jurisdiction," (2) "a short and plain statement of the claim showing that the pleader is entitled to relief," and (3) allegations that are

"simple, concise, and direct." Fed. R. Civ. P. 8(a)(1); 8(a)(2); 8(d)" in <u>Smith v. Borow</u>, No. 3:
19-cv-08553-GC-TJB (D.N.J. May 13, 2022). (<u>See</u> Exhibit B).


Defendants have admitted the "amended complaint is based on the same premise"

## **INTRODUCTION**

Plaintiff Jason Zangara ("Mr. Zangara") filed this pro se lawsuit against the

National Board of Medical Examiners ("NBME") in March 2022, alleging that

NBME violated the Americans with Disabilities Act ("ADA") by grading exams on

a curve that compared his performance to a group of people who previously took the

examination and "automatically drop[ping] out the lowest percentiles." Complaint

and Request for Injunction (Dkt. 1) at 5.

Mr. Zangara's claims in his amended Complaint are based on essentially the

same premise, but are now spread over a 184-page, 836-paragraph pleading with 86

As the court found in its April 6, 2023 opinion:

Plaintiff, a current medical student, alleges that Defendant NBME is not complying with the requirements of the ADA because of the manner in which several required medical exams are scored. (*Id.*) More specifically, Plaintiff asserts that the exams offered by NBME, such as the Comprehensive Basic Science Exam ("CBSE"), are "discriminatory against [Plaintiff] and others because [the exams] do not give [medical students] a fair chance to provide that [they] are competent in what [the students] are being tested on." (*Id.*) The Complaint ultimately requests that the Court enjoin Defendant from grading any of Plaintiff's exams, or the exams of others who have disabilities "on a curve and deciding passing or failing based on comparing [Plaintiff] to others." (*Id.* at 6.) Plaintiff further requests that all exams that he has already taken and will take in the future be "evaluated [on their] own merit to determine if [Plaintiff] meet[s] the objective requirements to practice medicine, not where [Plaintiff] stand[s] compar[ed] to other test takers." (*Id.*).....

.....Plaintiff asserts that Defendant, and not his medical school, have set the "low pass" score for

the CBSE as 62 to 68. (API, 6.) Plaintiff alleges:

Therefore in order to "Pass" CBSE, as required by his school[,] Plaintiff must score a 62 "corresponding to Step 1 Performance starting at the passing standard plus 2 standard errors of

measurement[.]" (*See* [Pl.'s Cert.] at 24[.]) As stated on the CBSE Plaintiff took on March 27, 2022, Plaintiff[']s score is shown "along with a range that corresponds to low passing[.]" (*See* [Pl.'s Cert.] at 23[.]) His score is "corresponding to Step l Performance starting at the passing standard plus 2 standard errors of measurement[.]" (*See* [Pl.'s Cert.] at 24[.]) Plaintiff[']s exam results specified that the "performance of a 2020 national cohort of students" was utilized to estimate his "probability of passing step l within a week[.]" (*See* [Pl.'s Cert.] at 23[.]) Therefore in order to obtain the passing score of 62 set by Defendants (*See* [Pl.'s Cert.] at 24) and required by his school (*See* [Pl.'s Cert.] at 19) he must score a 62 in the range on the "equated percent scale" which "represents CBSE scores corresponding to Step l Performance starting at the passing standard plus 2 standard errors of measurement[.]" (*See* [Pl.'s Cert.] at 24. The data utilized to "convert" the "equated percent correct" however is not public knowledge for the CBSE as stated by Defendants[.] (*See* [Pl.'s Cert.] at 24[.]) This requires a "table" in which Schools are prohibited from sharing with students[.] (*See* [Pl.'s Cert.] at 24) The CBSE does not grade on the objective standard to test if someone is qualified to safely treat patients, but a "low pass" in a "range" "from 62 to 68" that is "corresponding to Step 1 Performance starting at the passing standard plus 2 standard errors of measurement[.]" (See [Pl.'s Cert.] at 24)[.](API, 7.) <u>Zangara v. Nat'l Bd. of Med. Examiners</u>, Civil Action 22-1559, 3-4 (D.N.J. Apr. 6, 2023)

Since the amended complaint is based on the same thing as the original complaint and

"The legal standard for dismissing a complaint for failure to state a claim pursuant to 28 U.S.C. §

1915(e)(2)(B)(ii) is the same as that for dismissing a complaint pursuant to Federal Rule of Civil

Procedure 12(b)(6)." <u>Schreane v. Seana</u>, 506 F. App'x 120, 122 (3d Cir. 2012),  Plaintiffs

Complaint and allegations have already survived a motion to dismiss.

### III. Jurisdiction – Defendants Arguments are Barred by the Holding in<br><u>In re: Asbestos Products Liability Litigation (No. VI)</u>, No. 17-3471 (3d Cir. 2019)

"As this Court has explained, "a party is deemed to have consented to personal

jurisdiction if the party actually litigates the underlying merits or demonstrates a willingness to

engage in extensive litigation in the forum." <u>In re Tex. E. Transmission Corp. PCB</u>

<u>Contamination Ins. Coverage Litig</u>., 15 F.3d 1230, 1236 (3d Cir. 1994). "<u>In re: Asbestos Products</u>

<u>Liability Litigation (No. VI)</u>, No. 17-3471 (3d Cir. 2019):

"On September 26, 2022, Plaintiff filed a motion for a preliminary injunction seeking relief identical to what he sought in his Complaint...On October 17, 2022, Defendant opposed the motion, arguing against the merits of Plaintiffs injunction request " <u>Zangara v. Nat'l Bd. of Med.</u> <u>Examiners</u>, Civil Action 22-1559 (D.N.J. Jul. 21, 2023)

("Defendant alleges that an examinee's score on the CBSE is based on the number of correct answers they provide on the exam and are not based on a comparison of how the examinee performed compared to other examinees. (Id. at ¶ 10.) Contrary to Plaintiff's allegations, Defendant alleges that the CBSE and other NBME examinations are not scored on a curve. (Id. at¶ 11.)" <u>Zangara v. Nat'l Bd. of Med. Examiners</u>, Civil Action 22-1559 (D.N.J. Apr. 6, 2023))

"On April 7, 2023, Plaintiff filed the subject motion for reconsideration and/or to transfer the case to the Eastern District of Pennsylvania where Defendant is headquartered. (ECF No. 42.) " <u>Zangara v. Nat'l Bd. of Med. Examiners</u>, Civil Action 22-1559 (D.N.J. Jul. 21, 2023)

"Defendants opposed transfer to the [Eastern District of Pennsylvania]  Court but did not raise a personal jurisdiction defense in their opposition papers." <u>In re: Asbestos Products Liability Litigation (No. VI)</u>, No. 17-3471 (3d Cir. 2019):

"Defendant initially failed to respond, and on July 11, 2023, the Court ordered Defendant to file any opposition to Plaintiffs motion by July 14, 2023. (ECF No. 47.) On July 14, 2023, Defendant filed a brief submission opposing reconsideration and transfer. (ECF No. 48.)" <u>Zangara v. Nat'l Bd. of Med. Examiners</u>, Civil Action 22-1559 (D.N.J. Jul. 21, 2023)

"In particular, where a party seeks affirmative relief from a court, it normally submits itself to the jurisdiction of the court with respect to the adjudication of claims arising from the same subject matter." <u>Bel-Ray Co. v. Chemrite (Pty) Ltd.</u>, 181 F.3d 435, 443 (3d Cir. 1999) (citing <u>Adam v. Saenger</u>, 303 U.S. 59, 67 (1938))." <u>In re: Asbestos Products Liability Litigation (No. VI)</u>, No. 17-3471 (3d Cir. 2019):

"Plaintiff has already wasted the time, energy, and money of NBME by asserting meritless claims in this action. Now, his proposed amended complaint is a 184-page, 836-paragraph pleading with 86 separate counts. (Dkt. 38-3) "[D]ismissal in lieu of transfer best serves 'the interests of justice' where it is clear that transfer would be 'a futile waste of judicial and party resources.'" Sciore v. Phung, No. 19-13775, 2022 WL950261, at *17 (D.N.J. Mar. 30, 2022)" (Document 48 page 2 filed 7/14/2023)

"[P]ersonal jurisdiction may be conferred by consent of the parties, expressly or by failure to object." (citing Petrowski v. Hawkeye Security Ins. Co., 350 U.S. 495, 496 (1956))). Simply put, "[t]he actions of the defendant may amount to a legal submission to the jurisdiction of the court" even where a defendant has raised the defense. Ins. Corp. of Ireland, Ltd., 456 U.S. at 704–05; see also Yeldell v. Tutt, 913 F.2d 533, 539 (8th Cir. 1990)....... In re: Asbestos Products Liability Litigation (No. VI), No. 17-3471 (3d Cir. 2019) See **In re: Asbestos Products Liability Litigation (No. VI), No. 17-3471 (3d Cir. 2019)** (**Holding that behavior consistent with waiver, and which indicates an intent to litigate the case on the merits, is sufficient to constitute waiver, regardless of whether the parties also express a contrary intent in writing. As the Third Circuit succinctly explained, "[t]he law is clear that words alone are insufficient to preserve a personal jurisdiction defense where conduct indicates waiver**.")

Plaintiff has shown directly in the complaint that Defendants have multiple business contacts and all of the other courts did not dismiss any other action on the grounds of lack of jurisdiction naming the actual cases (See Ramsay v. Nat'l Bd. of Med. Examiners, 968 F.3d 251, 256 (3d Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021); Doe v. National Bd. of Med. Exam'rs, 199 F.3d 146, 154-155 (3d Cir. 1999); Katz v. Nat'l Bd. of Med. Exam'rs, 751 F. App'x 231 (3d Cir. 2018); Powell v. National Bd. of Medical Examiners , 364 F.3d 79 (2d Cir. 2004);  Jenkins v. Nat'l Bd. of Med. Exam'rs, No. 08-5371, 2009 U.S. App. LEXIS 2660 (6th Cir. Feb. 11, 2009); Gonzales v. National Bd. of Medical Examiners, 225 F.3d 620 (6th Cir. 2000); Biank v. Nat'l Bd. of Med. Examiners, 130 F. Supp. 2d 986, 988 (N.D. Ill. 2000) ; Currier v. National Board of Medical Examiners, 965 N.E.2d 829, 462 Mass. 1 (2012) ; Gonzalez v. National Bd. of Medical Examiners, 60 F. Supp. 2d 703 (E.D. Mich. 1999); Wright v. NBME, 2021WL 5028463, *9 (D. Colo. 2021); Black v. Nat'l Bd. of Med. Examiners, 281 F. Supp. 3d

1247, 1249-50 (S.D. Fla. 2017); <u>Berger v. Nat'l Bd. of Med. Exam'rs</u>, No. 1:19-cv-99, 2019 U.S. Dist. LEXIS 145666 (S.D. Ohio Aug. 27, 2019); <u>Price v. National Bd. of Medical Examiners</u>, 966 F. Supp. 419 (S.D.W. Va. 1997); <u>Rush v. National Board of Medical Examiners</u>, 268 F. Supp.2d 673 (N.D. Tex. 2003); <u>Scheibe v. Nat'l Bd. of Med. Examiners</u>, Civ. A. No. 05-180, 2005 WL 1114497, at *3 (W.D. Wis. May 10, 2005). Plaintiff has stated multiple times over and over again that Defendants have waived their "Personal Jurisdiction defense". Again, by arguing the merits of this case, they have continued to waive that argument.

Defendants should have opposed both applications for a preliminary injunction in this matter solely on the grounds of jurisdiction and stopped, not continuing to argue the merits. They should have filed a motion based on Rule 12 solely on the grounds of lack of jurisdiction and asked the court to rule before the answering first injunction (waiving one chance) and before answering this injunction application (waiving a second chance).

Therefore, their arguments are barred by vertical *stare decisis* as the holding of <u>In re: Asbestos Products Liability Litigation (No. VI)</u>, No. 17-3471 (3d Cir. 2019) has already decided this matter[3] unless they produce a case overruling this one.

### IV. Successive Motions to Dismiss – Defendants Motion is Barred by the Holding in <u>Leyse v. Bank of Am. Nat'l Ass'n</u>, 804 F.3d 316, 320 (3d Cir. 2015)

Defendants have claimed that *"Mr. Zangara's claims in his amended Complaint are based on essentially the same premise"* (Defendants brief page 1) as such they have already made a motion to dismiss on the same grounds in a prior motion to dismiss (dk#12) That motion was raised on the same grounds "the court lacks jurisdiction and the allegations are

---

[3] Mr. Mandelsberg is aware of this case but refuses to acknowledge it, as it is his responsibility personally not his clients. <u>See</u> Rule 3.3 Candor Toward The Tribunal- [4] *"Legal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal. A lawyer…must recognize…. pertinent legal authorities. Furthermore, as stated in paragraph (a)(2), an advocate has a duty to disclose directly adverse authority in the controlling jurisdiction"*

conclusionary" (dk#12). They are therefore barred from filing a second motion to dismiss on

*"the same premise"* by Rule 12(h)(2) by vertical *stare decisis* as the holding of <u>Leyse v. Bank of

Am. Nat'l Ass'n</u>, 804 F.3d 316, 320 (3d Cir. 2015) **(Holding that the District Court of New**

**Jersey erred under Rule 12 by allowing a defendant to file successive motions to dismiss)**

has already decided this matter[4] unless they produce a case overruling this one.

### V. The Application of <u>Leyse v. Bank of Am. Nat'l Ass'n</u>, 804 F.3d 316, 320 (3d Cir. 2015) & Rule 12(h)(2) to the filing of an Amended Complaint

Defendants have already made a motion pursuant to 12(b)(6) (DK#12) **and** they did not

submit one to oppose the filing of the amended complaint therefore, they **cannot** make another

one. In addition to this, they did not oppose the filing of the amended complaint as stated on the

second page of their response brief:

*"Nevertheless given Mr. Zangara's pro se status, NBME does not oppose his motion for leave to amend"*

"[A]any challenges relating to those decisions have now been abandoned." See  Beazer

E., Inc. v. Mead Corp., 525 F.3d 255, 263 (3d Cir. 2008) (collecting cases); Cty. of Suffolk v.

Stone & Webster Eng'g Corp., 106 F.3d 1112, 1117 (2d Cir. 1997) (when "a decision made at a

previous stage of litigation" was not "challenged in the ensuing appeal ... [,] the parties are

deemed to have waived the right to challenge that decision"). "Mullin v. Balicki, 875 F.3d 140,

157 n.63 (3d Cir. 2017)

See Fed.R.Civ.P. 12(g)(2) ("[A] party that makes a motion under this rule must not make

another motion under this rule"). "The filing of an amended complaint will not revive the right to

present by motion defenses that were available but were not asserted in timely fashion prior to

---

[4] Mr. Mandelsberg is aware of this case but refuses to acknowledge it, as it is his responsibility personally not his clients. See Rule 3.3 Candor Toward The Tribunal- [4] *"Legal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal. A lawyer…must recognize…. pertinent legal authorities. Furthermore, as stated in paragraph (a)(2),  an advocate has a duty to disclose directly adverse authority in the controlling jurisdiction"*

the amendment of the pleading." 5C Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1388 (3d ed.2004) . "The procedural bar of Rule 12(g)(2), however, covers all motions to dismiss for failure to state a claim, regardless of the grounds asserted." See Leyse v. Bank of Am. Nat'l Ass'n, 804 F.3d 316, 320 (3d Cir. 2015) (Holding that the District Court of New Jersey erred under Rule 12 by allowing a defendant to file successive motions to dismiss) See also Albers v. Bd. of Cty. Comm'rs of Jefferson Cty., 771 F.3d 697, 703 (10thCir. 2014); English v. Dyke, 23 F.3d 1086, 1090-91 (6th Cir.1994); DiLoreto v. Borough of Oaklyn, 744 F. Supp. 610 (D.N.J. 1990) (See Fed.R.Civ.P. 12(h); Fed.R.Civ.P. 8(c) ("a party shall set forth affirmatively ... [any] matter constituting an avoidance or affirmative defense") (emphasis added). Thus, "the filing of an amended complaint will not revive the right to present by motion defenses that were available but were not asserted in a timely fashion prior to amendment." 5A C. Wright & A. Miller Federal Practice and Procedure § 1388 at p. 736 (2d ed. 1990)") ; City of Las Cruces v. The Lofts at Alameda, LLC, 591 F. Supp. 3d 1038 (D.N.M. 2022); Rowley v. McMillan , 502 F.2d 1326, 1333 (4th Cir. 1974); Lim-bright v. Hofmeister, 2010 WL 1740905, *2 (E.D.Ky.2010) ("The filing of an amended complaint will not revive the right to present by motion defenses that were available but were not asserted in a timely fashion prior to the amendment of the pleading."); Burton v. Ghosh, 961 F.3d 960 (7th Cir. 2020); Townsend Farms v. Goknur Gida A.S., No. SACV150837DOCJCGX, 2016 WL 10570248, at *6 (C.D. Cal. Aug. 17, 2016); Brooks v. Caswell, No. 3:14-CV-01232-AC, 2016 WL 866303, at *3 (D. Or. Mar. 2, 2016); Regents of Univ. of California v. Triple S Steel Holdings Inc., No. SACV161408DOCFFMX, 2016 WL 11002545, at *2 (C.D. Cal. Nov. 1, 2016); Sears Petroleum & Transport Corp. v. Ice Ban Am., Inc., 217 F.R.D. 305, 307 (N.D.N.Y. 2003); Pascal v. Concentra, Inc., Case No. 19-cv-02559-JCS (N.D. Cal. Aug. 21, 2020)

### VI. Plaintiffs Amended Complaint Already Survived a Motion to Dismiss

Plaintiff already moved the court to amend his complaint, which was granted and that motion was unopposed as stated in the courts July 21,2023 opinion. "In determining whether the proposed amendment would be futile, the Court must apply the legal standard applicable to a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Kounelis v. Sherrer,396 F. Supp. 2d 525, 539 (D.N.J. 2005); Grillo v. BA Mortgage, LLC, 2004 U.S. Dist. LEXIS 20347 at *9 (E.D. Pa. Oct. 4, 2004). For purposes of analyzing the proposed Second Amended Complaint pursuant to Rule 12(b)(6), the Court must accept all well-pled allegations in the Complaint as true and construe the Complaint in the light most favorable to the Plaintiff; "[t]he question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail." Kounelis396 F. Supp. 2d at 530-31." Okpor v. Ocasio, Civil No. 05-5313(RMB), 7 (D.N.J. Aug. 24, 2006)

"Futility means that the complaint, as amended, would fail to state a claim upon which relief could be granted. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997). In assessing futility, the court applies the same standard of legal sufficiency as it applies under Fed.R.Civ.P. 12(b)(6). See Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000). Accordingly, if a claim is vulnerable to dismissal under Rule 12(b)(6), but the plaintiff moves to amend, leave to amend generally must be granted unless the amendment would not cure the deficiency. See id. Kounelis v. Sherrer, 396 F. Supp. 2d 525, 529-30 (D.N.J. 2005)

## VII. The Disparate Impact Claim

"This dispute comes to the Court on a disparate-impact theory of liability. In contrast to a disparate-treatment case, where a "plaintiff must establish that the defendant had a discriminatory intent or motive," a plaintiff bringing a disparate impact claim challenges practices that have a "disproportionately adverse effect on minorities" and are otherwise unjustified by a legitimate rationale. <u>Ricci v. DeStefano</u>, 557 U. S. 557, 577 (2009) (internal quotation marks omitted)." <u>Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.</u>, 576 U.S. 519 (2015).

### A. Plaintiff Must Establish the Claim

" To state a claim under either the ADA or the RA, [Plaintiff] must allege that he is a qualified individual with a disability, who was precluded from participating in a program, service, or activity, or otherwise was subject to discrimination, by reason of his disability" <u>Furgess v. Pa. Dep't of Corr.</u>, 933 F.3d 285, 288-89 (3d Cir. 2019)

1. "A qualified individual with a disability"

"(i) The definition of "disability" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. (ii) An individual may establish coverage under any one or more of the three prongs of the definition of disability in paragraph (a)(1) of this section, the "actual disability" prong in paragraph (a)(1)(i) of this section, the "record of" prong in paragraph (a)(1)(ii) of this section, or the "regarded as" prong in paragraph (a)(1)(iii) of this section. (iii) Where an individual is not challenging a public accommodation's failure to provide reasonable modifications under § 36.302, it is generally unnecessary to proceed under the "actual disability" or "record of" prongs, which require a showing of an impairment that substantially limits a major life activity or a record of such an impairment. In these cases, the evaluation of coverage can be made solely under the "regarded as" prong of the definition of "disability," which does not require a showing of an impairment that substantially limits a major life activity or a record of such an impairment. An individual may choose, however, to proceed under the "actual disability" or "record of" prong regardless of whether the individual is challenging a public accommodation's failure to provide reasonable modifications" 28 CFR § 36.105

2. "Who was precluded from participating in a program, service, or activity, or otherwise was subject to discrimination, by reason of his disability"

"(a) Denial of participation. A public accommodation shall not subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation. "28 CFR § 36.202

Next Plaintiff must show that he will be affected by Defendants actions, in this case the exclusion from passing his exams based on their current scoring methods. He can prove this in three ways as explained by Judge Beetlestone in Doe v. Perkiomen Valley Sch. Dist as applied to title II of the ADA and Section 504 of the Rehabilitation Act:

"Plaintiff must then show that he "will be excluded from participation in or denied the benefits of services, programs, or activities of the public entity, or subjected to discrimination by the public entity." Furgess , 933 F.3d at 288-89 ; 42 U.S.C. § 12132. To satisfy this element, a plaintiff may advance "one of three theories of liability: disparate treatment, disparate impact, or failure to make a reasonable accommodation." Payan v. Los Angeles Cmty. Coll. Dist. , 11 F.4th 729, 738 (9th Cir. 2021) (quoting Davis v. Shah , 821 F.3d 231, 260 (2d Cir. 2016) (citation omitted)); B.C. v. Mount Vernon Sch. Dist. , 837 F.3d 152, 158 (2d Cir. 2016) ("Exclusion or discrimination may take the form of disparate treatment, disparate impact, or failure to make a reasonable accommodation."). Doe v. Perkiomen Valley Sch. Dist., 585 F. Supp. 3d 668, 687 (E.D. Pa. 2022)

It is well settled as intended by Congress that the same protections apply interchangeably between titles I, II & III of the ADA and the Rehabilitation act which has been confirmed by the courts. See Furgess v. Pa. Dep't of Corr., 933 F.3d 285, 288-89 (3d Cir. 2019) ("We consider the Title II and Section 504 claims together because "the substantive standards for determining liability are the same."); Doe v. Perkiomen Valley Sch. Dist., 585 F. Supp. 3d 668, 686 (E.D. Pa. 2022) ("[C]ase law on Section 504 "is an appropriate guide to interpret the ADA" and vice versa. Henry H. Perritt Jr., Americans with Disabilities Act Handbook § 1.02 (5th ed. 2018); see also Berardelli , 900 F.3d at 110 (observing that the ADA and Section 504 "have been constant companions in our case law as it has developed to effect those rights"); Helen L. , 46 F.3d at 334-35 (applying the Supreme Court's analysis of Section 504 to the ADA.)

14

Defendants are aware of this as the Third Circuit has held this in Katz v. Nat'l Bd. of

Med. Exam'rs:

"Courts apply the same substantive standard to claims brought under the Rehabilitation Act and Title III of the ADA Under regulations implementing § 12189, the United States Medical Licensing Examination Step 1 exam must be administered in a way that best ensures that its results will accurately reflect a disabled examinee's aptitude rather than his disability. 28 C.F.R. § 36.309(b)(1)(i). The court defers to such regulations as reasonable interpretations of the statute." Katz v. Nat'l Bd. of Med. Exam'rs, 751 F. App'x 231 (3d Cir. 2018)

In addition to the same ruling in Ramsay v. Nat'l Bd. of Med. Examiners:

"[T]he standards adopted by titles II and III of the ADA are generally the same as those required under the RHA and that for this reason, Courts typically consider the merits of claims under both statutes together. Powell, supra, (citing Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003)); K.N. v. Gloucester City Board of Education, 379 F. Supp. 3d 334, 354-355 (D.N.J. 2019). See also, Bragdon v. Abbott, 524 U.S. 624, 631-632, 118 S. Ct. 2196, 2202, 141 L. Ed.2d 540, 553 (1998)("The ADA's definition of disability is drawn almost verbatim from the definition of "handicapped individual" included in the Rehabilitation Act of 1973, ... and the definition of "handicap" contained in the Fair Housing Amendments Act of 1988." (internal citations omitted)." quoting Ramsay v. Nat'l Bd. of Med. Examiners, CIVIL ACTION NO. 19-CV-2002, 20 n.6 (E.D. Pa. Dec. 30, 2019) affirmed by Ramsay v. Nat'l Bd. of Med. Examiners, 968 F.3d 251, 256 (3d Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021)

As explained by the Department of Justice in the commentary to the regulation, the

testing provision of Title III covers Title II also:

Examinations and Courses. The Department received one comment requesting that it specifically include language regarding examinations and courses in the title II regulation. Because section 309 of the ADA 42 U.S.C. 12189, reaches "[a]ny person that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or post secondary education, professional, or trade purposes," public entities also are covered by this section of the ADA. Indeed, the requirements contained in title II (including the general prohibitions against discrimination, the program access requirements, the reasonable modifications requirements, and the communications requirements) apply to courses and examinations administered by public entities that meet the requirements of section 309. While the Department considers these requirements to be sufficient to ensure that examinations and courses administered by public entities meet the section 309 requirements, the Department acknowledges that the title III regulation, because it addresses examinations in some detail, is useful as a guide for determining what constitutes discriminatory conduct by a public entity in testing situations. See 28 CFR 36.309.

15

Plaintiff can therefore proceed to prove not an accommodation claim, but a "Desperate

Impact" claim under Title III of the ADA (28 CFR § 36.301) since "Both disparate treatment and

disparate impact claims are cognizable under the ADA." Raytheon Co. v. Hernandez, 540 U.S.

44, 53, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003):

§ 36.301 Eligibility criteria.

(a) General.  A public accommodation shall not impose or apply eligibility criteria that screen
out or tend to screen out an individual with a disability or any class of individuals with
disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages,
or accommodations, unless such criteria can be shown to be necessary for the provision of the
goods, services, facilities, privileges, advantages, or accommodations being offered.

§ 36.309 Examinations and courses.
(b) Examinations.
(1) Any private entity offering an examination covered by this section must assure that -

(i) The examination is selected and administered so as to best ensure that, when the examination
is administered to an individual with a disability that impairs sensory, manual, or speaking skills,
the examination results accurately reflect the individual's aptitude or achievement level or
whatever other factor the examination purports to measure, rather than reflecting the individual's
impaired sensory, manual, or speaking skills (except where those skills are the factors that the
examination purports to measure);

**1. Disparate Impact**

Historically a Disparate Impact case had been related to Title VII of the Civil Rights act

but the courts have expended it to the ADA. The reason is "that the ADA's protections extend

beyond "deliberate discrimination" Doe v. Perkiomen Valley Sch. Dist., 585 F. Supp. 3d 668,

687 (E.D. Pa. 2022). As explained by Judge Beetlestone:

"In Alexander v. Choate , the Supreme Court found that, in passing Section 504,
"[d]iscrimination against the handicapped was perceived by Congress to be most often the
product, not of invidious animus, but rather of thoughtlessness and indifference—of benign
neglect.... [M]uch of the conduct that Congress sought to alter in passing the Rehabilitation Act
would be difficult if not impossible to reach were the Act construed to proscribe only conduct
fueled by a discriminatory intent." 469 U.S. 287, 297, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). On
this basis, the Court "assume[d] without deciding that § 504 reaches at least some conduct that
has an unjustifiable disparate impact upon the handicapped." Id. at 299, 105 S.Ct. 712.

Ten years later, the Third Circuit relied on Choate's reasoning to hold that the ADA's protections extend beyond "deliberate discrimination":

Because the ADA evolved from an attempt to remedy the effects of "benign neglect" resulting from the "invisibility" of the disabled, Congress could not have intended to limit the Act's protections and prohibitions to circumstances involving deliberate discrimination. Such discrimination arises from "affirmative animus" which was not the focus of the ADA or section 504.... "[M]uch of the conduct that Congress sought to alter in passing the Rehabilitation Act [and the ADA] would be difficult if not impossible to reach were the Act[s] construed to proscribe only conduct fueled by a discriminatory intent." Alexander v. Choate , 469 U.S. at 296-97, 105 S.Ct. at 718. Thus, we will not eviscerate the ADA by conditioning its protections upon a finding of intentional or overt "discrimination."

Helen L. , 46 F.3d at 335. Helen L. may not have used the words "disparate impact," but its holding that the ADA's protections extend beyond cases involving "deliberate," "intentional," and "overt" discrimination as well as "affirmative animus," amounts to the same thing. See Raytheon Co. v. Hernandez , 540 U.S. 44, 52, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003) (explaining that disparate impact claims may succeed "without evidence of the employer's subjective intent to discriminate that is required in a 'disparate-treatment' case"). Indeed, in the context of a claim brought under Title I of the ADA, the Supreme Court has held that "[b]oth disparate-treatment and disparate-impact claims are cognizable under the ADA." Id. at 53, 124 S.Ct. 513 (citing 42 U.S.C. § 12112(b) ). Although Raytheon fell under Title I of the ADA, the reasoning in Helen L. leads inexorably to the conclusion that disparate impact claims are cognizable under Title II of the ADA and, hence, under Section 504

Doe v. Perkiomen Valley Sch. Dist., 585 F. Supp. 3d 668, 687-88 (E.D. Pa. 2022)

"[T]he standards adopted by titles II and III of the ADA are generally the same as those required under the RHA and that for this reason, Courts typically consider the merits of claims under both statutes together"  Ramsay v. Nat'l Bd. of Med. Examiners, CIVIL ACTION NO. 19-CV-2002, 20 n.6 (E.D. Pa. Dec. 30, 2019) affirmed by Ramsay v. Nat'l Bd. of Med. Examiners, 968 F.3d 251, 256 (3d Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021)

In 2009, the Third Circuit then explained the interchangeability between Title I and the Rehabilitation Act:

"Under the ADA's Title I, an employer's failure to transfer a disabled employee to a vacant position constitutes discrimination. Id. After the ADA went into effect, Congress amended the Rehabilitation Act by incorporating the ADA's substantive standards for determining whether a covered employer has engaged in illegal discrimination. This conforming amendment was codified at 29 U.S.C. § 794(d), which provides as follows:

17

(d) Standards used in determining violation of section. The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 ( 42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 ( 42 U.S.C. 12201- 12204 and 12210)"

The next year the Third Circuit Interpreted the language and intent of these sections as applied to a claim of "Disparate Impact" regarding testing  in E.E.O.C. v. Kronos Inc., 620 F.3d 287, 296 (3d Cir. 2010)

"The ADA prohibits, inter alia, use of employment tests that "screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the . . . test . . ., as used by the [employer], is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6); see also 42 U.S.C. § 12112(b)(7) (defining "discriminate" to include "failing to select and administer tests concerning employment in the most effective manner to ensure that, when such test is administered to a job applicant or employee who has a disability that impairs sensory, manual, or speaking skills, such test results accurately reflect the skills, aptitude, or whatever other factor of such applicant or employee that such test purports to measure, rather than reflecting the impaired sensory, manual, or speaking skills of such employee or applicant. . . ."). "Both disparate treatment and disparate impact claims are cognizable under the ADA." Raytheon Co. v. Hernandez, 540 U.S. 44, 53, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003). Quoting E.E.O.C. v. Kronos Inc., 620 F.3d 287, 296 (3d Cir. 2010)

## 2. Title VII Framework Under Title III of the ADA

Since the courts have imported the framework for a Desperate Impact claim from Title VII Plaintiff will prove his claims by the same framework.

"Under the disparate-impact statute, a plaintiff establishes a prima facie violation by showing that an employer uses "a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(k)(1)(A)(i). An employer may defend against liability by demonstrating that the practice is "job related for the position in question and consistent with business necessity." Ricci v. DeStefano, 557 U.S. 557, 129 S. Ct. 2658, 174 L. Ed. 2d 490 (2009).

The key is that in order to keep their exams in place, Defendants must prove their exams are related to job performance. Unfortunately, as Plaintiff his directly pled in his complaint, they are not (See Paragraph 123 ("In agreement with other studies, we found no correlation between NBME scores and performance during residency")[5] ("USMLE scores are not effective indicators of a physician's success during residency.")[6] ("Our study finds that USMLE Step 2 is not a reliable predictor of residency performance")[7] ("During the eight years of the study period......There was a non-significant correlation between clinical performance and the Step 1 score. Conclusion: Neither USMLE Step 1 nor Step 2 Clinical Knowledge were good predictors of the actual clinical performance of residents during their training")[8]("(Step 1, 2 CK, grades, AOA) was not associated with residency clinical performance on milestones. Isolated correlations were found between specific milestones (eg, higher surgical grade increased wound care score), but most had no correlation with residency performance.")[9])

This was established in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) and explained in Ricci v. DeStefano:

 "The Griggs Court stated that the "touchstone" for disparate-impact liability is the lack of "business necessity": "If an employment practice which operates to exclude [minorities] cannot be shown to be related to job performance, the practice is prohibited." Ibid.; see also id., at 432, 91 S.Ct. 849 (employer's burden to demonstrate that practice has "a manifest relationship to the employment in question"); Albemarle Paper Co. v. Moody, 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Under those precedents, if an employer met its burden by showing that its

---

[5] Borowitz, S. M., Saulsbury, F. T., & Wilson, W. G. (2000). Information collected during the residency match process does not predict clinical performance. Archives of pediatrics & adolescent medicine, 154(3), 256-260.
[6] Miller, B., Dewar, S. B., & Nowalk, A. (2019). Lack of Correlation Between USMLE Scores and Performance in Pediatrics Residency Training Based on ACGME Milestones Ratings Academic Pediatrics, 19(6), e34

[7] Udawatta, M., Preet, K., Lagman, C., French, A. M., Bruton, C., Bergsneider, M., ... & Yang, I. (2020). United States Medical Licensing Examination Step 2 scores do not predict American Board of Neurological Surgery scores: a single-institution experience. Journal of the Neurological Sciences, 408, 116556.
[8] Sajadi-Ernazarova, K., Ramoska, E. A., & Saks, M. A. (2020). USMLE Scores Do Not Predict the Clinical Performance of Emergency Medicine Residents. Mediterranean Journal of Emergency Medicine & Acute Care, 1(2).
[9] Burkhardt, J. C., Parekh, K. P., Gallahue, F. E., London, K. S., Edens, M. A., Humbert, A. J., ... & Hopson, L. R. (2020). A critical disconnect: Residency selection factors lack correlation with intern performance. *Journal of graduate medical education*, *12*(6), 696-704.

practice was job-related, the plaintiff was required to show a legitimate alternative that would have resulted in less discrimination. Ibid. (allowing complaining party to show "that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest") Ricci v. DeStefano, 557 U.S. 557, 129 S. Ct. 2658, 174 L. Ed. 2d 490 (2009).

Plaintiff has plead the academic argument directly in his complaint the shows the exams exclude the lowest scores by using the Angoff and Hofstee which allow judges to establish "cut scores and "percent correct" used in all of Defendants examinations (See paragraphs 45-121). He will now show the mathematical argument which applies to the USMLE Steps and the Subject Examinations including the Comprehensive Basic Science Examination CBSE as they are all scores the same way - based on a cohort that took the exam prior and converted (which is also detailed in Plaintiffs Complaint)

The Equal Employment Opportunity Commission (EEOC) has created a standard or "rule" that has been proven to show an exam has a "disparate impact" on a particular group. This is known as the "80 percent rule" which has been adopted by the courts. Plaintiff has applied this rule to data available regarding Defendants USMLE exam (which is the comparison group to decide if someone passes the Comprehensive Basic Science Exam (CBSE)). This data includes the 2019 results for everyone who took the exam and a study done specifically relating to a group of disabled students.

The disabled group was a group of medical students that Defendants, NBME denied testing accommodations to, therefore they took the exam without them. This puts them in the same situation as Plaintiff - disabled, but no accommodations

*"Mr. Zangara is not seeking testing accommodations in this lawsuit, on the USMLE or any other test that NBME develops or administers."* (citing document 29, page 1 filed 11/10/2022*)*

Whatever "group" Plaintiff and these students are according to Defendants (since they claim "they are not disabled") didn't do so well on the exam. The study group had a shocking fail rate of 32% when the overall fail rate was only 4% of the overall 22,146 students that took the exam. When calculated using the "80% Rule" the results show Defendants scoring has a "disparate impact" on this group regardless of what they are referred to by Defendants (but referred to as disabled by the rest of the world) The calculation is as follows:

32% of disabled failed with 68% passing[10]

4% of all test takers failed with 96% passing[11]

68% of 96% is 65.28% which is well below the 80% requirement

65.28% is far less than the required 80%  so it is apparent that Defendants exam scoring falls "well below the 80-percent standard set by the EEOC to implement the disparate-impact provision of Title VII. See 29 CFR § 1607.4(D) (2008) (selection rate that is less than 80 percent "of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact"); Watson, 487 U.S., at 995-996, n. 3, 108 S.Ct. 2777 (plurality opinion) (EEOC's 80-percent standard is "a rule of thumb for the courts"). Ricci v. DeStefano, 557 U.S. 557, 129 S. Ct. 2658, 174 L. Ed. 2d 490 (2009)

"Ultimately, nearly one-third (32%) of SWD who were denied and took the exam without accommodations failed Step-1. This is particularly notable when compared to the overall Step-1

---

[10] Petersen, K. H., Jain, N. R., Case, B., Jain, S., & Meeks, L. M. (2022). Impact of USMLE Step-1 accommodation denial on US medical schools: A national survey. PloS one, 17(4), e0266685. https://doi.org/10.1371/journal.pone.0266685
[11] United States Medical Licensing Examination | Performance Data [Internet]. [cited 2023 Jul 22]. https://www.usmle.org/performance-data [Ref list]

failure rate of 4–5% during the 2018–2019 academic year"[12] Therefore, for this reason in

addition to the academic evidence in the complaint regarding Defendants scoring methods, the

available data at this time shows "tests that "tend to screen out an individual with a disability or a

class of individuals with disabilities" "E.E.O.C. v. Kronos Inc., 620 F.3d 287, 296 (3d Cir. 2010)

and therefore are discriminatory See Raytheon Co. v. Hernandez, 540 U.S. 44, 124 S. Ct. 513,

157 L. Ed. 2d 357 (2003) (defining "discriminate" to include "utilizing standards, criteria, or

methods of administration . . . that have the effect of discrimination on the basis of disability"

and "using...tests...that screen out or tend to screen out an individual with a disability")

   "Although the USMLE was designed for use as a licensing exam, it is common practice

for residency and fellowship programs to use USMLE test scores in evaluating candidates for

admission to their programs[13]" Doe v. National Bd. of Med. Exam'rs, 199 F.3d 146, 154-155 (3d

Cir. 1999)  See Lanning v. Southeastern Pennsylvania Transp. Auth., 181 F.3d 478 (3d Cir.

1999). (Holding that a discriminatory cutoff score on an entry level employment examination

must be shown to measure the minimum qualifications necessary for successful performance of

the job in question);  See also Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d

158 (1971)(Holding that discriminatory tests are impermissible unless shown to be predicative of

or significantly correlated with important elements of work behavior which comprise or are

relevant to the job or jobs for which candidates are being evaluated.) See also Albemarle Paper

---

[12] Petersen, K. H., Jain, N. R., Case, B., Jain, S., & Meeks, L. M. (2022). Impact of USMLE Step-1 accommodation denial on US medical schools: A national survey. PloS one, 17(4), e0266685. https://doi.org/10.1371/journal.pone.0266685

[13] 13 **Medical Resident: An individual who has completed medical school and is in training to become a licensed physician**. Residents generally train in a specialty for three to five years (although some specialties require a preliminary year of general medical training before specialty training commences). Obtaining a medical residency is competitive; medical students in their final year apply to residency programs in a particular location and specialty. **Medical residents are paid a salary during residency**, but this salary is generally a fraction of what they will earn after completing their residency. citing Heisler, E. J., Panangala, S. V., Mendez, B. H., Villagrana, M. A., & Mitchell, A. (2018). Federal Support for Graduate Medical Education: An Overview. CRS Report R44376, Version 9. Updated. Congressional Research Service.

Co. v. Moody, 422 U.S. 405, 95 S. Ct. 2362, 45 L. Ed. 2d 280 (1975).( "[D]iscriminatory tests are impermissible unless shown, by professionally acceptable methods, to be "predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated."...[Albemarle] compared test scores with subjective supervisorial rankings......The fact that the best of those employees working near the top of a line of progression score well on a test does not necessarily mean that that test, or some particular cutoff score on the test, is a permissible measure of the minimal qualifications of new workers entering lower level jobs..... we agree with the Court of Appeals that the District Court erred in concluding that Albemarle had proved the job relatedness of its testing program..)

### B. Plaintiff Must Establish & Meet the Pleading Requirements of that Claim

Since the courts have held that (1) the standards of liability are the same under titles I, II, & III of the ADA and the Rehabilitation Act interchangeably and (2) the standard, and framework used for a disparate impact claim under the ADA is the standard applied to Title VII claims, Plaintiff must use the same pleading standard to establish a claim under that framework.

In order to do this, he must apply the same pleading standard applicable to an employment discrimination claim under Title VII regarding discriminatory testing[14]. That standard was detailed and the holding of Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514-15 (2002):

"The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits").  Applying the relevant standard, petitioner's complaint easily satisfies the requirements of Rule 8(a) because it gives respondent

---

[14] Defendants can not claim "they are not an employer" because this claim is brought under Title III in which they are bound by ("Courts apply the same substantive standard to claims brought under the Rehabilitation Act and Title III of the ADA Under regulations implementing § 12189, the United States Medical Licensing Examination Step 1 exam must be administered in a way that best ensures that its results will accurately reflect a disabled examinee's aptitude rather than his disability. 28 C.F.R. § 36.309(b)(1)(i). The court defers to such regulations as reasonable interpretations of the statute." Katz v. Nat'l Bd. of Med. Exam'rs, 751 F. App'x 231 (3d Cir. 2018))

fair notice of the basis for petitioner's claims. Petitioner alleged that he had been terminated on account of his national origin in violation of Title VII and on account of his age in violation of the ADEA…These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest. See *Conley, supra*, at 47. In addition, they state claims upon which relief could be granted under Title VII and the ADEA.

Respondent argues that allowing lawsuits based on conclusory allegations of discrimination to go forward will burden the courts and encourage disgruntled employees to bring unsubstantiated suits. Brief for Respondent 34-40. Whatever the practical merits of this argument, the Federal Rules do not contain a heightened pleading standard for employment discrimination suits. A requirement of greater specificity for particular claims is a result that "must be obtained by the process of amending the Federal Rules, and not by judicial interpretation." *Leatherman, supra*, at 168. Furthermore, Rule 8(a) establishes a pleading standard without regard to whether a claim will succeed on the merits. "Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer*, 416 U.S., at 236.

For the foregoing reasons, we hold that an employment discrimination plaintiff need not plead a prima facie case of discrimination and that petitioner's complaint is sufficient to survive respondent's motion to dismiss. Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion." Quoting Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514-15 (2002)


The Supreme Court then explained the application of Swierkiewicz v. Sorema in

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)

"Swierkiewicz did not change the law of pleading, but simply re-emphasized . . . that the Second Circuit's use of a heightened pleading standard for Title VII cases was contrary to the Federal Rules' structure of liberal pleading requirements." 313 F. Supp. 2d, at 181 (citation and footnote omitted). Even though Swierkiewicz's pleadings "detailed the events leading to his termination, provided relevant dates, and included the ages and nationalities of at least some of the relevant persons involved with his termination," the Court of Appeals dismissed his complaint for failing to allege certain additional facts that Swierkiewicz would need at the trial stage to support his claim in the absence of direct evidence of discrimination. Swierkiewicz, 534 U.S., at 514, 122 S. Ct. 992. We reversed on the ground that the Court of Appeals had impermissibly applied what amounted to a heightened pleading requirement by insisting that Swierkiewicz allege "specific facts" beyond those necessary to state his claim and the grounds showing entitlement to relief. Id., at 508, 122 S. Ct. 992." Quoting  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)


The Third Circuit has explained in Martinez v. UPMC Susquehanna, 986 F.3d 261, 266

(3d Cir. 2021) what Plaintiff must allege in his complaint in order to deny Defendants motion:

What a plaintiff must allege to defeat a motion to dismiss . To defeat a motion to dismiss, it is sufficient to allege a prima facie case. Castleberry v. STI Grp. , 863 F.3d 259, 266 (3d Cir. 2017). But it is not necessary. Swierkiewicz v. Sorema N.A. , 534 U.S. 506, 508, 122 S.Ct. 992, 152

L.Ed.2d 1 (2002), cited with approval inTwombly , 550 U.S. at 569–70, 127 S.Ct. 1955. The complaint need only allege enough facts to "raise a reasonable expectation that discovery will reveal evidence of [each] necessary element." Fowler v. UPMC Shadyside , 578 F.3d 203, 213 (3d Cir. 2009) (quoting Phillips v. Cty. of Allegheny , 515 F.3d 224, 234 (3d Cir. 2008) ). Quoting Martinez v. UPMC Susquehanna, 986 F.3d 261, 266 (3d Cir. 2021)

"Under the disparate-impact statute, a plaintiff establishes a prima facie violation by showing that an employer uses "a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(k)(1)(A)(i). An employer may defend against liability by demonstrating that the practice is "job related for the position in question and consistent with business necessity." Ricci v. DeStefano, 557 U.S. 557, 129 S. Ct. 2658, 174 L. Ed. 2d 490 (2009).

Plaintiff has identified the specific practice by Defendants that is discriminatory and has pled this in his complaint – the examinations are comparing him to others to decide if he passes or fails. Defendants have reviewed the complaint and cited these allegations specifically:

### INTRODUCTION

Plaintiff Jason Zangara ("Mr. Zangara") filed this pro se lawsuit against the National Board of Medical Examiners ("NBME") in March 2022, alleging that NBME violated the Americans with Disabilities Act ("ADA") by grading exams on a curve that compared his performance to a group of people who previously took the examination and "automatically drop[ping] out the lowest percentiles." Complaint and Request for Injunction (Dkt. 1) at 5.

Mr. Zangara's claims in his amended Complaint are based on essentially the same premise, but are now spread over a 184-page, 836-paragraph pleading with 86 separate counts. *See* Dkt. 51 ("Complaint"). Mr. Zangara alleges that he is disabled and argues that he (and any individual with a disability) "do[es] not have the same ability as those who are not disabled," *id.* ¶ 64, and thus will "score[ ] lower" on any NBME exam, *id.* ¶ 87, purportedly because they are being compared to "an average student with normal abilities," *id.* ¶ 84; *see also id.* ¶ 101. According to Mr. Zangara, he has been unable to pass examinations "administered and graded" by NBME, *id.* ¶ 50, because his scores are compared "to the scores of others who took the exam prior," *id.* ¶ 53.

25

In paragraph 87 of the complaint Plaintiff states and cites Ramsay:

"a clinical diagnosis of a learning disability is typically based upon a comparison between the individual and others in the general population" Ramsay v. Nat'l Bd. of Med. Examiners, 968 F.3d 251, 256 (3d Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021).

The act itself of comparing Plaintiff or anyone disabled on an exam is going to show that

they will score lower and this is how a learning disability is established. The courts have

recognized this and the Third Circuit has explained this when they ruled against Defendants in

Ramsay:

"Dr. Smith's and Dr. Lewandowski's diagnostic assessments showed that Ramsay had abnormal functionalities in thinking, processing speed, attention, and sequencing. Indeed, some of the reading tests Dr. Smith administered placed Ramsay in less than the fifth percentile as compared to individuals her age. This is exactly the type of data DOJ contemplates as showing a learning disability that substantially limits an individual as compared to others in the general population…Accordingly, the District Court's reliance on evidence that Ramsay's reading, processing, and writing skills were abnormally low by multiple measures provided a sufficient comparison of her abilities to those of the general population to support the finding of disability." Ramsay v. Nat'l Bd. of Med. Examiners, 968 F.3d 251, 256 (3d Cir. 2020) cert. denied, 141 S. Ct. 1517, 209 L. Ed. 2d 255 (2021).

Plaintiff then states (and cites where he is getting the information from In paragraph 69 of

the complaint :

This is well known as a controversial method of scoring because judges limit the amount of people that can pass and decide a minimum amount of people that must fail:
**"the United State Medical Licensure Examination (USMLE), administered by the National Board of Medical Examiners (NBME), has turned to the Angoff and Hofstee methods in determining cut score.** The former approach involves a group of subject matter experts setting minimal qualifying requirements (in terms of test score) for a successful candidate, who will later be certified as a medical doctor. The Board's opinion serves as a foundation for the evaluation of each test item and a reference for determining cut score. The latter method asks judges to determine minimum/maximum acceptable scores, along with minimum/maximum fail rates, which serve as the key parameters in determining the final cut score[15]

---

[15] "Three controversies over item disclosure in medical licensure examinations" Park, Y. S., & Yang, E. B. (2015). Three controversies over item disclosure in medical licensure examinations. Medical education online, 20(1), 28821.

26

*"The latter method asks judges to determine minimum/maximum acceptable scores, along with minimum/maximum fail rates,"* which means regardless of Defendants statements and frivolous documentation, Plaintiff is accusing them of having a pre-determined number of students who will fail their exams. (1) Citing to a peer reviewed article that substantiates Plaintiffs Claims (2) Attaching Defendants own documentation (to his complaint as exhibit L) showing the names of these methods is not a "conclusionary allegation"





## SUBJECT EXAMINATION PROGRAM
### EMERGENCY MEDICINE ADVANCED CLINICAL EXAMINATION GRADING GUIDELINES

The NBME conducted webcast standard setting studies for the Emergency Medicine Subject Examination with medical school faculty. For each study, medical school faculty who were past or present clerkship directors (100% for 2015 and 88% for 2019) in Emergency Medicine participated as expert judges in webcast sessions that utilized the internet and conference calling to train participants in the standard setting procedure. Judges reviewed the content and rated the difficulty of each item on a current form of the examination. The study employed both a Modified Angoff content-based procedure and the Hofstee Compromise standard setting method. These two procedures together provide proposed passing standards that are based on an in-depth item-by-item analysis of the examination content, as well as a more global analysis of the content. The results were summarized and the proposed standards were expressed as the proportion of the content required for a candidate to pass and to receive honors status. Table 1 provides a summary of the medical school faculty who served as expert judges and their school information for each of the webcast studies conducted by the NBME.

**Table 1 – Demographics of Expert Judges and Schools Participating in Emergency Medicine Webcast Studies**

| Standard Setting Study | Number of Judges | Years of Experience | Number of Schools | Use CDEM Curriculum | Traditional School Curriculum | Integrated School Curriculum | School Clerkship Length |
|---|---|---|---|---|---|---|---|
| 2015 | 27 | 1 – 20 | 26 | 93% | 22% | 56% | 2 – 4 weeks |
| 2019 | 24 | 2 – 20 | 24 | 71% | 38% | 58% | 2 – 8 weeks |

The data shown below represent a compilation of the opinions of the medical school faculty who participated in each study. The results reported are on the Equated Percent Correct score scale that became effective August 2015. The study results are provided to assist you in setting fair and valid passing and honors standards for this examination.

Table 2 provides a summary of the results for passing scores from the Modified Angoff and Hofstee Compromise procedures. The recommended minimum passing score based on the 2019 Angoff results is a subject exam score of 61, which is higher than the recommended standard in 2015. This score was slightly below the acceptable range of minimum passing scores (63 to 72) computed from the 2019 Hofstee results. The recommended minimum passing score based on the 2019 Hofstee results is a subject exam score of 68, which is higher than the 2015 Hofstee results.

**Table 2 – Emergency Medicine Grading Guidelines for Passing (Equated Percent Correct Scores)**

| Standard Setting Study | Modified Angoff Recommended Passing Score | Hofstee Compromise Range of Acceptable Minimum Passing Scores | Hofstee Compromise Recommended Passing Score |
|---|---|---|---|
| 2015 | 59 | 54 to 66 | 62 |
| 2019 | 61 | 63 to 72 | 68 |

Table 3 provides a summary of the Hofstee results for honors. The 2019 study results indicate that the minimum acceptable score for honors should fall between a score of 86 to 92. The range of minimum acceptable Hofstee scores for honors based on the 2019 study is smaller than the range in 2015, but the maximum score is the same.

**Table 3 – Emergency Medicine Grading Guidelines for Honors (Equated Percent Correct Scores)**

| Standard Setting Study | Hofstee Compromise Range of Acceptable Minimum Honors Scores |
|---|---|
| 2015 | 80 to 92 |
| 2019 | 86 to 92 |

Plaintiff has plead that Defendants not his medical school deciding the passing scores for their exams in Paragraph 92:

Plaintiff learned this when he was told by the Student Performance Assessment Committee that they "cannot interfere with the rules or requirements of grading of exams" and that he has to "appeal to the administrators of the exams (NBME,CBSE or USMLE) to ask for special individual grading requirements" (See Plaintiff Cert. at Exhibit I)

**spac@cmumed.org** <spac@cmumed.org>
**To:** firefighterjazzyj@yahoo.com
**Cc:** aayubi@cmumed.org, mboegels@hotmail.com, students@cmumed.org, spac@cmumed.org
Wed, Oct 13, 2021 at 9:13 AM
Dear mr. Zangara,

The SPAC states that the SPAC cannot interfere with rules or requirements of gradings of exams. As the SPAC cannot influence gradings, there is no possibility to appeal with the SPAC itself.

He should appeal to the administrators of the exams (NBME, CBSE or USMLE) to ask for special individual grading requirements.


Kind Regards

Student Performance Assessment Committee (SPAC)
Dr. Marijn Bögels, Chair
Dr. Ali Ayubi, Member

**Caribbean Medical University**
Toll Free: +1 888 877 4268
Direct: +1 224 444 4700
Fax: +1 302 397 2092
Email: aayubi@cmumed.org

Defendants have attempted to argue that Plaintiffs school decides a passing score and the school is the one who requires the examination so they are off the hook. This is incorrect because **the courts do not hold the medical boards of all 50 states accountable for Defendants actions because <u>they</u> require the examinations to get licenses, <u>the courts hold Defendants liable</u> because they are the ones who actually create and administer the exams under the ADA and its implementing regulation 28 C.F.R. 36.309 which states:**

(b) Examinations.

        (1) Any private entity offering an examination covered by this section must assure that -

(i) The examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the **examination results** accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure);

Defendants are the ones liable regardless of where the exam is administered or who buy it as explained in by the DOJ in their Amicus Curiae brief submitted to the Third Circuit in Rawdin v. Am. Bd. of Pediatrics 582 F. App'x 114 (3d Cir. 2014):

"28 C.F.R. 36.309 require testing entities to do more than simply provide reasonable accommodations. .....Section 309 and its implementing regulation shift the burden away from the plaintiff and onto the testing entity to develop and administer the examination in a way that will best ensure the results accurately reflect that individual's aptitude or achievement level, rather than disability. **If the plaintiff can show that the results of the examination reflect his disability, rather than his skill or knowledge, the "best ensure" standard requires the testing entity to determine whether there is a testing alternative that, while still testing the same factors or knowledge the test is designed to measure, permits the person with a disability the opportunity to demonstrate the abilities measured by the test, as opposed to a test that reflects the manifestations of his disability.**[16]

Defendants admit that they are the developers and administrators of the examinations **not medical schools** on the second page of their brief.

### BACKGROUND

I.   **NBME**

NBME is a non-profit organization located in Pennsylvania. *See* Complaint p. 3. Its mission is to help protect the health of the public through the development and administration of high-quality examinations for health professionals.

---

[16] https://www.justice.gov/sites/default/files/crt/legacy/2014/03/19/rawdinbrief.pdf

As stated by the DOJ it is Defendants that are responsible and held accountable for the scoring **not medical schools**. **Medicals schools are not the administers or developers of the examinations** as confirmed by Defendants on the second page of their brief . *"Only the NBME, and not Prometric,*[or Plaintiffs school] *controls the conditions under which the exam is administered and* [developed]...*we refuse to let the NBME escape... for the services that the NBME solely provide."* Currier v. National Board of Medical Examiners, 965 N.E.2d 829, 462 Mass. 1 (2012)

"although NBME may not have liked the terminology used in the implementing regulations, despite its registered objections, the foregoing language is what was enacted and it is this language which must be followed" Ramsay v. Nat. Bd. of Medical Examiners 968 F.3d 251 (3d Cir. 2020) See also Price v. Nat'l. Bd. of Med. Examiners, 966 F. Supp. 419 (S.D.W. Va. 1997) (Holding that, because Congress authorized the DOJ to make issue regulations for Subchapter III, courts must give their decisions controlling weight unless arbitrary or manifestly contrary to the statute) See also  Love v. Law Sch. Admissions Council, Inc., 513 F. Supp. 2d 206, 223 (E.D. Pa. 2007) (finding that private, non-profit entity responsible for administering test required for admission to law school had to comply with ADA); see also Scheibe v. Nat'l Bd. of Med. Examiners, Civ. A. No. 05-180, 2005 WL 1114497, at *3 (W.D. Wis. May 10, 2005) (citing cases concluding that NBME is subject to ADA); Biank v. Nat'l Bd. of Med. Examiners, 130 F. Supp. 2d 986, 988 (N.D. Ill. 2000) (holding that NBME, "as a private entity offering examinations related to licensing, is subject to ADA under Section 12189") quoting Boggi v. Med. Rev. & Accrediting Council, 415 F. App'x 411, 414 (3d Cir. 2011) Specifically  the "application of  Section 12189, at issue in this case, is covered by the DOJ regulations in 28 C.F.R. part 36" Price v. Nat'l. Bd. of Med. Examiners, 966 F. Supp. 419 (S.D.W. Va. 1997)

(Holding that, because Congress authorized the DOJ to make issue regulations for Subchapter III, courts must give their decisions controlling weight unless arbitrary or manifestly contrary to the statute)

"If the plaintiff can show that the results of the examination reflect his disability, rather than his skill or knowledge, the "best ensure" standard requires the testing entity to determine whether there is a testing alternative that, while still testing the same factors or knowledge the test is designed to measure, permits the person with a disability the opportunity to demonstrate the abilities measured by the test, as opposed to a test that reflects the manifestations of his disability.[17]

Is the same language, intent and principle as:

"Once a plaintiff has established a prima facie case of disparate impact, the employer may defend by demonstrating that its policy or practice is "job related for the position in question and consistent with business necessity." *Ibid*. If the employer meets that burden, the plaintiff may still succeed by showing that the employer refuses to adopt an available alternative practice that has less disparate impact and serves the employer's legitimate needs" Ricci v. DeStefano, 557 U.S. 557, 129 S. Ct. 2658, 174 L. Ed. 2d 490 (2009).

Which is why Defendants are liable for a disparate impact claim under title III of the ADA. Despite their continued disregard for Plaintiff repeatedly citing the regulation over and over again they are held liable. They were told this by multiple other courts but refuse to acknowledge this action is based on the implementing regulations which Plaintiff pled directly in his complaint in paragraph 65. As explained again in Ramsay:

"In applying the foregoing to the case at hand, we note that insofar as the above-quoted regulations are "the equivalent[s] of a 'legislative rule' ... issued by an agency pursuant to statutory authority," they thus have the 'force and effect' of law. PDR Network, LLC v. Carlton & Harris Chiropractic, Inc., 139 S. Ct. 2051, 2055, 204 L. Ed.2d 433 (2019)(quoting Chrysler Corp. v. Brown, 441 U.S. 281, 302-303, 99 S. Ct. 1705, 60 L. Ed.2d 208 (1979) and Batterton v. Francis, 432 U.S. 416, 425, n.9, 97 S. Ct. 2399, 53 L. Ed.2d 448 (1977)). At the very minimum, the regulations are "entitled to substantial deference" and "given controlling weight" unless "it

---

[17] https://www.justice.gov/sites/default/files/crt/legacy/2014/03/19/rawdinbrief.pdf

can be shown that they are arbitrary, capricious, or manifestly contrary to the statute." See, n. 8, supra. See also, <u>Olmstead v. L.C. ex rel. Zimring</u>, 527 U.S. 581, 597-598, 119 S. Ct. 2176, 2185-2186, 144 L. Ed.2d 540 (1999)("Because the Department [of Justice] is the agency directed by Congress to issue regulations implementing Title II, ... its views warrant respect") and <u>Bragdon v. Abbott</u>, 524 U.S. 624, 642, 118 S. Ct. 2196, 141 L. Ed.2d 540 (1998)("It is enough to observe that the well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance'"(quoting <u>Skidmore v. Swift & Co</u>., 323 U.S. 134, 139-140, 65 S. Ct. 161, 89 L. Ed.2d 124 (1944)). quoting <u>Ramsay v. Nat. Bd. of Medical Examiners</u> 968 F.3d 251 (3d Cir. 2020)

The court have held the Defendants responsible for the regulations created by the DOJ under what is known as "Chevron Deference" in which the court treats the regulation as law and defers to the interpretation of the statue by the agency <u>See</u> <u>Chevron USA Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984) **(Holding that Government Agencies regulation is given difference when it is a permissible construction of the statue and congress has not spoken of the issue directly**) Chevron later used this ruling in a case under the ADA in which they were the defendants and it was affirmed by the Supreme Court <u>See</u> <u>Chevron USA Inc. v. Echazabal,</u> 536 U.S. 73, 122 S. Ct. 2045, 153 L. Ed. 2d 82 (2002) **(Holding that a Government Agency has the authority to create and enforce regulations regarding the Americans with Disabilities Act (ADA))**

Therefore, Plaintiff has pled all the requirements adequate not only for a disparate impact claim but for a motion for summary judgement. As stated in the prior argument, Defendants must show their examinations are job related in order for the current scoring methods to be kept in place as pled in paragraph 123 and they are not. Defendants refuse to settle the case and agree to Plaintiffs alternate scoring therefore they are in violation of the ADA under 28 C.F.R. 36.309 and Plaintiff has pled the required elements of a Disparate Impact discrimination claim as required by the courts.

## VIII. Defendants are State and Federal Actors

Defendants have attempted to argue that they are not "state actors" when in fact they are both state and federal actors. Since they test medical candidates on behalf of the states and are regulated by and subject to oversight by the United States Legislative Branch under the 14th amendment to the Constitution, they are to be held accountable as such.  The forefathers of this country intended for the United States Government to provide safe and regulated medical care to everyone and that includes Defendants examination procedures to decide who can administer that medical care to patients.

The preservation of and care of a human life is a subject of great public concern and importance that has been addressed by the courts. As much as a concern it might be however, its importance is not detailed directly in the Constitution. There comes a time however that there is an obligation of the judiciary to reinforce the intentions of our founding fathers and apply what they had written to today's society. This is done by using the "clues" left behind and the "logic" of what they were thinking when they actually wrote things such as the Constitution.

In the case of the Fourteenth Amendment the phrase "depriving persons of life, liberty" although only five words could have multiple meanings. To address this the judiciary has been tasked to figure out the meaning of these words and has indicated that these words apply to the field of healthcare and medicine. They have ruled that they protect the "rights" of individuals both in the civil and criminal context  See, e.g., Winston v. Lee, 470 U. S. 753, 766–767 (1985) (forced surgery); Rochin v. California, 342 U. S. 165, 166, 173–174 (1952) (forced stomach pumping); Washington v. Harper, 494 U. S. 210, 229, 236 (1990) (forced administration of antipsychotic drugs); Skinner v. Oklahoma ex rel. Williamson, 316 U. S. 535 (1942)( the right not to be sterilized without consent); Winston v. Lee, 470 U. S. 753 (1985) (the right in certain

circumstances not to undergo involuntary surgery, forced administration of drugs, or other substantially similar procedures, also <u>Washington v. Harper</u>, 494 U. S. 210 (1990), <u>Rochin v. California</u>, 342 U. S. 165 (1952))

The courts also have decided that rights afforded by the Constitution extend to the patients choice and medical care. See <u>Cruzan v. Missouri Department of Health</u>, 497 U.S. 261 (1990) (constitutional right to refuse medical treatment that sustains life), <u>Washington v. Glucksberg</u>, 521 U.S. 702, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997) (No right to physician assisted suicide under the Due Process Clause). When the judiciary is faced with an issue relating to healthcare not easily interpreted from the Constitution however, they must employ a different approach deciding if the subject is "deeply rooted in this Nation's history and tradition". As detailed by Justice Alito in <u>Dobbs v. Jackson Women's Health Organization</u>, 142 S. Ct. 2228, 597 U.S., 213 L. Ed. 2d 545 (2022):

"The Constitution makes no reference to abortion, and no such right is implicitly protected by any constitutional provision, including the one on which the defenders of Roe and Casey now chiefly rely—the Due Process Clause of the Fourteenth Amendment. That provision has been held to guarantee some rights that are not mentioned in the Constitution, but any such right must be "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." <u>Washington v. Glucksberg</u>, 521 U. S. 702, 721 (1997) (internal quotation marks omitted)."

The practice of medicine has been regulated all the way back to ancient times beginning with the "Code of Hammurabi (circa BC 1740)"which governed all aspects of physicians and surgeons[18]. In addition to this, Hippocrates (circa BC 460-360) of Greek antiquity, and Galen (AD 130-200), also established clinical guidelines and regulations for practice, many of which endure today[19] This regulation proceeded through the Medieval period, the Renaissance expanding through Europe & worldwide and ending up here in the United States in the Colonial

---

[18] Violato, C. A Brief History of the Regulation of Medical Practice: Hammurabi to the National Board of Medical Examiners (2016)
[19] Violato, C. A Brief History of the Regulation of Medical Practice: Hammurabi to the National Board of Medical Examiners (2016)

period. In 1649, Medical licensure and regulation officially began with Massachusetts determining that Physicians and Surgeons are prohibited from treating "without the advice and consent of such as are skillful in the same art" and in 1772 New Jersey was the first colony to require examination requirements for Physicians[20]

As time went on, more examinations were requirements for licensure, **but the government used medical societies** to administer them (See Federation of State Medical Boards, Medical Licensure Prior to 1900 " With the establishment of the first medical school (Pennsylvania 1765) and governmental use of a medical society to examine those seeking to practice medicine (New Jersey, 1766), the seeds of a major conflict were planted."[21] This conflict continued through the 1900's with Congress stepping up and beginning to regulate the practice of medicine by creating and using legislation such as The Narcotic Drug Act of December 17, 1914, c. 1, 38 Stat. 785, § 1.

This act was challenged for its Constitutional basis in the United States Supreme Court in 1919 and it was held that it was in fact Constitutional in United States v. Doremus, 249 U.S. 86 (1919) ( requiring  "dispensing, or distribution of any of the aforesaid drugs by a dealer to a consumer under and in pursuance of a written prescription issued by a physician" also requiring "physicians registered under the act in the course of professional practice only, provided the physicians keep certain records for official inspection")

The following year, the Supreme Court held the Act accountable to a physician who was dispensing Opium, but the court took it further then just "drug trafficking" and related his actions to, and suggested regulation of a standard of care in  Jin Fuey Moy v. United States, 254 U.S. 189 (1920):

---

[20] Violato, C. A Brief History of the Regulation of Medical Practice: Hammurabi to the National Board of Medical Examiners (2016)
[21] http://centennial.fsmb.org/medical-licensure-prior-1900.html

"The evidence shows that defendant was a practicing physician in Pittsburgh, registered under the act so as to be allowed to dispense or distribute opium and its derivatives without a written order in official form,.....he made a superficial physical examination, in others, none at all; his prescriptions called for large quantities of morphine -- 8 to 16 drams at a time -- to be used "as directed," while the directions left the recipient free to use the drug virtually as he pleased. His charges were not according to the usual practice of medical men, but according to the amount of the drug prescribed"

Finally in 1975 the Supreme Court finally confirmed the governments regulation of the practice of medicine itself using the Controlled Substances Act (CSA or Act), 84 Stat. 1242, 21 U.S.C. § 801 *et seq.,* which was the predecessor of the CSA in United States v. Moore, 423 U.S. 122 (1975) ("We reverse, and hold that registered physicians can be prosecuted under § 841 when their activities fall outside the usual course of professional practice"). Court also recognized and applied the same standard ("Physicians who stepped outside the bounds of professional practice could be prosecuted under the Harrison Act (Narcotics) of 1914, 38 Stat. 785, the predecessor of the CSA. In Jin Fey Moy v. United States, 254 U. S. 189 (1920), the Court affirmed the conviction of a physician on facts remarkably similar to those before us (*e.g.,* no adequate physical examination," ) citing  United States v. Moore, 423 U.S. 122 (1975)

As explained specifically in Moore the court detailed well beyond medication regulation and established the precedent that physicians could be held liable from departing from the standard of care:

"When a patient entered the office, he was given only the most perfunctory examination. Typically this included a request to see the patient's needle marks (which in more than one instance were simulated) and an unsupervised urinalysis (the results of which were regularly ignored). A prescription was then written for the amount requested by the patient. On return visits -- for which appointments were never scheduled -- no physical examination was performed and the patient again received a prescription for whatever quantity he requested. Accurate records were not kept, and in some cases the quantity prescribed was not recorded. There was no supervision of the administration of the drug. Dr. Moore's instructions consisted entirely of a label on the drugs reading: "Take as directed for detoxification."" United States v. Moore, 423 U.S. 122 (1975)

36

Following this in 1978, all states including New Jersey ended their own medical licensing examinations and "The Federation Licensing Exam or the National Boards become the standard"[22] In 1992 The current examination, the United States Medical Licensing Exam (USMLE) was administered by Defendants for the first time replacing this standard[23]. In addition to testing, "students who have earned a medical degree are required to undergo further postgraduate supervised clinical training. In the United States and Canada this is called residency, also called a house officer or senior house officer in the United Kingdom and several Commonwealth countries. Depending on the medical specialty and jurisdiction, residency can be 1 to 6 years in duration."[24] **These residency positions are created and paid for by Congress** using a portion of the funding for the program and the other portion to pay a salary to the resident themselves[25]

Now, as the states no longer controlled licensing examinations and congress establishes regulations for physicians, pays for their training along with a salary during that training, the courts have found everything from refusal of medical treatment to the standard of care to liability all within previsions of the United States Constitution. See e.g. Winston v. Lee, 470 U. S. 753, 766–767 (1985); Rochin v. California, 342 U. S. 165, 166, 173–174 (1952); Washington v. Harper, 494 U. S. 210, 229, 236 (1990); Skinner v. Oklahoma ex rel. Williamson, 316 U. S. 535

---

[22] Violato, C. A Brief History of the Regulation of Medical Practice: Hammurabi to the National Board of Medical Examiners (2016)

[23] Violato, C. A Brief History of the Regulation of Medical Practice: Hammurabi to the National Board of Medical Examiners (2016)

[24] Violato, C. A Brief History of the Regulation of Medical Practice: Hammurabi to the National Board of Medical Examiners (2016)

[25] Medical Resident: An individual who has completed medical school and is in training to become a licensed physician. Residents generally train in a specialty for three to five years (although some specialties require a preliminary year of general medical training before specialty training commences). Obtaining a medical residency is competitive; medical students in their final year apply to residency programs in a particular location and specialty. Medical residents are paid a salary during residency, but this salary is generally a fraction of what they will earn after completing their residency. citing Heisler, E. J., Panangala, S. V., Mendez, B. H., Villagrana, M. A., & Mitchell, A. (2018). Federal Support for Graduate Medical Education: An Overview. CRS Report R44376, Version 9. Updated. Congressional Research Service.

(1942); Washington v. Harper, 494 U. S. 210 (1990), Rochin v. California, 342 U. S. 165

(1952)); United States v. Moore, 423 U.S. 122 (1975); Jin Fuey Moy v. United States, 254 U.S.

189 (1920) Cruzan v. Missouri Department of Health, 497 U.S. 261 (1990); Washington v.

Glucksberg, 521 U.S. 702, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997)

"We begin, as we do in all due process cases, by examining our Nation's history, legal

traditions, and practices. See, e.g., Casey, 505 U. S., at 849-850; Cruzan, 497 U. S., at 269-279;

Moore v. East Cleveland, 431 U.S. 494, 503 (1977) (plurality opinion) (noting importance of

"careful `respect for the teachings of history'")" Washington v. Glucksberg, 521 U.S. 702, 117 S.

Ct. 2258, 138 L. Ed. 2d 772 (1997). That examination as detailed prior, shows that It is

abundantly clear that the forefathers of this country intended for the United States Government to

provide safe and regulated medical care, including licensing and testing to obtain that license, for

all of the citizens it protects. Therefore all aspects of the Defendants, the National Board of

Medical Examiners administering licensing examinations are subject to judicial scrutiny and

legislative accountability to protect the public.

### IX. Defendants Are Considered Employers

Defendants are employers as their exams control access to residency positions and their

scores decide who gets hired. "Although the USMLE was designed for use as a licensing exam,

it is common practice for residency and fellowship programs to use USMLE test scores in

evaluating candidates for admission to their programs." Doe v. National Bd. of Med. Exam'rs,

199 F.3d 146, 154-155 (3d Cir. 1999) (Medical Resident: An individual who has completed

medical school and is in training to become a licensed physician. Residents generally train in a

specialty for three to five years (although some specialties require a preliminary year of general

medical training before specialty training commences). Obtaining a medical residency is

competitive; medical students in their final year apply to residency programs in a particular location and specialty. Medical residents are paid a salary during residency, but this salary is generally a fraction of what they will earn after completing their residency.)[26]

See Veizaga v. National Bd. for Respiratory Therapy, 21 Fair Empl. Prac. Cas. 246 (N.D. IlM. 1977) (if class of respiratory therapists alleging racially discriminatory testing by defendant licensing body could demonstrate defendant controlled access to employment, a sufficient employment relationship would exist to assert Title VII jurisdiction); Puntolillo v. New Hampshire Racing Comm'n, 375 F. Supp. 1089 (D.N.H. 1974) (regulatory agency that governed horse racing activity controlled access to employment and was liable under Title VII for alleged national origin discrimination based on agency's control of licenses necessary to engage in horse racing).

Despite Defendants objections, they are the sole party that controls the examinations required to obtain a paid residency position funded with a salary by congress. Therefore, they are considered an employer.

### X. Disputed Facts and Meaning of the Documents

As Defendants have stated, all the allegations Plaintiff has made in his complaint including his application of the meanings of documents are true as conceded on page 5 of their brief:

> The Court must accept Mr. Zangara's allegations as true and construe disputed facts
>
> in his favor. *Norkunas v. Southern Pennsylvania Transp. Auth.*, 2019 WL 6337913,
>
> at *2 (D.N.J. Nov. 27, 2019) (citation omitted). Nevertheless, "the focus of the per-

---

[26] citing Heisler, E. J., Panangala, S. V., Mendez, B. H., Villagrana, M. A., & Mitchell, A. (2018). Federal Support for Graduate Medical Education: An Overview. CRS Report R44376, Version 9. Updated. Congressional Research Service.

Therefore all factual disputes are hereby resoled in favor of Plaintiff for the purpose of this motion.

## XI. Step 1 and Disparate Impact

Regardless of how Defendants are scoring exams, it has been shown the USMLE has a has a disparate impact on the disabled. This cannot be disputed with Defendants trying to explain away documents. Data is data and the only thing the court cares about at trial is the data. The data shows the exam is discriminatory and Defendants will have to wait until trial to disprove that. Since Plaintiff has demanded relief in the form of an injunction for all of Defendants examinations including USMLE Step 1 the data applies to all exams as Plaintiff has accused them of scoring the exams the same way. As stated prior in this brief:

The Equal Employment Opportunity Commission (EEOC) has created a standard or "rule" that has been proven to show an exam has a "disparate impact" on a particular group. This is known as the "80 percent rule" which has been adopted by the courts. Plaintiff has applied this rule to data available regarding Defendants USMLE exam (which is the comparison group to decide if someone passes the Comprehensive Basic Science Exam (CBSE)). This data includes the 2019 results for everyone who took the exam and a study done specifically relating to a group of disabled students.

The disabled group was a group of medical students that Defendants, NBME denied testing accommodations to, therefore they took the exam without them. This puts them in the same situation as Plaintiff - disabled, but no accommodations

*"Mr. Zangara is not seeking testing accommodations in this lawsuit, on the USMLE or any other test that NBME develops or administers."* (citing document 29, page 1 filed 11/10/2022*)*

Whatever "group" Plaintiff and these students are according to Defendants (since they claim "they are not disabled") didn't do so well on the exam. The study group had a shocking fail rate of  32% when the overall fail rate was only 4% of the overall 22,146 students that took the exam. When calculated using the "80% Rule" the results show Defendants scoring has a "disparate impact" on this group regardless of what they are referred to by Defendants (but referred to as disabled by the rest of the world) The calculation is as follows:

32% of disabled failed with 68% passing[27]

4% of all test takers failed with 96% passing[28]

68% of 96% is 65.28% which is well below the 80% requirement

65.28% is far less than the required 80%  so it is apparent that Defendants exam scoring falls "well below the 80-percent standard set by the EEOC to implement the disparate-impact provision of Title VII. See 29 CFR § 1607.4(D) (2008) (selection rate that is less than 80 percent "of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact"); Watson, 487 U.S., at 995-996, n. 3, 108 S.Ct. 2777 (plurality opinion) (EEOC's 80-percent standard is "a rule of thumb for the courts"). Ricci v. DeStefano, 557 U.S. 557, 129 S. Ct. 2658, 174 L. Ed. 2d 490 (2009)

Therefore the USMLE causes a disparate impact on the disabled and Defendants are liable for their actions.

---

[27] Petersen, K. H., Jain, N. R., Case, B., Jain, S., & Meeks, L. M. (2022). Impact of USMLE Step-1 accommodation denial on US medical schools: A national survey. PloS one, 17(4), e0266685. https://doi.org/10.1371/journal.pone.0266685
[28] United States Medical Licensing Examination | Performance Data [Internet]. [cited 2023 Jul 22]. https://www.usmle.org/performance-data [Ref list]

## XII. The CCSE

As confirmed by Defendants in their brief Plaintiff has included all the exams he will take in order to become licensed to practice medicine (as stated on page 19 of their brief). Ramsay allows him to obtain an injunction for exams he is not even eligible to take and reject Defendants "speculation" argument.

> to his amended Complaint. Mr. Zangara's claims cover the Comprehensive Basic Science Self-Assessment (CBSSA), individual subject examinations (Pediatrics Examination, Psychiatry Examination, Family Medicine Examination, Medicine Examination, Obstetrics & Gynecology Examination, Surgery Examination), the Comprehensive Basic Science Examination ("CBSE"), the Comprehensive Clinical Science Examination ("CCSE"), and Steps 1, 2, and 3 of the USMLE—some, but not all, of which he has taken in the past. *See* Complaint ¶¶ 125-824. The premise of Mr. Zangara's claims is that NBME's "scoring methods … only show how Plaintiff and others who are disabled compare to others who are not disabled and do not measure his or their competency". Complaint ¶ 101.

Defendants have incorrectly claimed Plaintiff has not made any allegations regarding the Comprehensive Clinical Science Exam (CCSE). This is proven incorrect as paragraphs 625-674 of the complaint specifically addresses the Comprehensive Clinical Science Exam (CCSE). Plaintiff has not included any documentation regarding the Comprehensive Clinical Science Exam (CCSE) as he is not required to according to the courts:

We reversed on the ground that the Court of Appeals had impermissibly applied what amounted to a heightened pleading requirement by insisting that Swierkiewicz allege "specific facts" beyond those necessary to state his claim and the grounds showing entitlement to relief. Id., at 508, 122 S. Ct. 992." Quoting  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)

The Third Circuit has explained in Martinez v. UPMC Susquehanna, 986 F.3d 261, 266 (3d Cir. 2021) what Plaintiff must allege in his complaint in order to deny Defendants motion:

What a plaintiff must allege to defeat a motion to dismiss . To defeat a motion to dismiss, it is sufficient to allege a prima facie case. Castleberry v. STI Grp. , 863 F.3d 259, 266 (3d Cir. 2017). But it is not necessary. Swierkiewicz v. Sorema N.A. , 534 U.S. 506, 508, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), cited with approval inTwombly , 550 U.S. at 569–70, 127 S.Ct. 1955. The complaint need only allege enough facts to "raise a reasonable expectation that discovery will reveal evidence of [each] necessary element." Fowler v. UPMC Shadyside , 578 F.3d 203, 213 (3d Cir. 2009) (quoting Phillips v. Cty. of Allegheny , 515 F.3d 224, 234 (3d Cir. 2008) ). Quoting Martinez v. UPMC Susquehanna, 986 F.3d 261, 266 (3d Cir. 2021)

" To state a claim under either the ADA or the RA, [Plaintiff] must allege that he is a

qualified individual with a disability, who was precluded from participating in a program,

service, or activity, or otherwise was subject to discrimination, by reason of his disability"

Furgess v. Pa. Dep't of Corr., 933 F.3d 285, 288-89 (3d Cir. 2019)

Plaintiff has alleged he is disabled under the ADA even though he is not required to[29]

He has alleged the necessary requirements of a violation of the ADA ("qualified individual with

a disability, who was precluded from participating in a program " Furgess v. Pa. Dep't of Corr.,

933 F.3d 285, 288-89 (3d Cir. 2019)) as conceded in the introduction of Defendants Brief (page

1)

---

[29] "Where an individual is not challenging a public accommodation's failure to provide reasonable modifications under § 36.302, it is generally unnecessary to proceed under the "actual disability" or "record of" prongs, which require a showing of an impairment that substantially limits a major life activity or a record of such an impairment. In these cases, the evaluation of coverage can be made solely under the "regarded as" prong of the definition of "disability," which does not require a showing of an impairment that substantially limits a major life activity or a record of such an impairment. An individual may choose, however, to proceed under the "actual disability" or "record of" prong regardless of whether the individual is challenging a public accommodation's failure to provide reasonable modifications" 28 CFR § 36.105

**INTRODUCTION**

Plaintiff Jason Zangara ("Mr. Zangara") filed this pro se lawsuit against the National Board of Medical Examiners ("NBME") in March 2022, alleging that NBME violated the Americans with Disabilities Act ("ADA") by grading exams on a curve that compared his performance to a group of people who previously took the examination and "automatically drop[ping] out the lowest percentiles." Complaint and Request for Injunction (Dkt. 1) at 5.

Mr. Zangara's claims in his amended Complaint are based on essentially the same premise, but are now spread over a 184-page, 836-paragraph pleading with 86 separate counts. *See* Dkt. 51 ("Complaint"). Mr. Zangara alleges that he is disabled and argues that he (and any individual with a disability) "do[es] not have the same ability as those who are not disabled," *id.* ¶ 64, and thus will "score[ ] lower" on any NBME exam, *id.* ¶ 87, purportedly because they are being compared to "an average student with normal abilities," *id.* ¶ 84; *see also id.* ¶ 101. According to Mr. Zangara, he has been unable to pass examinations "administered and graded" by NBME, *id.* ¶ 50, because his scores are compared "to the scores of others who took the exam prior," *id.* ¶ 53.

Defendants have not disputed Plaintiffs allegations in their moving brief or pointed to any "evidence" or documents attached to Plaintiffs complaint regarding the Comprehensive Clinical Science Exam (CCSE). They cannot raise this argument for the first time in their reply brief[30] Also, they cannot ask the court to take "judicial notice" or any documents or websites as the court can "take judicial notice of public records."  See <u>Oran v. Stafford</u>, 226 F.3d 275, 289 (3d Cir. 2000), see also <u>In re ATI Tech., Inc. Sec. Litig.</u>, 216 F.Supp.2d 418, 430 (E.D.Pa. 2002). Federal Rule of Evidence 201, et seq. is the cornerstone of judicial notice, and it states, in relevant part:

---

[30] See eg "As a general matter, the courts of appeals will not consider arguments raised on appeal for the first time in a reply brief." <u>Hoxworth v. Blinder, Robinson Co.</u>,903 F.2d 186, 204-05 n. 29 (3d Cir. 1990). We follow this rule so that appellees are not prejudiced by the lack of an opportunity to respond to issues raised for the first time in an appellant's reply brief. See <u>Wright v. Holbrook</u>,794 F.2d 1152, 1156 (3d Cir. 1986).
<u>U.S. v. Boggi</u>, 74 F.3d 470, 478 (3d Cir. 1996)

Judicial Notice of Adjudicative Facts - F.R.E. 201(b) Kinds of facts.  **A judicially noticed fact must be one not subject to reasonable dispute** in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

Should a document be judicially noticed, said document "may only be considered for the limited purpose of showing that a particular statement was made by a particular person" and not "for the truth of the matters purportedly contained within those documents."  Oran at 289 (quoting Kramer v. Time Warner, 937 F.2d 767, 774 (2d Cir. 1991)).  If a court were to consider and judicially notice documents for their truth it would be, in essence, authorizing a trial by public documents, impermissibly expanding the scope of a Rule 12(b)(6) motion. In Re Viropharma, Inc., 2003 WL 1824914 (E.D.Pa. 2003). Also, Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 540 (N.J. 1995) (The "judge's function is not himself [or herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Liberty Lobby, supra, 477 U.S. at 249, 106 S.Ct. at 2511, 91 L.Ed.2d at 212 . Credibility determinations will continue to be made by a jury and not the judge.)

Therefore, Plaintiffs has established and Defendants have not addressed Plaintiffs claim or demand for relief for the CCSE as pled in paragraph 674 and applies to all the examinations: Wherefore Plaintiff demands a declaratory judgment against Defendants in the form of permanent injunctive relief:

"Requiring Defendants, The National Board of Medical Examiners (NBME) their agents /servants  /employees / contractors /consultants to grade or score **all of their examinations (including Subject/ Shelf Examinations, Comprehensive Basic Science Examination, Comprehensive Clinical Science Examination, Comprehensive Self Assessment Examinations, United States Medicine Licensing Examination Steps 1,2&3 and any future developed Medical related examinations)** in a non discriminatory manner; based strictly and solely on the test candidates own merit, to the minimum standard required to safely practice medicine; including the public disclosure of all information, computations, studies, methods and justifications used to establish that standard and score as expected by the public and licensing authorities for the safety of the public; not basing passing or failing on a test candidates comparison to any current or prior testing candidate, group of candidates cohorts or norms or

curves; giving both disabled and non disabled individuals a fair opportunity to demonstrate their depth of knowledge, aptitude and achievement in order to successfully obtain the necessary education, certifications and/or licensure required to pursue a career as a Physician"

### XIII. The USMLE Steps

Defendants have attempted to "disprove" Plaintiffs allegations regarding the USMLE

Steps (1,2,&3) using a statement on a website that they maintain sole control over. Defendants

have not cited any documentation attached to Plaintiffs complaint to support their position. They

cannot ask the court to take "judicial notice" or any documents or websites as the court can "take

judicial notice of public records."  See Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000), see

also In re ATI Tech., Inc. Sec. Litig., 216 F.Supp.2d 418, 430 (E.D.Pa. 2002).  Federal Rule of

Evidence 201, et seq. is the cornerstone of judicial notice, and it states, in relevant part:

Judicial Notice of Adjudicative Facts - F.R.E. 201(b) Kinds of facts.  **A judicially noticed fact
must be one not subject to reasonable dispute** in that it is either (1) generally known within
the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by
resort to sources whose accuracy cannot reasonably be questioned.

Should a document be judicially noticed, said document "may only be considered for the

limited purpose of showing that a particular statement was made by a particular person" and not

"for the truth of the matters purportedly contained within those documents."  Oran at 289

(quoting Kramer v. Time Warner, 937 F.2d 767, 774 (2d Cir. 1991)).  If a court were to consider

and judicially notice documents for their truth it would be, in essence, authorizing a trial by

public documents, impermissibly expanding the scope of a Rule 12(b)(6) motion. In Re

Viropharma, Inc., 2003 WL 1824914 (E.D.Pa. 2003). Also, Brill v. Guardian Life Ins. Co. of

America, 142 N.J. 520, 540 (N.J. 1995) (The "judge's function is not himself [or herself] to

weigh the evidence and determine the truth of the matter but to determine whether there is a

genuine issue for trial." Liberty Lobby, supra, 477 U.S. at 249, 106 S.Ct. at 2511, 91 L.Ed.2d at

212 . Credibility determinations will continue to be made by a jury and not the judge.)

Therefore, all of the links, the information found at those links and exhibits submitted by

Defendants are not and cannot be considered by this court.

### XIV. The New Jersey Law Against Discrimination

Defendants keep ignoring the implementing regulations for the ADA found at  28 C.F.R.

36.309 and further have ignored the equivalent New Jersey regulation found at  N.J. Admin.

Code § 13:13-4.5 which reads as follows:

Section 13:13-4.5 - Examinations
An owner, lessee, proprietor, manager, superintendent, agent or employee of a place of public
accommodation that offers examinations or courses related to applications, licensing,
certification or credentialing for secondary or post-secondary education, professional, or trade
purposes shall assure that examinations are selected and administered to best ensure that when an
examination is administered to a person with a disability that impairs sensory, manual, or
speaking skills, the examination results accurately reflect the individual's aptitude or
achievement level or whatever other factor the examination purports to measure, rather than
reflecting the individual's impaired sensory, manual, or speaking skills, except where those skills
are the factors that the examination purports to measure.

Again, Defendants attorney Mr. Mandelsberg has the personal obligation (not NBME) as

an officer of the court to inform the court in his brief of the correct implementing regulations for

both the federal ADA and the New Jersey LAD. Again, he has failed to do that which is again, a

violation of (See Rule of Professional Conduct Rule 3.3 Candor Toward The Tribunal- [4] "Legal

argument based on a knowingly false representation of law constitutes dishonesty toward the

tribunal. A lawyer…must recognize…. pertinent legal authorities. Furthermore, as stated in

paragraph (a)(2), an advocate has a duty to disclose directly adverse authority in the controlling

jurisdiction")[31]

---

[31] In a further violation of RPC 3.3 Mr. Mandelsberg refuses to acknowledge that *"stare decisis"* controls his ability
to somehow claim only the law and not the implementing regulations apply to his clients  See Chevron USA Inc. v.
Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984) (Holding that

The New Jersey regulation is equally applicable as the courts of this state have held the same standard as the federal courts regarding implementing regulations. This was explained in In re N.J.A.C. 7:1B-1.1 et seq., No. A-3514-11 and A-4098-11(consol.), slip op. (N.J. App. Div. Mar. 21, 2013):

"In deciding this issue, we first look to some well-established standards for reviewing the validity of an agency's regulations.

Agency regulations are accorded a presumption of validity and reasonableness. In re Petition of N.J. Am. Water Co., 169 N.J. 181, 188 (2001); In re Adoption of N.J.A.C. 7:26B, 128 N.J. 442, 449 (1992); Bergen Pines Cnty. Hosp. v. N.J. Dep't of Human Servs., 96 N.J. 456, 477 (1984); A.A. Mastrangelo, Inc. v. Comm'r of Dep't of Envtl. Prot., 90 N.J. 666, 683 (1982); N.J. Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 561 (1978). Although not bound by an agency's determination on a question of law, In re Distribution of Liquid Assets Upon Dissolution of Union Cty. Reg. High Sch. Dist. No. 1, 168 N.J. 1, 11 (2001), our courts give "'great deference'" to an agency's "'interpretation of statutes within its scope of authority and its adoption of rules implementing' the laws for which it is responsible." N.J. Ass'n of Sch. Adm'rs v. Schundler, 211 N.J. 535, 549 (2012) (quoting N.J. Soc'y for Prevention of Cruelty to Animals v. N.J. Dep't of Agric., 196 N.J. 366, 385 (2008)); see also In re Election Law Enforcement Comm'n Advisory Op. No. 01-2008, 201 N.J. 254, 262 (2010). "This deference comes from the understanding that a state agency brings experience and specialized knowledge to its task of administering and regulating a legislative enactment within its field of expertise." Ibid.; accord Newark v. Natural Res. Council, 82 N.J. 530, 539-40, cert. denied, 449 U.S. 983, 101 S. Ct. 400, 66 L. Ed. 2d 245 (1980)."

"Only the NBME, and not Prometric,[or Plaintiffs school] controls the conditions under which the exam is administered and [developed]...we refuse to let the NBME escape... for the services that the NBME solely provide." Currier v. National Board of Medical Examiners, 965 N.E.2d 829, 462 Mass. 1 (2012)

"although NBME may not have liked the terminology used in the implementing regulations, despite its registered objections, the foregoing language is what was enacted and it is

---

Government Agencies regulation is given difference when it is a permissible construction of the statue and congress has not spoken of the issue directly) Chevron later used this ruling in a case under the ADA in which they were the defendants and it was affirmed by the Supreme Court  See Chevron USA Inc. v. Echazabal, 536 U.S. 73, 122 S. Ct. 2045, 153 L. Ed. 2d 82 (2002) (Holding that a Government Agency has the authority to create and enforce regulations regarding the Americans with Disabilities Act (ADA))

this language which must be followed" <u>Ramsay v. Nat. Bd. of Medical Examiners</u> 968 F.3d 251 (3d Cir. 2020) <u>See</u> also <u>Price v. Nat'l. Bd. of Med. Examiners</u>, 966 F. Supp. 419 (S.D.W. Va. 1997) (Holding that, because Congress authorized the DOJ to make issue regulations for Subchapter III, courts must give their decisions controlling weight unless arbitrary or manifestly contrary to the statute) <u>See</u> also  <u>Love v. Law Sch. Admissions Council</u>, Inc., 513 F. Supp. 2d 206, 223 (E.D. Pa. 2007) (finding that private, non-profit entity responsible for administering test required for admission to law school had to comply with ADA); see also <u>Scheibe v. Nat'l Bd. of Med. Examiners</u>, Civ. A. No. 05-180, 2005 WL 1114497, at *3 (W.D. Wis. May 10, 2005) (citing cases concluding that NBME is subject to ADA); <u>Biank v. Nat'l Bd. of Med. Examiners</u>, 130 F. Supp. 2d 986, 988 (N.D. Ill. 2000) (holding that NBME, "as a private entity offering examinations related to licensing, is subject to ADA under Section 12189") quoting <u>Boggi v. Med. Rev. & Accrediting Council</u>, 415 F. App'x 411, 414 (3d Cir. 2011) Specifically  the "application of  Section 12189, at issue in this case, is covered by the DOJ regulations in 28 C.F.R. part 36" <u>Price v. Nat'l. Bd. of Med. Examiners</u>, 966 F. Supp. 419 (S.D.W. Va. 1997) (Holding that, because Congress authorized the DOJ to make issue regulations for Subchapter III, courts must give their decisions controlling weight unless arbitrary or manifestly contrary to the statute)

## XV. The Statements by Defendants Attorney

The statements and references by Defendants attorney Mr. Mandelsberg, do not and can not dispute any information in this case (such as NBME's Supervising Psychometrician Carol Morrison's own statements from her study in a peer reviewed public article that was created specially to explain what an "equated percentage " or any other terminology actually is or means) He is not a witness to this case and the court cannot decide this motion based on

documents created after the start of this litigation and uploaded onto NBME's website. There is no court rule or case that allows a party to cite to information on their website, that they have sole control over for the purpose discounting prior copies of those documents, especially when those changes reflect the disputed facts of this litigation. There are no certifications or testimony attached to his motion authenticating any of the arguments or information he is presenting, nor is he in the position to interpret, explain, authenticate (or discount) any documentation.

A motion to dismiss is between Plaintiff and the courts as established by caselaw which does not allow for a "trial on the briefs". Credibility determinations are to be made by a jury and it is highly inappropriate that he is asking this court, and the judge reviewing this matter to act as that jury (The "judge's function is not himself [or herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Liberty Lobby, supra, 477 U.S. at 249, 106 S.Ct. at 2511, 91 L.Ed.2d at 212 . Credibility determinations will continue to be made by a jury and not the judge.) Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 540 (N.J. 1995)

Mr. Mandelsberg is improperly asking the court to take his words in his brief as non-disputable testimony which is strictly prohibited. See Versarge v. Township of Clinton N.J., 984 F.2d 1359, 1370 (3d Cir. 1993) ("we have repeatedly held that unsubstantiated arguments made in briefs or at oral argument are not evidence to be considered by this Court"); Bell v. United Princeton Properties, Inc., 884 F.2d 713, 720 (3d Cir. 1989) ("statements made in briefs are not evidence of the facts asserted); Jersey Cent. Power Light Co. v. Township of Lacey, 772 F.2d 1103, 1109-10 (3d Cir. 1985) ("[l]egal memoranda and oral argument are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion"). See also, In re Spring Ford Industries, Inc., 2005 WL 984180, at *6 (Bankr. E.D. Pa. Apr. 19,

50

2005) ("statements in briefs are not evidence); <u>Clements v. Diamond State Port Corporation</u>, 2004 WL 2223303, at *6 (D. Del. Sept. 30, 2004) ("[t]he Third Circuit has repeatedly held that unsubstantiated arguments made in briefs are not evidence to be considered by the Court"). "Vague" and "amorphous references" in the record "are insufficient to create a genuine issue of material fact on summary judgment." <u>Bocobo v. Radiology Consultants of South Jersey, P.A.</u>, 2005 WL 3158053, at *3 (D.N.J. Nov. 21, 2005).

The only statements that can and are used in this case are the ones of Mr. Mandelsberg stating his clients position ("this is not an accommodations case, NBME is the exams administrator, Defendants do not oppose this motion" ect.)  "[A]n attorney has authority to bind the client only with respect to statements directly related to the management of the litigation." <u>Accord Rhoades, Inc. v. United Air Lines, Inc.</u>, 340 F.2d 481 (3d Cir.1965)(holding that an admission of counsel during the trial is binding on the client); <u>United States v. Butler</u>, 496 F.Appx 158, 160-161 (3d Cir. 2012)(a district court may admit "previous statements made by counsel which ha[ve] been made on the record in the course of pretrial proceedings[.]"); <u>EF Operating Corp. v. American Bldgs.</u>, 993 F.2d 1046, 1050 (3d Cir. 1993) (representations made during the course of litigation, whether oral or written, are binding), cert. denied, 510 U.S. 868, 114 S.Ct. 193, 126 L.Ed.2d 151 (1993). See also, <u>Glick v. White Motor Company</u>, 458 F.2d 1287, 1291 (3d Cir. 1972), the court explained that "[T]he scope of judicial admissions is restricted to matters of fact which otherwise would require evidentiary proof, and does not include counsel's statement of his conception of the legal theory of the case." (internal citation omitted).

The entire point of the courts prohibition of Mr. Mandelsberg "testifying" in to any matter or presenting any documents or links is to uphold Plaintiffs right to litigate this case based

51

on the court rules and the rules of evidence. He cannot attempt judicial notice pursuant to Rule 201 because the court may only *"judicially notice a fact that is not subject to reasonable dispute because it: (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."* His explanation and position on the meaning on "equated percent correct" and scoring is disputed as pled in the complaint, by quotes from NBME's Supervising Psychometrician Carol Morrison's own statements; conflicting with documents in which the Rule cannot apply.  Morrison is allegedly alive which makes here available to testify, authenticate and certify the meaning of any related statements offered to this court.

If Mr. Mandelsberg has personal knowledge of this matter and is authorized by NBME to interpret documents, then the Rules of Professional Conduct require, he be disqualified since he will be testifying as a witness at trial:

Rule 3.7: Lawyer as Witness

(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:

(1) the testimony relates to an uncontested issue;

(2) the testimony relates to the nature and value of legal services rendered in the case; or

(3) disqualification of the lawyer would work substantial hardship on the client.

(b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9.

In addition to this, all of the links, (and information found at those links) statements, and exhibits submitted by Mr. Mandelsberg are not admissible evidence. They are not authenticated pursuant to Rule 901 and they do not meet any of the exceptions listed in Rules 901 or 902. They are not relevant pursuant to Rules 401 or 402 as they can not make the facts of this case more or

less probable. They are prohibited pursuant to Rule 403 as they prejudice Plaintiffs case since Plaintiff and the court have no way to prove they are correct.  They are prohibited by the hearsay Rules 801& 820 as the declaration is available for testimony and do not qualify for any exceptions under the Rule. They are prohibited by Rules 1002 & 1004 as the originals are required to be produced and validated to prove their content. There also needs to be a proven chain of custody proven for all documents and links submitted by Defendants showing when & why they are changed including their website & its contents as Plaintiff calls them into question as fraudulent documents.

Plaintiff has shown as directly pled in his complaint that Defendants entire defense of "Equated percentage correct" is nothing more then a sham advanced by their attorney in an attempt to commit fraud upon this court. In the own words of Defendants Principal Psychometrician pled in paragraph 60 of the complaint what "equated percentage correct" actually means, regardless of where Defendants reference oppositional materials from: Defendants Principal Psychometrician, Carol Morrison published a paper explaining this in 2019[32]

**Equated percent correct scores are based on the concept of a domain score calculated using item response theory (IRT) In this case, a domain is defined as a collection of items that represent the content outline of the particular clinical science examination. All of the items on the form the student took and all of the items that constitute the domain are put on the same scale...**

---

[32] Morrison, C., Ross, L., Baker, G., & Maranki, M. (2019). Implementing a New Score Scale for the Clinical Science Subject Examinations: Validity and Practical Considerations. Medical science educator, 29(3), 841–847. https://doi.org/10.1007/s40670-019-00747-9

The Rasch model is a widely used IRT model that considers only one item characteristic, difficulty, when **determining the probability of a student answering an item correctly. All of the items on the forms included in the content domain and on the forms taken by the students for each subject examination were calibrated using the Rasch model and put on a common scale...**

The Rasch model was used to calculate the probability $P_i(\theta)$ that a student with proficiency $\theta$ based on the particular examination form he/she took would answer domain item $i$ correctly; $b_i$ represents the difficulty of item $i$

$$Pi(\theta)=e(\theta-bi)/1+e(\theta-bi)(i=1,2,.....,n)$$

1

**An equated percent correct score ($\pi$) was then calculated that represents the percentage of items in the domain that a student with proficiency $\theta$ would answer correctly.**

$$\pi|\theta=(1n\sum ni=1Pi(\theta))\times100(i=1,2,.....,n)$$

Defendants cannot now claim her statements do not apply as she was working for NBME at the time of the publication ***"The authors are employed by the National Board of Medical Examiners"*** and are therefore __omissions__ on their behalf. The Federal Rules of Evidence allow Plaintiff to advance "expert" publications as a "learned treatise" to impeach Morrison's "testimony" as stated in Rule 803 of the Federal Rules of Evidence:

*The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:*

54

*(18) Statements in Learned Treatises, Periodicals, or Pamphlets. A statement contained in a treatise, periodical, or pamphlet if:*

*(A) the statement is called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination; and*

*(B) the publication is established as a reliable authority by the expert's admission or testimony, by another expert's testimony, or by judicial notice.*

See Maggipinto v. Reichman, 607 F.2d 621 (3d Cir. 1979)(Holding learned treatises exception to Rule 803 can be used to impeach medical expert); Jacober v. St. Peter's Medical Center, 608 A.2d 304 (N.J. 1992) (Holding learned treatises may be introduced as substantive evidence for impeachment of expert). Therefore, any attempt by their attorney (who is not a witness in this case) to explain away what she actually published is nothing more than an attempt to deliberately deceive this court. Mr. Mandelsberg should disqualify himself and be required to testify as to his statements if he is so confident that he knows more than the **published & peer reviewed statements of NBME's Principal Psychometrician.**

### Conclusion

In addition to the merits as argued, Defendants were given the opportunity to oppose the filing of the amended complaint and they specifically identified that they did not oppose the motion. When Plaintiff moved for reconsideration & to transfer, they ignored the motion and the court had to order them to respond; in which they did not raise any jurisdiction issues and on top of that, opposed the transfer. For this entire litigation, they continue to argue the merits of the case waving any right to a personal jurisdiction argument.

They have wasted the time of Plaintiff to prepare these motions, the clerks to file these motions the law clerks to research these motions and the judges to decide and write the opinions. They should have raised these issues all at once and opposed the filing of the complaint but they

chose not to resulting in 3 times the amount of wasted time & resources; along with now three opinions from the court.

      28 U.S.C. § 1927, provides, "An attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses and attorneys' fees reasonably incurred because of such conduct." Okpor v. Ocasio, Civil No. 05-5313(RMB), 9 (D.N.J. Aug. 24, 2006)

      Therefore, the court should deny Defendants motion.


Dated: 8/18/2023


Jason A. Zangara, MPH, MA
573 Sidorske Avenue
Manville, New Jersey 08835
(908) 672-0626
firefighterjazzyj@yahoo.com

Plaintiff, Pro Se